## ASSET PURCHASE AGREEMENT

THIS AGREEMENT, made this 31st day of January, 2002, by Menu Maker Foods, Inc. ("BUYER"), and Monsour's, Inc. ("Monsour's") and Mark D. Monsour and Sheila. D. Monsour of 112 N. Elm, Pittsburg, Kansas, 66762 (collectively "SELLER").

### RECITALS

A. Seller Monsour's, Inc. is the owner of a food distribution business operating under a trade name of "Monsour's" (the "Grocery Business") and also operates a produce business.
B. Seller desires to sell and Buyer desires to buy from Seller certain of the assets of Seller's Grocery Business.
C. Seller will retain the produce business subject to certain limitations contained herein.

In consideration of the mutual covenants herein, the parties agree as follows:

**I. Agreement to Purchase and Sell; Non-competition Agreement**
Section 1.1. <u>Assets Other Than Real Estate.</u> Subject to the terms of this Agreement, Seller agrees to sell, free and clear of all liens, and Buyer agrees to purchase the following assets:
   1. All of the Seller's inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition) which items are presently being sold to current customers of Buyer or to selected customers of Seller. Buyers will make its best efforts to sell or assist in the sale of Monsour's remaining inventory. The parties estimate that the inventory to be purchased is estimated from $750,000 to $800,000 in value.
   2. These intangible assets: Seller's list of all customers excluding retail grocery stores, all records (including electronic data) associated with such customers including but not limited to:
   
   (a) Name, address, phone, contract
   (b) Equipment on hand
   (c) Account history
   (d) Credit history and terms
   (e) List of products being purchased
   (f) Sales and delivery schedule
   (g) Pricing schedule
   (h) Rebate arrangements from suppliers or to customers earned after closing date, and the goodwill associated with those customers, (excluding retail grocery store customers which are retained by Seller to continue its business selling produce to those customers on the terms herein), the telephone number (620-231-6363) and listings of the Grocery Business [the Seller will share the use of the telephone number for 14 days after closing and will pay for any telephone charges therefore], and the right, title and interest in the Trade Name "Monsours" and other names so similar as to require its consent to their rightful use; provided that if the

Buyer ceases to buy substantially all of its produce requirements from Seller (so long as the Seller continues in such produce business), then the right to the use of Seller's name on the grocery business will terminate 60 days after notice by the Seller to the Buyer.
3. Certain equipment as listed on Exhibit "A" attached.
4. A covenant not to compete by the Sellers as set forth in Exhibit "B".
5. A covenant not to compete by Seller's Brother Rick Monsour as set forth in Exhibit "C".

Section 1.2. <u>Excluded Assets.</u> Seller shall retain and not transfer to Buyer the following assets:
1. all accounts payable and all accounts receivable.
2. The assets of the Seller used exclusively to service the customers retained by the Seller.
3. All real estate assets.
4. All equipment not listed on Exhibit "A".
5. All inventory not selected by Buyer.
6. The right to continue its operations in regard to the sale of produce to grocery stores and the right to continue sales to current jobbers (Seller is to provide a list of the current jobbers to Buyer at the Closing Date).

Section 1.3. <u>Assumption of Liabilities.</u> Buyer is not assuming and paying any liabilities or debts of the Sellers nor agreeing to perform any contract or obligation of the Sellers. Seller will be responsible for any and all federal, state, and local taxes due on his business prior to the date of closing and because of the transfer of the assets from Seller to Buyer.

## II. Purchase Price.

The purchase price which Buyer agrees to pay for the items described in Section I is as follows:

Section 2.1. <u>Inventory</u> - The inventory purchase price will be Seller's cost which will be computed at the Seller's NDS computer system average cost of last 3 purchases, except that if such price exceeds the current market cost for any such inventory item then the price for such item will be negotiated by Buyer and Seller. The inventory purchase will be subject to these terms:

(1). The Buyer shall be responsible for transportation of the inventory from Seller's location at Buyer's cost.

(2). The Seller will be responsible for inspection and loading of the inventory into Buyer's trucks pursuant to the purchase order of Buyer, and Seller warrants that all inventory loaded will meet the quality standards set out above. Buyer will be entitled to have an inspector present at all loading and any items objected to by that inspector shall be set aside for further inspection.

