

# MIDWEST LITIGATION SERVICES

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MARK MONSOUR, SHEILA MONSOUR AND MONSOUR'S, INC.**
vs.
**MENU MAKER FOODS, INC.**
Case No. 05-1204-MLB

## DEPOSITION OF MARK MONSOUR
### March 14, 2006

OFFICES   MISSOURI ■ ILLINOIS ■ KANSAS

HEADQUARTERS: 711 NORTH ELEVENTH STREET, ST. LOUIS, MISSOURI 63101
800.280.3376
www.midwestlitigation.com



EXHIBIT B

Dockets.Justia.com

Page 17

1  A   That was the words, yes.
2  Q   Okay. Well, what did you take that to
3  mean?
4  A   Come back to work in the family business.
5  Q   Okay. What about Monsour's at the time
6  needed turning around?
7  A   I think just the fact that -- I really
8  don't know. Those were their words, not mine. I
9  really don't know.
10 Q   Okay.
11 A   But I wouldn't say -- I wouldn't say it
12 was a thriving business. Pete had a conservative
13 attitude, conservative management style.
14 Q   What was his management style? What was
15 conservative about it?
16 A   Pretty much -- anything. He just had a
17 different management style, very conservative.
18 Q   In terms of?
19 A   I think it had to do with more of his --
20 of his area in life, you know, where he was at. You
21 know, some people, when you're young, you want to
22 take risks or whatever, and as you get older you try
23 to regroup and pull in your horses.
24 Q   Was he reluctant to take on debt necessary
25 to keep the business operating properly?

Page 18

1  A   I really can't answer that question, but
2  -- I really don't. It would just be speculation.
3  Q   Okay. How long had -- is it Peter? Pete
4  Monsour?
5  A   Pete, Sr., then you have Pete, Jr.
6  Q   And was it Pete, Sr., that was running the
7  business at that time?
8  A   Correct.
9  Q   How long had he run the business, do you
10 remember?
11 A   He had been in the business with my --
12 with his brothers and sisters for his life, or for a
13 large portion of his life.
14 Q   You came back to Pittsburg and went to
15 work at Monsour's; is that right?
16 A   Right.
17 Q   In what capacity did you go back to work
18 there?
19 A   Sales person.
20 Q   And that was in what year?
21 A   '98, guessing. Approximately. '97. '96.
22 I'm not --
23 Q   One of those years?
24 A   Yeah.
25 Q   Did -- before you acquired Monsour's, did

Page 19

1  your position, your work position at Monsour's change?
2  In other words were you always a salesman?
3  A   And produce buyer.
4  Q   And produce buyer; any other
5  responsibilities that you had?
6  A   I probably wore a few different caps, but
7  as far as actual titles, that would be it.
8  Q   As far as actual titles; what other caps
9  did you wear?
10 A   In a family business you do whatever you
11 need to do, you know, so probably helped with the
12 sales force.
13 Q   Anything else that you can think of?
14 A   Not that I can recall.
15 Q   Did there come a time when you decided
16 that you would like to acquire Monsour's?
17 A   Yes.
18 Q   All right. What -- what caused you to
19 start thinking about that?
20 A   I believe Pete was either going to sell
21 the business, and I believe he was in negotiations,
22 or he was going to close the business, one of the
23 two.
24 Q   You believed that he might have been in
25 negotiations to sell the business; did you know --

Page 20

1  did you have an idea -- no. Bad question. Did you
2  know with whom he was negotiating for sale?
3  A   Could have been other parties; I know Dick
4  was one of those at one time.
5  Q   When did you make the decision that you
6  were going to acquire Monsour's?
7  A   '98.
8  Q   With whom did you negotiate for the
9  acquisition of Monsour's?
10 A   Pete.
11 Q   Tell me about those negotiations. Well,
12 first, how long did those negotiations take before an
13 agreement was reached?
14 A   Probably three or four months.
15 Q   I know that is a long time ago; were the
16 negotiations primarily over price?
17 A   Yes, I believe.
18 Q   How much did -- initially, if you can
19 recall, how much did Mr. Pete Monsour -- I'm sorry,
20 was Mr. Pete Monsour the only shareholder at that
21 time?
22 A   If it wasn't just him, it was his wife.
23 Q   All right. How much did Mr. Monsour want
24 -- I'm sorry; was this going to be an acquisition --
25 this wasn't going to be an asset deal, right, you

