## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARK MONSOUR, SHEILA MONSOUR)
and MONSOUR'S INC.                     )
                                       )
                    Plaintiffs,        )
                                       )       Case No. 05-1204-MLB
vs.                                    )
                                       )
MENU MAKER FOODS, INC.                 )
                                       )
                    Defendant.         )
_____)

## EXHIBITS TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Exhibit 1:    Mark Monsour's Answers to Menu Maker Foods, Inc.'s
              Interrogatories to Plaintiff, Mark Monsour
Exhibit 2:    Asset Purchase Agreement
Exhibit 3:    Non-Competition Agreement
Exhibit 4:    Sheila Monsour's Answers to Menu Maker Foods, Inc.'s First
              Interrogatories to Plaintiff, Sheila Monsour

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK MONSOUR, SHEILA MONSOUR )
and MONSOUR'S INC. )
)
                         Plaintiffs, )
vs. )                               Case No. 05-1204-MLB
)
MENU MAKER FOODS, INC. )
)
                         Defendant. )
_____)

## MARK MONSOUR'S ANSWERS TO MENU MAKER FOODS, INC.'S INTERROGATORIES TO PLAINTIFF, MARK MONSOUR.

COMES NOW plaintiff Mark Monsour, by and through his attorneys of record, Richard W. James and Dustin L. DeVaughn of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., and provides answers to defendant's First Interrogatories as follows:

### INTERROGATORIES

**INTERROGATORY NO. 1:** Identify persons or entities to whom you were indebted as of the effective date of the Agreement. State the amount of each indebtedness and the terms of re-payment. State as well, whether as of the effective date of the Agreement, demand for payment of any or all such indebtedness had been made, and if so by whom. State whether you had been threatened with suit to collect any or all of the indebtedness, and if so by whom, and state whether as of that date there was any litigation pending against you, by whom, identify the litigation by caption, case number and court.

**ANSWER:** Objection. This interrogatory is not reasonably calculated to seek discoverable information and is not relevant to the subject matter of this litigation. However, without waiving such objection, plaintiff answers as follows. Please see response to Interrogatory No. 1 by Monsour's Inc.



EXHIBIT
1

**INTERROGATORY NO. 2.** Describe with particularity the part you played, if any, in negotiating the terms of the Agreement.

**ANSWER:** I negotiated the Asset Purchase Agreement with Dick Graves and acted as the principle and only negotiator on behalf of Monsour's Inc. I interacted with Mr. Graves in reaching the particular terms of the Asset Purchase Agreement.

**INTERROGATORY NO. 3:** Identify all other persons known to you who, on behalf of Monsour's, Inc., were involved in negotiating the Agreement with the Defendant, and describe the involvement of each such person in the negotiations.

**ANSWER:** No other party had authority to negotiate or provide information to Menu Maker other than me. In the process of negotiation, I relied on information received from other Monsour's employees and their knowledge of our sales and purchases in dry and frozen goods and produce. Further, none of these individuals had authority to negotiate the agreement with the defendant.

**INTERROGATORY NO. 4:** State the principal and material facts that support your fraud claim against the Defendant, including the allegations contained in Count V of your Complaint. Identify each person that has knowledge of or would testify about the information set forth in your answer and state the substance of such person's knowledge or testimony. Identify the principal and material documents that contain information set forth in your answer to this interrogatory.

**ANSWER:** Please see Monsour's Inc.'s response to Interrogatory No. 2.

**INTERROGATORY NO. 5:** If, with respect to the allegations contained within Count V of your Complaint, you allege that the Defendant made any untrue statements of existing and material facts, identify each untrue statement, state by whom, to whom and when each untrue statement was made.

    **ANSWER:**   Please see Monsour's Inc.'s response to Interrogatory No. 3.

**INTERROGATORY NO. 6:** With respect to the statements of material fact set out in your answer to the preceding Interrogatory, state the facts and circumstances upon which you rely to prove that the persons making the statements knew that the statements were untrue.

    **ANSWER:**   Please see Monsour's Inc.'s response to Interrogatory No. 4.

**INTERROGTORY NO. 7:** With respect to the statements of material fact set out in your answer to Interrogatory No. 5, state the facts and circumstances upon which you rely to prove that the persons making each such statement either made the statements intentionally with the intent to deceive, or made the statements recklessly and with disregard for the truth.

    **ANSWER:**   Please see Monsour's Inc.'s response to Interrogatory No. 5.

**INTERROGATORY NO. 8:** If you, as an individual, owned assets which were acquired by the Defendant pursuant to the terms of the Agreement, identify each and every asset owned by you that was sold to the Defendant, state the then value of each such individually owned asset which was sold to the Defendant and state the amount of money paid by the

Defendant to you or for your benefit pursuant to the terms the Agreement and/or any assignment of the proceeds of the Agreement for your individual assets.

**ANSWER:**    None to my knowledge.

**INTERROGATORY NO. 9:** If you, as an individual, sold no assets to the Defendant under the Agreement, state your understanding of why you signed the Agreement in your individual capacity.

**ANSWER:**    I had personally guaranteed Monsour's Inc.'s debts and defendant was adamant that I execute the Asset Purchase Agreement in case I owned any of the assets.

**INTERROGATORY NO. 10:** Given your answers to these Interrogatories, state why your claims for damages as set out in the Complaint are exactly the same as the claims for damages made by Monsour's, Inc. and Sheila Monsour. If your claims for damages are not the same as the claims made by Monsour's, Inc. and Sheila Monsour, state what your claims for damages are with respect to each Count of the Complaint, and state how they were calculated, by whom they were calculated, and identify all documents relied upon in making such calculations. Also state how they are distinct from and disproportionate to the damages suffered by Monsour's, Inc. and any other plaintiff.

**ANSWER:**    The damages sought by plaintiffs in this case are not cumulative. Each plaintiff is not seeking the same damage individually.

