Case Compress

Sheet 1

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK MONSOUR, SHEILA MONSOUR
and MONSOUR'S, INC.,

   Plaintiffs,

vs.     Case Number 05-1204-MLB

MENU MAKER FOODS, INC.,

   Defendant.

DEPOSITION OF KEVIN F. MITCHELSON, a Witness herein, taken on behalf of the Plaintiffs, pursuant to the Kansas Rules of Civil Procedure and Notice To Take Deposition, at Wheeler & Mitchelson, 4th and Broadway Street, Pittsburg, Kansas, on the 22nd day of February, 2006, at 1:37 o'clock a.m., before:

Patricia K. Smith, C.S.R.
P.O. Box 1123
Pittsburg, KS 66762
(620) 231-5380

## Page 3

INDEX

Direct Examination by Mr. Wachtel----------------4
Cross Examination by Mr. DeVaughn --------------37
Redirect Examination by Mr. Wachtel-------------38
Recross Examination by Mr. DeVaughn-------------40

| Exhibit Number | Identified |
|---|---|
| 1 | 5 |
| 2 & 3 | 16 |
| 4 | 41 |
| 5 | 28 |
| 6 | 29 |
| 7 | 30 |
| 8 | 32 |
| 9 & 10 | 42 |

## Page 2

APPEARANCES:

FOR THE PLAINTIFFS:

Dustin L. DeVaughn, Esq.
Richard W. James, Esq.
McDonald, Tinker, Skaer, Quinn & Herrington, P.A.
300 West Douglas Avenue, Suite 500
P.O. Box 207
Wichita, KS 67201-0207

FOR THE DEFENDANT:

John Val Wachtel, Esq.
Klenda, Mitchell, Austerman & Zuercher, L.L.C.
1600 Epic Center
301 North Main Street
Wichita, KS 67202-4888

FOR THE WITNESS:

Robert S. Tomassi, Jr., Esq.
Wheeler & Mitchelson
4th and Broadway
Pittsburg, KS 66762

Also Present: Creighton Cox and Mary Goedeke.

EXHIBIT A

Patricia K. Smith, C.S.R.    (620) 231-5380

## Page 4

KEVIN F. MITCHELSON, having been first duly sworn on his oath by the reporter, testified as follows:

DIRECT EXAMINATION
BY MR. WACHTEL:

Q. Mr. Mitchelson, my name is Val Wachtel. I represent Menu Maker Foods in this litigation between Monsour's, Inc., Mark and Sheila Monsour. And I'm not going to waste your time with the usual folderol about depositions. But, please, if I ask you a question that you don't understand, please let me know so that I might be able to rephrase it.

A. Yes, sir.

Q. For the record, you are Kevin Mitchelson?

A. Yes.

Q. And the name of your firm, sir, is?

A. Wheeler and Mitchelson, Chartered.

Q. And how long have you been practicing?

A. I graduated from KU Law School in 1982.

Q. Do you have any particular area of specialty?

A. Most of my work is business and tax and municipal type transactional work.

Q. In late 2001 did you represent Monsour's, Inc.?

A. No, I don't think so.

Q. Did you represent Mark Monsour?

Page 1 to Page 4

**Page 5**

1  A.  Not until he called about doing some work on a
2      transaction that he was working on. And I think that
3      occurred in early 02.
4  Q.  Let me give you what I have identified as Exhibit 1
5      Mitchelson depo and represent to you that it is a copy
6      of a portion, but not all, of the Asset Purchase
7      Agreement that was ultimately signed by Menu Maker
8      Foods, Mark Monsour, Sheila Monsour and Monsour's, Inc.
9      There may be some portions of it missing, but generally
10     it is all there. Is that the transaction that Mark
11     Monsour might have asked you to work on?
12 A.  Yes, sir.
13         MR. TOMASSI: Before we get to that part, could we
14     just have on the record -- and I understand there's
15     been a waiver of the attorney-client privilege between
16     Kevin and the corporation, but could we have the
17     corporation put on the record that that waiver exists?
18         MR. WACHTEL: I don't know that the corporation
19     exists, but they can certainly waive it.
20         MR. TOMASSI: Or whoever.
21         Mr. DeVAUGHN: You bet. Dustin DeVaughn, attorney
22     for Mark Monsour individually, Sheila Monsour
23     individually and Monsour's, Inc., have all formally
24     waived the attorney-client privilege and Mr. Mitchelson
25     is free to testify.

