KLENDA, MITCHELL, AUSTERMAN & ZUERCHER, L.L.C.
301 N. Main, Suite 1600
Wichita, KS 67202-4888
(316) 267-0331

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MARK MONSOUR, SHEILA MONSOUR and MONSOUR'S, INC., | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| vs. | ) ) | No. 05-1204-MLB |
| MENU MAKER FOODS, INC., | ) ) | |
| *Defendant.* | ) ) ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring this action claiming defendant breached its contract to purchase the inventory of Monsour's, Inc. and to thereafter purchase substantially all of its produce needs from Monsour's, Inc.  Defendant, Menu Maker Foods, Inc. ("Menu Maker") previously filed a motion for summary judgment against the individual claims of Mark and Sheila Monsour.  This present motion is for summary judgment on all claims for damages.

Plaintiffs retained Marshall Hull, CPA, as an expert witness to quantify plaintiffs' alleged damages.  Mr. Hull was retained to estimate a loss of cash flow, rather than calculate any lost profits arising from the alleged breach.  Plaintiffs have no evidence of lost profits from this alleged breach of contract.  Plaintiffs have no evidence of the difference between the contract price and the market price for the inventory at the time of tender of delivery.

Dockets.Justia.com

Furthermore, Mr. Hull's calculations rest on pure speculation and are inadmissible. Defendant submits plaintiffs have failed to establish any damages resulting from an alleged breach of contract. This brief is submitted in support of the defendant's motion for summary judgment.

## STATEMENT OF UNDISPUTED FACTS

1.      Attached hereto as Exhibit A is a true and correct copy of the Asset Purchase Agreement entered into by the parties on January 31, 2002. *Exhibit A to the Complaint; Pretrial Conference Order, Stipulation b.1.*

2.      Pursuant to the terms of the Asset Purchase Agreement, defendant was to purchase, in addition to other intangible assets, "all of [Monsour's] inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition)." *Section 1.1 of Exhibit A.*

3.      Pursuant to the terms of the Asset Purchase Agreement, defendant was to purchase the inventory at a price equal to Monsour's cost. *Section 2.1 of Exhibit A.*

4.      Attached hereto as Exhibit B is the report of Marshal Hull, plaintiffs' expert witness on damages. *Marshal Hull deposition, p. 4, ln. 24-p. 5, ln. 1.*

5.      No profit to Monsour's was contemplated or intended by the defendant's purchase of Monsour's inventory. *Marshal Hull deposition, p. 20, ln. 3.*

6.      Pursuant to the terms of the Asset Purchase Agreement, defendant was to purchase "substantially all of its produce requirements through Monsour's." *Section XI, paragraph F, of Exhibit A.*

7.      Plaintiffs intended to charge defendant for the produce at a 10% gross margin. *Marshal Hull deposition, p. 20, ln. 20-23.*

8.     Marshal Hull was retained by plaintiffs' counsel to determine the following: if defendant had purchased the inventory of Monsour's, paid $150,000 to Mark Monsour for his covenant not to compete, and thereafter purchased substantially all of Menu Maker's produce requirements from Monsour's, would Monsour's have had enough cash flow to continue as a business. *Marshal Hull deposition, p. 4, ln. 4-9.*

9.     Marshal Hull made no calculations or estimates of Monsour's lost profits, if any, nor any projection of costs saved from an alleged breach of the Asset Purchase Agreement by defendant. *Marshal Hull deposition, p. 5, ln. 4-p.6, ln. 7; p. 57, ln. 5-14*.

10.     In making his projections of cash flow, Marshal Hull assumed Monsour's inventory to be sold to defendant at a purchase price of $750,000. *Marshal Hull deposition, p. 14, ln. 6-13*.

11.     Marshal Hull's assumption of an inventory price of $750,000 was based on the fact the parties estimated the value in the Asset Purchase Agreement at between $750,000 and $800,000, and he found one internally prepare balance sheet that showed an inventory value of $797,950 as of January 26, 2002. *Marshal Hull deposition, pp. 14, ln. 11-p. 15, ln. 19*.

