MARSHALL HULL, CPA - 07/27/06

ORIGINAL

1

```
IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF KANSAS

MARY MONSOUR, SHEILA MONSOUR  )
and MONSOUR, INC.,            )
              Plaintiffs,     )
                              )
   vs.                        )  Civil Action Number
                              )     05-1204-MLB
MENU MAKER FOODS, INC.        )
              Defendant.      )
                              )
```

D E P O S I T I O N

The deposition of MARSHALL HULL, CPA, CMA taken on behalf of the Defendant pursuant to the Federal Rules of Civil Procedure before Raymond E. Barber, a Certified Shorthand Reporter of Kansas, at 300 West Douglas, Wichita, Sedgwick County, Kansas, on the 27th day of July, 2006 at 1:00 p.m.

A P P E A R A N C E S

The Plaintiff appeared by their attorney, Mr. Dustin DeVaughn of McDonald, Tinker, Skaer, Quinn & Herrington, P. A., Attorneys at Law, 500 R. H. Garvey Building, Wichita, Kansas 67202.

The Defendant appeared its attorney, Mr. Alexander B. Mitchell, II of Klenda, Mitchell, Austerman & Zuercher, LLC, Attorneys at Law, 301 North Main, Suite 1600, Wichita, Kansas 67202.

BARBER & ASSOCIATES
(316) 267-8278

4

1      It is not designated our engagement letter. I
2      do have an engagement letter, but the rate per
3      hour is not included.
4  Q.  What was the purpose of your being retained?
5  A.  Dustin had contacted me to review the
6      information, part of this case, and determine
7      whether his client had the ability to -- had
8      certain facts occurred would have had the cash
9      flow to continue as a business.
10 Q.  You rendered an opinion in this case, a written
11     opinion?
12 A.  Correct.
13 Q.  Have you been retained in any other instance to
14     render expert opinions?
15 A.  No.
16 Q.  This is your first case?
17 A.  This is my first case.
18 Q.  Have you ever had occasion to calculate losses
19     based on -- from a breach of contract, lost
20     profits?
21 A.  No.
22 Q.  Never have?
23 A.  No.
24 Q.  You recognize what I have marked as Exhibit 1
25     as your report in this case?

BARBER & ASSOCIATES
(316) 267-8278

1  A.  Yes.
2  Q.  Attached is your resume?
3  A.  Correct.
4  Q.  So in this particular instance you were
5      retained to determine whether Monsour, Inc.
6      would have been able to generate a positive
7      cash flow had Menu Maker purchased the
8      inventory consistent with the asset purchase
9      agreement and, therefore, purchased
10     substantially all of the produce from Monsour?
11 A.  Correct.
12 Q.  Are you advocating that this calculation of
13     cash flow is the correct measure of damages for
14     breach of contract?
15 A.  No.  I would assume this would be a significant
16     tool in arriving at that amount, but the
17     purpose of my report was to extend the cash
18     flows.
19 Q.  Cash flow only?
20 A.  Cash flow.
21 Q.  Correct?
22 A.  Correct.
23 Q.  Not to consider what lost profits there may
24     have been, correct?
25 A.  Not specifically lost profit.  A lot of the

6

|    |    |                                                                |
|----|----|----------------------------------------------------------------|
| 1  |    | features of my report of course will be                        |
| 2  |    | considered in that calculation.                                |
| 3  | Q. | Well, have you arrived at any opinion as to                    |
| 4  |    | whether there was or was not lost profits on                   |
| 5  |    | this contract?                                                 |
| 6  | A. | No.  The terms of my engagement were for the                   |
| 7  |    | cash flow projection.                                          |
| 8  | Q. | The opinions that you expressed in Exhibit 1                   |
| 9  |    | were within a reasonable degree of accounting                  |
| 10 |    | certainty or probability?                                      |
| 11 | A. | Correct.                                                       |
| 12 | Q. | What do you mean by that phrase?                               |
| 13 | A. | I was given certain information and extended                   |
| 14 |    | that based on accounting principles to arrive                  |
| 15 |    | at an end result of cash flow.                                 |
| 16 | Q. | And it is expressed in a reasonable degree of                  |
| 17 |    | accounting certainty means what?                               |
| 18 | A. | The accounting certainty results -- the                        |
| 19 |    | practice of accounting, accounting for cash for                |
| 20 |    | business, expenditures, certainty is the                       |
| 21 |    | correctness of that amount.  Reasonableness                    |
| 22 |    | means with a -- I have not done this before.                   |
| 23 |    | The legal term I am not sure of.  Reasonable                   |
| 24 |    | would mean a high probability.                                 |
| 25 | Q. | High probability or more likely than not, which                |

