**REGIER CARR & MONROE, L.L.P.**
CERTIFIED PUBLIC ACCOUNTANTS

MEMBERS OF
THE AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS
THE DIVISION FOR CPA FIRMS

January 30, 2006

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
300 West Douglas, Suite 100
Wichita, Kansas 67202

Re: Monsour's, Inc.

Dear Mr. DeVaughn:

You have asked me to evaluate whether or not Monsour's Inc. (hereafter referred to as Monsour's) would have been able to generate on going positive cash flow had Menu Maker Foods, Inc. (hereafter referred to as Menu Maker) purchased Monsour's existing inventory at an amount consistent with that stated in the January 31, 2002 Asset Purchase Agreement (Bates numbered beginning 10007 and hereafter referred to as Purchase Agreement), and had Menu Maker also subsequently purchased substantially all of their produce from Monsour's Inc. as described in the Purchase Agreement.

My evaluation is based upon projections of what would have occurred had the terms of the Purchase Agreement been fulfilled because Menu Maker's initial purchase of Monsour's inventory was significantly less than stated in the Purchase Agreement, and because Menu Maker's did not subsequently purchase any significant amounts of produce from Monsour's.

Monsour's Inc. Financial Condition at Time of Agreement
The first phase of my evaluation was to gain an understanding of Monsour's financial condition at the time of the Purchase Agreement.

The financial condition of Monsour's Inc. at the time of the agreement is summarized at **Exhibit 1.0**. This schedule was prepared from Monsour's internally prepared financial statements dated January 26, 2002 (Bates numbered 11468-11469) and is supported by documentation obtained from interrogatories, documentation provided to me related to Bank of America's loan documents, tax returns and discussions with Mark Monsour.

From this initial point of evaluation, there were expected to be two immediate significant sources of cash flow generated from the Purchase Agreement. The most significant source of immediate cash flow was to have been from the sale of Monsour's existing inventory (excluding produce) which had an estimated value of $750,000 to $800,000. For purposes of my evaluation, I have used $750,000, the lowest end of the stated range. A second source of significant cash flow per the Purchase Agreement was a base amount of $150,000, which was received related to Mark Monsour's covenant not to compete.

300 WEST DOUGLAS, SUITE 100 ❖ WICHITA, KANSAS 67202-2905 ❖ 316 264-2335 ❖ FAX
TUCSON ❖ WICHITA ❖ TULSA
www.rcmllp.com

EXHIBIT B

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 2 of 6

Based upon discussion with Mark Monsour, I have assumed that the $750,000 to have been received from the initial sale of inventory and $150,000 received from the covenant not to compete would have first been applied to deficit cash, and then applied to the $975,000 note payable to Bank of America. The book value of the remaining assets, excluding property and equipment, approach the book value of current liabilities, leaving a remaining balance of current liabilities of less than $3,000. The application of cash described in this paragraph is demonstrated in **Exhibit 1.1**.

From my evaluation of Monsour's financial condition at the time of the Purchase Agreement, it is apparent that Monsour's Inc.'s ability to service existing debt and continue operating was dependent upon the cash flow to be generated from the initial sale of inventory of $750,000 and the receipt of $150,000 related to Mark Monsour's covenant not to compete. Given the receipt of the expected proceeds from the Purchase Agreement and the liquidation of other operating assets and liabilities, Monsour's remaining liabilities would have consisted of notes payable. The servicing of these notes payable is considered as part of my cash flow analysis of continuing operations in **Exhibit 2.3**, and assumes there are no significant change to the terms of the notes payable that existed at the time of Purchase Agreement.

Projected Operations Following the Purchase Agreement
Projected future operations of Monsour's following the Purchase Agreement are summarized at **Exhibit 2.0**. The starting point of the evaluation was the Proforma Statement (Bates document 10065). It is my understanding that this Proforma Statement was created by Mark Monsour and by Gene Fields, the general manager of Monsour's prior to the Purchase Agreement, who was subsequently hired by Menu Maker following the Purchase Agreement.

The following discusses the basis used to determine future cash flow activity to be derived from operating activities.

