IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MARK MONSOUR, SHEILA MONSOUR and MONSOUR'S, INC. | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 05-1204-MLB |
| v. | ) ) | |
| MENU MAKER FOODS, INC., | ) ) | |
| Defendant. | ) ) | |

_____

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, by and through their counsel of record, Dustin L. DeVaughn and Richard W. James of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., respond to Defendant's Motion for Summary Judgment.

**INTRODUCTION**

Defendant filed this Motion for Summary Judgment seeking "summary judgment on all claims for damages." (Defendant's Memorandum in Support of Motion for Summary Judgment, p.1). While it is very difficult to discern defendant's actual arguments, it is clear that defendant is alleging that plaintiff's expert's calculations "rest on pure speculation and are inadmissible." (Defendant's Memorandum in Support of Motion for Summary Judgment, p.2).[1]

---

[1] Clearly, defendant is attacking the methodology of plaintiff's expert. This argument is repeated throughout the memorandum. However, these arguments are not appropriate to a motion for summary judgment; these are arguments that are properly made in a *Daubert* motion to exclude the testimony of plaintiff's expert. In the Final Pretrial Order, the court set the date for any Daubert motion as 28 days before the trial. Because defendant has not moved to exclude the testimony of Mr. Marshall Hull under the standards enunciated in *Daubert*, the court should see these attacks as what they are – an attempt to deflect the

Dockets.Justia.com

As will be made clear in this motion, defendant's arguments lack merit because expert testimony is not required to establish damages.  In addition, defendant's arguments relate to an expert's methodology in reaching his conclusions.    If defendants seek to exclude the testimony of plaintiff's expert, the appropriate tool is a *Daubert* motion.

## I.     RESPONSE TO STATEMENT OF FACTS

1.     Uncontroverted that defendant attached a copy of the contract between the parties.

2.     Uncontroverted.

3.     Controverted.  The Agreement provides that "the seller's costs will be computed at the Seller's NDS computer system average cost of last 3 purchases, except that if such price exceeds the current market cost for any such item then the price for such item will be negotiated by buyer and seller."  (Asset Purchase Agreement, § 2.1, attached as **Exhibit 1**).

4.     Uncontroverted.

5.     Uncontroverted that no profit was envisioned regarding the sale of the inventory.[2]    Controverted as to any implication that Plaintiff was not

---

court's attention from the real issue.  The real issue is whether defendants fulfilled their obligations under the contract.  Kansas law does not require the testimony of experts to establish damages, thus this motion is premature because defendant is predicting what the evidence will be at trial.  Defendant's arguments are "begging the question."

[2] The contract provided for the sale of two separate categories of goods.  First, the contract provided a $750,000 payment for the "inventory."  The inventory was the dry goods and food service (excluding produce).  The second category was "produce."  The produce was sold according to the pricing terms in the contract and is separate from the inventory.

damaged. Because of defendant's breach, plaintiff was damaged in the amount of $750,000.

6. Uncontroverted, but incomplete. The quoted section adds numerous additional terms and conditions labeled A-H under Section XI F. The Asset Purchase Agreement contained numerous additional negotiated terms. The terms are:

a. The quality of all products must meet or exceed current Menu Maker Foods, Inc., house acceptability standards.

b. The minimum fill rate of all orders received may not be less than 99.25% of acceptable quality produce under normal circumstances and conditions. Acts of God, severe whether, trucking strikes, and otherwise similar situations and not in the control of Sellers and Buyer will not effect the validity of this Agreement.

c. Credit Terms will be Net 21 days the first 90 days, and Net 26 days thereafter.

d. Marketing – will not begin until agreed to both parties and produce associated with it until Seller like program in place:

1. Includes our current level of support at $4,125.00 quarterly, which will be deducted on a quarterly basis, toward the Menu Maker Foods, Inc., "BBP" Plan.

2. Current shelter income of .25 cents per case shall be paid by Monsours to Menu Maker Foods, Inc. quarterly by the 10th of the month following the end of the quarter.

3. Sales support staff will be available for two sales meetings annually, participate in our annual food show and key end user calls upon request.

