## EXHIBIT LIST

1.     Asset Purchase Agreement

2.     Report of Marshall Hull

3.     Deposition of Mark Monsour as Corporate Representative

4.     Letter from Bank of America dated February 6, 2002

5.     Deposition of Marshall Hull

6.     Deposition of Mark Monsour in his personal capacity

Dockets.Justia.com

## ASSET PURCHASE AGREEMENT

THIS AGREEMENT, made this 31st day of January, 2002, by Menu Maker Foods, Inc. ("BUYER"), and Monsour's, Inc. ("Monsour's") and Mark D. Monsour and Sheila. D. Monsour of 112 N. Elm, Pittsburg, Kansas, 66762 (collectively "SELLER").

### RECITALS

A.  Seller Monsour's, Inc. is the owner of a food distribution business operating under a trade name of "Monsour's" (the "Grocery Business") and also operates a produce business.

B.  Seller desires to sell and Buyer desires to buy from Seller certain of the assets of Seller's Grocery Business.

C.  Seller will retain the produce business subject to certain limitations contained herein.

In consideration of the mutual covenants herein, the parties agree as follows:

## I. Agreement to Purchase and Sell; Non-competition Agreement

Section 1.1.  <u>Assets Other Than Real Estate.</u>  Subject to the terms of this Agreement, Seller agrees to sell, free and clear of all liens, and Buyer agrees to purchase the following assets:

1.  All of the Seller's inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition) which items are presently being sold to current customers of Buyer or to selected customers of Seller.  Buyers will make its best efforts to sell or assist in the sale of Monsour's remaining inventory.  The parties estimate that the inventory to be purchased is estimated from $750,000 to $800,000 in value.

2.  These intangible assets: Seller's list of all customers excluding retail grocery stores, all records (including electronic data) associated with such customers including but not limited to:

      (a) Name, address, phone, contract
      (b) Equipment on hand
      (c) Account history
      (d) Credit history and terms
      (e) List of products being purchased
      (f) Sales and delivery schedule
      (g) Pricing schedule
      (h) Rebate arrangements from suppliers or to customers earned after closing date, and the goodwill associated with those customers, (excluding retail grocery store customers which are retained by Seller to continue its business selling produce to those customers on the terms herein), the telephone number (620-231-6363) and listings of the Grocery Business [the Seller will share the use of the telephone number for 14 days after closing and will pay for any telephone charges therefore], and the right, title and interest in the Trade Name "Monsours" and other names so similar as to require its consent to their rightful use; provided that if the

1

EXHIBIT

1

Buyer ceases to buy substantially all of its produce requirements from Seller (so long as the Seller continues in such produce business), then the right to the use of Seller's name on the grocery business will terminate 60 days after notice by the Seller to the Buyer.

3.  Certain equipment as listed on Exhibit "A" attached.

4.  A covenant not to compete by the Sellers as set forth in Exhibit "B".

5.  A covenant not to compete by Seller's Brother Rick Monsour as set forth in Exhibit "C".

Section 1.2.  Excluded Assets.  Seller shall retain and not transfer to Buyer the following assets:

1.  all accounts payable and all accounts receivable.

2.  The assets of the Seller used exclusively to service the customers retained by the Seller.

3.  All real estate assets.

4.  All equipment not listed on Exhibit "A".

5.  All inventory not selected by Buyer.

6.  The right to continue its operations in regard to the sale of produce to  grocery stores and the right to continue sales to current jobbers (Seller is to provide a list of the current jobbers to Buyer at the Closing Date).

Section 1.3.  Assumption of Liabilities.  Buyer is not assuming and paying any liabilities or debts of the Sellers nor agreeing to perform any contract or obligation of the Sellers. Seller will be responsible for any and all federal, state, and local taxes due on his business prior to the date of closing and because of the transfer of the assets from Seller to Buyer.

## II. Purchase Price.

The purchase price which Buyer agrees to pay for the items described in Section I is as follows:

Section 2.1.  Inventory - The inventory purchase price will be Seller's cost which will be computed at the Seller's NDS computer system average cost of last 3 purchases, except that if such price exceeds the current market cost for any such inventory item then the price for such item will be negotiated by Buyer and Seller.  The inventory purchase will be subject to these terms:

(1).  The Buyer shall be responsible for transportation of the inventory from Seller's location at Buyer's cost.

(2).  The Seller will be responsible for inspection and loading of the inventory into Buyer's trucks pursuant to the purchase order of Buyer, and Seller warrants that all inventory loaded will meet the quality standards set out above.  Buyer will be entitled to have an inspector present at all loading and any items objected to by that inspector shall be set aside for further inspection.

(3).  Buyer shall pay Seller for inventory on a 'as received" basis, with payment to be made after delivery of possession of the inventory to Buyer for invoices for inventory sold during each Friday through Thursday period by wire transfer to Seller's account at the Bank of America, N.A. in Pittsburg, Kansas, on each Friday not later than 1:30 p.m..

(4).  Buyer will assist the Seller in selling inventory not necessary to Buyer to supply current customers of the Seller or the Buyer, and may buy on a negotiated price purchase such items.

Section 2.2.  <u>Customer Lists, Records</u>.  Included in the Covenant Not To Compete price.

Section 2.3.  <u>Equipment.</u>  The purchase price will be agreed at the Closing Date.

Section 2.4.  <u>Rick Monsour Covenant Not to Compete.</u>  The Purchase Price for the Covenant Not to Compete will be $5,000.00.

Section 2.5.  <u>Mark D. Monsour Covenant Not to Compete</u>.  The Purchase Price for the Covenant not to Compete of Monsours, Inc. and Mark D. Monsour (and items in Section 2.2) shall be (i) $150,000.00, plus (ii) 2% of the Buyer's gross sales receipts (less sales taxes) sold by the Buyer's salespeople working out of the Buyer's Pittsburg location [plus sales to Infina Nursing Homes] within the first year following the Closing Date, and plus (iii) 1 % of the Buyer's gross sales receipts (less sales taxes) sold by the Buyer's salespeople working out of the Buyer's Pittsburg location [plus sales to Infina Nursing Homes] within the second year following the Closing Date if the sales volume exceeds $11,000,000, which Price will be paid as follows:

1. $50,000 paid at date of contract signing and the balance of $100,000 will be paid at the Closing Date.

2.  A.  The 2 % percentage payments for the first year will be paid quarterly on the 20th day after the end of each quarter beginning the quarter after the Closing Date.  The first payment will be due May 20, 2002.

B.  The 1 % percentage payments for the second year will be paid on the 20th day after the end of the first month following the end of the second year after the Closing Date.

3.  The payments will terminate in the event of a material breach by the Seller of the Covenant Not To Compete.

Section 2.6.  <u>Vendor Credits.</u>  If the Seller has unused vendor credits which the Buyer is able to pass through the on its account with the vendor, then within 7 days of the Buyer's receipt of funds or credit on its account it will pay the Seller an amount the that which it received

## IV.  Closing.

Section 4.1.  <u>Closing Date.</u>  The Closing Date under this Agreement shall be in the offices of Seller's attorney, at 1 p.m., on the day agreed to by the parties, but in no event later than thirty days from the date of this agreement.

Section 4.2.  <u>Offset.</u>  The Buyer shall be entitled to offset any sums owed to Buyer or its subsidiaries by Sellers against the payments owed to the Sellers.

## V.  Title and Conveyance of Assets.

Section 5.1.  <u>Instruments of Conveyance.</u>  Title to the assets being conveyed shall, at closing, be free and clear of liens, charges, restrictions and encumbrances, by the Sellers' bill of sale with full warranties, provided that title to the inventory will not transfer until delivery to the Buyer.  Seller by the signing of the each of the Buyer's purchase orders on inventory will make the same warranties as are contained in the bill of sale.

Section 5.2.  <u>Bulk Sale.</u>  If applicable, the Seller will fully comply with any bulk sales laws or, in lieu thereof, provide proof that all liens on the inventory and other assets being

purchased by Buyer are released.

## VI. Representations and Warranties.

Section 6.1. <u>Representations by Seller.</u> Seller represents and warrants to Buyer that the following statements are true, complete, and correct now and will be such on the date of closing and such representations and warranties shall survive closing:

1. Seller is the sole owner of all of the assets to be transferred. Seller has, or shall have, upon delivery to and payment by Buyer, good, absolute and marketable title to the assets to be transferred, free and clear of all claims, liens, charges, encumbrances and restrictions of every kind. There are no outstanding options, contracts, commitments, agreements or other rights of any character or relating in any manner to the assets being transferred or entitling any third party to acquire such assets. Seller has and shall have at closing the complete and unrestricted right to sell, transfer and assign the assets pursuant to this Agreement. Upon the delivery of the equipment at closing, Buyer shall acquire good and marketable title to the assets free and clear of all claims, liens, charges, encumbrances and restrictions of any kind.

2. Seller Monsour's, Inc., is a corporation in good standing under the laws of the State of Kansas, has authority to own and operate its respective assets, to carry on its business as presently conducted, and to consummate the transactions completed in this Agreement. The execution, delivery, and performance of this Agreement has been duly and effectively authorized by its Board of Directors, and it necessary its Shareholders, and no further action or other authorization or consent is required.

3. Seller is a corporation owned by the Seller Mark D. Monsour and Sheila D. Monsour and no other person. Sellers Mark D. Monsour and Sheila D. Monsour are individuals residing in the State of Kansas.

4. This Agreement shall constitute a binding and valid obligation of Sellers enforceable according to its terms.

5. Seller ,upon delivery to and payment by Buyer, shall provide to Buyer a release of all liens upon any of the assets being conveyed and a consent to transfer such assets by the secured creditors of Seller.

6. Seller is not a party in any litigation now pending, or threatened, nor are there any proceedings pending or to the best of their knowledge threatened, before any federal, state, or local court, agency or board, regarding Seller's business.

7. Seller has duly and timely filed all required federal and state tax returns, and has timely paid all federal and state taxes required to be paid and all other taxes and government charges, duties, penalties, interest and fines owed by it. If at closing any state, local, or federal taxes, charges, etc. are not paid in full, Buyer may deduct the same from payments due at closing or thereafter in order to pay the same.

8. That all of the books of accounts and records which Seller has exhibited to Buyer are complete and correct and reflect all material transactions involving Seller's assets.

9. That Seller has complied with all laws of all state, federal and local government bodies and have not received any notice from any government bodies of any violations of any laws and have no knowledge of any facts that would be a violation or would give rise to any such notice.