(3). Buyer shall pay Seller for inventory on a 'as received" basis, with payment to be made after delivery of possession of the inventory to Buyer for invoices for inventory sold during each Friday through Thursday period by wire transfer to Seller's account at the Bank of America, N.A. in Pittsburg, Kansas, on each Friday not later than 1:30 p.m..

(4). Buyer will assist the Seller in selling inventory not necessary to Buyer to supply current customers of the Seller or the Buyer, and may buy on a negotiated price purchase such items.

Section 2.2. <u>Customer Lists, Records</u>. Included in the Covenant Not To Compete price.

Section 2.3. <u>Equipment.</u> The purchase price will be agreed at the Closing Date.

Section 2.4. <u>Rick Monsour Covenant Not To Compete.</u> The Purchase Price for the Covenant Not to Compete will be $5,000.00.

Section 2.5. <u>Mark D. Monsour Covenant Not To Compete</u>. The Purchase Price for the Covenant not to Compete of Monsours, Inc. and Mark D. Monsour (and items in Section 2.2) shall be (i) $150,000.00, plus (ii) 2% of the Buyer's gross sales receipts (less sales taxes) sold by the Buyer's salespeople working out of the Buyer's Pittsburg location [plus sales to Infina Nursing Homes] within the first year following the Closing Date, and plus (iii) 1 % of the Buyer's gross sales receipts (less sales taxes) sold by the Buyer's salespeople working out of the Buyer's Pittsburg location [plus sales to Infina Nursing Homes] within the second year following the Closing Date if the sales volume exceeds $11,000,000, which Price will be paid as follows:

    1. $50,000 paid at date of contract signing and the balance of $100,000 will be paid at the Closing Date.

    2. A. The 2 % percentage payments for the first year will be paid quarterly on the 20th day after the end of each quarter beginning the quarter after the Closing Date. The first payment will be due May 20, 2002.

    B. The 1 % percentage payments for the second year will be paid on the 20th day after the end of the first month following the end of the second year after the Closing Date.

    3. The payments will terminate in the event of a material breach by the Seller of the Covenant Not To Compete.

Section 2.6. <u>Vendor Credits.</u> If the Seller has unused vendor credits which the Buyer is able to pass through the on its account with the vendor, then within 7 days of the Buyer's receipt of funds or credit on its account it will pay the Seller an amount the that which it received

**IV. Closing.**

Section 4.1. <u>Closing Date.</u> The Closing Date under this Agreement shall be in the offices of Seller's attorney, at 1 p.m., on the day agreed to by the parties, but in no event later than thirty days from the date of this agreement.

Section 4.2. <u>Offset.</u> The Buyer shall be entitled to offset any sums owed to Buyer or its subsidiaries by Sellers against the payments owed to the Sellers.

**V. Title and Conveyance of Assets.**

Section 5.1. <u>Instruments of Conveyance.</u> Title to the assets being conveyed shall, at closing, be free and clear of liens, charges, restrictions and encumbrances, by the Sellers' bill of sale with full warranties, provided that title to the inventory will not transfer until delivery to the Buyer. Seller by the signing of the each of the Buyer's purchase orders on inventory will make the same warranties as are contained in the bill of sale.

Section 5.2. <u>Bulk Sale.</u> If applicable, the Seller will fully comply with any bulk sales laws or, in lieu thereof, provide proof that all liens on the inventory and other assets being

D00003

purchased by Buyer are released.

## VI. Representations and Warranties.

Section 6.1. <u>Representations by Seller.</u> Seller represents and warrants to Buyer that the following statements are true, complete, and correct now and will be such on the date of closing and such representations and warranties shall survive closing:

1. Seller is the sole owner of all of the assets to be transferred. Seller has, or shall have, upon delivery to and payment by Buyer, good, absolute and marketable title to the assets to be transferred, free and clear of all claims, liens, charges, encumbrances and restrictions of every kind. There are no outstanding options, contracts, commitments, agreements or other rights of any character or relating in any manner to the assets being transferred or entitling any third party to acquire such assets. Seller has and shall have at closing the complete and unrestricted right to sell, transfer and assign the assets pursuant to this Agreement. Upon the delivery of the equipment at closing, Buyer shall acquire good and marketable title to the assets free and clear of all claims, liens, charges, encumbrances and restrictions of any kind.