Page 21

1 weren't going to buy the assets, you were going to
2 buy the entire business?
3    A   Right.
4    Q   How much did he want for his and his
5 wife's ownership interest in Monsour's?
6    A   I can't recall that figure, but I imagine
7 I could supply it. But just not --
8    Q   At the top of your head?
9    A   Yeah.
10   Q   What did you finally agree to pay?
11   A   I don't remember. I'm not trying to evade
12 your question either.
13   Q   No, I don't mean to indicate that I think
14 you are. Where would I find the records of what you
15 paid to acquire Monsour's?
16   A   Bank of America. I'm sure Bank of America
17 would have that information because they -- you know,
18 Pete was doing business there, and I did business
19 there. Or probably the attorney, whoever the
20 attorney was.
21   Q   Whoever Monsour's attorney was at the time?
22   A   Yeah. Yeah.
23   Q   Do you not know who that was?
24   A   It would either be Wilbert and Towner or
25 Mitchelson. I believe Wilbert and Towner.

Page 22

1    Q   Wilbert and Towner?
2    A   Yeah, the law firm.
3    Q   Located in Pittsburg, Kansas?
4    A   Yeah. I might be able to find that
5 information out for you.
6    Q   Okay. And you don't remember the purchase
7 price?
8    A   Right. At the moment I haven't thought
9 about that for quite some time, so --
10   Q   I don't want you to guess at the purchase
11 price, nor do I want you to speculate, but would the
12 purchase price have been in excess of one million
13 dollars?
14   A   I believe.
15   Q   Would it have been in excess of two?
16   A   I don't know. If I did, I would tell you.
17   Q   I'm sure you would. But it was at least,
18 we are agreed, it was at least in excess of one
19 million dollars; right?
20   A   (Witness nodded.)
21   Q   You have to say yes or no.
22   A   Yes, sir.
23   Q   Thank you. Did you have a million dollars
24 just laying around that you didn't know what to do
25 with?

Page 23

1    A   I had money. I don't think I had a
2 million dollars laying around.
3    Q   How did you finance your acquisition of
4 Monsour's?
5    A   Through Bank of America.
6    Q   A loan?
7    A   Correct.
8    Q   I know you won't remember the terms of
9 that loan, or what your monthly payments were; am I
10 right?
11   A   It was 25 -- there was five shares of
12 stock. I know I paid $5,000 a year on the shares of
13 stock loan.
14   Q   There were five shares of stock?
15   A   To my recollection.
16   Q   Okay. And you acquired all five?
17   A   (Witness nodded.)
18       MR. DEVAUGHN: You need to make your
19 response audibly.
20   A   Correct.
21   Q   (By Mr. Wachtel) You acquired all five,
22 if I understand you correctly, through a loan with
23 Bank of America; did you put any of your personal
24 money along with that?
25   A   As far as personal money, I think what I

Page 24

1 did is when I cross collateralized I had significant
2 assets and equity in other properties.
3    Q   Uh-huh.
4    A   And they did -- it was cross
5 collateralization, and I believe that they received,
6 by my guarantee on that, in the cross
7 collateralizing, they were amply collateralized or
8 felt they were secured.
9    Q   What other properties did you own?
10   A   Rental properties, mini storage, etc.,
11 which I just -- you know, just properties. Real
12 estate.
13   Q   Real estate; business real estate
14 properties?
15   A   What do you mean by business?
16   Q   As opposed to residential?
17   A   Both.
18   Q   Did you own any other companies at the
19 time? I'm trying to find out whether these assets
20 were held by companies that you owned or whether they
21 were personally held by you?
22   A   Personally held.
23   Q   Now Mrs. Monsour is a plaintiff in this
24 case; was the stock of Monsour's sold to you and her?
25   A   Correct.