4

**INTERROGATORY NO. 11:** State the actions, if any, you took to mitigate your alleged damages. Identify each person who has knowledge of, or who would testify about the information set forth in your answer, and state the substance of such person's knowledge or testimony. Identify the principal and material documents that contain information set forth in your answer to this Interrogatory. If, however, you claim that you were unable to mitigate all or any part of your alleged damages, state why you were unable to mitigate

**ANSWER:** See Monsour's Inc.' response to Interrogatory No. 11. In addition, after Menu Maker informed me they would not purchase any more food service inventory, contrary to the Asset Purchase Agreement, I had Matt Warford contact a broker to attempt to sell any amount of inventory that could be sold. The broker purchased two trailer loads of inventory at a substantially reduced cost. These funds were forwarded directly to Bank of America. Individuals who also have knowledge of this include Matt Warford, Fred Foster and Junior Oehme. This was a fractional amount of the total inventory. I was unable to additionally mitigate the damages because of the Asset Purchase Agreement and the Non-compete Agreement which prevented me from selling inventory to former customers.

**INTERROGATRORY NO. 12:** At any time after the inspection of inventory which you allege in paragraph 11 of the Complaint that the Defendant conducted prior to the execution of the Agreement, did you allow any person or entity other than the Defendant, to remove and use or sell any inventory? If you did, identify each such person or entity who removed any inventory, identify by description and quantity the inventory removed by each person or entity, state when each such item of inventory was removed by each such person or entity, state the reason(s) such inventory was removed by each such person or entity, state whether and to whom

any such removed inventory was sold, state the price paid for each item of inventory by the ultimate purchasers, state the price paid to you and/or Monsour's, Inc. for each item of inventory by any such person or entity who removed the inventory and state your knowledge of the disposition of funds from any such transaction.

    **ANSWER:**   See Monsour's Inc.'s response to Interrogatory No. 14.

    **INTERROGATRORY NO. 13:**  At any time from and after the date that the Agreement was executed, did you allow any person or entity other than the Defendant, to remove and use or sell any inventory? If you did, identify each such person or entity who removed any inventory, identify by description and quantity the inventory removed by each person or entity, state when each such item of inventory was removed by each such person or entity, state the reason(s) such inventory was removed by each such person or entity, state whether and to whom any such removed inventory was sold, state the price paid for each item of inventory by the ultimate purchasers and state the price paid to you and/or to Monsour's, Inc. for each item of inventory by any such person or entity who removed the inventory.

    **ANSWER:**   See Monsour's Inc.'s response to Interrogatory No. 15.

    **INTERROGATRORY NO. 14:**  If, either concurrent with or subsequent to the effective date of the Agreement, you assigned the proceeds of the Agreement to any persons, businesses, banks or other entities, including without limitation Bank of America, N.A. and/or the PACA Trust Beneficiaries as the same are more fully described in that certain document titled "ASSIGNMENT OF THE MENU MAKERS AGREEMENT," executed in by you, Mark Monsour and Monsour's, Inc. in September, 2002, identify all such assignments and the terms thereof, state your then plans for remaining in business without receiving any of the proceeds of

the Agreement, and state how you would have received future funding, when, based upon any or all of such assignments you were to receive no proceeds from the Agreement.

**ANSWER:**    See Monsour's Inc.'s response to Interrogatory No. 21.

**INTERROGATORY NO. 15:** Describe your day-to-day activities, responsibilities and express authority with respect to the operation and management of Monsour's, Inc.

**ANSWER:**    My day-to-day activities involved sales to retail accounts, interaction and direction of employees, interaction with customers and problem solving. I had authority and management responsibility over all aspects of Monsour's Inc.'s business.

**INTERROGATORY NO 16:**  As of the effective date of the Agreement, state how much Monsour's, Inc. stock you owned, from whom you acquired the stock, how you acquired the stock, the purchase price of the stock, if payment was not made in full at the time of the purchase state the payment arrangements, if any, for the purchase of the stock, if applicable, how much you still owe for the purchase of the stock, and state how much stock you now own.

**ANSWER:**    Sheila Monsour and I owned all of the shares of stock to Monsour's Inc. We acquired these shares through purchase from Peter L. Monsour. Payment was made in full at the time of the purchase. I do not recall the purchase price. Sheila Monsour and I still own all the stock although it has no value.

**INTERROGAGORY NO. 17:** Have you ever been convicted of a crime or of crimes involving dishonesty or moral turpitude? If you have, state the date of each conviction, the charge or charges upon which you were convicted for each such conviction, and identify each

such conviction by case caption, case number and the federal, state or local court or judicial district.

**ANSWER:**    I was convicted of possession of a methamphetamine on July 19, 2004. The case was captioned *State of Kansas v. Mark Monsour*, Case No. 04 CR 76, in Crawford County, Kansas.

I was charged with possession of marijuana and methamphetamine in Joplin, Missouri for an incident that occurred on July 2, 2005. To my knowledge, I have not been convicted on those charges.

**INTERROGATORY NO. 18:**  On or about October 2, 2001 Monsour's, Inc. borrowed $975,000.00 from Bank of America, N.A., in addition, Monsour's, Inc. secured the guarantee of Pitt Plastics on $500,000.00 of indebtedness with University National Bank which appears to have been incurred on or about December 2001. State whether you received any of the funds borrowed by Monsour's, Inc. from Bank of America, N.A. and/or University National Bank in either or both of those loans, if you did receive any such funds, state when you received any funds, the amounts of funds received, why you received such funds and what you did with any such funds received

**ANSWER:**    Please see Monsour's Inc.'s response to Interrogatory No. 28.

**INTERROGATORY NO. 19:**  For the period commencing five (5) years prior to the filing of the Complaint herein through the date of your answers to these Interrogatories state your annual taxable income for both federal and state income tax purposes if they are somehow different, and identify the sources of all income during that period.

**ANSWER:**    Please see tax returns previously produced.

**INTERROGATORY NO. 20:**  As pertaining to you and no other plaintiff, do you contend, as part of your claims of breach of contract on the part of the Defendant, that you suffered lost business profits as a result of any such breach? If you do, please state with specificity the amount of lost business profits you are claiming, state with specificity exactly how the same were calculated, identify each person who participated in the calculation of the alleged loss of business profits, and identify all documents relied upon by each and every person who participated in the calculation of the alleged loss of business profits.

**ANSWER:**    See Monsour's Inc.'s response to Interrogatory No. 24.

**INTERROGATORY NO. 21:**  As pertaining to you and no other plaintiff, on a yearly basis and for the five year period prior to the execution of the Agreement at issue herein, please state the total amount of all of your expenses associated with the operation of your business, the total amount of fixed costs associated with your business, the total income generated by your business, identify the person(s) most knowledgeable about these expenses, costs and income and identify all documents relied upon or reviewed in answering this Interrogatory.