**Page 6**

1          MR. WACHTEL: Thank you very much.
2  A.  The answer to your question, Val, is yes, this was the
3      transaction I was referring to. But as I said that, it
4      occurs to me that our firm may have done some
5      collection work for Monsour's through the years that I
6      didn't have anything personally to do with.
7  Q.  (By Mr. Wachtel) All right. And I rather doubt that
8      that has anything to do with the case.
9  A.  Right.
10 Q.  But thank you very much for sharing that. Did you play
11     any part in the negotiation of any of the terms and
12     conditions found within the Asset Purchase Agreement,
13     Exhibit 1?
14 A.  Yes.
15 Q.  Could you tell us what part you played?
16 A.  Well, Mr. Cowherd prepared the agreement, provided it
17     to us. I reviewed it with Mr. Monsour, had a couple of
18     conference calls with Mr. Graves and Mr. Cowherd and
19     the banker from over there and made certain revisions,
20     requested and discussed possible revisions, and just
21     sort of the normal give and take in a corporate
22     transaction.
23 Q.  The final draft, was that prepared by your office or
24     was it by Mr. Cowherd's office, if you can recall?
25 A.  My recollection is that all of the documents, at least

**Page 7**

1      all of the documents in Exhibit 1, were prepared by Mr.
2      Cowherd's office.
3  Q.  In the course of negotiating this agreement did you
4      have any meetings with Richard Jon, J-O-N, otherwise
5      known as Dick, Graves?
6  A.  Telephone calls. I don't think -- I don't think we met
7      Mr. Graves personally until the day of the closing.
8      Just telephone calls previously. At least, that's my
9      recollection.
10 Q.  Sure. Do you happen to have a recollection of what
11     those telephone calls might have been about?
12 A.  I have notes from them.
13 Q.  If looking at your notes would help refresh your
14     recollection, go right ahead on it.
15 A.  Well, I made a copy of the notes. You'd subpoenaed
16     them and I made a copy of them. I also made a
17     photocopy of the bill we sent to Monsour's so I could
18     gauge the time, in case you asked about dates. I'm
19     sorry, what was your question about then?
20 Q.  You know, it was probably a pretty bad question. Let
21     me go about this another -- in another fashion. In the
22     course of your negotiating or being involved in the
23     negotiation of this agreement did -- well, just, for
24     example, if you'd look at Exhibit 1 on the first page.
25     Exhibit 1, first page.

**Page 8**

1  A.  Uh-huh.
2  Q.  Section I, paragraph 1. It says, "All of the seller's
3      inventory, except produce, which is in a good and
4      wholesome condition and a hundred percent resellable
5      condition," that's a parenthetical. Did you and Mr.
6      Graves have any discussions about what that language,
7      "which is in a good and wholesome condition and a
8      hundred percent resellable condition," might mean?
9  A.  I don't -- I don't know -- I don't know that we made
10     any revisions to that from the first draft that Mr.
11     Cowherd provided. I know in a number of conversations
12     we had discussions and Mr. Graves made it clear that he
13     intended to buy Monsour's inventory and he intended to
14     buy produce from them going -- on an ongoing basis and
15     that's -- you know, that was part of the deal.
16 Q.  In the very last -- the very last sentence of Section
17     I, paragraph 1, the agreement says, "The parties
18     estimate that the inventory to be purchased is
19     estimated from $750,000 to $800,000 in value." Did you
20     have any -- did you play any part in arriving at the
21     estimate of the value of the inventory to be purchased?
22 A.  No. I -- that was something that -- I know we were
23     discussing that in our conference calls. Mr. Graves
24     was familiar with what they had over at Monsour's and
25     that's the number that ultimately they gave the lawyers