12.     Attached hereto as Exhibit C is a balance sheet of Monsour's, Inc. dated December 29, 2001. *Marshal Hull deposition, p. 16, ln. 11-18.*

13.     Attached hereto as Exhibit D is a balance sheet of Monsour's, Inc. dated December 29, 2001. *Marshal Hull deposition, p. 16, ln. 22-p. 17, ln. 2.*

14.     While Exhibit C shows an inventory of $1,643,819.80 and Exhibit D shows an inventory of $997,950, Marshal Hull made no investigation or conducted any due diligence review to determine why there was a discrepancy on December 29, 2001 of

over $645,000 for the value of the inventory. *Marshal Hull deposition, pp. 16, ln. 19-ln. 21; p. 17, ln. 3-6.*

15.    Attached hereto as Exhibit E is a balance sheet of Monsour's, Inc. dated April 27, 2002. *Marshal Hull deposition, p. 17, ln. 17-22.*

16.    Attached hereto as Exhibit F is a balance sheet of Monsour's, Inc. dated April 27, 2002. *Marshal Hull deposition, p. 18, ln. 8-14.*

17.    While Exhibit E shows an inventory of $527,950 and Exhibit F shows an inventory of $337,950, Marshal Hull made no investigation or conducted any due diligence review to determine why there was a discrepancy on April 27, 2002 of $190,000 for the value of the inventory. *Marshal Hull deposition, pp. 17, ln. 23-18, ln. 14.*

18.    Mark Monsour admitted that the balance sheets and statements of assets for Monsour's, Inc. were inflated to maximize its borrowing power with its bank. *Mark Monsour deposition, pp. 182, ln. 4-184, ln. 19.*

19.    Marshal Hull was told that the amount of inventory and other assets stated on financial statements of Monsour's, Inc. were exaggerated to maintain Monsour's credit at the bank. *Marshal Hull deposition, p. 28, ln 5-13.*

20.    Marshal Hull made no accounting of the inventory actually sold by Monsour's, Inc. to anyone after execution of the Asset Purchase Agreement. *Marshal Hull deposition, pp. 27, ln. 19-p. 28, ln. 4.*

21.    At the time the parties entered into the Asset Purchase Agreement, Monsour's Inc. had a negative net worth in excess of $1,300,000, had current liabilities in excess of $3,500,000, had liabilities in excess of 1.5 times the book value of all of its

4

assets, and was overdrawn on its checking account of over $452,000. *Marshal Hull deposition, pp. 11, ln. 11-p. 13, ln. 9.*

22.    Marshal Hull assumed that all of the initial proceeds from the Asset Purchase Agreement ($750,000 for the purchase of inventory and $150,000 paid to Mark Monsour) would be paid to Bank of America to first cover the overdraft on the checking account of $452,000, and second the remainder to be applied the balance owed Bank of America of over $1,200,000. *Marshal Hull deposition, p. 33, ln. 5-11.*

23.    Marshal Hull assumed that after the initial purchase, Bank of America would continue to extend credit to Monsour's, Inc. *Marshal Hull deposition, p. 33, ln. 12-19.*

24.    Attached hereto as Exhibit G is a letter from Bank of America dated February 6, 2002 delivered to Monsour's, Inc. on that date. *Mark Monsour deposition, pp. 114, ln. 3-12.*

25.    Marshal Hull admits that obtaining continued financing from Bank of America was critical, and if that credit was not extended, the business of Monsour's, Inc. could not continue. *Marshal Hull deposition, p. 33, ln. 12-23; p. 36, ln. 9-19 .*

26.    There is no admissible evidence that Bank of America would have continued to extend credit to Monsour's Inc. after February 6, 2002. Mark Monsour relies upon an alleged oral agreement purportedly made with Michael Slack, the then President of the Bank of America branch in Pittsburg, that additional credit would have been extended to Monsour's Inc. by Bank of America. Mr. Slack, however, is dead. *Mark Monsour deposition, pp. 118, ln. 11-p. 120, ln. 12.*

27.    Marshal Hull assumed that, after selling all of its inventory, Monsour's, Inc. would continue in business buy purchasing additional inventory on credit. *Marshal Hull deposition, pp. 45, ln. 5-p. 46, ln. 10.*

28.    Marshal Hull verified that immediately prior to the Asset Purchase Agreement Monsour's, Inc. owed its trade creditors over $1 Million. *Exhibit B (Exhibits 1 and Exhibit 1.1 in the report).*

29.    Marshal Hull performed no investigation or due diligence to determine the credit worthiness of Monsour's with its vendors for it to be able to purchase additional inventory on credit after it sold its existing inventory to defendant. *Marshal Hull deposition, p. 47, ln. 8-11.*

30.    There is no evidence Monsour's, Inc. could have purchased additional inventory on credit after it sold its existing inventory to defendant.