1   immediately prior to the asset purchase
2   agreement it was insolvent?
3   A.  ~~They had negative equity.~~
4   Q.  The question I asked you calls for a yes or a
5       no.
6   A.  Insolvent being that they didn't have the
7       ability to continue?
8   Q.  Correct.
9   A.  I would say they were not insolvent, as my cash
10      flow analysis demonstrated.
11  Q.  Would you agree they had a negative net worth
12      in excess of a million 3, as shown in Exhibit 1
13      to your report?
14  A.  I would agree.
15  Q.  Would you agree that the liabilities are in
16      excess of one and a half times the book value
17      of all assets?
18  A.  I would agree.
19  Q.  Do you agree the current liabilities went in
20      1999 from 364,000 to 3-1/2 million in 2001?
21  A.  I had reviewed historical balance sheet
22      information.
23  Q.  Not what I asked you.
24  A.  I don't recall the specific number of the date
25      you referenced.

| | | |
|---|---|---|
| 1 | Q. | As shown on Exhibit 1.0 to your report |
| 2 | | Exhibit 1? |
| 3 | A. | Correct. |
| 4 | Q. | That was as of January 31, 2002? |
| 5 | A. | Correct. The financial statement may have been |
| 6 | | dated -- it is actually January 26, 2002. |
| 7 | Q. | Okay. Had a negative cash balance of in excess |
| 8 | | of 452,000? |
| 9 | A. | Correct. |
| 10 | Q. | Now, as of that date, January 26, 2002, are you |
| 11 | | saying it was a viable going concern even |
| 12 | | without the Menu Maker purchase? |
| 13 | A. | I wasn't asked to specifically evaluate |
| 14 | | every -- |
| 15 | Q. | I am just asking you a yes or a no. You looked |
| 16 | | at the financials. Can you tell whether it was |
| 17 | | a viable going concern at the end of |
| 18 | | January 2002? |
| 19 | A. | This purchase agreement was critical to -- |
| 20 | Q. | Okay. Go ahead. You are answering a yes and |
| 21 | | no question in a roundabout way, but go ahead. |
| 22 | A. | I did not do a forecast to pursue what other |
| 23 | | options, if any, there may have been available |
| 24 | | to make that conclusion. |
| 25 | Q. | Wouldn't you agree that from your review it was |

| | | |
|---|---|---|
| 1 | | in financial difficulty? |
| 2 | A. | Yes, I would. |
| 3 | Q. | And that this asset purchase agreement may have |
| 4 | | been some resolution of that difficulty? |
| 5 | A. | Yes, I would agree with that. |
| 6 | Q. | Okay. In your report you assume that the |
| 7 | | inventory of Monsour was $750,000, correct? |
| 8 | A. | That was to be acquired as part of the purchase |
| 9 | | agreement. |
| 10 | Q. | Correct? |
| 11 | A. | That was spelled out per the purchase agreement |
| 12 | | in a range of 750 to 800,000, I recall, and I |
| 13 | | used the lower end of that range. |
| 14 | Q. | So in answer to my question, yes, you used |
| 15 | | $750,000 as a stated inventory of Monsour as of |
| 16 | | the asset purchase? |
| 17 | A. | The balance in my report shows a total |
| 18 | | inventory of 797,950 as of that date, which |
| 19 | | 700 -- |
| 20 | Q. | That is not what I asked you. Have you got |
| 21 | | Exhibit 1 there? |
| 22 | A. | I do. |
| 23 | Q. | Looking at Exhibit 1, which is your report, |
| 24 | | down at the bottom of the first page you state |
| 25 | | that you had assumed it was $750,000, correct? |