*Revenue*
As described in the Purchase Agreement, Menu Maker was to have purchased substantially all of their produce from Monsour's following the Purchase Agreement. Per discussion with Mark Monsour, the price of the produce sold to Menu Maker was to have been Monsour's cost, plus 10%. **Exhibit 2.1** reflects Menu Maker's actual subsequent purchases of produce, which was obtained from Menu Maker's responses to interrogatories. Based upon an average of the actual subsequent annual purchases of produce from 2002 through September 30, 2005, and multiplying this average by 95% to represent substantially all of Menu Maker's produce purchases, an estimate of produce that would have been purchased by Menu Maker from Monsour's is $1,350,000 per year.

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 3 of 6

Other revenue sources were to have been from an on going customer (Harp's) and other sales to miscellaneous customers. The covenant not to compete applied to institutional customers (schools, restaurants, nursing homes, etc.), but not to grocery and related stores. The estimates of these sales were based upon the Proforma Statement. It is my understanding that the projected sales to Harp's are based upon historical sales, with no growth anticipated and that other retail sales projection are based upon historical sales to various customers.

*Cost of Sales*
As described above, the price of sales to Menu Maker was based upon Monsour's cost, plus 10%. The cost of these sales was derived from the estimated annual sales to Menu Maker of $1,350,000.

The cost of sales to Harp's and other retail sales is based upon a review of Monsour's prior tax returns (Bates document 11747 to 11883) and internal financial statements (Bates document 10004) as reflected in **Exhibit 2.2** and resulted in an average ratio of cost of sales to sales for the period July 1, 1998 to December 31, 2001 of 24.47%. Although this ratio is significantly less than the ratio in the Proforma Statement, for purposes of conservatism, this ratio was used for the cash flow analysis.

*Operating Expenses*
Operating expenses were initially derived from the Proforma Statement. I then compared the expenses per the Proforma statement to the five most recent tax returns filed by Monsour's (Bates documents numbered 11747-11883). I also reviewed each operating expense line item of the Proforma Statement and the tax returns with Mark Monsour. For purposes of my evaluation, adjustments were made to the Proforma amounts where it appeared necessary based upon comparison to historical costs per the tax returns or discussion with Mark Monsour. Information provided to obtain amounts used for operating expenses are listed in **Exhibit 2.4**.

*Other Revenue*
The Proforma Statement identified certain other rebate income based upon a rate of 35 cents per case. Because the estimate of sales to Menu Maker based upon subsequent actual Menu Maker purchases are less than those identified in the Proforma Statement and other sales estimates have been rounded down from the Proforma Statement, I have reduced the rebate income by approximately 20% of the amount identified in the Proforma Statement.

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 4 of 6

*Debt Servicing*

Debt and the related monthly servicing requirement are illustrated in **Exhibit 2.3**. As previously discussed in **Exhibit 1.1**, Mark Monsour has indicated that portions of the debt to Bank of America would likely have been repaid with proceeds from the initial sale of inventory and the covenant not to compete. For purposes of my evaluation, I have assumed that these proceeds would have been applied to the $975,000 note payable. Per Mark Monsour, negotiations were on going with Bank of America for renewal of the balloon note payable which was scheduled to mature April 2, 2002 and were expected to be renewed under consistent terms.

Terms of the Bank of America debt were obtained from copies of actual loan documents (Bates documents 12029-12030 and 12031-12033).

Terms of the other debt were obtained from interrogatories and discussion with Mark Monsour. The significant portion of other notes payable is a $600,000 payable to Union National Bank. Per Mark Monsour, this debt was personally guaranteed by an individual who had the ability to perform on the guarantee. This note payable required monthly interest only payments. The balance of other notes payable were payable to related parties who also required monthly interest only payments. Per Mark Monsour, the debt to Union National Bank did have a stated maturity, but due to the strength of the individual guarantee, would continue to have been renewed at consistent terms. Per Mark Monsour, debt to related parties would have also been renewed at consistent terms.

Summary

As previously noted, the Purchase Agreement included covenants not to compete which limited Monsour's ability to continue serving certain markets that it had historically serviced. By foregoing these markets, Monsour's financial condition and ability to continue operating following the Purchase Agreement were dependent upon Menu Maker fulfilling the other aspects of the Purchase Agreement, including the purchase of approximately $750,000 of inventory.

From my evaluation of projected cash flows described in **Exhibit 2.0**, had Monsour's had the opportunity to continue operations and had Menu Maker purchased substantially all of their produce requirement from Monsour's, gross profit from sales to Menu Maker would have approximated $122,727 per year and an overall positive cash flow of approximately $53,670 per year could have been expected.