4. Shall provide promotional items and appropriate allowances for flyers, auction, food show, and other BBP activities.

e. Pricing – Monsours will need to maintain a competitive cost of goods to insure our current gross profit levels are not jeopardized.

f. Pre Cut Produce – Will require further discussion. Seller understands the importance of this program to Buyer and will present programs similar to currently being used by Buyer for Buyer's review and approval. Seller believes that this new program will increase Buyer's market advantage and Buyer will move to this

new program only after approval from a representative designated by Buyer.

      g.     Product Specification – Below are a few item specific requirements, and unless other wise stated, agreed quality will be USDA quality standards or better at time of receiving.

          1.     Colorado Potato – Must be US No. 1 "Centennial" when available

          2.     Apples – Washington State – US Extra Fancy

          3.     Oranges – Sunkist US 1

          4.     Lunch Bunch Grapes – Corrin Shipper Brand

          5.     West Coast – Head Lettuce, Green Leaf, & Romaine – all Liner Pack

          6.     Idaho Potatoes – Grade US No. 1 "Burbank" when available

          7.     Buyer shall purchase no less than 99.25% of approximate weekly quantities of the specialty and limited life items as estimated by Buyer on the preceding Monday.

      h.     Time lines –

          1.     Pricing for the following week will need to be faxed by no later than 11:15 a.m. on Thursdays.

          2.     Order Entry – Buyer will supply Seller with approximate quantities and delivery dates for the following week by 2 p.m. on the preceding Monday for the following week. Specialty items will need to be exact or within the agreed fill rate requirements.

              a)     To meet the 99.25% fill rate required for Buyer, Seller will need orders placed with a 2 day lead time. Every available effort to accommodate add-ons and late items (both normal stock and specialty items) will be made. Add-ons or late entry items will not be included in the 99.25% required fill rate.

(Asset Purchase Agreement, attached as **Exhibit 1**).

      7.     Uncontroverted.

      8.     Controverted. Mr. Hull stated in his report that he was asked to evaluate:

    "[w]hether or not Monsour's Inc. . . . would have been able to generate on going positive cash flow had Menu Maker Foods, Inc. . . . purchased Monsour's existing inventory at an amount consistent with that stated in the January 31, 2002 Asset Purchase Agreement . . . and had Menu Maker also subsequently purchased

substantially all of their produce from Monsour's Inc. as described in the Purchase Agreement."

(Report of Marshall Hull, p. 1, attached as **Exhibit 2**).

9.     Controverted. Marshall Hull stated in his report that

"had Monsour's had the opportunity to continue operations and had Menu Maker purchased substantially all of their produce requirement from Monsour's, gross profit from sales to Menu Maker would have approximated $122,727 per year and an overall positive cash flow of approximately $53,670 per year could have been expected."

(Report of Marshall Hull, p. 4, attached as **Exhibit 2**).

10.     Controverted.  Mr. Hull did not just assume that the value of the inventory was $750,000.   The Asset Purchase Agreement specifically notes that Menu Maker agreed to purchase the inventory and "the parties estimate that the inventory to be purchased is estimated from $750,000 to $800,000 in value."  In fact, Mr. Hull used the most conservative estimate of damage when he based his figures on $750,000. (Asset Purchase Agreement, §1.1(2), attached as **Exhibit 1**).

11.     Uncontroverted that the parties agreed in the Asset Purchase Agreement that the value of the inventory was $750,000-800,000.

12.     Uncontroverted that Defendant has attached a balance sheet dated 12/29/2001.

13.     Uncontroverted that Defendant has attached a balance sheet dated 12/29/2001.

14.     Controverted.   Plaintiff's expert used the terms provided in the contract and agreed upon by the parties to establish the value of inventory. (Asset Purchase Agreement, § 1.1(2), attached as **Exhibit 1**).

15.     Uncontroverted that Defendant has attached a balance sheet dated 4/27/2002.

16.     Uncontroverted that Defendant has attached a balance sheet dated 4/27/2002.

17.     Controverted.   Plaintiff's expert used the terms provided in the contract and agreed upon by the parties to establish the value of inventory. (Asset Purchase Agreement, § 1.1(2), attached as **Exhibit 1**).