10.  Seller knows of no adverse change or threatened adverse change in the relationships of Seller with customers, other than changes occurring in the ordinary course of business which, individually or in the aggregate, have been materially adverse.  Seller does not have any direct or indirect interest in any competitor of Seller's business within the territory described in the covenant not to compete.

Section 6.2.  Representations by Buyer.  Buyer represents and warrants to Seller that the following statements are true, complete and correct as of this date  and shall be true on the date of closing, and such representations and warranties shall survive closing.

1.  Buyer is a corporation duly organized, and in good standing in the State of Missouri, with all of the requisite corporate power and authority to own and operate its property, assets, and business.

2.  Buyer has complete and unrestricted right, power and authority to enter into this Agreement and to consummate the transaction.

3.  Execution and delivery of this Agreement has been duly authorized by all necessary corporate action on the part of the Buyer.  Execution and delivery of the Agreement will not contravene Buyer's certificate of incorporation or by-laws, conflict with or result in the breach of any agreement which Buyer is a party; entitle any party to terminate, accelerate or call a default with respect to any Agreement which Buyer is a party; or result in any violation by Buyer of any laws applicable to it.

4.  Buyer is not a party to or subject to or bound by any judgment, order, injunction, or decree of any court or government body which may restrict or interfere with the performance of this Agreement.

5.  Upon execution and delivery, this Agreement shall constitute a valid obligation of Buyer enforceable against it and in accordance with its terms.

V.  Actions of Seller Prior to Closing.

Seller covenants and agrees that, prior to closing, they shall take, or cause to be taken, the following actions:

Section 5.1.  Access to Records.  Seller shall permit Buyer and its agents reasonable access during normal business hours to all books, files, and records of Seller relating to the Grocery Business; provided however that no such examination shall constitute a waiver by Buyer of its right to rely on the covenants, representations and warranties made herein or on Seller's obligation to perform under this Agreement.  Buyer agrees that the information that it receives or obtains from Seller as a result of any investigation shall be deemed confidential and shall not be disclosed to any person or entity other than Buyer's employees, agents, financiers, and investors.  If the closing is not completed hereunder for any reason, Buyer shall return to Seller any and all papers and data.

Section 5.2.  No Extraordinary Sales.  Seller shall not, without the prior written consent of Buyer, make any sale of goods except in the ordinary course of business, or engage in any other activities or transactions which are outside of the ordinary course of business of Seller as conducted on the date of this Agreement in which, in the aggregate, would be material.

Section 5.3.  Tax Returns.  Seller shall file all federal, state, and other tax returns and amendments thereto required to be filed by Seller up to, or which relates to periods before

the date of closing, and Seller shall pay all taxes to be due by Seller, at or prior to closing.

      Section 5.4. <u>Operations.</u> Seller shall operate its business in accordance to all applicable laws.

      Section 5.5. <u>Notice of Change.</u> Seller shall inform Buyer in writing of any change in any information provided to Buyer in any exhibit.

## VI. Conditions precedent to the Obligation of the Buyer.

      The obligation of the Buyer to complete the closing hereunder (and all liability to Sellers) is subject to satisfaction or waiver by Buyer on or before the closing date of the following conditions:

      Section 6.1. <u>No Breach.</u> There shall be no breach of any of Seller's representations and warranties as of closing. Seller shall deliver to Buyer a certificate dated as of closing to such affect.

      Section 6.2. <u>Perform Obligations.</u> At or prior to closing, Seller shall have performed all obligations required to be performed by them hereunder; executed and delivered all documents required to consummate the transactions contemplated hereunder, including but not limited to execution of a bill of sale with full warranties transferring the assets to Buyer.

      Section 6.3. <u>No Limits on Use.</u> On the closing date there should be no order, writ, injunction, or decree issued by any government body or any court which prevents or significantly limits the use by Buyer of the assets being purchased.

      Section 6.4. <u>Employment of Salespersons of Seller.</u> All of the obligations of Buyer are subject to the condition that the Seller is able to employ the following current salespersons of the Seller: Sean Krokroskia, Penne Cheny, Jim Senecaut, Michael Ray, Ron McGaugh, and Kyle Robertson. In the event that the Buyer is not able to hire such persons, then the Buyer shall have the option to terminate this Agreement prior to the Closing Date and shall have no liability to Sellers under this Agreement.

## VII. Conditions precedent to the Obligations of Seller.

      The obligation of the Seller to complete the closing hereunder is subject to the satisfaction or waiver by the Seller on or before the closing on the following conditions:

      A. The representations and warranties of Buyer shall be true and correct as of now and at the closing. Buyer shall delivery to Seller a certificate of its President and Secretary dated as of the closing to such effect.

      B. Buyer shall have performed all of the obligations required to be performed by it hereunder on or prior to closing, Buyer shall delivery to Seller a certificate of its President and Secretary dated as of the closing to such effect.

## VIII. Survival of Representations, Warranties and Covenants; Indemnification.

      Section 8.1. <u>Nature of Representation.</u> For purposes of this Agreement, the contents of all exhibits incorporated by reference shall constitute representations and warranties made in this Agreement by the Sellers.

      Section 8.2. <u>Survival of Representations, Warranties and Covenants.</u> The Representations, Warranties and Covenants in this Agreement shall survive the closing for a period equal to the statute of limitations pertaining to written agreements in the State of

Missouri.

Section 8.3. <u>Indemnification by Sellers.</u> Sellers agree to indemnify, defend, and hold the Buyer and its directors, officers, employees, agents, and representatives harmless from and to reimburse Buyer for any loss, cost, expense, liability, or damage, (including counsel fees) resulting from inaccuracies or breach of any representation, warranty, agreement or covenant made by Seller or from their breach of or failure to perform any of the covenants or agreements hereunder.

Section 8.4. <u>Indemnification of Buyer.</u> Buyer agrees to indemnify and defend and hold the Seller harmless from and to reimburse Seller for any loss, cost expense, liability, or damage, (including counsel fees) resulting from the inaccuracies or breach of any representation, warranty, agreement or covenant made by the Buyer pursuant to this Agreement and from Buyer's breach of or failure to perform any of the covenants or agreements hereunder.

## IX. Brokers.

A. Each party represents and warrants to the other that no finder, broker or similar agent has acted on behalf of or been retained by it.

## X. Notice.

A.1. Any notice required hereunder shall be given in writing, served in person, or deposited in the form of a written notice in the United States Mail, sent postage prepaid, properly addressed and directed to the party to receive the same at the following address or such other address as may be substituted by notice in writing.

2.      Seller:      Mark D. Monsour and Sheila D. Monsour
                     112 N. Elm
                     Pittsburg, Kansas 66762
                     620-231-6363

        Buyer:       Menu Maker Foods
                     913 Big Horn Drive
                     Jefferson City, MO  65109
                     573-893-3000

## XI. Miscellaneous.

A. The parties agree that this document, including exhibits, is the entire agreement between the parties and that there are no other promises, conditions, representations, warranties, understandings or agreements of any type or kind between the parties.

B. This Agreement made be executed in any number of counterparts and each counterpart shall be deemed an original instrument.

C. This Agreement shall be construed by and according to the laws of the State of Missouri. This Agreement shall apply to and bind the parties, their respective personal representatives, heirs, successors and assigns.

D. The invalidity of any one or more word, phrase, sentence, clause, section, or paragraph contained in this Agreement shall not effect the enforceability of the remaining in the Agreement.

E.  Each of the parties shall keep the terms of this Agreement confidential.

F.  Fresh Produce - Menu Maker Foods, Inc., will purchase substantially all of its produce requirements through Monsour's under the following terms and conditions:

(A)  The quality of all products must meet or exceed current Menu Maker Foods, Inc., house acceptability standards.

(B)  The minimum fill rate of all orders received may not be less than 99.25% of acceptable quality produce under normal circumstances and conditions. Acts of God, severe weather, trucking strikes, and otherwise similar situations and not in the control of Sellers and Buyer will not effect the validity of this Agreement.

(C)  Credit Terms will be Net 21 Days the first 90 days, and Net 26 days thereafter.

(D)  Marketing - will not begin until agreed to both parties and produce associated with it until Seller has like program in place:

(1)  Includes our current level of support at $4,125.00 quarterly, which will be deducted on a quarterly basis, toward the Menu Maker Foods, Inc., "BBP" Plan.

(2)  Current shelter income of .25 cents per case shall be paid by Monsours to Menu Maker Foods, Inc. quarterly by the 10th of the month following the end of the quarter.

(3)  Sales support staff will be available for two sales meetings annually, participate in our annual food show and key end user calls upon request.

(4)  Shall provide promotional items and appropriate allowances for flyers, auction, food show, and other BBP activities.

E)  Pricing - Monsours will need to maintain a competitive cost of goods to insure our current gross profit levels are not jeopardized.

(F)  Pre Cut Produce - Will require further discussion. Seller understands the importance of this program to Buyer and will present programs similar to currently being used by Buyer for Buyer's review and approval.  Seller believes that this new program will increase Buyer's market advantage and Buyer will move to this new program only after approval from a representative designated by Buyer.

(G)  Product Specification - Below are a few item specific requirements, and unless other wise stated, agreed quality will be USDA quality standards or better at time

8

of receiving.

(1)   Colorado Potato - Must be US No. 1 "Centennial" when available
(2)   Apples - Washington State - US Extra Fancy
(3)   Oranges - Sunkist US 1
(4)   Lunch Bunch Grapes - Corrin Shipper Brand
(5)   West Coast - Head Lettuce, Green Leaf, & Romaine - All Liner Pack
(6)   Idaho Potatoes - Grade US No. 1 "Burbank" when available
(7)   Buyer shall purchase no less than 99.25% of approximate weekly quantities of the speciality and limited life items as estimated by Buyer on the preceding Monday.

(H)   Time lines -

(1)   Pricing for the following week will need to be faxed by no later than 11:15 a.m. on Thursdays.
(2)   Order Entry - Buyer will supply Seller with approximate quantities and delivery dates for the following week by 2 p.m. on the preceding Monday for the following week.  Specialty items will need to be exact or within the agreed fill rate requirements.
(A)   To meet the 99.25% fill rate required for Buyer, Seller will need orders placed with a 2 day lead time.  Every available effort to accommodate add-ons and late items (both normal stock and specialty items) will be made.  Add-ons or late entry items will not be included in the 99.25% required fill rate.