2. Seller Monsour's, Inc., is a corporation in good standing under the laws of the State of Kansas, has authority to own and operate its respective assets, to carry on its business as presently conducted, and to consummate the transactions completed in this Agreement. The execution, delivery, and performance of this Agreement has been duly and effectively authorized by its Board of Directors, and it necessary its Shareholders, and no further action or other authorization or consent is required.

3. Seller is a corporation owned by the Seller Mark D. Monsour and Sheila D. Monsour and no other person. Sellers Mark D. Monsour and Sheila D. Monsour are individuals residing in the State of Kansas.

4. This Agreement shall constitute a binding and valid obligation of Sellers enforceable according to its terms.

5. Seller ,upon delivery to and payment by Buyer, shall provide to Buyer a release of all liens upon any of the assets being conveyed and a consent to transfer such assets by the secured creditors of Seller.

6. Seller is not a party in any litigation now pending, or threatened, nor are there any proceedings pending or to the best of their knowledge threatened, before any federal, state, or local court, agency or board, regarding Seller's business.

7. Seller has duly and timely filed all required federal and state tax returns, and has timely paid all federal and state taxes required to be paid and all other taxes and government charges, duties, penalties, interest and fines owed by it. If at closing any state, local, or federal taxes, charges, etc. are not paid in full, Buyer may deduct the same from payments due at closing or thereafter in order to pay the same.

8. That all of the books of accounts and records which Seller has exhibited to Buyer are complete and correct and reflect all material transactions involving Seller's assets.

9. That Seller has complied with all laws of all state, federal and local government bodies and have not received any notice from any government bodies of any violations of any laws and have no knowledge of any facts that would be a violation or would give rise to any such notice.

D00004

        10. Seller knows of no adverse change or threatened adverse change in the relationships of Seller with customers, other than changes occurring in the ordinary course of business which, individually or in the aggregate, have been materially adverse. Seller does not have any direct or indirect interest in any competitor of Seller's business within the territory described in the covenant not to compete.

    Section 6.2. <u>Representations by Buyer.</u> Buyer represents and warrants to Seller that the following statements are true, complete and correct as of this date and shall be true on the date of closing, and such representations and warranties shall survive closing.

        1. Buyer is a corporation duly organized, and in good standing in the State of Missouri, with all of the requisite corporate power and authority to own and operate its property, assets, and business.

        2. Buyer has complete and unrestricted right, power and authority to enter into this Agreement and to consummate the transaction.

        3. Execution and delivery of this Agreement has been duly authorized by all necessary corporate action on the part of the Buyer. Execution and delivery of the Agreement will not contravene Buyer's certificate of incorporation or by-laws, conflict with or result in the breach of any agreement which Buyer is a party; entitle any party to terminate, accelerate or call a default with respect to any Agreement which Buyer is a party; or result in any violation by Buyer of any laws applicable to it.

        4. Buyer is not a party to or subject to or bound by any judgment, order, injunction, or decree of any court or government body which may restrict or interfere with the performance of this Agreement.

        5. Upon execution and delivery, this Agreement shall constitute a valid obligation of Buyer enforceable against it and in accordance with its terms.

## V. Actions of Seller Prior to Closing.

    Seller covenants and agrees that, prior to closing, they shall take, or cause to be taken, the following actions:

    Section 5.1. <u>Access to Records.</u> Seller shall permit Buyer and its agents reasonable access during normal business hours to all books, files, and records of Seller relating to the Grocery Business; provided however that no such examination shall constitute a waiver by Buyer of its right to rely on the covenants, representations and warranties made herein or on Seller's obligation to perform under this Agreement. Buyer agrees that the information that it receives or obtains from Seller as a result of any investigation shall be deemed confidential and shall not be disclosed to any person or entity other than Buyer's employees, agents, financiers, and investors. If the closing is not completed hereunder for any reason, Buyer shall return to Seller any and all papers and data.

    Section 5.2. <u>No Extraordinary Sales.</u> Seller shall not, without the prior written consent of Buyer, make any sale of goods except in the ordinary course of business, or engage in any other activities or transactions which are outside of the ordinary course of business of Seller as conducted on the date of this Agreement in which, in the aggregate, would be material.