Page 97

1   Q   And that was for how many years?
2   A   Three.
3   Q   Three. How much money are we talking
4   about?
5   A   Over three years?
6   Q   Yes, sir.
7   A   Maybe 25, 30,000 total, to my recollection.
8   Q   Maybe 25 to $30,000 over a three year
9   period?
10  A   Correct.
11  Q   Did you report this income -- I'm sorry.
12  Did Monsour's make financial reports regarding its
13  financial condition to its lenders.
14  A   Standard.
15  Q   That's a yes?
16  A   Yes.
17  Q   Was this income included in any of those
18  reports?
19  A   It would not have been.
20  Q   That being the case, I don't have any
21  further -- whoops. That being the case, I don't have
22  any further questions of Mr. Monsour.
23          MR. DEVAUGHN: We will read and sign.
24  Are we ready to go forward with the 30 (b) (6)?
25          MR. WACHTEL: I would like to reorganize

Page 98

1   my file here for a moment, if you don't mind.
2           (WHEREIN, the deposition was concluded
3   at 11:30 a.m.)

Page 99

CERTIFICATE OF REPORTER

I, Richard E. Schroeder, a Certified Court Reporter and duly commissioned Notary Public within and for the State of Missouri, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____
Notary Public within and for
the State of Missouri.

My Commission expires August 9, 2006.

Page 100

MIDWEST LITIGATION SERVICES
711 North Eleventh Street
St. Louis, Missouri 63101

Phone (314) 644-2191 * Fax (314) 644-1334

March 20, 2006

McDonald, Tinker, Skaer, Quinn & Herrington, P.A.
300 West Douglas, Suite 500
Wichita, Kansas 67202-2909
Attn: Dustin L. DeVaughn
IN RE: Monsour vs. Menu Maker Foods
Dear Mr. DeVaughn:
Herewith, copy of Mark Monsour's deposition, taken individually, on March 14, 2006. Also enclosed is the original signature page and some errata sheets. Please have Mr. Monsour read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheets, and sign the signature page before a notary public.

Please return the errata sheets and signed, notarized signature page to John Val Wachtel, Attorney for Defendant, for filing prior to trial date.
Thank you for your attention to this matter.
Yours very truly,

Richard E. Schroeder
Encl:
cc: John Val Wachtel, Esq.

25 (Pages 97 to 100)

Page 101

```
1   STATE OF MISSOURI  )
                        ) SS
2   CITY OF ST. LOUIS  )
3
4       I, MARK MONSOUR, do hereby certify:
5          That I have read the foregoing deposition;
6          That I have made such changes in form and/or
7   substance to the within deposition as might be
8   necessary to render the same true and correct;
9          That having made such changes thereon, I hereby
10  subscribe my name to the deposition.
11         I declare under penalty of perjury that the
12  foregoing is true and correct.
13
14      Executed this         day of        2006,
    at                  .
15
16                    MARK MONSOUR
17         Subscribed and sworn before me this
18  day of         , 2006.
19
                      Notary Public
20
    My Commission Expires:
21
    Signature page and letter to Dustin DeVaughn on
22  March 20, 2006.
23
24  RES   Monsour vs. Menu Maker Foods
25
```

Page 102

```
1              WITNESS ERRATA SHEET
2   Witness Name: Mark Monsour
3   Case Name: Monsour vs. Menu Maker
4   Date taken: March 14, 2006
5
6   Page #      Line #
7   Should Read:
8   Reason for Change:
9
10  Page #      Line #
11  Should Read:
12  Reason for Change:
13
14  Page #      Line #
15  Should Read:
16  Reason for Change:
17
18  Page #      Line #
19  Should Read:
20  Reason for Change:
21
22  Page #      Line #
23  Should Read:
24  Reason for Change:
25
```

26 (Pages 101 to 102)