**ANSWER:**    See Monsour's Inc.'s response to Interrogatory No. 32.

**INTERROGATORY NO. 22:**  As pertaining to you and no other plaintiff, if you claim in this case a breach of an alleged contract for the sale of goods, please state with specificity, the goods you allege were the subject of the alleged contract, the alleged contract price for the alleged goods, the market value of the alleged goods at the time of the alleged breach, the resale

9

value, if any, of the alleged goods, identify the person(s) most knowledgeable about the prices and values stated, and identify all documents relied on or reviewed in preparing your answer to this Interrogatory.

      **ANSWER:**   See Monsour's Inc.'s response to Interrogatory No. 33.

                    Respectfully submitted,

                    McDONALD, TINKER,
                      SKAER, QUINN & HERRINGTON, P.A.

                 By: _____
                      Dustin L. DeVaughn, 16559
                      Richard W. James, 19822
                      300 W. Douglas, Suite 500
                      Wichita, KS 67202-2909
                      Tele: 316.263.5851
                      Fax: 316.263.4677
                      E-mail: rjames@mtsqh.com
                                ddevaughn@mtsqh.com
                      *Attorneys for Plaintiffs*

12- 5-06;  1:25PM;B OF A MESA MAIN9990                              ;1 480 610 4924        # 2/ 2
RECEIVED: 12/ 5/05 10:03AM; ->SCOTTBLUE#REPROGRAP; #992; PAGE 12
12/05/2005  10:30    3162634677              MCDONALD TINKER ETAL              PAGE  12/12

## VERIFICATION

STATE OF KANSAS          )
                         ) SS:
COUNTY OF MONTGOM        )

    I, the undersigned, of lawful age, having first been duly sworn upon my oath, depose and state that I am a Plaintiff in this action, that I have read the above and foregoing answers to the Interrogatories, I know and understand the contents thereof, and state that the statements and answers contained therein are true and correct, according to my knowledge, information and belief.

                  By: _____

                          Mark Monsour

    SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 5 day of December , 2005.

My Commission Expires: 06-26

_____
Notary Public

CANDIDO GARCIA III
Notary Public - Arizona
Maricopa County
My Commission Expires
June 26, 2008

11

12- 7-05; 9:03AM;B OF A MESA MAIN0890                    ;1 480 610 4924      # 2/ 2

12/07/2005  09:10   3152634677          MCDONALD TINKER ETAL           PAGE  02/04

## VERIFICATION

STATE OF KANSAS            )
                          ) SS:
COUNTY OF SEDGWICK         )

I, the undersigned, of lawful age, having first been duly sworn upon my oath,

depose and state, that I am an officer of Monsour's, Inc., a Plaintiff in this action, that in

that capacity I have authority to sign the Interrogatories on behalf of that Plaintiff, that I

have read the above and foregoing answers to the Interrogatories, I know and

understand the contents thereof, and state that the statements and allegations

contained in the answers thereto are true and correct, according to my knowledge,

information and belief.

Monsour's, Inc.

By: _____

Mark Monsour

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this

7 day of _December_____, 2005.

My Commission Expires: _Jn 28 08_

Notary Public

CANDIDO GARCIA III
Notary Public - Arizona
Maricopa County
My Commission Expires
June 28, 2008

28

## ASSET PURCHASE AGREEMENT

THIS AGREEMENT, made this 31st day of January, 2002, by Menu Maker Foods, Inc. ("BUYER"), and Monsour's, Inc. ("Monsour's") and Mark D. Monsour and Sheila. D. Monsour of 112 N. Elm, Pittsburg, Kansas, 66762 (collectively "SELLER").

### RECITALS

A. Seller Monsour's, Inc. is the owner of a food distribution business operating under a trade name of "Monsour's" (the "Grocery Business") and also operates a produce business.

B. Seller desires to sell and Buyer desires to buy from Seller certain of the assets of Seller's Grocery Business.

C. Seller will retain the produce business subject to certain limitations contained herein.

In consideration of the mutual covenants herein, the parties agree as follows:

### I. Agreement to Purchase and Sell; Non-competition Agreement

Section 1.1. _Assets Other Than Real Estate._ Subject to the terms of this Agreement, Seller agrees to sell, free and clear of all liens, and Buyer agrees to purchase the following assets:

1. All of the Seller's inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition) which items are presently being sold to current customers of Buyer or to selected customers of Seller. Buyers will make its best efforts to sell or assist in the sale of Monsour's remaining inventory. The parties estimate that the inventory to be purchased is estimated from $750,000 to $800,000 in value.

2. These intangible assets: Seller's list of all customers excluding retail grocery stores, all records (including electronic data) associated with such customers including but not limited to:

　　　　(a) Name, address, phone, contract
　　　　(b) Equipment on hand
　　　　(c) Account history
　　　　(d) Credit history and terms
　　　　(e) List of products being purchased
　　　　(f) Sales and delivery schedule
　　　　(g) Pricing schedule
　　　　(h) Rebate arrangements from suppliers or to customers earned after closing date, and the goodwill associated with those customers, (excluding retail grocery store customers which are retained by Seller to continue its business selling produce to those customers on the terms herein), the telephone number (620-231-6363) and listings of the Grocery Business [the Seller will share the use of the telephone number for 14 days after closing and will pay for any telephone charges therefore], and the right, title and interest in the Trade Name "Monsours" and other names so similar as to require its consent to their rightful use; provided that if the

Blumberg No. 5119

EXHIBIT
2

D 0 0 0 0 1

Buyer ceases to buy substantially all of its produce requirements from Seller (so long as the Seller continues in such produce business), then the right to the use of Seller's name on the grocery business will terminate 60 days after notice by the Seller to the Buyer.

3. Certain equipment as listed on Exhibit "A" attached.

4. A covenant not to compete by the Sellers as set forth in Exhibit "B".

5. A covenant not to compete by Seller's Brother Rick Monsour as set forth in Exhibit "C".

Section 1.2. Excluded Assets. Seller shall retain and not transfer to Buyer the following assets:

1. all accounts payable and all accounts receivable.