31.    There is no evidence of the market value of Monsour's inventory at any time from and after the date of the Asset Purchase Agreement.

32.    There is no evidence of Monsour's lost profits from an alleged breach of the Asset Purchase Agreement.

33.    There is no evidence of expenses saved by defendant's alleged breach of the Asset Purchase Agreement.

34.    There is no evidence of the amount realized on the sale of inventory not purchased by defendant.

<u>**ARGUMENT AND AUTHORITIES**</u>

**A.  Summary Judgment Standards.**

In *Brooks v. City of Wichita, Kansas,* 2006 WL 1675952 (June 16, 2006) (Slip

Opinion, pp. 1-2), this Court succinctly stated the standards for summary judgment

motions:

> The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a] n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citations omitted); *see also Adams v. American Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler).*  The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be *material. See Renfro v. City of Emporia,* 948 F.2d 1529, 1533 (10th Cir.1991).  In determining whether genuine issues of material fact exist, the court "constru[es] all facts and reasonable inferences in a light most favorable to the nonmoving party." *Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.,* 26 F.3d 1508, 1513-14 (10th Cir.1994) .
>
> Defendant initially must show both an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Adler,* 144 F.3d at 670. Because plaintiff bears the burden of proof at trial, defendant need not "support [its] motion with affidavits or other similar materials *negating* [plaintiff's]" claims or defenses. *Celotex,* 477 U.S. at 323 (emphasis in original). Rather, defendant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of plaintiff's claim. *See Adler,* 144 F.3d at 671 (citing *Celotex,* 477 U.S. at 325).
>
> If defendant properly supports its motion, the burden then shifts to plaintiff, who may not rest upon the mere allegation or denials of its pleading, but must set forth specific facts showing that there is a genuine issue for trial. *See Mitchell v. City of Moore,* 218 F.3d 1190, 1197-98 (10th Cir.2000). In setting forward these specific facts, plaintiff must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F.3d at 671.  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *See Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 533 *(10th*

*Cir.1994*). Plaintiff "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988). Put simply, plaintiff must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).

Certain local rules further govern the presentation of facts and evidence. Local Rule 56.1 requires the movant to set forth a concise statement of material facts. D. Kan. Rule 56.1. Each fact must appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which the defendant relies. *See id.* The opposing memorandum must contain a similar statement of facts. Plaintiff must number each fact in dispute, refer with particularity to those portions of the record upon which he relies and, if applicable, state the number of the defendants' fact that he disputes. The court may, *but is not obligated to,* search for and consider evidence in the record that would rebut the defendant's evidence, but that plaintiff has failed to cite. *See Mitchell,* 218 F.3d at 1199; *Adler,* 144 F.3d at 672. All material facts set forth in the statement of defendant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of plaintiff. *See id.; Gullickson v. Southwest Airlines Pilots' Ass'n,* 87 F.3d 1176, 1183 (10th Cir.1996) (applying local rules of District of Utah). A standing order of this court also precludes drawing inferences or making arguments within the statement of facts.

The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible. *See Thomas v. Int'l Bus. Machs.,* 48 F.3d 478, 485 (10th Cir.1995) (internal quotations and citations omitted). For example, hearsay testimony that would be inadmissible at trial may not be included. *See Adams,* 233 F.3d at 1246. Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. *See Cole v. Ruidoso Mun. Schs.,* 43 F.3d 1373, 1382 (10th Cir.1994) (regarding conclusory statements); *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir.1995) (requiring personal knowledge). Finally, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e). *See* Fed.R.Civ.P. 56(e); D. Kan. Rule 56.1; 10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2722 (2d ed.1983) (footnotes omitted).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). If sufficient evidence exists on which a trier of fact could reasonably find for the plaintiff,

summary judgment is inappropriate.  *See Prenalta Corp. v. Colo. Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

Here, Monsour's has failed to offer any evidence of lost profits from the alleged breach of contract, or offered any evidence of the market price for goods not purchased by defendant.  Nor is there any evidence of the amount received on sale of inventory not purchased by defendant.  Rather than estimate the lost profits arising from the alleged breach of contract, or determine the difference between the market price and contract price for goods not purchased, or account for the mitigation of any loss, Marshal Hull opined as to a loss of cash flow.  This is not the proper measure of damages for a breach of this contract.  Furthermore, the evidence of loss of cash flow offered through the testimony of Marshal Hull rests on pure speculation concerning (1) the amount that should have been paid to plaintiff, and (2) whether plaintiff could have obtained additional credit to sustain its business.