Case 6:05-cv-01204-JTM    Document 87-2    Filed 08/14/2006    Page 8 of 19

16

| | | |
|---|---|---|
| 1 | | statements that have -- |
| 2 | Q. | I am not talking about subsequently prepared. |
| 3 | | I am talking about those that were in existence |
| 4 | | at or about the time the asset purchase |
| 5 | | agreement was made. |
| 6 | A. | There is another internally prepared financial |
| 7 | | statement that I think has -- let me find it to |
| 8 | | say specifically, but the inventory, I believe, |
| 9 | | is higher on that statement. I will find it |
| 10 | | specifically. |
| 11 | Q. | Let me give them to you here. Let me show you |
| 12 | | Deposition Exhibit 3. It purports to be an |
| 13 | | internal balance sheet as of December 29, 2001. |
| 14 | | Did you review this statement? |
| 15 | A. | I have seen that statement. |
| 16 | Q. | Shows an inventory of a million 600 some |
| 17 | | thousand dollars? |
| 18 | A. | Correct. |
| 19 | Q. | Did you do anything to verify that amount as of |
| 20 | | December 29th? |
| 21 | A. | I did not. |
| 22 | Q. | Same date, December 29th, I will have you -- |
| 23 | | hand you Exhibit 4. Have you seen this before? |
| 24 | | It is Bates stamped 11688. |
| 25 | A. | Yes, I have seen it before. |

BARBER & ASSOCIATES
(316) 267-8278

```
 1   Q.   It has an inventory of $997,950, correct?
 2   A.   Correct.
 3   Q.   Did you do anything to reconcile the fact that
 4        these are 700,000 roughly, 650,000 apart on the
 5        same date?
 6   A.   I did not.
 7   Q.   Let me show you Deposition Exhibit 5, which is
 8        a March 30, 2002 balance sheet.  Have you seen
 9        this before?
10   A.   I have.
11   Q.   It shows an inventory of $527,950, correct?
12   A.   Correct.
13   Q.   Would that have included -- been the inventory
14        after some purchases by Menu Maker, or do you
15        know?
16   A.   I do not know.
17   Q.   That is as of March 30, 2002.  Let me show you
18        what I have marked as Exhibit 6.  It is a
19        balance sheet as of April 27, 2002?
20   A.   Correct.
21   Q.   And it shows an inventory of $527,950?
22   A.   Correct.
23   Q.   Do you have any explanation as to why it would
24        be that much?
25   A.   Reviewing the internally prepared financial
```

|   |   |   |
|---|---|---|
| 1 |   | statements subsequent to the agreement were |
| 2 |   | beyond the scope of what I was engaged to do. |
| 3 | Q. | I didn't ask you that. Do you have any |
| 4 |   | explanation for why the figure was 500 and some |
| 5 |   | thousand in that April 27, 2002 statement? |
| 6 | A. | I could speculate, but that is all it would be |
| 7 |   | is speculation. |
| 8 | Q. | Let me show you another one internally |
| 9 |   | generated from Monsour, been marked as |
| 10 |   | Deposition Exhibit 7, it has the same date, |
| 11 |   | April 27, 2002. Now the inventory is $377,950. |
| 12 |   | Did you do any due diligence to figure out why |
| 13 |   | the discrepancy between Exhibit 6 and 7? |
| 14 | A. | I did not. |
| 15 | Q. | Would you agree that the inventory amount that |
| 16 |   | you picked would be a driving, significantly |
| 17 |   | driving figure for your cash flow calculations? |
| 18 | A. | The purchase price would be a driving factor, |
| 19 |   | as stated in the purchase agreement. That was |
| 20 |   | from information provided to me, the amount of |
| 21 |   | inventory that was expected to have been |
| 22 |   | purchased. |
| 23 | Q. | Not what I asked you. I asked you if you would |
| 24 |   | agree that the amount of the inventory that you |
| 25 |   | plugged into your calculations of cash flow is |

20

```
 1        costs, correct?  Paragraph 2.1, I mean.
 2   A.   2.1, correct.
 3   Q.   So can we agree that there would be no profit
 4        to Monsour for the purchase of its inventory at
 5        cost?
 6   A.   Correct.
 7   Q.   And you have made some comments in your report
 8        about the produce being purchased.  Do you know
 9        what the price was for the produce?
10   A.   Ongoing?
11   Q.   Yes.
12   A.   From Menu Maker was to be cost plus 10 percent,
13        is that what you are referencing?
14   Q.   You mentioned that in your report.  I don't
15        find any 10 percent anywhere in this asset
16        purchase agreement.  I want to know where you
17        got that.
18   A.   That was through discussions with Dustin and
19        confirmed with Mark Monsour.
20   Q.   He was going to charge 10 percent markup?
21   A.   Correct.
22   Q.   On his produce?
23   A.   Correct.
24   Q.   Let me direct your attention to page 8 of that
25        asset purchase agreement.  Subparagraph E,
```