In contrast, without the proceeds received from the initial sale of inventory and without the subsequent sales of produce to Menu Maker as described in the Purchase Agreement, Monsour's was not able to continue operating activities. Even if Monsour's would have been able to continue operating activities without the receipt of the $750,000 from the initial sale of inventory, without the gross profit of $122,725 derived from subsequent sales to Menu Maker, Monsour's would have experienced negative cash flow of approximately $69,055 per year ($53,670 per **Exhibit 2.0** less $122,725).

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 5 of 6

Pursuant to your direction, you have asked me to extend the differences in cash flow resulting from Menu Maker's failure to purchase the initial inventory as described in the Purchase Agreement, and the resulting differences in cash flow from Menu Maker not purchasing substantially all of the subsequent produce purchases from Monsour's over the six year term of the not to compete agreement between Mark Monsour and Menu Maker. Additionally, you have asked that I include in this calculation the amount of salary that is included in the cash flow projections that was not paid to Mark Monsour.

| | | |
|---|---:|---:|
| Projected annual positive cash flow had Menu Maker purchased substantially all of their produce requirement from Monsour's | $ 53,670 | |
| Projected annual negative cash flow had Monsour's continued operations and Menu Marker not purchased their produce requirement from Monsour's | 69,055 | |
| Net difference (gross profit on projected Menu Maker sales) | 122,725 | |
| Mark Monsour's annual salary included within operating expenses | 78,000 | |
| Combined net difference in annual cash flow | $ 200,725 | |
| Term of covenant not to compete | 6 years | |
| Extended difference in combined cash flow over the term of the not to compete agreement | $ 1,204,350 | $ 1,204,350 |
| Expected proceeds from initial sale of inventory at time of Purchase Agreement | $ 750,000 | |
| Actual proceeds from initial sale of inventory at time of Purchase Agreement | 232,957 | |
| Net difference in initial sale of inventory at time of Purchase Agreement | $ 517,043 | 517,043 |
| Cumulative differences in cash flow | | $ 1,721,393 |

The opinions herein are to a reasonable degree of accounting certainty and are based upon the information provided to me as described in this report.

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 6 of 6

My resume is attached as Exhibit 3.0.

Please contact me if you have any questions on this report.

Yours very truly,

*Marshal Hull*

Marshal Hull, CPA, CMA
Of Regier Carr & Monroe, LLP

## Exhibit 1.0

### Financial Position Immediately Prior to Purchase Agreement

| | | |
|---|---|---:|
| Cash | $ | (452,447) |
| Accounts Receivable-Trade | | 933,825 |
| Notes Rec | | 7,820 |
| Inventory | | 797,950 |
| Prepaid Expenses | | 16,050 |
| Total current assets | | 1,303,198 |
| Net property & equipment | | 977,426 |
| Other assets | | 61,520 |
| Total assets | $ | 2,342,144 |
| Accounts payable-trade | $ | 1,017,983 |
| Sales and payroll taxes payable | | 7,969 |
| Interest expense payable | | 7,291 |
| Accrued expenses | | 44,150 |
| | | 1,077,393 |
| Notes payable-Bank of America | | 975,000 |
| Note payable-other | | 916,088 |
| Notes payable-Bank of America | | 693,917 |
| | | 2,585,005 |
| Total liabilities | | 3,662,398 |
| Total stockholders equity/(deficit) | | (1,320,254) |
| Total liabilities and stockholders equity | $ | 2,342,144 |