18.     Controverted.  Mr. Monsour testified that the numbers were inflated for "bank purposes" and "to stop a loan from being called."  (Deposition of Mark Monsour as Corporate Representative, p. 182, lines 21-25 and p. 183, lines 1-2, attached as **Exhibit 3**).[3]

19.     Uncontroverted.

20.     Uncontroverted, but incomplete.  Mr. Monsour and Monsour's Inc. were under a non-compete agreement and thus could not sell the inventory to a third party.  (Asset Purchase Agreement, § 2.5, attached as **Exhibit 1**).

21.     Uncontroverted.

22.     Controverted.  Mr. Monsour's agreement with Bank of America provided that significant portions of the money received from the sale of the inventory and the proceeds from the non-compete agreement would be paid to

---

[3] Defendants took the deposition of Mark Monsour as a corporate representative and a separate deposition of Mark Monsour in his personal capacity.  The corporate representative deposition is labeled as Exhibit 3 and the personal deposition is labeled as Exhibit 6.

Bank of America.   (Letter from Bank of America dated February 6, 2002, attached as **Exhibit 4**).   See also Deposition of Mark Monsour as Corporate Representative, p. 117, lines 22-25 and p. 118 lines 1-5, attached as **Exhibit 3**).

23.     Controverted.  Mr. Hull did not assume this; he was told that Bank of America would continue to extend credit.  (Deposition of Marshall Hull, p. 33, line 1- p. 34, line 25, attached as **Exhibit 5**).

24.     Uncontroverted that the letter is attached.

25.     Uncontroverted

26.     Plaintiff objects to this "statement."  This is not a statement of fact, but is rather argument.   This statement fails to comply with Local Rule 7.6 because this statement is not supported by reference to the record.  In addition, this statement contains argument which must be excluded from the Statement of Facts.   *See also Desmarteau v. City of Wichita*, 64 F.Supp.2d 1067 (D.Kan. 1999).

27.     Controverted.   Mr. Hull stated that had Menu Maker fulfilled its obligations under the contract, Monsour's would continue to operate.  Mr. Hull summarized his opinions best when he said:

> "[i]f they are an ongoing business, they purchased additional inventory, they sell the inventory, they would maintain an inventory balance, that would be collateral. They would also have additional customers that would create other receivables. I didn't assume that these receivables would be collected overnight."

(Deposition of Marshall Hull, p. 45 lines 8-15, attached as **Exhibit 5**).

28.     Uncontroverted

29.     Controverted.  See Response to ¶ 27.

30.     Controverted.    Mark Monsour testified that after he paid the proceeds of the Asset Purchase agreement to Bank of America, the bank was going to continue to provide credit to Monsour's.  (Deposition of Mark Monsour as Corporate Representative, p. 118, lines 5-25 p. 119, lines 1-25, attached as **Exhibit 3**).  In addition, this fact statement fails to comply with Local Rule 7.6, which requires citation to the record in this case.

31.     Controverted. The parties agreed (in the Asset Purchase Agreement) that the value of the inventory was $750,000-800,000. In addition, this fact statement fails to comply with Local Rule 7.6, which requires citation to the record in this case.

32.     Controverted.  The sales of produce were to be sold at 10% gross. (Deposition of Mark Monsour as Corporate Representative, p. 74, line 1–p. 75, line 5, attached as **Exhibit 3**).  In addition, this fact statement fails to comply with Local Rule 7.6, which requires citation to the record in this case.

33.     Controverted. This fact statement fails to comply with Local Rule 7.6, which requires citation to the record in this case.  In addition, defendant appears to be asserting an affirmative defense as it relates to mitigation of damages.  Plaintiff objects to this argument contained in the Statement of Facts.

34.     Controverted.   Any inventory not sold to defendant could not be sold to any other entity because of the non-compete agreement, therefore the entire value of the inventory ($750,000) represents the measure of damages for this provision in the contract. (Asset Purchase Agreement, §2.5, attached as

**Exhibit 1**). In addition, this fact statement fails to comply with Local Rule 7.6, which requires citation to the record in this case.

## II.    ADDITIONAL STATEMENTS OF FACT

1.    Mark Monsour grew up working with his family in the family business. (Deposition of Mark Monsour in his personal capacity, p. 13, lines 8-24, attached as **Exhibit 6**).