**XII.  Lease**

A.  The Seller agrees to lease to the Buyer office, cross docking and transportation space for Buyer's tractors, trailers, and cars at the Seller's warehouse pursuant to the lease terms set out in Exhibit "D" attached.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on the day and year first above written.

MONSOUR'S, INC.                              MENU MAKER FOODS, INC.

BY: _____         BY: _____
     Mark D. Monsour, President              Jon R. Grayes, President

_____
     Mark D. Monsour

_____
     Sheila D. Monsour

9

# REGIER CARR & MONROE, L.L.P.

### CERTIFIED PUBLIC ACCOUNTANTS

MEMBERS OF
THE AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS
THE DIVISION FOR CPA FIRMS

January 30, 2006

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
300 West Douglas, Suite 100
Wichita, Kansas 67202

Re: Monsour's, Inc.

Dear Mr. DeVaughn:

You have asked me to evaluate whether or not Monsour's Inc. (hereafter referred to as Monsour's) would have been able to generate on going positive cash flow had Menu Maker Foods, Inc. (hereafter referred to as Menu Maker) purchased Monsour's existing inventory at an amount consistent with that stated in the January 31, 2002 Asset Purchase Agreement (Bates numbered beginning 10007 and hereafter referred to as Purchase Agreement), and had Menu Maker also subsequently purchased substantially all of their produce from Monsour's Inc. as described in the Purchase Agreement.

My evaluation is based upon projections of what would have occurred had the terms of the Purchase Agreement been fulfilled because Menu Maker's initial purchase of Monsour's inventory was significantly less than stated in the Purchase Agreement, and because Menu Maker's did not subsequently purchase any significant amounts of produce from Monsour's.

Monsour's Inc. Financial Condition at Time of Agreement
The first phase of my evaluation was to gain an understanding of Monsour's financial condition at the time of the Purchase Agreement.

The financial condition of Monsour's Inc. at the time of the agreement is summarized at **Exhibit 1.0**. This schedule was prepared from Monsour's internally prepared financial statements dated January 26, 2002 (Bates numbered 11468-11469) and is supported by documentation obtained from interrogatories, documentation provided to me related to Bank of America's loan documents, tax returns and discussions with Mark Monsour.

From this initial point of evaluation, there were expected to be two immediate significant sources of cash flow generated from the Purchase Agreement. The most significant source of immediate cash flow was to have been from the sale of Monsour's existing inventory (excluding produce) which had an estimated value of $750,000 to $800,000. For purposes of my evaluation, I have used $750,000, the lowest end of the stated range. A second source of significant cash flow per the Purchase Agreement was a base amount of $150,000, which was received related to Mark Monsour's covenant not to compete.

EXHIBIT

2

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 2 of 6

Based upon discussion with Mark Monsour, I have assumed that the $750,000 to have been received from the initial sale of inventory and $150,000 received from the covenant not to compete would have first been applied to deficit cash, and then applied to the $975,000 note payable to Bank of America.  The book value of the remaining assets, excluding property and equipment, approach the book value of current liabilities, leaving a remaining balance of current liabilities of less than $3,000.  The application of cash described in this paragraph is demonstrated in **Exhibit 1.1**.

From my evaluation of Monsour's financial condition at the time of the Purchase Agreement, it is apparent that Monsour's Inc.'s ability to service existing debt and continue operating was dependent upon the cash flow to be generated from the initial sale of inventory of $750,000 and the receipt of $150,000 related to Mark Monsour's covenant not to compete.  Given the receipt of the expected proceeds from the Purchase Agreement and the liquidation of other operating assets and liabilities, Monsour's remaining liabilities would have consisted of notes payable. The servicing of these notes payable is considered as part of my cash flow analysis of continuing operations in **Exhibit 2.3**, and assumes there are no significant change to the terms of the notes payable that existed at the time of Purchase Agreement.

Projected Operations Following the Purchase Agreement
Projected future operations of Monsour's following the Purchase Agreement are summarized at **Exhibit 2.0**.  The starting point of the evaluation was the Proforma Statement (Bates document 10065).  It is my understanding that this Proforma Statement was created by Mark Monsour and by Gene Fields, the general manager of Monsour's prior to the Purchase Agreement, who was subsequently hired by Menu Maker following the Purchase Agreement.

The following discusses the basis used to determine future cash flow activity to be derived from operating activities.

*Revenue*
As described in the Purchase Agreement, Menu Maker was to have purchased substantially all of their produce from Monsour's following the Purchase Agreement.  Per discussion with Mark Monsour, the price of the produce sold to Menu Maker was to have been Monsour's cost, plus 10%.  **Exhibit 2.1** reflects Menu Maker's actual subsequent purchases of produce, which was obtained from Menu Maker's responses to interrogatories.  Based upon an average of the actual subsequent annual purchases of produce from 2002 through September 30, 2005, and multiplying this average by 95% to represent substantially all of Menu Maker's produce purchases, an estimate of produce that would have been purchased by Menu Maker from Monsour's is $1,350,000 per year.

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 3 of 6

Other revenue sources were to have been from an on going customer (Harp's) and other sales to miscellaneous customers. The covenant not to compete applied to institutional customers (schools, restaurants, nursing homes, etc.), but not to grocery and related stores. The estimates of these sales were based upon the Proforma Statement. It is my understanding that the projected sales to Harp's are based upon historical sales, with no growth anticipated and that other retail sales projection are based upon historical sales to various customers.

*Cost of Sales*
As described above, the price of sales to Menu Maker was based upon Monsour's cost, plus 10%. The cost of these sales was derived from the estimated annual sales to Menu Maker of $1,350,000.

The cost of sales to Harp's and other retail sales is based upon a review of Monsour's prior tax returns (Bates document 11747 to 11883) and internal financial statements (Bates document 10004) as reflected in **Exhibit 2.2** and resulted in an average ratio of cost of sales to sales for the period July 1, 1998 to December 31, 2001 of 24.47%. Although this ratio is significantly less than the ratio in the Proforma Statement, for purposes of conservatism, this ratio was used for the cash flow analysis.

*Operating Expenses*
Operating expenses were initially derived from the Proforma Statement. I then compared the expenses per the Proforma statement to the five most recent tax returns filed by Monsour's (Bates documents numbered 11747-11883). I also reviewed each operating expense line item of the Proforma Statement and the tax returns with Mark Monsour. For purposes of my evaluation, adjustments were made to the Proforma amounts where it appeared necessary based upon comparison to historical costs per the tax returns or discussion with Mark Monsour. Information provided to obtain amounts used for operating expenses are listed in **Exhibit 2.4.**

*Other Revenue*
The Proforma Statement identified certain other rebate income based upon a rate of 35 cents per case. Because the estimate of sales to Menu Maker based upon subsequent actual Menu Maker purchases are less than those identified in the Proforma Statement and other sales estimates have been rounded down from the Proforma Statement, I have reduced the rebate income by approximately 20% of the amount identified in the Proforma Statement.

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 4 of 6

*Debt Servicing*

Debt and the related monthly servicing requirement are illustrated in **Exhibit 2.3**. As previously discussed in **Exhibit 1.1**, Mark Monsour has indicated that portions of the debt to Bank of America would likely have been repaid with proceeds from the initial sale of inventory and the covenant not to compete. For purposes of my evaluation, I have assumed that these proceeds would have been applied to the $975,000 note payable. Per Mark Monsour, negotiations were on going with Bank of America for renewal of the balloon note payable which was scheduled to mature April 2, 2002 and were expected to be renewed under consistent terms.

Terms of the Bank of America debt were obtained from copies of actual loan documents (Bates documents 12029-12030 and 12031-12033).

Terms of the other debt were obtained from interrogatories and discussion with Mark Monsour. The significant portion of other notes payable is a $600,000 payable to Union National Bank. Per Mark Monsour, this debt was personally guaranteed by an individual who had the ability to perform on the guarantee. This note payable required monthly interest only payments. The balance of other notes payable were payable to related parties who also required monthly interest only payments. Per Mark Monsour, the debt to Union National Bank did have a stated maturity, but due to the strength of the individual guarantee, would continue to have been renewed at consistent terms. Per Mark Monsour, debt to related parties would have also been renewed at consistent terms.

Summary

As previously noted, the Purchase Agreement included covenants not to compete which limited Monsour's ability to continue serving certain markets that it had historically serviced. By foregoing these markets, Monsour's financial condition and ability to continue operating following the Purchase Agreement were dependent upon Menu Maker fulfilling the other aspects of the Purchase Agreement, including the purchase of approximately $750,000 of inventory.

From my evaluation of projected cash flows described in **Exhibit 2.0**, had Monsour's had the opportunity to continue operations and had Menu Maker purchased substantially all of their produce requirement from Monsour's, gross profit from sales to Menu Maker would have approximated $122,727 per year and an overall positive cash flow of approximately $53,670 per year could have been expected.

In contrast, without the proceeds received from the initial sale of inventory and without the subsequent sales of produce to Menu Maker as described in the Purchase Agreement, Monsour's was not able to continue operating activities. Even if Monsour's would have been able to continue operating activities without the receipt of the $750,000 from the initial sale of inventory, without the gross profit of $122,725 derived from subsequent sales to Menu Maker, Monsour's would have experienced negative cash flow of approximately $69,055 per year ($53,670 per **Exhibit 2.0** less $122,725).

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 5 of 6

Pursuant to your direction, you have asked me to extend the differences in cash flow resulting from Menu Maker's failure to purchase the initial inventory as described in the Purchase Agreement, and the resulting differences in cash flow from Menu Maker not purchasing substantially all of the subsequent produce purchases from Monsour's over the six year term of the not to compete agreement between Mark Monsour and Menu Maker. Additionally, you have asked that I include in this calculation the amount of salary that is included in the cash flow projections that was not paid to Mark Monsour.

| | | | |
|---|---|---|---|
| Projected annual positive cash flow had Menu Maker purchased substantially all of their produce requirement from Monsour's | $ | 53,670 | |
| Projected annual negative cash flow had Monsour's continued operations and Menu Marker not purchased their produce requirement from Monsour's | | 69,055 | |
| Net difference (gross profit on projected Menu Maker sales) | | 122,725 | |
| Mark Monsour's annual salary included within operating expenses | | 78,000 | |
| Combined net difference in annual cash flow | $ | 200,725 | |
| Term of covenant not to compete | | 6 years | |
| Extended difference in combined cash flow over the term of the not to compete agreement | $ | 1,204,350 | $ 1,204,350 |
| Expected proceeds from initial sale of inventory at time of Purchase Agreement | $ | 750,000 | |
| Actual proceeds from initial sale of inventory at time of Purchase Agreement | | 232,957 | |
| Net difference in initial sale of inventory at time of Purchase Agreement | $ | 517,043 | 517,043 |
| Cumulative differences in cash flow | | | $ 1,721,393 |

The opinions herein are to a reasonable degree of accounting certainty and are based upon the information provided to me as described in this report.