    Section 5.3. <u>Tax Returns.</u> Seller shall file all federal, state, and other tax returns and amendments thereto required to be filed by Seller up to, or which relates to periods before

D00005

the date of closing, and Seller shall pay all taxes to be due by Seller, at or prior to closing.

Section 5.4. <u>Operations.</u> Seller shall operate its business in accordance to all applicable laws.

Section 5.5. <u>Notice of Change.</u> Seller shall inform Buyer in writing of any change in any information provided to Buyer in any exhibit.

### VI. Conditions precedent to the Obligation of the Buyer.

The obligation of the Buyer to complete the closing hereunder (and all liability to Sellers) is subject to satisfaction or waiver by Buyer on or before the closing date of the following conditions:

Section 6.1. <u>No Breach.</u> There shall be no breach of any of Seller's representations and warranties as of closing. Seller shall deliver to Buyer a certificate dated as of closing to such affect.

Section 6.2. <u>Perform Obligations.</u> At or prior to closing, Seller shall have performed all obligations required to be performed by them hereunder; executed and delivered all documents required to consummate the transactions contemplated hereunder, including but not limited to execution of a bill of sale with full warranties transferring the assets to Buyer.

Section 6.3. <u>No Limits on Use.</u> On the closing date there should be no order, writ, injunction, or decree issued by any government body or any court which prevents or significantly limits the use by Buyer of the assets being purchased.

Section 6.4. <u>Employment of Salespersons of Seller.</u> All of the obligations of Buyer are subject to the condition that the Seller is able to employ the following current salespersons of the Seller: Sean Krokroskia, Penne Cheny, Jim Senecaut, Michael Ray, Ron McGaugh, and Kyle Robertson. In the event that the Buyer is not able to hire such persons, then the Buyer shall have the option to terminate this Agreement prior to the Closing Date and shall have no liability to Sellers under this Agreement.

### VII. Conditions precedent to the Obligations of Seller.

The obligation of the Seller to complete the closing hereunder is subject to the satisfaction or waiver by the Seller on or before the closing on the following conditions:

A. The representations and warranties of Buyer shall be true and correct as of now and at the closing. Buyer shall delivery to Seller a certificate of its President and Secretary dated as of the closing to such effect.

B. Buyer shall have performed all of the obligations required to be performed by it hereunder on or prior to closing, Buyer shall delivery to Seller a certificate of its President and Secretary dated as of the closing to such effect.

### VIII. Survival of Representations, Warranties and Covenants; Indemnification.

Section 8.1. <u>Nature of Representation.</u> For purposes of this Agreement, the contents of all exhibits incorporated by reference shall constitute representations and warranties made in this Agreement by the Sellers.

Section 8.2. <u>Survival of Representations, Warranties and Covenants.</u> The Representations, Warranties and Covenants in this Agreement shall survive the closing for a period equal to the statute of limitations pertaining to written agreements in the State of

D00006

Missouri.

Section 8.3. <u>Indemnification by Sellers.</u> Sellers agree to indemnify, defend, and hold the Buyer and its directors, officers, employees, agents, and representatives harmless from and to reimburse Buyer for any loss, cost, expense, liability, or damage, (including counsel fees) resulting from inaccuracies or breach of any representation, warranty, agreement or covenant made by Seller or from their breach of or failure to perform any of the covenants or agreements hereunder.

Section 8.4. <u>Indemnification of Buyer.</u> Buyer agrees to indemnify and defend and hold the Seller harmless from and to reimburse Seller for any loss, cost expense, liability, or damage, (including counsel fees) resulting from the inaccuracies or breach of any representation, warranty, agreement or covenant made by the Buyer pursuant to this Agreement and from Buyer's breach of or failure to perform any of the covenants or agreements hereunder.

### IX. Brokers.

A. Each party represents and warrants to the other that no finder, broker or similar agent has acted on behalf of or been retained by it.

### X. Notice.

A.1. Any notice required hereunder shall be given in writing, served in person, or deposited in the form of a written notice in the United States Mail, sent postage prepaid, properly addressed and directed to the party to receive the same at the following address or such other address as may be substituted by notice in writing.