2. The assets of the Seller used exclusively to service the customers retained by the Seller.

3. All real estate assets.

4. All equipment not listed on Exhibit "A".

5. All inventory not selected by Buyer.

6. The right to continue its operations in regard to the sale of produce to  grocery stores and the right to continue sales to current jobbers (Seller is to provide a list of the current jobbers to Buyer at the Closing Date).

Section 1.3. Assumption of Liabilities. Buyer is not assuming and paying any liabilities or debts of the Sellers nor agreeing to perform any contract or obligation of the Sellers. Seller will be responsible for any and all federal, state, and local taxes due on his business prior to the date of closing and because of the transfer of the assets from Seller to Buyer.

## II. Purchase Price.

The purchase price which Buyer agrees to pay for the items described in Section I is as follows:

Section 2.1. Inventory - The inventory purchase price will be Seller's cost which will be computed at the Seller's NDS computer system average cost of last 3 purchases, except that if such price exceeds the current market cost for any such inventory item then the price for such item will be negotiated by Buyer and Seller.  The inventory purchase will be subject to these terms:

(1).  The Buyer shall be responsible for transportation of the inventory from Seller's location at Buyer's cost.

(2).  The Seller will be responsible for inspection and loading of the inventory into Buyer's trucks pursuant to the purchase order of Buyer, and Seller warrants that all inventory loaded will meet the quality standards set out above.  Buyer will be entitled to have an inspector present at all loading and any items objected to by that inspector shall be set aside for further inspection.

(3).  Buyer shall pay Seller for inventory on a 'as received" basis, with payment to be made after delivery of possession of the inventory to Buyer for invoices for inventory sold during each Friday through Thursday period by wire transfer to Seller's account at the Bank of America, N.A. in Pittsburg, Kansas, on each Friday not later than 1:30 p.m..

D 0 0 0 0 2

(4). Buyer will assist the Seller in selling inventory not necessary to Buyer to supply current customers of the Seller or the Buyer, and may buy on a negotiated price purchase such items.

Section 2.2. <u>Customer Lists, Records.</u> Included in the Covenant Not To Compete price.

Section 2.3. <u>Equipment.</u> The purchase price will be agreed at the Closing Date.

Section 2.4. <u>Rick Monsour Covenant Not To Compete.</u> The Purchase Price for the Covenant Not to Compete will be $5,000.00.

Section 2.5. <u>Mark D. Monsour Covenant Not To Compete</u>. The Purchase Price for the Covenant not to Compete of Monsours, Inc. and Mark D. Monsour (and items in Section 2.2) shall be (i) $150,000.00, plus (ii) 2% of the Buyer's gross sales receipts (less sales taxes) sold by the Buyer's salespeople working out of the Buyer's Pittsburg location [plus sales to Infina Nursing Homes] within the first year following the Closing Date, and plus (iii) 1 % of the Buyer's gross sales receipts (less sales taxes) sold by the Buyer's salespeople working out of the Buyer's Pittsburg location [plus sales to Infina Nursing Homes] within the second year following the Closing Date if the sales volume exceeds $11,000,000, which Price will be paid as follows:

1. $50,000 paid at date of contract signing and the balance of $100,000 will be paid at the Closing Date.

2. A. The 2 % percentage payments for the first year will be paid quarterly on the 20th day after the end of each quarter beginning the quarter after the Closing Date. The first payment will be due May 20, 2002.

B. The 1 % percentage payments for the second year will be paid on the 20th day after the end of the first month following the end of the second year after the Closing Date.

3. The payments will terminate in the event of a material breach by the Seller of the Covenant Not To Compete.

Section 2.6. <u>Vendor Credits.</u> If the Seller has unused vendor credits which the Buyer is able to pass through the on its account with the vendor, then within 7 days of the Buyer's receipt of funds or credit on its account it will pay the Seller an amount the that which it received

**IV. Closing.**

Section 4.1. <u>Closing Date.</u> The Closing Date under this Agreement shall be in the offices of Seller's attorney, at 1 p.m., on the day agreed to by the parties, but in no event later than thirty days from the date of this agreement.

Section 4.2. <u>Offset.</u> The Buyer shall be entitled to offset any sums owed to Buyer or its subsidiaries by Sellers against the payments owed to the Sellers.

**V. Title and Conveyance of Assets.**

Section 5.1. <u>Instruments of Conveyance.</u> Title to the assets being conveyed shall, at closing, be free and clear of liens, charges, restrictions and encumbrances, by the Sellers' bill of sale with full warranties, provided that title to the inventory will not transfer until delivery to the Buyer. Seller by the signing of the each of the Buyer's purchase orders on inventory will make the same warranties as are contained in the bill of sale.

Section 5.2. <u>Bulk Sale.</u> If applicable, the Seller will fully comply with any bulk sales laws or, in lieu thereof, provide proof that all liens on the inventory and other assets being

D 0 0 0 0 3

purchased by Buyer are released.

## VI. Representations and Warranties.

Section 6.1. Representations by Seller. Seller represents and warrants to Buyer that the following statements are true, complete, and correct now and will be such on the date of closing and such representations and warranties shall survive closing:

1. Seller is the sole owner of all of the assets to be transferred. Seller has, or shall have, upon delivery to and payment by Buyer, good, absolute and marketable title to the assets to be transferred, free and clear of all claims, liens, charges, encumbrances and restrictions of every kind. There are no outstanding options, contracts, commitments, agreements or other rights of any character or relating in any manner to the assets being transferred or entitling any third party to acquire such assets. Seller has and shall have at closing the complete and unrestricted right to sell, transfer and assign the assets pursuant to this Agreement. Upon the delivery of the equipment at closing, Buyer shall acquire good and marketable title to the assets free and clear of all claims, liens, charges, encumbrances and restrictions of any kind.

2. Seller Monsour's, Inc., is a corporation in good standing under the laws of the State of Kansas, has authority to own and operate its respective assets, to carry on its business as presently conducted, and to consummate the transactions completed in this Agreement. The execution, delivery, and performance of this Agreement has been duly and effectively authorized by its Board of Directors, and it necessary its Shareholders, and no further action or other authorization or consent is required.

3. Seller is a corporation owned by the Seller Mark D. Monsour and Sheila D. Monsour and no other person. Sellers Mark D. Monsour and Sheila D. Monsour are individuals residing in the State of Kansas.