**B.  Nature of Action.**

Defendant agreed to purchase the inventory of Monsour's "which is in good and wholesome condition and 100% resellable condition."  *Section 1.1.1 of the Asset Purchase Agreement.*  Defendant also agreed to purchase "substantially all of its produce requirements through Monsour's."  *Section XI.F of the Asset Purchase Agreement.* Monsour's brings this action claiming defendant breached the contract by failing to purchase the entire inventory and failing to purchase substantially all of its produce needs from Monsour's.  Plaintiff retained Marshal Hull, CPA, to render an expert opinion on the damages allegedly suffered by Monsour's from this purported breach.

Mr. Hull did not calculate lost profits from the breach.  Indeed, there were no lost profits on the sale of inventory as it was to be purchased at Monsour's cost.  Mr. Hull did

not calculate the difference between the market value of the inventory and produce and the contract price. Mr. Hull did not account for any revenue received by Monsour's from the sale of inventory and produce to others. Instead, Mr. Hull calculated a loss of cash flow, an inappropriate measure of damages for this alleged breach.

Furthermore, Mr. Hull made his calculations on two assumptions that are based on pure speculation. First, Mr. Hull assumed defendant should have paid $750,000 for the inventory. The contract called for the inventory to be purchased at Monsour's cost. There is no evidence as to what that cost was. Instead, all of the financial records report grossly inconsistent amounts for the cost of the inventory on hand. Mark Monsour even admitted that these inventory amounts on the financial statements were overstated to enable Monsour's to maintain credit at Bank of America. Second, Mr. Hull assumed that after Monsour's sold its entire inventory to defendant, it would have been able to buy additional inventory from its vendors on credit. Mr. Hull's assumption rests on pure speculation. Indeed, at the time of the Asset Purchase Agreement, Monsour's was indebted to its vendors in excess of $1 Million. All were demanding payment. The debts were reduced to confessed judgments against Monsour's by August 2002.

## B. Proper Measure of Damages.

The methodology for calculating the damages to be awarded is a question of law for the Court. *Southern Colorado MRI, LTD. V. Med-Alliance, Inc.*, 166 F.3d 1094, 1100 (10th Cir. 1999). Defendant submits that the claimed damages by Monsour's is not the appropriate measure of damages as a matter of law.

The principal place of business of Monsour's, Inc. was in Kansas. Defendant's principal place of business was in Missouri. The inventory and produce were to be

shipped from Monsour's facility in Kansas to defendant's facility in Missouri. Paragraph XI.C. of the Asset Purchase Agreement provides that the contract will be construed in accordance with the laws of Missouri. There is no difference or conflict between the laws of Kansas and Missouri on the issue of the measure of damages in this case.

Since this dispute involves a sale of goods between merchants, the Uniform Commercial Code applies. K.S.A. 84-2-102; V.A.M.S. 400.2-102. Missouri and Kansas adopted the same provision of the UCC that applies here to Monsour's measure of damages, Section 2-708. See V.A.M.S. 400.2-708 and K.S.A. 84-2-708. Section 2-708 provides:

> (1) Subject to Subsection (2) and to the provisions of this article with respect to proof of market price (section 2-723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (section 2-710), but less expenses saved in consequence of the buyer's breach.

> (2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

If Menu Maker defaulted on the contract and failed to purchase some or all of the inventory of Monsour's, Monsour's measure of damages was the difference between the contract price (here it was Monsour's cost) and the market price at the time and place of tender by Monsour's. As stated by the Kansas Supreme Court in *Desbien v. Penokee Farmers Union Co-0p. Ass'n*, 220 Kan. 358, 369, 552 P.2d 917, 926-27 (1976),

> Under the circumstances the correct measure of damages to be applied was the difference between the market price at the time and place for tender and the unpaid contract price. In some cases incidental damages are also recoverable but they are not involved in this case. This measure of damages is adopted in K.S.A.

84-2-708 and by a number of Kansas cases prior to the enactment of the Uniform Commercial Code. (*Neiswender v. Bolen*, 113 Kan. 271, 214 P. 96; and *Rock v. Gaede*, 111 Kan. 214, 207 P. 323.) It should also be noted that under K.S.A. 84-2-703, where the buyer breaches a sales contract by failing to make payment when due on or before delivery, a seller may retain possession of the goods and resell them and recover damages from the buyer where the sale price of the wheat was less than the purchase price provided for under the contract. (*International T. & R. Corp. v. Benscheidt*, 141 Kan. 416, 41 P.2d 737; Hayes v. Cardwell, 107 Kan. 556, 192 P. 757.)