| | | |
|---|---|---|
| 1 | Q. | Which was what? |
| 2 | A. | I find specifically 235,000 -- $232,957. |
| 3 | Q. | That is from Exhibit -- |
| 4 | A. | That is on page 5 of my report. |
| 5 | Q. | Are you talking about the $232,000 figure? |
| 6 | A. | Correct. |
| 7 | Q. | This is from the inventory. I am talking |
| 8 | | produce. |
| 9 | A. | Okay. |
| 10 | Q. | What produce, what money came into Monsour from |
| 11 | | Menu Maker's produce purchases? |
| 12 | A. | Subsequent to the purchase agreement? |
| 13 | Q. | Yes. |
| 14 | A. | That was not part of my -- |
| 15 | Q. | You didn't do that calculation? |
| 16 | A. | I didn't do that calculation. |
| 17 | Q. | Didn't consider that amount? |
| 18 | A. | I did not. |
| 19 | Q. | Now, when Menu Maker did not purchase what |
| 20 | | Mr. Monsour claims it should have purchased, |
| 21 | | something happened to that inventory. Do you |
| 22 | | know what happened? |
| 23 | A. | I do not know specifically what happened. |
| 24 | Q. | Do you know where the proceeds are? |
| 25 | A. | I do not. |

1  Q.    You haven't accounted for those at all in your
2        calculations?
3  A.    I have not. It is beyond the scope of what I
4        was asked to do.
5  Q.    Backing up to the amount of inventory that you
6        used of $750,000 for your calculations, did you
7        review Mr. Monsour's deposition testimony? Let
8        me ask you simply, do you recall or have you
9        been told that these internally generated
10       financial statements exaggerated the inventory
11       and other assets to maintain the credit at the
12       bank?
13 A.    I have heard that, yes.
14 Q.    Was there any reason for you to accept the
15       figure of $750,000 other than that was what was
16       mentioned in the asset purchase agreement as
17       the parties' estimate of value?
18 A.    It was consistent with the balance sheet figure
19       that I used as part of my calculation in the
20       report.
21 Q.    Which balance sheet? Because I have shown you
22       several that have all over the board in
23       inventory from a million 6 to 500 and
24       something.
25 A.    Consistent with the inventory of $797,950.

33

1  A.  If I can clarify your last question, I was
2      acting upon information given to me. I did not
3      ~~assume that information was provided to me.~~
4      That was part of my conclusion.
5  Q.  I said assumed. You took as true that $750,000
6      paid to Monsour, Inc. and $150,000 paid to Mark
7      Monsour for his covenant not to compete would
8      have gone to the bank first to satisfy the
9      shortage of cash, second to be applied on a
10     line of credit?
11 A.  Correct.
12 Q.  Then didn't you assume that the Bank of America
13     would continue to extend credit to Monsour?
14 A.  Mark Monsour indicated that they had
15     discussions going and he expected that to
16     happen, correct.
17 Q.  And did you do any independent due diligence to
18     verify that statement?
19 A.  I did not.
20 Q.  Wasn't that important for your calculations to
21     determine whether or not Monsour would have
22     credit available to continue to do business?
23 A.  That fact is important to my calculation.
24 Q.  Were you furnished any correspondence from the
25     bank indicating that it was not extending

| | | |
|---|---|---|
| 1 | | able to extend additional credit? |
| 2 | A. | That is beyond the scope of what I was asked to |
| 3 | | do. |
| 4 | Q. | So your answer is no, you can't? |
| 5 | A. | Can I say they were going to do -- |
| 6 | Q. | Yes. |
| 7 | A. | No, I understood that to be true from Mark |
| 8 | | Monsour. |
| 9 | Q. | Did you take any steps to inquire of Bank of |
| 10 | | America directly whether they would have |
| 11 | | continued to extend credit to Monsour, Inc.? |
| 12 | A. | I did not. |
| 13 | Q. | Yet while they pulled the plug and stopped |
| 14 | | loaning money to Monsour was critical to your |
| 15 | | calculations, wasn't it? |
| 16 | A. | Continued financing was critical. |
| 17 | Q. | If they didn't get the loan they wouldn't |
| 18 | | continue; is that a fair statement? |
| 19 | A. | That would be a fair statement. |
| 20 | Q. | Now, in addition to this $900,000 coming from |
| 21 | | Menu Maker, you made a calculation in your |
| 22 | | report as a liquidation of prepaid assets, |
| 23 | | correct? |
| 24 | A. | Part of my calculations did say that prepaid |
| 25 | | assets would be offset by accrued expenses and |

```
1   A.   Correct.
2   Q.   And that substantially all of the produce of
3        Monsour would have been purchased, correct?
4   A.   Correct.
5   Q.   What collateral then is there for the bank to
6        continue to loan money to Monsour if all of the
7        inventory, produce and other goods, are gone?
8   A.   My calculation doesn't assume this happens
9        overnight.  If they are an ongoing business,
10       they purchased additional inventory, they sell
11       the inventory, they would maintain an inventory
12       balance, that would be collateral.  They would
13       also have additional customers that would
14       create other receivables.  I didn't assume that
15       these receivables would be collected overnight.
16       So the same types of receivables would -- same
17       types of assets could serve as collateral.
18  Q.   I don't think that exactly answered my
19       question.  I was asking you what collateral
20       would have been -- would have remained for the
21       bank to continue to extend credit to Monsour.
22       Part of your answer was, as I understood it,
23       they would buy additional inventory and that
24       could be pledged as collateral?
25  A.   Correct.
```