**EXHIBIT 1.1**

## Financial Position for Purposes of Ongoing Cash Flow Analysis

| | Balance Immediately Prior to Purchase Agreement | Initial Sale of Inventory to Menu Makers | Covenant Not to Compete | Payment of Bank of America Debt | Offset Other Assets & Liabilities | Remaining Balance |
|---|---|---|---|---|---|---|
| Cash | $ (452,447) | $ 750,000 | $ 150,000 | $ (440,000) | $ (7,553) | $ - |
| Accounts Receivable-Trade | 933,825 | | | | (933,825) | - |
| Notes Rec | 7,820 | | | | (7,820) | - |
| Inventory | 797,950 | (750,000) | | | (47,950) | - |
| Prepaid Expenses | 16,050 | | | | (16,050) | - |
| Total current assets | 1,303,198 | - | 150,000 | (440,000) | (1,013,198) | - |
| Net property & equipment | 977,426 | | | | | 977,426 |
| Other assets | 61,520 | | | | (61,520) | - |
| Total assets | $ 2,342,144 | $ - | $ 150,000 | $ (440,000) | $ (1,074,718) | $ 977,426 |
| Accounts payable-trade | $ 1,017,983 | $ - | $ - | $ - | $ (1,015,308) | $ 2,675 |
| Sales and payroll taxes payable | 7,969 | | | | (7,969) | - |
| Interest expense payable | 7,291 | | | | (7,291) | - |
| Accrued expenses | 44,150 | | | | (44,150) | - |
| | 1,077,393 | - | - | - | (1,074,718) | 2,675 |
| Notes payable-Bank of America | 975,000 | | | (440,000) | | 535,000 |
| Note payable-other | 916,088 | | | | | 916,088 |
| Notes payable-Bank of America | 693,917 | | | | | 693,917 |
| Total liabilities | 2,585,005 | - | - | (440,000) | - | 2,145,005 |
| | 3,662,398 | - | - | (440,000) | (1,074,718) | 2,147,680 |
| Total stockholders equity/(deficit) | (1,320,254) | - | 150,000 | - | (1,074,718) | (1,170,254) |
| Total liabilities and stockholders equity | 2,342,144 | - | 150,000 | (440,000) | - | 977,426 |

## Exhibit 2.0

### Projected Future Operations

|  | Monthly | Annual |
|---|---:|---:|
| **Revenue** | | |
| Menu Maker Foods | 112,500 | 1,350,000 |
| Harp's | 190,000 | 2,280,000 |
| Other retail | 215,000 | 2,580,000 |
|  | 517,500 | 6,210,000 |
| **Cost of Goods Sold** | | |
| Menu Maker Foods | (102,273) | (1,227,273) |
| Harp's | (143,507) | (1,722,084) |
| Other | (162,390) | (1,948,674) |
|  | (408,169) | (4,898,031) |
| **Gross Profit** | 109,331 | 1,311,969 |
| **Operating Expenses** | | |
| Salaries | | |
| Warehouse labor | (10,780) | (129,360) |
| Drivers ($10/hour + benefits) | (9,816) | (117,792) |
| Sales | (17,400) | (208,800) |
| Office Payroll | (2,360) | (28,320) |
| Non-Wage Personnel Cost | (4,000) | (48,000) |
|  | (44,356) | (532,272) |
| **Lease Payments and Auto Loan** | | |
| Forklifts | (6,912) | (82,944) |
| Pallet Jacks | (900) | (10,800) |
| Company Auto-P&I | (4,000) | (48,000) |
|  | (11,812) | (141,744) |
| **Repairs & Maintenance** | (5,000) | (60,000) |
| **Bad Debts** | (2,000) | (24,000) |
| **Real Estate and Property Taxes** | (1,000) | (12,000) |
| **Advertising** | (850) | (10,200) |
| **Other Expenses** | | |
| Entertainment | (120) | (1,440) |
| Tractors | (8,400) | (100,800) |
| Trailers | (6,680) | (80,160) |
| Fuel | (2,400) | (28,800) |
| Utilities | (5,472) | (65,664) |
| Cell Phone | (240) | (2,880) |
| Phone | (2,700) | (32,400) |
| Insurance | (4,000) | (48,000) |
| Workmens Comp | (1,200) | (14,400) |
| Company Car/Insurance | (400) | (4,800) |
| Fuel/Service (Company cars) | (320) | (3,840) |
| Supplies | (1,000) | (12,000) |
| NDS/SPS TrackMax Computer (License Fees) | (800) | (9,600) |
| Professional Fees | (500) | (6,000) |
| Other Expense | (500) | (6,000) |
|  | (34,732) | (416,784) |
| **Rebate Income** | 13,000 | 156,000 |
| **Cash Flow From Operations** | 22,581 | 270,969 |
| **Debt Service (Principal and Interest)** | | |
| Bank of America Loan #9004 (Principal and Interest) | (11,457) | (137,490) |
| Bank of America Line of Credit (Interest only) | (2,452) | (29,425) |
| Other notes payable (Interest only) | (4,199) | (50,385) |
|  | (18,108) | (217,299) |
| **Net Cash Flow** | 4,472 | 53,670 |