2.    Mr. Monsour's family has owned the business for decades. *Id.*

3.    Mr. Monsour began working at Monsour's when he was 12 or 13 years old. *Id.*

4.    In 1996-97, Mr. Monsour returned to help his family run the business. (Deposition of Mark Monsour in his personal capacity, p. 18, lines 17-24, attached as **Exhibit 6**).

5.    Mr. Monsour served as the produce buyer for the company. (Deposition of Mark Monsour in his personal capacity, p. 19, lines 1-7, attached as **Exhibit 6**).

6.    After aquiring the business he operated the business and served as its President. (Deposition of Mark Monsour in his personal capacity, p. 19, lines 15-25, attached as **Exhibit 6**).

## III.    ARGUMENT AND AUTHORITIES

### A.    SUMMARY JUDGMENT STANDARD

Rule 56 governs summary judgment. It is axiomatic that summary judgment shall be granted, "where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact . . . " Fed. R. Civ. P. 56(c).

However, this is not the end of the discussion.  The party seeking summary

judgment bears the burden of demonstrating an absence of a genuine issue of

material fact.  *Sally Beauty Co. v. Beauty Co, Inc.*, 304 F.3d 964 (10th Cir. 2002).

The Court also stated that "a fact is "material" if it "might affect the outcome of the

suit under the governing law," and a "genuine" issue exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."

*Occusafe v. EG&G Rocky Flats, Inc.*, 54 F.3d 618 (10th Cir. 1995).  The cautious

nature of courts in granting summary judgment is justified "[b]ecause a summary

judgment denies one of the litigants his or her right to a trial, courts have

generally construed the pleadings liberally in favor of the party opposing the

motion."  *Richards*, 19 Kan.App.2d 950, 957, 879 P.2d 638, 644 (citing *Oller v.

Kincheloe's*, Inc., 235 Kan. 440, 448, 681 P.2d 630 (1984).

### B.     KANSAS LAW IS APPLICABLE FOR DEFENDANT'S MOTION.

Defendant asks this court to grant it summary judgment by presenting

presents arguments in its motion under Kansas and Missouri law without any

argument about which state law actually applies to the present motion.  However,

long standing precedent demonstrates that a Federal Court sitting in diversity

applies the law of the forum unless the forum's choice of law rules point to

different forum's law. In *Pepsi-Cola Bottling Company of Pittsburgh, Inc. v.

Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2006), the Tenth Circuit declared

unequivocally that in a diversity action, "we apply the substantive law of the

forum state, including its choice of law rules." *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-97 (1941).

The Tenth Circuit recognized in *Pepsi Cola*, that the Kansas choice of law rules permit contracting parties to agree to a choice of law clause in a contract. The plaintiff in *Pepsi Cola* sued in Kansas federal court and the Court applied New York law because the contract contained a choice of law clause. The parties chose New York as the state whose laws would govern the interpretation and enforcement of the contract. *Id.* However, the Kansas Court applied Kansas substantive law to the other claims in the case. For example, Kansas law governed the general tort claims and claims for breach of fiduciary duties. *See Id.* at 1264, 1266.

Under Pepsi Cola, this Court should apply Missouri law to the interpretation and enforcement of the contract. However, determining whether an expert is required to testify regarding damages is not a question regarding the interpretation or enforcement of the contract. On this issue, nothing points to Missouri law.[4] This is a question outside the scope of the contract, and thus Court should apply Kansas law in deciding whether to grant Defendant's Motion for Summary Judgment.

---

[4] Plaintiff believes that the Pepsi Cola case controls this issue and that Kansas law applies. However, even assuming *arguendo* that Missouri law might apply to this issue, it is irrelevant. The result is the same. In *Margolies v. McCleary, Inc.*, 447 F.3d 1115 (8th Cir. 2006), the Eighth Circuit determined that "[u]nder Missouri law, [the plaintiff] was not required to prove the exact amount of his damages, but only to produce evidence which established with reasonable certainty. **Moreover it is the fact of damages, rather than the amount of damages, which must be proven with reasonable certainty.**" *Id.* at *5 (citing *Cole v. Control Data Corp.*, 947 F.2d 313, 319 (8th Cir. 1991) (emphasis added).