McDonald Tinker Skaer Quinn & Herrington, P.A.
Attn: Dustin DeVaughn
January 30, 2006
Page 6 of 6

My resume is attached as Exhibit 3.0.

Please contact me if you have any questions on this report.

Yours very truly,

Marshal Hull, CPA, CMA
Of Regier Carr & Monroe, LLP

Exhibit 1.0

### Financial Position Immediately Prior to Purchase Agreement

| | | |
|---|---:|---:|
| Cash | $ | (452,447) |
| Accounts Receivable-Trade | | 933,825 |
| Notes Rec | | 7,820 |
| Inventory | | 797,950 |
| Prepaid Expenses | | 16,050 |
|    Total current assets | | 1,303,198 |
| Net property & equipment | | 977,426 |
| Other assets | | 61,520 |
|    Total assets | $ | 2,342,144 |
| Accounts payable-trade | $ | 1,017,983 |
| Sales and payroll taxes payable | | 7,969 |
| Interest expense payable | | 7,291 |
| Accrued expenses | | 44,150 |
| | | 1,077,393 |
| Notes payable-Bank of America | | 975,000 |
| Note payable-other | | 916,088 |
| Notes payable-Bank of America | | 693,917 |
| | | 2,585,005 |
|    Total liabilities | | 3,662,398 |
| Total stockholders equity/(deficit) | | (1,320,254) |
|    Total liabilities and stockholders equity | $ | 2,342,144 |

**EXHIBIT 1.1**

### Financial Position for Purposes of Ongoing Cash Flow Analysis

| | Balance Immediately Prior to Purchase Agreement | Initial Sale of Inventory to Menu Makers | Covenant Not to Compete | Payment of Bank of America Debt | Offset Other Assets & Liabilities | Remaining Balance |
|---|---|---|---|---|---|---|
| Cash | $ (452,447) | $ 750,000 | $ 150,000 | $ (440,000) | $ (7,553) | $ - |
| Accounts Receivable-Trade | 933,825 | | | | (933,825) | - |
| Notes Rec | 7,820 | | | | (7,820) | - |
| Inventory | 797,950 | (750,000) | | | (47,950) | - |
| Prepaid Expenses | 16,050 | | | | (16,050) | - |
| Total current assets | 1,303,198 | - | 150,000 | (440,000) | (1,013,198) | - |
| Net property & equipment | 977,426 | | | | | 977,426 |
| Other assets | 61,520 | | | | (61,520) | - |
| Total assets | $ 2,342,144 | $ - | $ 150,000 | $ (440,000) | $ (1,074,718) | $ 977,426 |
| Accounts payable-trade | $ 1,017,983 | | $ - | $ - | $ (1,015,308) | $ 2,675 |
| Sales and payroll taxes payable | 7,969 | | | | (7,969) | - |
| Interest expense payable | 7,291 | | | | (7,291) | - |
| Accrued expenses | 44,150 | | | | (44,150) | - |
| Total liabilities | 1,077,393 | - | - | - | (1,074,718) | 2,675 |
| Notes payable-Bank of America | 975,000 | | | (440,000) | | 535,000 |
| Note payable-other | 916,088 | | | | | 916,088 |
| Notes payable-Bank of America | 693,917 | | | | | 693,917 |
| | 2,585,005 | - | - | (440,000) | - | 2,145,005 |
| Total liabilities | 3,662,398 | - | - | (440,000) | (1,074,718) | 2,147,680 |
| Total stockholders equity/(deficit) | (1,320,254) | - | 150,000 | - | | (1,170,254) |
| Total liabilities and stockholders equity | 2,342,144 | - | 150,000 | (440,000) | (1,074,718) | 977,426 |

<u>Exhibit 2.0</u>

### Projected Future Operations

|  | Monthly | Annual |
|---|---:|---:|
| **Revenue** | | |
| Menu Maker Foods | 112,500 | 1,350,000 |
| Harp's | 190,000 | 2,280,000 |
| Other retail | 215,000 | 2,580,000 |
|  | 517,500 | 6,210,000 |
| **Cost of Goods Sold** | | |
| Menu Maker Foods | (102,273) | (1,227,273) |
| Harp's | (143,507) | (1,722,084) |
| Other | (162,390) | (1,948,674) |
|  | (408,169) | (4,898,031) |
| **Gross Profit** | 109,331 | 1,311,969 |
| **Operating Expenses** | | |
| Salaries | | |
| Warehouse labor | (10,780) | (129,360) |
| Drivers ($10/hour + benefits) | (9,816) | (117,792) |
| Sales | (17,400) | (208,800) |
| Office Payroll | (2,360) | (28,320) |
| Non-Wage Personnel Cost | (4,000) | (48,000) |
|  | (44,356) | (532,272) |
| Lease Payments and Auto Loan | | |
| Forklifts | (6,912) | (82,944) |
| Pallet Jacks | (900) | (10,800) |
| Company Auto-P&I | (4,000) | (48,000) |
|  | (11,812) | (141,744) |
| Repairs & Maintenance | (5,000) | (60,000) |
| Bad Debts | (2,000) | (24,000) |
| Real Estate and Property Taxes | (1,000) | (12,000) |
| Advertising | (850) | (10,200) |
| Other Expenses | | |
| Entertainment | (120) | (1,440) |
| Tractors | (8,400) | (100,800) |
| Trailers | (6,680) | (80,160) |
| Fuel | (2,400) | (28,800) |
| Utilities | (5,472) | (65,664) |
| Cell Phone | (240) | (2,880) |
| Phone | (2,700) | (32,400) |
| Insurance | (4,000) | (48,000) |
| Workmens Comp | (1,200) | (14,400) |
| Company Car/Insurance | (400) | (4,800) |
| Fuel/Service (Company cars) | (320) | (3,840) |
| Supplies | (1,000) | (12,000) |
| NDS/SPS TrackMax Computer (License Fees) | (800) | (9,600) |
| Professional Fees | (500) | (6,000) |
| Other Expense | (500) | (6,000) |
|  | (34,732) | (416,784) |
| Rebate Income | 13,000 | 156,000 |
| **Cash Flow From Operations** | 22,581 | 270,969 |
| Debt Service (Principal and Interest) | | |
| Bank of America Loan #9004 (Principal and Interest) | (11,457) | (137,490) |
| Bank of America Line of Credit (Interest only) | (2,452) | (29,425) |
| Other notes payable (Interest only) | (4,199) | (50,385) |
|  | (18,108) | (217,299) |
| **Net Cash Flow** | 4,472 | 53,670 |

<u>Exhibit 2.1</u>

### Menu Maker, Inc.'s Subsequent Purchases of Produce

| Period | Amount | |
|---|---|---|
| 2002 | $ 1,547,292 | |
| 2003 | $ 1,348,925 | |
| 2004 | $ 1,382,533 | |
| 1/1/05 to 9/30/05 | $ 1,063,131 | ($1,417,508.65 if annualized) |
| Average of 2002 to 2005 | $ 1,424,065 | (2005 annualized amount used) |
| Ratio of "Substantially All" | 95% | |
| | $ 1,352,861 | |
| Estimate of Substantially All Produce Purchases for Purposes of Cash Flow | $ 1,350,000.00 | |

<u>Exhibit 2.2</u>

### Cost of Sales Ratio

| | Per Tax Returns | | | Per Internal Financial Statement |
|---|---|---|---|---|
| | 7/1/1998 6/30/1999 | 7/1/1999 6/30/2000 | (Six months) 7/1/2000 to 12/31/2000 | FYE 12/31/2001 |
| Gross Sales | $ 7,901,537 | $ 10,465,305 | $ 5,715,234 | 15,002,041 |
| Returns and allowances | (767) | (2,415) | (2,589) | |
| Net Sales | 7,900,770 | 10,462,890 | 5,712,645 | 15,002,041 |
| Cost of goods sold | (6,064,276) | (7,892,440) | (4,371,218) | (11,012,739) |
| Gross profits | $ 1,836,494 | $ 2,570,450 | $ 1,341,427 | $ 3,989,302 |
| Gross Profit Margin | 23.24% | 24.57% | 23.48% | 26.59% |
| | Average of 7/1/98 to 12/31/01 | | | 24.47% |

Exhibit 2.3

## Monthly Debt Service Requirement

| | | Balance Per Exhibit 1.2 | | Monthly Cash Requirement | Terms |
|---|---|---|---|---|---|
| **Bank of America** | | | | | |
| Balloon | $ | 535,000 | $ | 2,452 | Monthly interest only payment based upon Prime Rate, plus .75% |
| Monthly amortizing | $ | 693,917 | $ | 11,457 | Monthly principal & interest as stated in promissory note |
| **Other Notes Payable** | | | | | |
| Union National Bank | $ | 600,000 | | | |
| Earl McGavran | $ | 100,000 | | | |
| Terri Monsour | $ | 38,000 | | | |
| Corrine Monsour | $ | 81,912 | | | |
| Other | $ | 96,175 | | | |
| | | | | | Monthly interest only payment based upon Prime Rate, plus .75% |
| | $ | 916,088 | $ | 4,199 | |
| | $ | 2,145,004 | $ | 18,108 | |

Note: The following table documents prime rate. For purposes of this evaluation, 4.75% was used.

| Prime Rate | | | | | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 |
| 1-Jan | 9.50% | 4.75% | 4.25% | 4.00% | 5.25% |
| 1-Feb | 8.50% | 4.75% | 4.25% | 4.00% | 5.25% |
| 1-Mar | 8.50% | 4.75% | 4.25% | 4.00% | 5.50% |
| 1-Apr | 8.00% | 4.75% | 4.25% | 4.00% | 5.75% |
| 1-May | 7.50% | 4.75% | 4.25% | 4.00% | 5.75% |
| 1-Jun | 7.00% | 4.75% | 4.25% | 4.00% | 6.00% |
| 1-Jul | 6.75% | 4.75% | 4.00% | 4.25% | 6.25% |
| 1-Aug | 6.75% | 4.75% | 4.00% | 4.25% | 6.25% |
| 1-Sep | 6.50% | 4.75% | 4.00% | 4.50% | 6.50% |
| 1-Oct | 6.00% | 4.75% | 4.00% | 4.75% | 6.75% |
| 1-Nov | 5.50% | 4.75% | 4.00% | 4.75% | 7.00% |
| 1-Dec | 5.00% | 4.25% | 4.00% | 5.00% | 7.00% |

Copyright 2006 MoneyCafe.com

<u>Exhibit 2.4</u>

## Operating Expenses

*Salaries*-There was no change to the estimated salary expenses per the Proforma Statement based upon comparison to similar expense per the prior tax returns or discussion with Mark Monsour. It should be noted that Mark Monsour's salary of $1,500 per week, or $78,000 per year, is included within sales salaries.