2. Seller:    Mark D. Monsour and Sheila D. Monsour
              112 N. Elm
              Pittsburg, Kansas 66762
              620-231-6363

   Buyer:     Menu Maker Foods
              913 Big Horn Drive
              Jefferson City, MO  65109
              573-893-3000

### XI. Miscellaneous.

A. The parties agree that this document, including exhibits, is the entire agreement between the parties and that there are no other promises, conditions, representations, warranties, understandings or agreements of any type or kind between the parties.

B. This Agreement made be executed in any number of counterparts and each counterpart shall be deemed an original instrument.

C. This Agreement shall be construed by and according to the laws of the State of Missouri. This Agreement shall apply to and bind the parties, their respective personal representatives, heirs, successors and assigns.

D. The invalidity of any one or more word, phrase, sentence, clause, section, or paragraph contained in this Agreement shall not effect the enforceability of the remaining in the Agreement.

D00007

  E. Each of the parties shall keep the terms of this Agreement confidential.
  F. Fresh Produce - Menu Maker Foods, Inc., will purchase substantially all of its produce requirements through Monsour's under the following terms and conditions:

(A) The quality of all products must meet or exceed current Menu Maker Foods, Inc., house acceptability standards.

(B) The minimum fill rate of all orders received may not be less than 99.25% of acceptable quality produce under normal circumstances and conditions. Acts of God, severe weather, trucking strikes, and otherwise similar situations and not in the control of Sellers and Buyer will not effect the validity of this Agreement.

(C) Credit Terms will be Net 21 Days the first 90 days, and Net 26 days thereafter.

(D) Marketing - will not begin until agreed to both parties and produce associated with it until Seller has like program in place:

 (1) Includes our current level of support at $4,125.00 quarterly, which will be deducted on a quarterly basis, toward the Menu Maker Foods, Inc., "BBP" Plan.

 (2) Current shelter income of .25 cents per case shall be paid by Monsours to Menu Maker Foods, Inc. quarterly by the 10th of the month following the end of the quarter.

 (3) Sales support staff will be available for two sales meetings annually, participate in our annual food show and key end user calls upon request.

 (4) Shall provide promotional items and appropriate allowances for flyers, auction, food show, and other BBP activities.

(E) Pricing - Monsours will need to maintain a competitive cost of goods to insure our current gross profit levels are not jeopardized.

(F) Pre Cut Produce - Will require further discussion. Seller understands the importance of this program to Buyer and will present programs similar to currently being used by Buyer for Buyer's review and approval. Seller believes that this new program will increase Buyer's market advantage and Buyer will move to this new program only after approval from a representative designated by Buyer.

(G) Product Specification - Below are a few item specific requirements, and unless other wise stated, agreed quality will be USDA quality standards or better at time

8

D00008

of receiving.

(1) Colorado Potato - Must be US No. 1 "Centennial" when available
(2) Apples - Washington State - US Extra Fancy
(3) Oranges - Sunkist US 1
(4) Lunch Bunch Grapes - Corrin Shipper Brand
(5) West Coast - Head Lettuce, Green Leaf, & Romaine - All Liner Pack
(6) Idaho Potatoes - Grade US No. 1 "Burbank" when available
(7) Buyer shall purchase no less than 99.25% of approximate weekly quantities of the speciality and limited life items as estimated by Buyer on the preceding Monday.

(H) Time lines -

(1) Pricing for the following week will need to be faxed by no later than 11:15 a.m. on Thursdays.
(2) Order Entry - Buyer will supply Seller with approximate quantities and delivery dates for the following week by 2 p.m. on the preceding Monday for the following week. Specialty items will need to be exact or within the agreed fill rate requirements.
  (A) To meet the 99.25% fill rate required for Buyer, Seller will need orders placed with a 2 day lead time. Every available effort to accommodate add-ons and late items (both normal stock and specialty items) will be made. Add-ons or late entry items will not be included in the 99.25% required fill rate.

**XII. Lease**

A. The Seller agrees to lease to the Buyer office, cross docking and transportation space for Buyer's tractors, trailers, and cars at the Seller's warehouse pursuant to the lease terms set out in Exhibit "D" attached.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on the day and year first above written.

MONSOUR'S, INC.                           MENU MAKER FOODS, INC.

BY: _____              BY: _____
    Mark D. Monsour, President                Jon R. Graves, President

_____
Mark D. Monsour

_____
Sheila D. Monsour

D00009