4. This Agreement shall constitute a binding and valid obligation of Sellers enforceable according to its terms.

5. Seller ,upon delivery to and payment by Buyer, shall provide to Buyer a release of all liens upon any of the assets being conveyed and a consent to transfer such assets by the secured creditors of Seller.

6. Seller is not a party in any litigation now pending, or threatened, nor are there any proceedings pending or to the best of their knowledge threatened, before any federal, state, or local court, agency or board, regarding Seller's business.

7. Seller has duly and timely filed all required federal and state tax returns, and has timely paid all federal and state taxes required to be paid and all other taxes and government charges, duties, penalties, interest and fines owed by it. If at closing any state, local, or federal taxes, charges, etc. are not paid in full, Buyer may deduct the same from payments due at closing or thereafter in order to pay the same.

8. That all of the books of accounts and records which Seller has exhibited to Buyer are complete and correct and reflect all material transactions involving Seller's assets.

9. That Seller has complied with all laws of all state, federal and local government bodies and have not received any notice from any government bodies of any violations of any laws and have no knowledge of any facts that would be a violation or would give rise to any such notice.

D 0 0 0 0 4

10. Seller knows of no adverse change or threatened adverse change in the relationships of Seller with customers, other than changes occurring in the ordinary course of business which, individually or in the aggregate, have been materially adverse. Seller does not have any direct or indirect interest in any competitor of Seller's business within the territory described in the covenant not to compete.

Section 6.2. <u>Representations by Buyer.</u> Buyer represents and warrants to Seller that the following statements are true, complete and correct as of this date and shall be true on the date of closing, and such representations and warranties shall survive closing.

1. Buyer is a corporation duly organized, and in good standing in the State of Missouri, with all of the requisite corporate power and authority to own and operate its property, assets, and business.

2. Buyer has complete and unrestricted right, power and authority to enter into this Agreement and to consummate the transaction.

3. Execution and delivery of this Agreement has been duly authorized by all necessary corporate action on the part of the Buyer. Execution and delivery of the Agreement will not contravene Buyer's certificate of incorporation or by-laws, conflict with or result in the breach of any agreement which Buyer is a party; entitle any party to terminate, accelerate or call a default with respect to any Agreement which Buyer is a party; or result in any violation by Buyer of any laws applicable to it.

4. Buyer is not a party to or subject to or bound by any judgment, order, injunction, or decree of any court or government body which may restrict or interfere with the performance of this Agreement.

5. Upon execution and delivery, this Agreement shall constitute a valid obligation of Buyer enforceable against it and in accordance with its terms.

### V. Actions of Seller Prior to Closing.

Seller covenants and agrees that, prior to closing, they shall take, or cause to be taken, the following actions:

Section 5.1. <u>Access to Records.</u> Seller shall permit Buyer and its agents reasonable access during normal business hours to all books, files, and records of Seller relating to the Grocery Business; provided however that no such examination shall constitute a waiver by Buyer of its right to rely on the covenants, representations and warranties made herein or on Seller's obligation to perform under this Agreement. Buyer agrees that the information that it receives or obtains from Seller as a result of any investigation shall be deemed confidential and shall not be disclosed to any person or entity other than Buyer's employees, agents, financiers, and investors. If the closing is not completed hereunder for any reason, Buyer shall return to Seller any and all papers and data.

Section 5.2. <u>No Extraordinary Sales.</u> Seller shall not, without the prior written consent of Buyer, make any sale of goods except in the ordinary course of business, or engage in any other activities or transactions which are outside of the ordinary course of business of Seller as conducted on the date of this Agreement in which, in the aggregate, would be material.

Section 5.3. <u>Tax Returns.</u> Seller shall file all federal, state, and other tax returns and amendments thereto required to be filed by Seller up to, or which relates to periods before

D 0 0 0 0 5

the date of closing, and Seller shall pay all taxes to be due by Seller, at or prior to closing.

Section 5.4. Operations. Seller shall operate its business in accordance to all applicable laws.

Section 5.5. Notice of Change. Seller shall inform Buyer in writing of any change in any information provided to Buyer in any exhibit.

## VI. Conditions precedent to the Obligation of the Buyer.

The obligation of the Buyer to complete the closing hereunder (and all liability to Sellers) is subject to satisfaction or waiver by Buyer on or before the closing date of the following conditions:

Section 6.1. No Breach. There shall be no breach of any of Seller's representations and warranties as of closing. Seller shall deliver to Buyer a certificate dated as of closing to such affect.

Section 6.2. Perform Obligations. At or prior to closing, Seller shall have performed all obligations required to be performed by them hereunder; executed and delivered all documents required to consummate the transactions contemplated hereunder, including but not limited to execution of a bill of sale with full warranties transferring the assets to Buyer.

Section 6.3. No Limits on Use. On the closing date there should be no order, writ, injunction, or decree issued by any government body or any court which prevents or significantly limits the use by Buyer of the assets being purchased.

Section 6.4. Employment of Salespersons of Seller. All of the obligations of Buyer are subject to the condition that the Seller is able to employ the following current salespersons of the Seller: Sean Krokroskia, Penne Cheny, Jim Senecaut, Michael Ray, Ron McGaugh, and Kyle Robertson. In the event that the Buyer is not able to hire such persons, then the Buyer shall have the option to terminate this Agreement prior to the Closing Date and shall have no liability to Sellers under this Agreement.

## VII. Conditions precedent to the Obligations of Seller.

The obligation of the Seller to complete the closing hereunder is subject to the satisfaction or waiver by the Seller on or before the closing on the following conditions:

A. The representations and warranties of Buyer shall be true and correct as of now and at the closing. Buyer shall delivery to Seller a certificate of its President and Secretary dated as of the closing to such effect.

B. Buyer shall have performed all of the obligations required to be performed by it hereunder on or prior to closing, Buyer shall delivery to Seller a certificate of its President and Secretary dated as of the closing to such effect.

## VIII. Survival of Representations, Warranties and Covenants; Indemnification.

Section 8.1. Nature of Representation. For purposes of this Agreement, the contents of all exhibits incorporated by reference shall constitute representations and warranties made in this Agreement by the Sellers.

Section 8.2. Survival of Representations, Warranties and Covenants. The Representations, Warranties and Covenants in this Agreement shall survive the closing for a period equal to the statute of limitations pertaining to written agreements in the State of

5308\monsours\contract - February 5, 2002 - 2:17PM                    6

D 0 0 0 0 6

Missouri.