The measure of damages is the same in Missouri:

Section 400.2-708, RSMo 1994, governs how damages are to be measured in such cases as this. Section 400.2-708(1) provides that American Laminates' damages should be the difference between the market price at the time and place for tender and the unpaid contract price plus any incidental damages less expenses saved by American Laminates because of Latta's cancellation. If this is inadequate to put American Laminates in as good a position as performance would have put it, § 400.2-708(2) provides that the court must award profit, including reasonable overhead, which American Laminates would have made but for the breach.

*American Laminates, Inc. v. J.S. Latta Co.,* 980 S.W.2d 12, 22 (Mo. App. 1998).

Here, Monsour's has no evidence of the difference between the market price for the inventory and the contract price.

If the difference between the market price and the contract price is an inadequate measure of damages for the purchase of inventory, Monsour's should proffer evidence of lost profits. UCC 2-708(2). No such evidence is offered by plaintiffs. Indeed, the purchase price for the inventory was Monsour's cost; so, there would be no lost profit on the inventory purchase. As noted in *Desbien, supra,* Monsour's could resell the inventory not purchased by Menu Maker and recover the difference in price. No such evidence of the resale has been offered here.

The contractual obligation of Menu Maker to purchase substantially all of its produce requirements from Monsour's is enforceable. See, K.S.A. 84-2-306; V.A.M.S 400.2-306. The appropriate measure of damages for the claim that Menu Maker did not

purchase substantially all of its produce requirements from Monsour's is Monsour's lost profits. K.S.A. 84-20708(2); V.A.M.S. 400.2-708(2). Monsour's offers no evidence of lost profits on the contract obligation to purchase substantially all of defendant's requirements for produce. Instead, Monsour's hired Mr. Hull to opine on a loss of cash flow. That is not the proper measure of damages. There is no accounting by Mr. Hull of profits lost, costs saved, or the mitigation of any damages by Monsour's. Instead, Mr. Hull projects a loss of cash flow based on several speculative assumptions.

**C. Speculation.**

Two assumptions were made by Marshal Hull in rendering his opinion on Monsour's loss of cash flow. First, he assumed the inventory to be purchased by Menu Maker had a cost of $750,000. Second, he assumed that after its sale of all of its inventory and the liquidation of all of its remaining assets, Monsour's would have continued to operate on credit from Bank of America and Monsour's vendors. These two assumptions are pure speculation.

Mr. Hull admits there is no actual accounting for the cost of Monsour's inventory at the time it was to be tendered to Menu Maker. Two different financial statements of Monsour's dated December 29, 2001, show an inventory cost of $1,643,819.80 on one statement, and $997,950 on the other. Two different financial statements of Monsour's dated April 27, 2002, show an inventory cost of $527,950 on one statement, and $337,950 on the other. Indeed, Mark Monsour admitted the financial statements of Monsour's, Inc. were inflated to encourage Bank of America to continue to extend it credit. For Marshal Hull to assume the cost of the inventory to be purchased was $750,000 rests on pure speculation.

Mr. Hull's estimate of cash flow assumes Bank of America and Monsour's vendors would continue to extend credit to Monsour's.  There is no basis for that assumption.  Indeed, as of February 6, 2002, Bank of America had notified Monsour's Inc. that there would be no further extension of credit.  Further, Monsour's owed over $1 Million to its vendors and had no commitments to be able to continue its produce purchases on credit.  For Mr. Hull to rely on these assumptions is to base his opinion on pure speculation.

## CONCLUSION

Defendant submits that for the foregoing reasons, it is entitled to summary judgment on the claim of Monssour's, Inc.

s/ Alexander B. Mitchell, II
Bar Number 8204
Attorney for Defendant
Klenda, Mitchell, Austerman & Zuercher, L.L.C.
301 N. Main, Suite 1600
Wichita, KS 67202-4888
Telephone:  (316) 267-0331
Fax:  (316) 267-0333
E-mail:  amitchell@kmazlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of August, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which should send a notice of electronic filing to Dustin DeVaughn, attorney for plaintiffs.

s/ Alexander B. Mitchell, II