46

1  Q.   Is that what you said?
2  A.   Correct.
3  Q.   Now, that would depend upon Monsour's credit
4       worthiness with its vendors, would it not?
5  A.   It would.
6  Q.   Did you do any independent due diligence to
7       determine what that status was between Monsour
8       and its vendors?
9  A.   Other than Mark's representation that that
10      could be established, no.
11 Q.   So you are relying on Mark Monsour to tell you
12      that at Bank of America things are hunky-dorey
13      and the same with the vendors?
14 A.   I didn't say hunky-dorey.
15 Q.   Everything is fine, continue to march, keep the
16      doors open, continue to do business because I
17      know my bank, they will loan me money and I can
18      get the produce from my vendors; is that
19      essentially what he told you?
20 A.   No.  He said the bank was willing to work with
21      them.  Absent those collateral items, it is in
22      the bank's best interest to work with a
23      customer to help them succeed.  That allows
24      them to not only possibly recoup their
25      principal, but continue with a customer.

1  Q.   So you are prepared to give an opinion as to
2       what is the best interest of Bank of America?
3  A.   No.
4  Q.   Well, are you saying that Bank of America would
5       have probably loaned money and kept the doors
6       open without any collateral?
7  A.   No.
8  Q.   Did you do any due diligence to determine what
9       the credit worthiness of Monsour was with its
10      vendors?
11 A.   I did not.
12 Q.   Were you made aware of the forbearance
13      agreement, forbearance and settlement agreement
14      entered August 12, 2002, which I have marked as
15      Hull Deposition Exhibit 10?
16 A.   I was aware of the issue, but did not review
17      that agreement as part of my report.
18 Q.   You did not look at the agreement?
19 A.   I don't believe that I did.
20 Q.   Were you made aware that as of August 2002
21      Monsour owed $402,000 to eight of its produce
22      vendors?
23 A.   What was the date?  I am sorry.
24 Q.   August 12, 2002.
25 A.   Okay.  Again, my report starts --

|   |    |                                                          |
|---|----|----------------------------------------------------------|
| 1 |    | efforts, so --                                           |
| 2 | Q. | No, you did not?                                         |
| 3 | A. | I am not for sure specifically what you are --           |
| 4 |    | as part of this calculation (indicating)?                |
| 5 | Q. | Yes. Did you consider any of the expenses                |
| 6 |    | saved by the fact that Menu Maker did not pay            |
| 7 |    | $750,000?                                                |
| 8 | A. | I did not. That was beyond the scope of what I           |
| 9 |    | was asked to do.                                         |
| 10| Q. | Would you agree with me that in any calculation          |
| 11|    | of lost profits expenses saved should be                 |
| 12|    | considered?                                              |
| 13| A. | You said any calculation. It would be a factor           |
| 14|    | in calculation of lost profits.                          |
| 15| Q. | Would you also agree that the proper measure of          |
| 16|    | damages for a breach of contract would be lost           |
| 17|    | profits as opposed to lost cash flow?                    |
| 18|    | MR. DeVAUGHN: Objection, calls for                       |
| 19|    | legal conclusion.                                        |
| 20| A. | Again, that is beyond what I was asked to do as          |
| 21|    | part of this.                                            |
| 22| Q. | I know, but 16 years as a CPA, wouldn't you              |
| 23|    | agree that breach of contract measure of                 |
| 24|    | damages is lost profits?                                 |
| 25|    | MR. DeVAUGHN: Same objection.                            |