## Exhibit 2.1

### Menu Maker, Inc.'s Subsequent Purchases of Produce

| Period | | Amount | |
|---|---|---|---|
| 2002 | $ | 1,547,292 | |
| 2003 | $ | 1,348,925 | |
| 2004 | $ | 1,382,533 | |
| 1/1/05 to 9/30/05 | $ | 1,063,131 | ($1,417,508.65 if annualized) |
| | | | |
| Average of 2002 to 2005 | $ | 1,424,065 | (2005 annualized amount used) |
| Ratio of "Substantially All" | | 95% | |
| | $ | 1,352,861 | |
| | | | |
| Estimate of Substantially All Produce Purchases for Purposes of Cash Flow | $ | 1,350,000.00 | |

## Exhibit 2.2

### Cost of Sales Ratio

| | Per Tax Returns | | | Per Internal Financial Statement |
|---|---|---|---|---|
| | 7/1/1998 6/30/1999 | 7/1/1999 6/30/2000 | (Six months) 7/1/2000 to 12/31/2000 | FYE 12/31/2001 |
| Gross Sales | $ 7,901,537 | $ 10,465,305 | $ 5,715,234 | $ 15,002,041 |
| Returns and allowances | (767) | (2,415) | (2,589) | |
| Net Sales | 7,900,770 | 10,462,890 | 5,712,645 | 15,002,041 |
| Cost of goods sold | (6,064,276) | (7,892,440) | (4,371,218) | (11,012,739) |
| Gross profits | $ 1,836,494 | $ 2,570,450 | $ 1,341,427 | $ 3,989,302 |
| | | | | |
| Gross Profit Margin | 23.24% | 24.57% | 23.48% | 26.59% |
| | | | | |
| | | Average of 7/1/98 to 12/31/01 | | 24.47% |

## Exhibit 2.3

### Monthly Debt Service Requirement

|  | Balance Per Exhibit 1.2 | Monthly Cash Requirement | Terms |
|---|---|---|---|
| Bank of America |  |  |  |
| Balloon | $ 535,000 | $ 2,452 | Monthly interest only payment based upon Prime Rate, plus .75% |
| Monthly amortizing | $ 693,917 | $ 11,457 | Monthly principal & interest as stated in promissory note |
| Other Notes Payable |  |  |  |
| Union National Bank | $ 600,000 |  |  |
| Earl McGavran | $ 100,000 |  |  |
| Terri Monsour | $ 38,000 |  |  |
| Corrine Monsour | $ 81,912 |  |  |
| Other | $ 96,175 |  |  |
|  | $ 916,088 | $ 4,199 | Monthly interest only payment based upon Prime Rate, plus .75% |
|  | $ 2,145,004 | $ 18,108 |  |

Note: The following table documents prime rate. For purposes of this evaluation, 4.75% was used.

| Prime Rate | | | | | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2004 | 2005 |
| 1-Jan | 9.50% | 4.75% | 4.25% | 4.00% | 5.25% |
| 1-Feb | 8.50% | 4.75% | 4.25% | 4.00% | 5.25% |
| 1-Mar | 8.50% | 4.75% | 4.25% | 4.00% | 5.50% |
| 1-Apr | 8.00% | 4.75% | 4.25% | 4.00% | 5.75% |
| 1-May | 7.50% | 4.75% | 4.25% | 4.00% | 5.75% |
| 1-Jun | 7.00% | 4.75% | 4.25% | 4.00% | 6.00% |
| 1-Jul | 6.75% | 4.75% | 4.00% | 4.25% | 6.25% |
| 1-Aug | 6.75% | 4.75% | 4.00% | 4.25% | 6.25% |
| 1-Sep | 6.50% | 4.75% | 4.00% | 4.50% | 6.50% |
| 1-Oct | 6.00% | 4.75% | 4.00% | 4.75% | 6.75% |
| 1-Nov | 5.50% | 4.75% | 4.00% | 4.75% | 7.00% |
| 1-Dec | 5.00% | 4.25% | 4.00% | 5.00% | 7.00% |

Copyright 2006 MoneyCafe.com

**Exhibit 2.4**

## Operating Expenses

*Salaries*-There was no change to the estimated salary expenses per the Proforma Statement based upon comparison to similar expense per the prior tax returns or discussion with Mark Monsour. It should be noted that Mark Monsour's salary of $1,500 per week, or $78,000 per year, is included within sales salaries.

*Lease Payments*-No change from the lease expense per the Proforma Statement amounts deemed necessary.