### C.    KANSAS LAW DOES NOT REQUIRE EXPERT TESTIMONY TO PROVE DAMAGES.

The Kansas Supreme Court stated unequivocally that "Kansas law does not require that a plaintiff must present expert testimony on a claim for damages." *Hare v. Wendler*, 263 Kan. 434, 949 P.2d 1141, Syl. ¶ 2 (1997).    In *Hare*, the court decided an issue that was remarkably similar to issue at bar.    The defendant in that case filed a motion for summary judgment claiming that plaintiff lacked expert testimony on the issues of causation and damages.    The Supreme Court disposed of the motion as it related to damages in two short sentences. The Court held, "We note that the district court's requirement that [plaintiff] present expert testimony on damages is not established in our case law. **Kansas law does not require that a plaintiff must present expert testimony on a claim for damages.**" *Id.* at 1143 (emphasis added).    The result is the same in this case.

Defendant also suggests that plaintiff's expert did not offer any opinions on lost profits.    However, it is clear under Kansas law that plaintiff need not offer expert testimony on this issue. The *Hare* decision indicates that Mark and Sheila Monsour (or anyone else having personal knowledge of the facts) may testify regarding the lost profits. *Id.*    At that point, it is a question for the jury.    The trier of fact will weigh the credibility and make a determination.

### D.    PLAINTIFF MARK MONSOUR CAN TESTIFY REGARDING THE AMOUNT OF DAMAGES.

Defendant suggests that this Court should enter summary judgment on all

claims for damages[5] because plaintiffs' expert has failed to make any calculations regarding lost profits and calculations supporting any offsets that could occur if the goods were sold to other parties. This argument fails because Mark Monsour can offer testimony on this issue. In *Telluride Power Co. v. Williams*, 164 F.2d 685 (10th Cir. 1947), the owner of a mine sued the power company for damages sustained when the mine flooded. The mine owner testified regarding the amount of damages. On appeal, the Tenth Circuit held that in an action for negligent flooding of a mine, the owner of the mine may testify regarding the damages because he was experienced in the mining business and was familiar with the mine involved. In fact, the court held that "his testimony in the nature of an estimate of loss suffered by reason of the damage [to the property] was admissible; and, standing alone, it was sufficient to take the case to the jury on that element of damage. " *Id.* at. 688.

The *Telluride Power Co.* case is analogous to the case at bar. Mr. Monsour's experience and expertise is comparable to the Mine Owner's expertise. Mr. Mark Monsour has tremendous experience with the grocery business. (Statements of Additional Fact ¶ 1-5). Mark and his family have owned Monsour's for decades. (*Id.*) He grew up around his father and uncles while they ran the family business. (*Id.*) Mr. Monsour has been around the

---

[5] Defendant does not articulate what it is seeking from the court. Defendant does not explain in its motion whether it is seeking the court's intervention to determine what the appropriate measure of damages may be or how much damages plaintiff is entitled to, or even asking the court to determine that plaintiff has suffered no damages. Plaintiff suggests the reason for this is that the motion is actually a motion attacking plaintiff's expert. However, defendant never applies the standard in *Daubert*. Defendant is simply lobbing arguments about the alleged failure of the expert hoping that some of the arguments will stick.

grocery business his entire life. (*Id.*)  In approximately 1996-97, Mr. Monsour returned to help his family run the business.  Statement of Additional Fact ¶ 4. He also became the produce buyer for the company before he decided to acquire the business. (Statement of Additional Fact ¶ 5).   After acquiring the business, Mr. Monsour operated the business and served as its president.  (Statement of Additional Fact ¶ 6).  Mr. Monsour is permitted to offer testimony on the amount of damages in addition to the calculations put forth by plaintiff's expert, Mr. Marshall Hull.

### E.    K.S.A. 84-2-709 PROVIDES AN ALTERNATIVE REMEDY – AN ACTION FOR PRICE.

Defendant cites the UCC sections found at K.S.A. 84-2-708 and V.A.M.S. § 400.2-708 as providing the proper measure of damages in a breach of contract case for the sale of goods.  This is a red herring and a nonsensical argument. K.S.A. 84-2-708 is only part of the story.  Under this section, plaintiff will be required to present evidence of the unpaid contract price (plus incidental damages) but less expenses saved.  If this calculation is inadequate, plaintiff will be required to offer evidence of lost profit (including reasonable overhead), plus incidental damages (minus a credit for any proceeds of sale of the goods to others).   Defendants suggest that summary judgment is appropriate because plaintiff's expert did not offer this opinion.  Yet, under Kansas law, this is not required.