*Lease Payments*-No change from the lease expense per the Proforma Statement amounts deemed necessary.

*Repairs and Maintenance*-There were no amounts projected for repairs and maintenance on the Proforma Statement. These amounts had ranged from $52,980 for the six months ended December 31, 2000 to $260,154 for the year ended June 30, 1999 on the tax returns. Per discussion with Mark Monsour, one freezer that had required significant repairs in the past was no longer needed and had been shut off, therefore, would not require any further repairs. Other significant repairs in prior years, such as repairs to compressors, were not expected to recur. Per Mark Monsour, on going repairs should be less than half of the years which had had the lowest repair costs. For purposes of this evaluation, this projection was rounded up to $5,000 per month, or $60,000 per year.

*Bad Debts*-There were no amounts projected for bad debts on the Proforma Statement. Per discussion with Mark, he would estimate 1% of other retail sales as bad debt. This amount is in excess of bad debts reported on prior tax returns.

*Real Estate Taxes*-There were no amounts projected for real estate taxes on the Proforma Statement. Based upon discussion with Mark Monsour, certain parcels of real estate had been sold and real estate taxes would have been less than half of the historical costs. For purposes of this evaluation, this projection was rounded up to $1,000 per month, or $60,000 per year.

*Advertising*-There were no amounts projected for advertising on the Proforma Statement. Per Mark Monsour, advertising in the phone book and other miscellaneous advertising would have likely continued to promote other retail sales. Mark Monsour estimated $850 per month, or $10,250 per year, to be spent on advertising.

*Insurance*-There were no amounts projected for insurance on the Proforma Statement. Per discussion with Mark Monsour, hazard insurance on property would have declined from prior levels due to disposition of certain property, but would have been otherwise consistent with historical costs. Mark Monsour estimated $4,000 per month, or $48,000 per year, to be spent on insurance.

(Continued)

Exhibit 2.4 (Continued)

## Operating Expenses (Continued)

*Professional Fees*-There were no amounts projected for professional fees on the Proforma Statement.   Per discussion with Mark Monsour, assistance with tax return preparation and other compliance issues would have been required.  Per Mark Monsour, approximately $6,000 annually would have been required.

*Other expenses*-There was no miscellaneous expense included on the Proforma Statement.  Per Mark Monsour, he would anticipate no more the $500 per month to be required for unforeseen expenditures.

The following remaining expenses were included on the Proforma Statement and appear to be consistent with prior tax returns and discussion with Mark Monsour's expectations:
- Entertainment
- Tractors
- Trailers
- Fuel
- Utilities
- Cell Phone
- Telephone
- Workmens compensation
- Company Car/Insurance
- Fuel/Service (Company Cars)
- Supplies
- License fees

MARSHAL HULL, CPA, CMA
REGIER CARR & MONROE, L.L.P.
300 West Douglas, Suite 100
Wichita, Kansas 67202
Telephone 316-264-2335
Fax 316-264-1489

**Experience**
- Over Fifteen Years of Public Accounting

**Special Expertise**
- Audit, Accounting and Taxation of Not-for-Profit Organizations, Small Businesses, Financial Institutions, and Corporations
- Management Advisory Services for Not-for-Profit Organizations and Small Businesses

**Professional Activities**
- American Institute of CPA's
- Kansas Society of CPA's
- Institute of Management Accountants
- Leadership Council of Kansas Society of CPA's
- Peer Review Committee of Kansas Society of CPA's
- 2000-2005-Board of Directors, Wichita Chapter of Institute of Management Accountants; President 2005
- Former member of AICPA Accounting and Auditing Focus Panel
- Former member of an AICPA Standard Setting Panel - Accounting & Reporting-Managerial and Governmental and Not-for-Profit Organizations

**Civic Organizations**
- 2001-2003-Advisory Board of Central Branch YMCA (Young Men's Christian Association), Central Branch Co-chair of 2002-2003 Strong Kids Campaign, Metro Finance Committee
- 2001-2005-Board of Directors and treasurer – Dress for Success of Wichita (a non-profit organization assisting low-income women make transitions into the workplace)
- 2000-2005-Board of Directors and treasurer – Downtown Y's Mens Club (a service club to the Wichita YMCA)
- 2006-Board of Directors of Respite Outreach Care for Kids Organization, Inc. (ROCKO)
- 2002-2004-Board of Directors and President of Augusta Little League Basketball
- 2003-Current-Board of Directors of Augusta Little League Baseball

**Education and Certification**
- Wichita State University, BBA, 1989
- Certified Public Accountant, 1992
- Certified Management Accountant, 2000

**Other**
- Wichita Business Journal's 40 Under 40, 2004

CORPORATE REPRESENTATIVE, MARK MONSOUR 3/13/2006

Page 17

1  debt that was attributable to Menu Maker's refusal
2  was somewhere between 120 and $200,000; is that right?
3      A   Of the produce that we threw away, that
4  they either never took, ordered and never took.
5      Q   Do you have any better recollection of the
6  amount than what you told me here today?
7      A   Most of the produce they did take.
8      Q   I was trying to get --
9      A   Then they credited back. I'm answering
10  your question. They would take credits for, so you
11  have to see how much they ordered, large amount of
12  that was credited.
13     Q   In c., Monsour's, Inc. answered as
14  follows: "Notes payable to others totaling
15  $916,087.55. It is believed that these notes
16  payables consisted of $600,000 to UNB (Guaranteed by
17  Gene Bicknell); $100,000 to Earl McGavran," which I
18  have probably mispronounced, "$38,000 to Terri
19  Monsour, and $81,912.45 to Corrine Monsour." We have
20  discussed, have we not, guaranteed by Mr. Bicknell's
21  company in your prior deposition?
22     A   Right. That amount to Gene Bicknell is
23  probably that, the other, the one there -- I think
24  Gene Bicknell's total was $500,000. Most likely, I
25  think the extra hundred there, was dropped to my

Page 18

1  mother, Corrine.
2      Q   All right. Let me go through the
3  remainder of that with you. Monsour's wrote 100,000
4  to Earl --
5      A   McGavran.
6      Q   -- McGavran; what was that indebtedness
7  for?
8      A   To pay produce.
9      Q   And who is Mr. McGavran?
10     A   My uncle.
11     Q   Okay. And Mr. McGavran loaned the company
12  $100,000?
13     A   Correct.
14     Q   Okay. Is there a written note or contract
15  that covers that loan?
16     A   Not to my knowledge.
17     Q   Did you personally guarantee the loan from
18  your uncle, Mr. McGavran?
19     A   In effect, yes.
20     Q   What does that mean?
21     A   Means I probably called him and told him I
22  need 100,000, and he gave me 100,000.
23     Q   $38,000 to Terri Monsour; what was that
24  loan for?
25     A   Probably just working capital.

Page 19

1      Q   Okay. Did -- you now believe that the
2  $81,912.45 to Corrine Monsour should be $181,912.45?
3      A   I believe that's correct.
4      Q   Why did you borrow that amount -- why did
5  Monsour's borrow that amount from her?
6      A   Working capital.
7      Q   Has Corrine Monsour been repaid?
8      A   No.
9      Q   Has Terri Monsour's been repaid?
10     A   No.
11     Q   Has Earl McGavran been repaid?
12     A   Yes.
13     Q   He has been?
14     A   Yes.
15     Q   When was he repaid?
16     A   My mother paid him.
17     Q   I see. So on the date that the question
18  was answered, Mr. McGavran was owed $100,000, but
19  that has since been repaid?
20     A   My mother paid my brother -- her brother.
21     Q   And she did that after Monsour's, Inc.
22  answered this interrogatory?
23     A   Absolutely.
24     Q   All right. So as we sit here today, Mr.
25  McGavran is not owed $100,000?

Page 20

1      A   That's correct.
2      Q   All right. d. is notes payable. d.
3  reads, "Notes payable -- life insurance. Monsour's,
4  Inc. borrowed $81,751 against a life insurance
5  policy." Whose life insurance policy?
6      A   Most likely Pete.
7      Q   When did -- when was that life insurance
8  policy borrowed against?
9      A   Somewhere between 2001 and 2003, most
10  likely.
11     Q   And that is a debt that Monsour's owned?
12     A   We never had to pay it back. There was
13  life insurance -- there was cash value in the life
14  insurance. I believe the policy has since lapsed.
15     Q   Then on e. reads, "Sales tax, payroll and
16  accrued expenses existed as set forth on the January
17  26th, 2002 balance sheet"; do you have a recollection
18  of what the sales tax, payroll accrued expenses were?
19     A   No, sir.
20     Q   All right. But I would find it on a
21  January 26th, 2002 balance sheet?
22     A   I believe.
23     Q   All right. Current long term debt in the
24  amount of 100 -- excuse me. f. reads: "Current long
25  term debt in the amount of $126,153.98 on Bank of



EXHIBIT
3

CORPORATE REPRESENTATIVE, MARK MONSOUR  3/13/2006

Page 73

1  develop customers.
2      Q  **For marketing purposes?**
3      A  Marketing and development.
4      Q  **Marking and development, and not as just**
5  **income to be spent on other costs necessarily?**
6      A  Yeah.  Exactly.
7      Q  **"Allowance Income," we talked about that.**
8  **Then the next column is "Less: Costs of Goods Sold";**
9  **what does that mean?**
10     A  I believe what you have there is simply --
11 you have total sales at the very top, and your Less:
12 Cost of Goods Sold is probably your total of the Cost
13 of Goods sold.  Those are just summary numbers, total
14 figures.
15     Q  **Then I see a column titled "Gross Profit"?**
16     A  That's correct.
17     Q  **And what is that column telling me?**
18     A  Your income less your cost of goods sold.
19     Q  **And that is my projected gross profit for**
20 **some period of time; right?**
21     A  Right.  Weekly, monthly, annualized.
22     Q  **Okay.**
23     A  That would probably be an average.
24     Q  **Average.  And was this done for the -- to**
25 **consider the year going forward after the asset**