Section 8.3. <u>Indemnification by Sellers.</u>  Sellers agree to indemnify, defend, and hold the Buyer and its directors, officers, employees, agents, and representatives harmless from and to reimburse Buyer for any loss, cost, expense, liability, or damage, (including counsel fees) resulting from inaccuracies or breach of any representation, warranty, agreement or covenant made by Seller or from their breach of or failure to perform any of the covenants or agreements hereunder.

Section 8.4. <u>Indemnification of Buyer.</u>  Buyer agrees to indemnify and defend and hold the Seller harmless from and to reimburse Seller for any loss, cost expense, liability, or damage, (including counsel fees) resulting from the inaccuracies or breach of any representation, warranty, agreement or covenant made by the Buyer pursuant to this Agreement and from Buyer's breach of or failure to perform any of the covenants or agreements hereunder.

## IX. Brokers.

A.  Each party represents and warrants to the other that no finder, broker or similar agent has acted on behalf of or been retained by it.

## X. Notice.

A.1.  Any notice required hereunder shall be given in writing, served in person, or deposited in the form of a written notice in the United States Mail, sent postage prepaid, properly addressed and directed to the party to receive the same at the following address or such other address as may be substituted by notice in writing.

2.  Seller:  Mark D. Monsour and Sheila D. Monsour
112 N. Elm
Pittsburg, Kansas 66762
620-231-6363

Buyer:  Menu Maker Foods
913 Big Horn Drive
Jefferson City, MO  65109
573-893-3000

## XI. Miscellaneous.

A.  The parties agree that this document, including exhibits, is the entire agreement between the parties and that there are no other promises, conditions, representations, warranties, understandings or agreements of any type or kind between the parties.

B.  This Agreement made be executed in any number of counterparts and each counterpart shall be deemed an original instrument.

C.  This Agreement shall be construed by and according to the laws of the State of Missouri.  This Agreement shall apply to and bind the parties, their respective personal representatives, heirs, successors and assigns.

D.  The invalidity of any one or more word, phrase, sentence, clause, section, or paragraph contained in this Agreement shall not effect the enforceability of the remaining in the Agreement.

5908\monsour\contract - February 5, 2002 - 2:17PM                    7

D 0 0 0 0 7

E. Each of the parties shall keep the terms of this Agreement confidential.

F. Fresh Produce - Menu Maker Foods, Inc., will purchase substantially all of its produce requirements through Monsour's under the following terms and conditions:

(A)   The quality of all products must meet or exceed current Menu Maker Foods, Inc., house acceptability standards.

(B)   The minimum fill rate of all orders received may not be less than 99.25% of acceptable quality produce under normal circumstances and conditions. Acts of God, severe weather, trucking strikes, and otherwise similar situations and not in the control of Sellers and Buyer will not effect the validity of this Agreement.

(C)   Credit Terms will be Net 21 Days the first 90 days, and Net 26 days thereafter.

(D)   Marketing - will not begin until agreed to both parties and produce associated with it until Seller has like program in place:

(1)   Includes our current level of support at $4,125.00 quarterly, which will be deducted on a quarterly basis, toward the Menu Maker Foods, Inc., "BBP" Plan.

(2)   Current shelter income of .25 cents per case shall be paid by Monsours to Menu Maker Foods, Inc. quarterly by the 10th of the month following the end of the quarter.

(3)   Sales support staff will be available for two sales meetings annually, participate in our annual food show and key end user calls upon request.

(4)   Shall provide promotional items and appropriate allowances for flyers, auction, food show, and other BBP activities.

(E)   Pricing - Monsours will need to maintain a competitive cost of goods to insure our current gross profit levels are not jeopardized.

(F)   Pre Cut Produce - Will require further discussion. Seller understands the importance of this program to Buyer and will present programs similar to currently being used by Buyer for Buyer's review and approval. Seller believes that this new program will increase Buyer's market advantage and Buyer will move to this new program only after approval from a representative designated by Buyer.

(G)   Product Specification - Below are a few item specific requirements, and unless other wise stated, agreed quality will be USDA quality standards or better at time

8

D 0 0 0 0 8

of receiving.

(1)    Colorado Potato - Must be US No. 1 "Centennial" when available
(2)    Apples - Washington State - US Extra Fancy
(3)    Oranges - Sunkist US 1
(4)    Lunch Bunch Grapes - Corrin Shipper Brand
(5)    West Coast - Head Lettuce, Green Leaf, & Romaine - All Liner Pack
(6)    Idaho Potatoes - Grade US No. 1 "Burbank" when available
(7)    Buyer shall purchase no less than 99.25% of approximate weekly quantities of the speciality and limited life items as estimated by Buyer on the preceding Monday.

(H)    Time lines -

(1)    Pricing for the following week will need to be faxed by no later than 11:15 a.m. on Thursdays.
(2)    Order Entry - Buyer will supply Seller with approximate quantities and delivery dates for the following week by 2 p.m. on the preceding Monday for the following week. Specialty items will need to be exact or within the agreed fill rate requirements.

(A)    To meet the 99.25% fill rate required for Buyer, Seller will need orders placed with a 2 day lead time. Every available effort to accommodate add-ons and late items (both normal stock and specialty items) will be made. Add-ons or late entry items will not be included in the 99.25% required fill rate.

**XII.  Lease**

A.  The Seller agrees to lease to the Buyer office, cross docking and transportation space for Buyer's tractors, trailers, and cars at the Seller's warehouse pursuant to the lease terms set out in Exhibit "D" attached.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on the day and year first above written.

MONSOUR'S, INC.                          MENU MAKER FOODS, INC.

BY: _____  PRESIDENT     BY: _____
     Mark D. Monsour, President                 Jon R. Graves, President

_____
     Mark D. Monsour

_____
     Sheila D. Monsour

9

D 0 0 0 0 9

## NON-COMPETITION AGREEMENT

THIS AGREEMENT is made and entered into on February 6, 2002, between Menu

Maker Foods, Inc., a Missouri corporation ("Buyer") and Monsour's, Inc., and Mark D. Monsour

("Sellers").