*Repairs and Maintenance*-There were no amounts projected for repairs and maintenance on the Proforma Statement. These amounts had ranged from $52,980 for the six months ended December 31, 2000 to $260,154 for the year ended June 30, 1999 on the tax returns. Per discussion with Mark Monsour, one freezer that had required significant repairs in the past was no longer needed and had been shut off, therefore, would not require any further repairs. Other significant repairs in prior years, such as repairs to compressors, were not expected to recur. Per Mark Monsour, on going repairs should be less than half of the years which had had the lowest repair costs. For purposes of this evaluation, this projection was rounded up to $5,000 per month, or $60,000 per year.

*Bad Debts*-There were no amounts projected for bad debts on the Proforma Statement. Per discussion with Mark, he would estimate 1% of other retail sales as bad debt. This amount is in excess of bad debts reported on prior tax returns.

*Real Estate Taxes*-There were no amounts projected for real estate taxes on the Proforma Statement. Based upon discussion with Mark Monsour, certain parcels of real estate had been sold and real estate taxes would have been less than half of the historical costs. For purposes of this evaluation, this projection was rounded up to $1,000 per month, or $60,000 per year.

*Advertising*-There were no amounts projected for advertising on the Proforma Statement. Per Mark Monsour, advertising in the phone book and other miscellaneous advertising would have likely continued to promote other retail sales. Mark Monsour estimated $850 per month, or $10,250 per year, to be spent on advertising.

*Insurance*-There were no amounts projected for insurance on the Proforma Statement. Per discussion with Mark Monsour, hazard insurance on property would have declined from prior levels due to disposition of certain property, but would have been otherwise consistent with historical costs. Mark Monsour estimated $4,000 per month, or $48,000 per year, to be spent on insurance.

(Continued)

Exhibit 2.4 (Continued)

## Operating Expenses (Continued)

*Professional Fees*-There were no amounts projected for professional fees on the Proforma Statement. Per discussion with Mark Monsour, assistance with tax return preparation and other compliance issues would have been required. Per Mark Monsour, approximately $6,000 annually would have been required.

*Other expenses*-There was no miscellaneous expense included on the Proforma Statement. Per Mark Monsour, he would anticipate no more the $500 per month to be required for unforeseen expenditures.

The following remaining expenses were included on the Proforma Statement and appear to be consistent with prior tax returns and discussion with Mark Monsour's expectations:
- Entertainment
- Tractors
- Trailers
- Fuel
- Utilities
- Cell Phone
- Telephone
- Workmens compensation
- Company Car/Insurance
- Fuel/Service (Company Cars)
- Supplies
- License fees

MARSHAL HULL, CPA, CMA
REGIER CARR & MONROE, L.L.P.
300 West Douglas, Suite 100
Wichita, Kansas 67202
Telephone 316-264-2335
Fax 316-264-1489

**Experience**
- Over Fifteen Years of Public Accounting

**Special Expertise**
- Audit, Accounting and Taxation of Not-for-Profit Organizations, Small Businesses, Financial Institutions, and Corporations
- Management Advisory Services for Not-for-Profit Organizations and Small Businesses

**Professional Activities**
- American Institute of CPA's
- Kansas Society of CPA's
- Institute of Management Accountants
- Leadership Council of Kansas Society of CPA's
- Peer Review Committee of Kansas Society of CPA's
- 2000-2005-Board of Directors, Wichita Chapter of Institute of Management Accountants; President 2005
- Former member of AICPA Accounting and Auditing Focus Panel
- Former member of an AICPA Standard Setting Panel - Accounting & Reporting-Managerial and Governmental and Not-for-Profit Organizations

**Civic Organizations**
- 2001-2003-Advisory Board of Central Branch YMCA (Young Men's Christian Association), Central Branch Co-chair of 2002-2003 Strong Kids Campaign, Metro Finance Committee
- 2001-2005-Board of Directors and treasurer – Dress for Success of Wichita (a non-profit organization assisting low-income women make transitions into the workplace)
- 2000-2005-Board of Directors and treasurer – Downtown Y's Mens Club (a service club to the Wichita YMCA)
- 2006-Board of Directors of Respite Outreach Care for Kids Organization, Inc. (ROCKO)
- 2002-2004-Board of Directors and President of Augusta Little League Basketball
- 2003-Current-Board of Directors of Augusta Little League Baseball

**Education and Certification**
- Wichita State University, BBA, 1989
- Certified Public Accountant, 1992
- Certified Management Accountant, 2000

**Other**
- Wichita Business Journal's 40 Under 40, 2004