Defendants ignore the remedy available to plaintiff under K.S.A. 84-2-709. Under K.S.A. 84-2-703, the remedies available to a seller are cumulative.  An aggrieved seller may proceed under 84-2-706, 84-2-708, or 84-2-709.   In fact, in

*Sharp Electronics Corp. v. Lodgistix*, 802 F.Supp. 370, 378 (D. Kan. 1992), the court held that "failure to succeed in the action for the contract price [84-2-709] will not prevent the unsuccessful seller from bringing an action for damages. The cumulative nature of remedies under § 84-2-703 allows the seller to bring an action under § 84-2-708 after his action for the price fails." *Id.  See also Smyers v. Quartz Work Corp.*, 880 F.Supp. 1425, 1434 (D. Kan. 1995) (holding that the "seller has several available remedies, including recovery of damages for repudiation, (§ 84-2-708) and, in appropriate circumstances, recovery of the contract price § 84-2-709").

Essentially, a plaintiff seller has separate possible avenues for recovery and defendants fail to acknowledge this possibility.   Plaintiff seeks what the contract provides $750-800,000 for the inventory and for the damages caused by defendant's failure to purchase substantially of its produce from Monsour. Defendant breached this agreement and plaintiff is owed damages because of that breach.  This motion for summary judgment fails to address all of plaintiff's possible avenues for recovery and this court should deny the motion.

### F.    DEFENDANT DOES NOT OFFER EVIDENCE TO REFUTE THE TESTIMONY OF PLAINTIFF'S EXPERT.

Plaintiff's expert relies on the language of the Asset Purchase Agreement to calculate whether Monsour's would have been able to continue operating if defendants would have met their obligation under the contract. The value of the inventory was agreed to by the parties; in fact, **the amount that defendant**

**agreed to pay for the inventory is specifically memorialized in the contract.**[6]

Defendant wants this court to ignore the plain language of the contract and to punish the plaintiff for defendant's breach.    Defendant attempts to confuse this issue with smoke and mirrors.    In reality, this case is about a breach of a contract.  The defendant failed to perform and plaintiff has been damaged as a result.

> **G.    DEFENDANT FAILS TO COMPLY WITH THE RIGOROUS REQUIREMENTS OF *DAUBERT*.**

Defendant also attempts to attack the methodology of plaintiff's expert without having to comply with the rigorous requirements of *Daubert*.  Admissibility of an expert's opinion is governed by the Federal Rules of Evidence and *Daubert*.  "The admissibility of expert testimony in federal courts is governed by Fed. R. Evid. 702, which superseded the *Frye* general acceptance test." *Koch*, 49 F. Supp 2d at 1265 (citing *Daubert* 509 U.S. 579, 587-88, 113 S. Ct. 2786, 125 L. Ed. 2d 469). Rule 702 provides:

> If scientific, technical or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an
> opinion or otherwise, if (1) the testimony **is based
> upon sufficient facts or data**, (2) the testimony is

---

[6] It is important to point out the $750,000-800,000 was the agreed upon price for the inventory. The contract provided a very specific methodology for calculating this amount.  It is an negotiated term in the contract. It was agreed to by the parties when the contract was formed.   It is also important to note that defendant is confusing the distinct requirements of the contract.  Two separate groups of goods were to be sold in this contract.  First, defendant agreed to buy Monsour's entire food service inventory for $750,000-$800,000, second, Menu Maker also agreed to buy substantially of its produce from Monsour's. These are two distinct parts of the contract.

the product of reliable principles and methods, and (3) the witness **has applied the principles and methods reliably to the facts of the case**.

Fed. R. Evid. 702 (emphasis added).

In *Daubert*, the Supreme Court held that the trial judge, pursuant to Fed. R. Evid. 104(a), must first determine whether the testimony will convey "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact at issue." *Daubert*, 509 U.S. at 592, 113 S. Ct. 1286; *Koch*, 49 F.2d at 1266.   As part of this determination, the trial judge must decide whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.  *Daubert*, 509 U.S. at 592-93, 113 S. Ct. 2786; *Koch*, 49 F.2d at 1266.