Page 74

1  **purchase --**
2      A  Yes.
3      Q  **-- agreement?**
4      A  Yes.
5      Q  **Then "G.P. %"; what is that called?**
6      A  Gross profit percentage.
7      Q  **Tell me what it means.**
8      A  Sales, less cost of goods sold.
9      Q  **So what does the, under weekly, "19.1%"**
10 **mean?**
11     A  Gross.  That is your gross profit of your
12 total sales.
13     Q  **All right.  To the right of that column, I**
14 **see in handwriting, "10% margin lowers the total**
15 **gross margin"; do you see that?**
16     A  Yes.
17     Q  **What does that mean?**
18     A  What that is referring to is with Menu
19 Maker, what was agreed on was that we would sell Menu
20 Maker cost plus 10%.
21     Q  **Which would be what, lower than the 19.1%**
22 **otherwise --**
23     A  Exactly.  That's why we lowered the
24 margin.
25     Q  **What was the -- what was the normal gross**

Page 75

1  **profit for retail sales?**
2      A  Higher.
3      Q  **Higher than 19.1?**
4      A  Yeah, that's why it's lower, because the
5  10% is having a -- or in effect.
6      Q  **To the best of your recollection, how much**
7  **higher was it?  Excuse me.  To the best of your**
8  **recollection, how much higher?**
9      A  I wouldn't -- I wouldn't want to recollect
10 on that.  I just know that it probably would have
11 been higher.  How much higher, that's a moving
12 target.
13         MR. WACHTEL:  Okay.  Everything is here.
14 We might as well just go off the record and dispense
15 with that, because I am going to stay on this
16 document.
17         (WHEREIN, a recess was taken.)
18     Q  **(By Mr. Wachtel)  Back on the record.**
19 **With regard to Graves Exhibit 2, which you have**
20 **before you, does the section of this document that**
21 **was already -- that we have already talked about take**
22 **into consideration rebates that Monsour's would have**
23 **had to have given to its customers?**
24     A  The revenue wouldn't take into effect
25 that.

Page 76

1      Q  **Does that show up someplace else in this**
2  **document?**
3      A  I'm going to have to look at this thing to
4  answer that question.  I don't know offhand.
5      Q  **Take a look.**
6      A  Offhand, I didn't see that.
7      Q  **All right.  Would that be an important**
8  **consideration in trying to figure out the**
9  **profitability over the --**
10     A  It would have an effect, that's correct.
11     Q  **What was the -- if you know, what was the**
12 **average rebate that your customers would receive, in**
13 **a percent number?**
14     A  If we got a quarter you might give them a
15 nickel.
16     Q  **So it's about what, 20?**
17     A  20%.
18     Q  **Do you know why that was not included in**
19 **this?**
20     A  One, I'm not sure that it wasn't.
21     Q  **All right.**
22     A  But if it wasn't, no, I wouldn't.
23     Q  **If you -- if Monsour's had not done the**
24 **asset agreement with Menu Maker, would Monsour's have**
25 **been as profitable in 2002 as it was in 2001?**

19 (Pages 73 to 76)

CORPORATE REPRESENTATIVE, MARK MONSOUR  3/13/2006

Page 117

1      A   Yes.
2      Q   Subparagraph 7 says, "Monsour's, Inc.
3   promptly shall provide to the Bank of America, N.A.
4   such financial statements and other financial
5   information as Bank of America, N.A. reasonably may
6   request from time to time."  And you agreed to do
7   that?
8      A   Yes.
9      Q   And you understood that Bank of America
10  wanted correct, accurate and true financial
11  statements, did you not?
12     A   I understand that.  I understand that.
13     Q   So -- okay.  I think you have answered my
14  question.  Also, paragraph 8 says, "Monsour's, Inc.
15  acknowledges that revolving credit ceases as of this
16  date, that the revolving credit loan matures on April
17  2nd, 2002, and that it shall be paid in full at that
18  time, and there will be no further draws or advances
19  on the revolving credit from and after February 5th,
20  2002."  I have read that accurately, have I not?
21     A   Yes.
22     Q   So that means, if I understand this
23  agreement correctly, that -- I'm sorry.  If I read
24  this Defendant's Exhibit 3 in conjunction with
25  Defendant's Exhibit 2, that every nickel that came

Page 118

1   out of the purchase of inventory by Menu Maker was
2   going to go to the bank, and in addition, Monsour's
3   was going to have to pay its revolving credit line on
4   April 2nd?
5      A   That's the way it reads; correct?
6      Q   And that's what you agreed to do --
7   Monsour's agreed to do?
8      A   Right.  Mark Monsour and Michael Slack,
9   the President of Bank of America, had an oral
10  agreement that is not included here.
11     Q   And we will come to your personal
12  agreement all in due time.  But -- and we have
13  established in discussions of the Monsour's
14  interrogatory answers what the revolving credit
15  indebtedness was; right?
16     A   Right.
17     Q   So by April -- assuming that Menu Maker
18  had paid you $800,000 for your produce, how much
19  money in total would Menu Maker had to have given
20  Bank of America by April 2nd -- excuse me.  How much
21  money total would Monsour's had to have given Bank of
22  America by April 2nd, 2002?
23     A   Under this agreement?
24     Q   Yes, sir, under -- under Exhibits 2 and 3
25  hereto.

Page 119

1      A   Right.  Every penny, as it reads here.
2      Q   Which would have been what?  A lot of
3   money?
4      A   Right.
5      Q   In excess of a million dollars?
6      A   Correct.
7      Q   Where were you going to get the money?
8   Where was Monsour's going to get the money?
9      A   When Menu Maker bought the inventory, the
10  funds would have gone to Bank of America.
11     Q   That takes care of at best $800,000; where
12  was the rest of money going to come from?
13     A   The rest of the money was going to have to
14  be repaid.  After talking to Michael Slack, and we
15  performed $300,000 to $500,000 worth, that was
16  going to change.  We were going do redraw the notes, with a
17  larger fixed note, and actually a lower floater.
18     Q   I understand.  Please tell me where I find
19  that agreement in written form.
20     A   Like I said, that was an oral agreement
21  that Mark Monsour had with Michael Slack, President
22  of Bank of America.
23     Q   Michael Slack -- are you telling me that
24  was -- the bank committed to that oral agreement, is
25  what you are telling me; right?

Page 120

1      A   Yes, sir.
2      Q   Who else was aware of that, other than you
3   and Mr. Slack?
4      A   No one.
5      Q   Mr. Slack is dead.
6      A   Unfortunately, at this time.
7      Q   Unfortunately.  You have no written
8   documentation to prove what you have just told me
9   about the agreement with Mr. Slack; is that true?
10     A   Right.  But if Menu Maker had done what
11  they were supposed to do, I wouldn't have to prove
12  that to you.  It would have happened.
13     Q   That may or may not be.  Please take a
14  look -- excuse me.  I am going to now place before
15  you what has been marked as Defendant's Exhibit 4,
16  and tell you that it appears to be a University
17  National Bank letter from Mr. Yoakam to you, as
18  President of Monsour's, Inc.  It is dated February
19  6th.  Have you seen that before?
20     A   Yes.
21     Q   And this simply, if I understand it
22  correctly, is that particular bank agreeing to
23  release its UCC filings on Monsour's inventory held
24  as collateral for loans that the bank made to
25  Monsour's?

30 (Pages 117 to 120)

CORPORATE REPRESENTATIVE, MARK MONSOUR  3/13/2006

Page 181

1  Operations for the period 11-25-2001 through
2  12-29-2001." It's a multiple -- it's a one page
3  document, and has "Monsour's" at the top.  It was
4  provided to us during the discovery.  Let me ask you
5  to look at that, and tell me if you recognize it?
6      A  Yes.
7      Q  Is that on Monsour's document?
8      A  It's an income statement.
9      Q  Sir?
10     A  It's an income statement.
11     Q  For what purpose was it prepared?
12     A  I don't offhand know.
13     Q  Let me show you what has been marked for
14  purpose of identification as Exhibit 9C, which
15  appears to be a one page document.  It is Bates
16  stamped by your counsel 11687, was produced by
17  Monsour's counsel.  It is titled "Monsour's.
18  Statement of Operations for the period 11-25-2001
19  through 12-29-2001." I would ask you to examine that
20  document, tell me if you recognize it.
21     A  It's an income statement.
22     Q  Uh-huh.  Were those documents created,
23  produced based on Monsour's -- on information that
24  Monsour's had regarding its financing condition?
25  I'm talking 9, 9A, 9B, 9C.

Page 182

1      A  These are internally generated reports.
2      Q  Just take a look at 9 and 9A.  When I
3  review those documents, in the entry "Accounts
4  Receivable - trade (net)," do you see that entry?
5      A  Both documents.  Correct.
6      Q  And 9 reflects "Accounts Receivable -
7  trade (net), value of $1,090,500," and 9A reflects
8  "$765,071"; they are of like date.  I don't
9  understand the difference; can you explain it to me?
10     A  I will have to review them, but I will try
11  to explain it.
12        MR. DEVAUGHN:  Take your time.
13     Q  (By Mr. Wachtel)  And I just want you to
14  explain that entry to me.
15     A  Which entry is that?
16     Q  The "Accounts Receivable - Trade (net)."
17     A  Could be one of two things.  One,
18  sometimes from Shelly's cutoff to when she actually
19  brings them up-to-date, those numbers can change.  Or
20  two, I could have told her to raise those numbers.
21     Q  Why would you do that?
22     A  To make the balance sheet look better.
23     Q  Why would you do that?
24     A  For bank purposes.
25     Q  Why would you do that?  I don't

Page 183

1  understand.
2      A  To stop a loan from being called.
3      Q  Are you familiar with the term "dishonest"?
4      A  Yes, sir.
5      Q  Don't you think that is just downright
6  dishonest?
7      A  What it is is a man trying to keep his
8  business going.
9      Q  I understand that.  And therefore, would I
10 be correct in understanding that you were willing to
11 do anything that you could do to keep your business
12 afloat, including provide false information to
13 lending institutions; isn't that true?
14     A  That is true.
15     Q  All right.  Good.  Let's look at the
16 inventory amount.  I will tell you that Exhibit 9
17 shows an inventory of $1,643,820, and Exhibit 9A
18 shows $997,950; can you account for the difference in
19 that?
20     A  That would have been artificial inflation
21 on my part.
22     Q  Sir?
23     A  I would have told Shelly Corn to raise
24 that number.
25     Q  For the same reasons that you gave me for

Page 184

1  artificially inflating accounts receivable trade net?
2      A  Yes, sir.
3      Q  Look at accounts payable - trade.
4  Document Exhibit 9 shows 455,194, and 9A shows
5  $914,286; how do you account for the difference?
6      A  I must say that is simply Shelly Corn
7  getting all her bills she actually paid up, because
8  the only two numbers played with were accounts
9  receivable and inventory.
10     Q  So this --
11     A  To the best of my knowledge.
12     Q  So this number, although it is -- the
13 numbers in those documents, although they are
14 widely disparate --
15     A  Yes.
16     Q  -- only the accounts payable trade has not
17 either been artificially inflated or artificially
18 deflated?
19     A  Yes.
20     Q  All right.  Let's move forward, if we may,
21 to -- I'm sorry.  Look at Exhibits 9B and 9C.  Do you
22 have those in front of you?
23     A  I do.
24     Q  Look at the column or the entry "Net
25 income/loss."  Do you see that?