### RECITALS

A.  Pursuant to an Asset Purchase Agreement dated January 31, 2002 (the "Agreement"),

Monsour's, Inc, and Mark D. Monsour have sold and transferred to the Buyer at closing on this

date certain assets of its business.  As a material inducement to Buyer's performance under the

Agreement, Sellers have agreed to enter into this contract.

NOW THEREFORE, the parties agree as follows:

1.  For a period of 6 years, commencing on the Closing Date of the Agreement, Sellers

shall not, individually or through others, directly or through any entity, operate or otherwise be

engaged in the ownership or management of a food distribution business  (except permitted sales

of produce to grocery stores and the right to continue produce sales to its current jobbers) within

any county that Sellers or the Buyer are doing business as of this date.

Sellers also agree for a period of 6 years after the date of this Contract,  not to sell to any

customers of either the Buyer and Sellers, directly or indirectly, any items being sold by Sellers

or the Buyer as of the Closing Date of the Agreement (except permitted sales of produce to

grocery stores and the right to continue produce sales to its current jobbers) whether as a

principal, proprietor, agent, employee, salesman, partner, officer, shareholder, consultant, or

otherwise.

2.      Sellers recognize that the Buyer's remedy at law for breach of this contract is

Page 1 of  3



EXHIBIT
3

Blumberg No. 5119

10182

inadequate and in the event of such breach by Sellers, Buyer may apply for and shall be entitled to injunctive relief without the necessity of proving actual damages to Buyer. Such relief shall be in addition to, and not in lieu of, the award of any damages Buyer may sustain or be entitled to or any other rights that Buyer may have at law or in equity for such breach. Sellers agree to pay any attorneys fees, costs, and expenses incurred by Buyer to enforce this contract.

In the event the provisions of this contract should be adjudicated to exceed the time or geographical limitations permitted by applicable law, then such provisions shall be deemed reformed to the maximum time or geographical limitation permitted by applicable law. The time period restrictions set forth in this contract shall be extended for the length of time of any litigation that is instituted by Buyer to enforce the provisions hereof.

3. The consideration for this agreement is a part of the consideration set forth in the Agreement. Sellers acknowledge the receipt and sufficiency of that consideration. Because this contract is given in connection with the sale of business assets, Sellers agree that the terms are reasonable and necessary to protect the interest of Buyer and the times and geographical coverages are reasonable.

4. This Agreement contains the entire understanding of the parties. No amendment to this Agreement shall be effective unless in writing and duly signed by all parties.

5. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, successors and assigns. This Agreement shall be construed in accordance with the laws of the State of Missouri. Buyer may assign its rights hereunder.

5308\Monsours\covenant

Page 2 of 3

10183

IN WITNESS WHEREOF the parties have executed this Agreement as of the day first above written.

_____
Mark D. Monsour

Monsour's, Inc.
by: _____ PRESIDENT
Mark D. Monsour, its President

Menu Maker Foods, Inc.
by: _____
Jon R. Graves, its President

10184

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK MONSOUR, SHEILA MONSOUR )
and MONSOUR'S INC. )
)
Plaintiffs, )
vs. )        Case No. 05-1204-MLB
)
MENU MAKER FOODS, INC. )
)
Defendant. )
_____)

### SHEILA MONSOUR'S ANSWERS TO MENU MAKER FOODS, INC.'S
### FIRST INTERROGATORIES TO PLAINTIFF, SHEILA MONSOUR

COMES NOW plaintiff Sheila Monsour, by and through her attorneys of record, Richard

W. James and Dustin L. DeVaughn of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., and

provides answers to defendant's First Interrogatories as follows:

### INTERROGATORIES

**INTERROGATORY NO. 1.** Describe with particularity the part you played, if any, in

negotiating the terms of the Agreement.

**ANSWER:** None

**INTERROGATORY NO. 2:** If you, as an individual, owned assets which were

acquired by the Defendant pursuant to the terms of the Agreement, identify each and every asset

owned by you which was acquired by the Defendant under the Agreement, state the then value of

each such individually owned asset and the amount of money paid by the Defendant to you or for

your benefit pursuant to the terms of the Agreement and/or any assignment of the proceeds of the

Agreement for such individually owned assets

**ANSWER:** I do not know the value of items that were acquired by defendant.



EXHIBIT
4

Blumberg No. 5119

**INTERROGATORY NO. 3:**  If you, as an individual, sold no assets to Menu Maker under the Agreement, state your understanding of why you signed the Agreement in your individual capacity.

     **ANSWER:**    I was an owner of Monsour's, Inc.

**INTERROGATORY NO. 4:**  Given your answers to these Interrogatories, state why your claims for damages as set out in the Complaint are exactly the same as the claims for damages made by Monsour's, Inc. and Mark Monsour.  If your claims for damages are not the same as the claims made by Monsour's, Inc. and Mark Monsour, state what your claims for damages are with respect to each count of the Complaint and state how they were calculated, identify who calculated them and identify all documents relied upon in calculating the damages. Also state how the claims for damages are distinct from and disproportionate to the damages suffered by Monsour's, Inc. and any other Plaintiff

     **ANSWER:**  My claims for damages are the same as Monsour's, Inc. and Mark Monsour.  The damages sought by the plaintiffs in this case are not cumulative.  Each plaintiff is not seeking the same damages individually.

**INTERROGATORY NO. 5:**  State the actions, if any, you took to mitigate any of your alleged damages.  Identify each person who has knowledge of, or who would testify about, the information set forth in your answer, and state the substance of such person's knowledge or testimony.  Identify the principal and material documents that contain information set forth in

your answer to this Interrogatory. If, however, you claim that you were unable to mitigate all or any part of your alleged damages, state why you were unable to mitigate.

**ANSWER:**   I did not actively participate in the operation of the business and only had knowledge of mitigation efforts by Monsour's Inc. based on my conversations with Mark Monsour.

**INTERROGATRORY NO. 6:** At any time after the inspection of inventory which you allege in paragraph 11 of the Complaint that the Defendant conducted prior to the execution of the Agreement, did you allow any person or entity other than the Defendant, to remove and use or sell any inventory? If you did, identify each such person or entity who removed any inventory, identify by description and quantity the inventory removed by each person or entity, state when each such item of inventory was removed by each such person or entity, state the reason(s) such inventory was removed by each such person or entity, state whether and to whom any such removed inventory was sold, state the price paid for each item of inventory by the ultimate purchasers, state the price paid to you and/or Monsour's, Inc. for each item of inventory by any such person or entity who removed the inventory and state your knowledge of the disposition of funds from any such transaction.