In other words, all expert testimony offered pursuant to Rule 702 is subjected to the heightened requirements of *Daubert* and its progeny.  Therefore, the trial judge must "ensur[e] that an expert's testimony both rests on a **reliable foundation** and is **relevant** to the task at hand."  *Kumho*, 526 U.S. at 141, 119 S. Ct. at 1171 (emphasis added).  Plaintiff has not made any of these arguments and is attacking the methodology of plaintiff's expert without following the rigorous guidelines set out in *Daubert* and this Court should see past that attempt and deny defendants motion.

## H.    DEFENDANT'S ARGUMENTS ARE MISDIRECTED.

Defendant suggests that Monsour's has failed to offer any evidence of lost profits from the breach of contract, or "offered any evidence of the market price for goods not purchased by defendant."  (Defendant's Memorandum in Support

of Motion for Summary Judgment, p. 9) However, these arguments are non-sequiturs because Plaintiff's expert was not retained to make any calculations regarding lost profits. In addition, defendant suggests that plaintiff has failed to offer proof of the value of goods that were sold to other parties. This argument lacks merit because Mark Monsour was under a non-compete agreement and thus could not sell the produce to others without violating the agreement. Defendants want this Court to ignore this provision and to find that plaintiff failed to offer evidence of the possible sale of produce to other entities when the contract specifically prohibits this. Whether plaintiff could have sold the inventory to another party is a question of fact that the jury must determine when evaluating the non-compete agreement. The trier of fact must determine if, under the circumstances, the inventory in its perishable condition could have been sold to a third party without violating the non-compete agreement. This is not an issue that can be resolved with this motion and this Court should deny the motion accordingly.

## CONCLUSION

WHEREFORE for the above and foregoing reasons, plaintiff requests that this court deny defendants motion for summary judgment.

Respectfully Submitted,

___/s/ Dustin L. DeVaughn_____
Dustin L. DeVaughn, #16559
Richard W. James, #19822
Donald H. Snook, #21775
*Attorney for Plaintiffs*
McDONALD, TINKER,
SKAER, QUINN & HERRINGTON, P.A.
R.H. Garvey Building
300 West Douglas Avenue, Suite 500
P.O. Box 207
Wichita, KS 67202-2909
Telephone: (316) 263-5851
Fax: (316) 263-4677
Email: ddevaughn@mtsqh.com
         rjames@mtsqh.com
         dsnook@mtsqh.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of September,  2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

John Val Wachtel
Alex Mitchell
Klenda, Mitchell, Austerman
 & Zuercher,
Suite 1600, 201 North Main,
Wichita, KS 67202
Tele: 316.267.0221
Fax: 316.267.0333
jvwachtes@kmazlaw.com
Attorney for Defendant

Jeffrey Eastman
Keleher & Eastman Law Firm
403 N.W. Englewood Rd.
Gladstone MO 64118
Business Tele: 816.452.6030
Fax: 816.455.0969
Home: 816.436.1506
Cell: 816.213.0819
jse@keleher-eastman.com
Attorney for Defendant

　　　　　　　　　　　/s/  Dustin L. DeVaughn
　　　　　　　　　Dustin L. DeVaughn, #16559
　　　　　　　　　Richard W. James, #19822
　　　　　　　　　Donald H. Snook,#21775
　　　　　　　　　*Attorney for Plaintiffs*
　　　　　　　　　McDONALD, TINKER,
　　　　　　　　　SKAER, QUINN & HERRINGTON, P.A.
　　　　　　　　　R.H. Garvey Building
　　　　　　　　　300 West Douglas Avenue, Suite 500
　　　　　　　　　P.O. Box 207
　　　　　　　　　Wichita, KS 67202-2909
　　　　　　　　　Telephone: (316) 263-5851
　　　　　　　　　Fax: (316) 263-4677
　　　　　　　　　Email: ddevaughn@mtsqh.com
　　　　　　　　　　　　　rjames@mtsqh.com
　　　　　　　　　　　　　dsnook@mtsqh.com