46 (Pages 181 to 184)

**Bank of America**

Bank of America
Commercial Banking
KS8-376-01-01
216 North Broadway
Pittsburg, KS 66762

Tel  316.231.0600
Fax  316.231.0696

February 6, 2002

HAND DELIVERED

Mr. Mark D. Monsour, President
Monsour's, Inc.
112 North Elm Street
Pittsburg, Kansas 66762

Re:  Terms for Monsour's-Graves Menu Maker closing

Dear Mark:

The following are the terms upon which Bank of America, N.A. will proceed with the closing of the proposed sale of your institutional grocery business to Menu Maker, Inc. and ultimately the release of our security interest in your assets proposed to be sold:

1.  Monsour's, Inc. shall pay to Bank of America, N.A. the $60,000 of the $100,000 to be received at the closing today pursuant to § 2.5(i) of the Asset Purchase Agreement;
2.  Monsour's, Inc. shall assign to and shall pay to Bank of America, N.A., as and when received, the 2% and 1% additional compensation to be received for the Covenant Not To Compete pursuant to § 2.5(ii) of the Asset Purchase Agreement;
3.  The Inter-Creditor Agreement with Central Bank of Jefferson City, the buyer's bank, shall require that the inventory shipped from Friday to Thursday of each week shall be paid for by wire transfer to our Bank weekly on Friday;
4.  Monsour's, Inc. understands and agrees that execution of Inter-Creditor Agreement by Bank of America is not an implication that Bank of America will and does not commit Bank of America to continue to loan money to Monsour's, Inc.
5.  Monsour's, Inc. shall provide to Bank of America, N.A. each Friday a detailed invoice and itemized receipt detailing the items of inventory purchased by buyer from the preceding Friday through Thursday;
6.  Monsour's, Inc. promptly shall provide to Bank of America, N.A., and shall authorize Menu Maker, Inc. to disclose to Bank of America, N.A., such information about Monsour's inventory and accounts receivable as Bank of America, N.A. shall request from time to time;
7.  Monsour's, Inc. promptly shall provide to Bank of America, N.A. such financial statements and other financial information as Bank of America, N.A. reasonably may request from time to time;

1



EXHIBIT
4

8.  Monsour's, Inc. acknowledges that the revolving credit ceases as of this date, that the revolving credit loan matures on April 2, 2002, that it shall be paid in full at that time, and that there will be no further draws or advances on that revolving credit from and after February 5, 2002;

Mr. Mark D. Monsour, President
February 6, 2002
Page 2

9.  Monsour's, Inc. shall be solely responsible for and promptly pay all legal fees and related expenses incurred by or on behalf of Bank of America, N.A. with respect to transaction, and you acknowledge that Wheeler & Mitchelson, Chartered represents both your Company and our Bank from time to time and waive any conflict of interest with respect to such representation; and

10. All of Bank of America, N.A.'s rights under any agreement previously executed by Monsour's, Inc. and its stockholders continue in full force and effect.

We are pleased to cooperate with you in this transaction and appreciate your efforts. Please indicate your agreement to these terms by signing the enclosed copy of this letter and returning it to me at the Closing.

Sincerely,
Bank of America, N.A.

By: Michael W. Slack
      Senior Vice President

Accepted and agreed to
this 6th day of February 6, 2002

Monsour's, Inc.

By: _____

      Mark D. Monsour, President

_____
      Mark D. Monsour, individually

_____
      Sheila D. Monsour, individually

2

33

1  A.  If I can clarify your last question, I was
2      acting upon information given to me. I did not
3      assume that information was provided to me.
4      That was part of my conclusion.
5  Q.  I said assumed. You took as true that $750,000
6      paid to Monsour, Inc. and $150,000 paid to Mark
7      Monsour for his covenant not to compete would
8      have gone to the bank first to satisfy the
9      shortage of cash, second to be applied on a
10     line of credit?
11 A.  Correct.
12 Q.  Then didn't you assume that the Bank of America
13     would continue to extend credit to Monsour?
14 A.  Mark Monsour indicated that they had
15     discussions going and he expected that to
16     happen, correct.
17 Q.  And did you do any independent due diligence to
18     verify that statement?
19 A.  I did not.
20 Q.  Wasn't that important for your calculations to
21     determine whether or not Monsour would have
22     credit available to continue to do business?
23 A.  That fact is important to my calculation.
24 Q.  Were you furnished any correspondence from the
25     bank indicating that it was not extending

34

1      additional credit?
2  A.  I am familiar with the term in that letter.
3      The correspondence in that letter -- can I
4      borrow that, rather than look it up in my work
5      papers?
6  Q.  Sure. I thought I marked that. I don't think
7      I did.
8  A.  The letter from Bank of America, I have seen
9      item 8 that states that that particular
10     revolving credit ceases as of that date,
11     maturity April 2, 2002. I followed that up
12     with discussions with Mark Monsour, and he had
13     indicated that Bank of America was working with
14     him and he expected financing arrangements to
15     continue.
16 Q.  What you are just looking at was a hand
17     delivered letter of February 6, 2002 from Bank
18     of America to Mark Monsour as president?
19 A.  Correct.
20 Q.  And on the second page, item number 8, it says,
21     "Monsour, Inc. acknowledges that the revolving
22     credit ceases as of this date, that the
23     revolving credit loan matures on April 2, 2002,
24     that it shall be paid in full at that time, and
25     that there will be no further draws or advances

35

1      on that revolving credit from and after
2      February 5, 2002," you read that, did you not?
3  A.  I did.
4  Q.  Did I read it correctly?
5  A.  That sounds correct.
6  Q.  Okay. You turned to Mark Monsour and he says,
7      "Ignore that. They promised me they would
8      continue to loan me money"; is that what your
9      testimony is?
10         MR. DeVAUGHN: Objection, misstates
11     his testimony. You can answer.
12 A.  I didn't ignore the fact. It is not uncommon
13     for a bank in a situation such as theirs to
14     work with their customers as to both of their
15     advantage.
16 Q.  You got that experience with Bank of America in
17     Pittsburg?
18 A.  Not with that particular bank.
19 Q.  Do you have that experience with Michael W.
20     Slack, the senior vice-president of Bank of
21     America in Pittsburg?
22 A.  I do not.
23 Q.  So can you tell us with any reasonable degree
24     of certainty that despite what he said in this
25     letter, Bank of America was ready, wlling and

36

1      able to extend additional credit?
2  A.  That is beyond the scope of what I was asked to
3      do.
4  Q.  So your answer is no, you can't?
5  A.  Can I say they were going to do --
6  Q.  Yes.
7  A.  No, I understood that to be true from Mark
8      Monsour.
9  Q.  Did you take any steps to inquire of Bank of
10     America directly whether they would have
11     continued to extend credit to Monsour, Inc.?
12 A.  I did not.
13 Q.  Yet while they pulled the plug and stopped
14     loaning money to Monsour was critical to your
15     calculations, wasn't it?
16 A.  Continued financing was critical.
17 Q.  If they didn't get the loan they wouldn't
18     continue; is that a fair statement?
19 A.  That would be a fair statement.
20 Q.  Now, in addition to this $900,000 coming from
21     Menu Maker, you made a calculation in your
22     report as a liquidation of prepaid assets,
23     correct?
24 A.  Part of my calculations did say that prepaid
25     assets would be offset by accrued expenses and

EXHIBIT 5

45

1  A.   Correct.

2  Q.   And that substantially all of the produce of

3       Monsour would have been purchased, correct?

4  A.   Correct.

5  Q.   What collateral then is there for the bank to

6       continue to loan money to Monsour if all of the

7       inventory, produce and other goods, are gone?

8  A.   **My calculation doesn't assume this happens**

9       **overnight. If they are an ongoing business,**

10      **they purchased additional inventory, they sell**

11      **the inventory, they would maintain an inventory**

12      **balance, that would be collateral. They would**

13      **also have additional customers that would**

14      **create other receivables. I didn't assume that**

15      **these receivables would be collected overnight.**

16      **So the same types of receivables would -- same**

17      **types of assets could serve as collateral.**

18  Q.  I don't think that exactly answered my

19      question. I was asking you what collateral

20      would have been -- would have remained for the

21      bank to continue to extend credit to Monsour.

22      Part of your answer was, as I understood it,

23      they would buy additional inventory and that

24      could be pledged as collateral?

25  A.  Correct.

BARBER & ASSOCIATES
(316) 267-8278

46

1  Q.   Is that what you said?

2  A.   **Correct.**

3  Q.   Now, that would depend upon Monsour's credit

4       worthiness with its vendors, would it not?

5  A.   **It would.**

6  Q.   Did you do any independent due diligence to

7       determine what that status was between Monsour

8       and its vendors?

9  A.   **Other than Mark's representation that that**

10      **could be established, no.**

11  Q.  So you are relying on Mark Monsour to tell you

12      that at Bank of America things are hunky-dorey

13      and the same with the vendors?

14  A.  **I didn't say hunky-dorey.**

15  Q.  Everything is fine, continue to march, keep the

16      doors open, continue to do business because I

17      know my bank, they will loan me money and I can

18      get the produce from my vendors; is that

19      essentially what he told you?