.**ANSWER:**   No.

**INTERROGATRORY NO. 7:** At any time from and after the date that the Agreement was executed, did you allow any person or entity other than the Defendant, to remove and use or sell any inventory? If you did, identify each such person or entity who removed any inventory, identify by description and quantity the inventory removed by each person or entity, state when each such item of inventory was removed by each such person or entity, state the reason(s) such

3

inventory was removed by each such person or entity, state whether and to whom any such removed inventory was sold, state the price paid for each item of inventory by the ultimate purchasers and state the price paid to you and/or to Monsour's, Inc. for each item of inventory by any such person or entity who removed the inventory.

ANSWER:    No

INTERROGATRORY NO. 8:    If, either concurrently with or subsequent to the effective date of the Agreement, you assigned the proceeds of the Agreement to any persons, businesses, banks or other entities, including without limitation Bank of America, N.A. and/or the PACA Trust Beneficiaries as the same are more fully described in that certain document titled "ASSIGNMENT OF THE MENU MAKERS AGREEMENT," executed in by you, Mark Monsour and Monsour's, Inc. in September, 2002, identify all such assignments and the terms thereof, state your then plans for remaining in business without receiving any of the proceeds of the Agreement, and state how you would have received future funding, when, based upon any or all of such assignments you were to receive no proceeds from the Agreement.

ANSWER:    I do not have personal knowledge of the information requested.    All information that I am aware of was received from Mark Monsour.

INTERROGATORY NO. 9:    Describe your day-to-day activities, responsibilities and express authority with respect to the operation and management of Monsour's, Inc., if any.

ANSWER:    In 2001, I performed some basic office functions such as filing invoices approximately two days a week.    However, I had no additional involvement in the day-to-day activities of Monsour's, Inc.

**INTERROGATORY NO 10:**  As of the effective date of the Agreement, state how much Monsour's, Inc. stock you owned, from whom you acquired the stock, how you acquired the stock, the purchase price of the stock, if payment was not made in full at the time of the purchase state the payment arrangements, if any, for the purchase of the stock, if applicable, how much you still owe for the purchase of the stock, and state how much stock you now own.

**ANSWER:**    I do not know.

**INTERROGATORY NO. 11:**  For the period commencing five (5) years prior to the filing of the Complaint herein through the date of your answers to these Interrogatories state your annual taxable income for both federal and state income tax purposes if they are somehow different, and identify the sources of all income during that period.

**ANSWER:**    Please see the personal tax returns that have been produced pursuant to the Request for Production of Documents.

**INTERROGAGORY NO. 12:**  Have you ever been convicted of a crime or of crimes involving dishonesty or moral turpitude? If you have, state the date of each conviction, the charge or charges upon which you were convicted for each such conviction, and identify each such conviction by case caption, case number and the federal, state or local court or judicial district.

**ANSWER:**  No.

5

**INTERROGATORY NO. 13:**  As pertaining to you and no other Plaintiff, do you contend, as part of your claims of breach of contract on the part of the Defendant, that you suffered lost business profits as a result of any such breach?  If you do, please state with specificity the amount of lost business profits you are claiming, state with specificity exactly how the same were calculated, identify each person who participated in the calculation of the alleged loss of business profits, and identify all documents relied upon by each and every person who participated in the calculation of the alleged loss of business profits.

    **ANSWER:**  Please see response to Interrogatory No. 4 above.

**INTERROGATORY NO. 14:**  As pertaining to you and no other Plaintiff, on a yearly basis and for the five year period prior to the execution of the Agreement at issue herein, please state the total amount of all of your expenses associated with the operation of your business, the total amount of fixed costs associated with your business, the total income generated by your business, identify the person(s) most knowledgeable about these expenses, costs and income and identify all documents relied upon or reviewed in answering this Interrogatory.

    **ANSWER:**  I do not know.

**INTERROGATORY NO. 15:**  As pertaining to you and no other Plaintiff, if you claim in this case a breach of an alleged contract for the sale of goods, please state with specificity, the goods you allege were the subject of the alleged contract, the alleged contract price for the alleged goods, the market value of the alleged goods at the time of the alleged breach, the resale value, if any, of the alleged goods, identify the person(s) most knowledgeable about the prices

and values stated, and identify all documents relied on or reviewed in preparing your answer to this Interrogatory.

       **ANSWER:**   I do not know.

                     Respectfully submitted,

                     McDONALD, TINKER,
                     SKAER, QUINN & HERRINGTON, P.A.

                     By: _____
                        Dustin L. DeVaughn, 16559
                        Richard W. James, 19822
                        300 W. Douglas, Suite 500
                        Wichita, KS 67202-2909
                        Tele: 316.263.5851
                        Fax: 316.263.4677
                        E-mail: rjames@mtsqh.com
                                 ddevaughn@mtsqh.com
                        *Attorneys for Plaintiffs*

G:\Menu Maker Foods, Inc 60035-001\Discovery\Sheila's Answers to Menu Maker's 1st IGS

7

**VERIFICATION**

STATE OF KANSAS          )

                         ) SS:

COUNTY OF Crawford )

I, the undersigned, of lawful age, having first been duly sworn upon my oath, depose and state that I am a Plaintiff in this action, that I have read the above and foregoing answers to the Interrogatories, I know and understand the contents thereof, and state that the statements and answers contained therein are true and correct, according to my knowledge, information and belief.

By: _Sheila Monsour_

Sheila Monsour

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 28th day of November, 2005.

My Commission Expires: 8/12/2006

_Sarah Stephenson_

Notary Public

NOTARY PUBLIC - State of Kansas
SARAH STEPHENSON
My Appt. Exp. 8/12/2006

20

## CERTIFICATE OF SERVICE

I hereby certify that on the __6th__ day of December, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

John Val Wachtel
Klenda, Mitchell,
   Austerman & Zuercher, L.L.C.
1600 EPIC Center
201 North Main,
Wichita, KS 67202-4888
Telephone: 316.267.0331
Facsimile:  316.267.0333
jvwachtel@kmazlaw.com
*Attorneys for Defendant*

Dustin L. DeVaughn