20  A.  **No. He said the bank was willing to work with**

21      **them. Absent those collateral items, it is in**

22      **the bank's best interest to work with a**

23      **customer to help them succeed. That allows**

24      **them to not only possibly recoup their**

25      **principal, but continue with a customer.**

BARBER & ASSOCIATES
(316) 267-8278

47

1  Q.   So you are prepared to give an opinion as to

2       what is the best interest of Bank of America?

3  A.   **No.**

4  Q.   Well, are you saying that Bank of America would

5       have probably loaned money and kept the doors

6       open without any collateral?

7  A.   **No.**

8  Q.   Did you do any due diligence to determine what

9       the credit worthiness of Monsour was with its

10      vendors?

11  A.   **I did not.**

12  Q.   Were you made aware of the forbearance

13      agreement, forbearance and settlement agreement

14      entered August 12, 2002, which I have marked as

15      Hull Deposition Exhibit 10?

16  A.   **I was aware of the issue, but did not review**

17      **that agreement as part of my report.**

18  Q.   You did not look at the agreement?

19  A.   **I don't believe that I did.**

20  Q.   Were you made aware that as of August 2002

21      Monsour owed $402,000 to eight of its produce

22      vendors?

23  A.   **What was the date? I am sorry.**

24  Q.   August 12, 2002.

25  A.   **Okay. Again, my report starts --**

BARBER & ASSOCIATES
(316) 267-8278

48

1  Q.   Calls for yes or no. Did you have any

2       information that that was the amount owed in

3       August to its vendors?

4  A.   **I wasn't aware of an amount owed. I don't**

5       **recall that specific amount.**

6  Q.   Were you made aware that under this forbearance

7       and settlement agreement that all the proceeds

8       from the asset purchase agreement with Menu

9       Maker was to go to these vendors and Bank of

10      America?

11  A.   **I had an understanding of that with Bank of**

12      **America. And, again, I am not familiar with**

13      **this agreement.**

14  Q.   So you didn't know that whatever may be left in

15      proceeds goes to the vendors?

16  A.   **You are talking about an agreement in August of**

17      **'02?**

18  Q.   Correct.

19  A.   **The purchase agreement was earlier that year.**

20  Q.   Correct.

21  A.   **After the fact that certain conditions didn't**

22      **happen, and I haven't done an analysis, but**

23      **likely contributed to the issues involved with**

24      **the forbearance and settlement agreement.**

25  Q.   Let's back into it then. Between February of

BARBER & ASSOCIATES
(316) 267-8278

MARK MONSOUR  3/13/2006

Page 13

1   A   Correct.
2   Q   Any postgraduate study, formal, Master's
3   Degree or anything like that?
4   A   Never completed, but some post.
5   Q   No degree, but you did do some
6   postgraduate work?
7   A   That's correct.
8   Q   Okay.  Let's describe your work history
9   moving from, oh, I don't know, from when you
10  graduated from college, what did you do?
11  A   Monsour's, Inc.
12  Q   From when until when, approximately?
13  A   From the age of 12 up.  Actually.  I mean
14  I grew up in that business.
15  Q   So -- but after you graduated college?
16  A   I went to work at Monsour's.
17  Q   What did you do there?
18  A   Salesperson.
19  Q   And for how many years did you operate as
20  a sales person?
21  A   When my father died, I left that business.
22  My father died in '85.
23  Q   You left Monsour's in 1985?
24  A   That's correct.
25  Q   What did you do when you left Monsour's?

Page 14

1   A   I was a Federal Deposit Insurance
2   Corporation bank examiner, approximately 13 1/2
3   years.
4   Q   That made you a Federal employee, did it
5   not?
6   A   Those are the -- those are the people who
7   send three people to do one man's job.  It's a joke.
8   Q   It's kind of like lawyers taking
9   depositions, don't you think?  In what cities did you
10  perform your work as an FDIC examiner?
11  A   Based out of Houston, Texas, worked in
12  Arlington, Virginia, worked in New York City, New
13  York, worked in Los Angeles, California, worked in
14  Dallas Texas.  There was a period of time when you
15  got to go to where the hot spots were.
16  Q   What does an FDIC examiner do?
17  A   You work extensively with the banks.  When
18  your -- when you are an assistant examiner you would
19  work on financial reports.  When you are an examiner
20  to senior examiner you would work on the loan
21  portfolios.  And policies of the bank, you interact
22  with the bank, with the bank management and board.
23  Q   When you tell me you would work on loan
24  portfolios --
25  A   It would be extensive.  We could stay here

Page 15

1   for days for me to describe that, really.
2   Q   Why don't you describe it.  I don't have
3   days, but why don't you describe that for me briefly
4   in terms of what does that mean?
5   A   Looking at a loan, evaluate it and --
6   (inaudible).
7       MR. DEVAUGHN:  You need to speak up.
8   A   You look at a loan, evaluate it on a
9   financial basis, look at the policies of the bank,
10  look at the management in place.
11  Q   (By Mr. Wachtel)  And what -- why?  Why do
12  you look at that?
13  A   To engage in the safety and soundness of
14  the bank.
15  Q   I think you told me you had a Business
16  Degree; right?
17  A   Correct.
18  Q   With hours in accounting, I'm assuming?
19  Some?
20  A   Some.
21  Q   Why did you leave the FDIC?
22  A   When I took the job it was a 60/40 travel.
23  a year before I left I traveled 95% of the time.  I
24  was home 22 days out of that year.
25  Q   Uh-huh.

Page 16

1       (Telephone interruption.)
2   Q   (By Mr. Wachtel)  I'm sorry.  Please
3   continue your answer.
4   A   I instructed my supervisor that I wanted
5   to get back to more in town, because I was engaged at
6   the time, and I was home 21 days the following year.
7   Pretty much once to twice a month for a weekend.  So
8   I had been asked by my brother and some other people
9   at Monsour's to return to the company, to help turn
10  it around, so I took that opportunity and I came back
11  to be in my home town, to be around my family.
12  Q   Is your brother Richard?  Rick Monsour?
13  A   Rick.  Call him Rick, yeah.
14  Q   Your brother asked you to come back; who
15  were the other people who asked you to come back?
16  A   John Keller.
17  Q   Anybody else?
18  A   No.
19  Q   Okay.  Who is Mr. Keller?
20  A   He was sales manager at Monsour's at that
21  time.
22  Q   If I understood you correctly, you told me
23  your brother and Mr. Keller had asked you to come
24  back to help turn Monsour's around, is that what you
25  said?

MIDWEST LITIGATION SERVICES
Phone: 1.800.280.DEPO(3376)

EXHIBIT
6

Page 17

1    A    That was the words, yes.
2    Q    Okay.  Well, what did you take that to
3 mean?
4    A    Come back to work in the family business.
5    Q    Okay.  What about Monsour's at the time
6 needed turning around?
7    A    I think just the fact that -- I really
8 don't know.  Those were their words, not mine.  I
9 really don't know.
10    Q    Okay.
11    A    But I wouldn't say -- I wouldn't say it
12 was a thriving business.  Pete had a conservative
13 attitude, conservative management style.
14    Q    What was his management style?  What was
15 conservative about it?
16    A    Pretty much -- anything.  He just had a
17 different management style, very conservative.
18    Q    In terms of?
19    A    I think it had to do with more of his --
20 of his area in life, you know, where he was at.  You
21 know, some people, when you're young, you want to
22 take risks or whatever, and as you get older you try
23 to regroup and pull in your horses.
24    Q    Was he reluctant to take on debt necessary
25 to keep the business operating properly?

Page 18

1    A    I really can't answer that question, but
2 -- I really don't.  It would just be speculation.
3    Q    Okay.  How long had -- is it Peter?  Pete
4 Monsour?
5    A    Pete, Sr., then you have Pete, Jr.
6    Q    And was it Pete, Sr., that was running the
7 business at that time?
8    A    Correct.
9    Q    How long had he run the business, do you
10 remember?
11    A    He had been in the business with my --
12 with his brothers and sisters for his life, or for a
13 large portion of his life.
14    Q    You came back to Pittsburg and went to
15 work at Monsour's; is that right?
16    A    Right.
17    Q    In what capacity did you go back to work
18 there?
19    A    Sales person.
20    Q    And that was in what year?
21    A    '98, guessing.  Approximately.  '97.  '96.
22 I'm not --
23    Q    One of those years?
24    A    Yeah.
25    Q    Did -- before you acquired Monsour's, did

Page 19

1 your position, your work position at Monsour's change?
2 In other words were you always a salesman?
3    A    And produce buyer.
4    Q    And produce buyer; any other
5 responsibilities that you had?
6    A    I probably wore a few different caps, but
7 as far as actual titles, that would be it.
8    Q    As far as actual titles; what other caps
9 did you wear?
10    A    In a family business you do whatever you
11 need to do, you know, so probably helped with the
12 sales force.
13    Q    Anything else that you can think of?
14    A    Not that I can recall.
15    Q    Did there come a time when you decided
16 that you would like to acquire Monsour's?
17    A    Yes.
18    Q    All right.  What -- what caused you to
19 start thinking about that?
20    A    I believe Pete was either going to sell
21 the business, and I believe he was in negotiations,
22 or he was going to close the business, one of the
23 two.
24    Q    You believed that he might have been in
25 negotiations to sell the business; did you know --

Page 20

1 did you have an idea -- no.  Bad question.  Did you
2 know with whom he was negotiating for sale?
3    A    Could have been other parties; I know Dick
4 was one of those at one time.
5    Q    When did you make the decision that you
6 were going to acquire Monsour's?
7    A    '98.
8    Q    With whom did you negotiate for the
9 acquisition of Monsour's?
10    A    Pete.
11    Q    Tell me about those negotiations.  Well,
12 first, how long did those negotiations take before an
13 agreement was reached?
14    A    Probably three or four months.
15    Q    I know that is a long time ago; were the
16 negotiations primarily over price?
17    A    Yes, I believe.
18    Q    How much did -- initially, if you can
19 recall, how much did Mr. Pete Monsour -- I'm sorry,
20 was Mr. Pete Monsour the only shareholder at that
21 time?
22    A    If it wasn't just him, it was his wife.
23    Q    All right.  How much did Mr. Monsour want
24 -- I'm sorry; was this going to be an acquisition --
25 this wasn't going to be an asset deal, right, you