

**AGH** ALLEN, GIBBS & HOULIK, L.C.

Certified Public Accountants & Consultants

━━━━ www.aghlc.com

March 31, 2006

Epic Center • 301 N. Main, Suite 1700
Wichita, Kansas 67202-4868
(316) 267-7231 • FAX (316) 267-0339

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC
1600 Epic Center
301 North Main
Wichita, KS 67202-4888

Re:   *Mounsour's, Inc., et al, vs. Menu Maker Foods, Inc.*
      United States District Court, District of Kansas
      Case No. 05-1204-MLB

Dear Mr. Wachtel:

You have engaged me to assist you by providing expert witness services concerning defendant's response to plaintiff's purported lost profits and damage calculations and methods in the above-referenced matter.

I am a Certified Public Accountant in the states of Kansas and Oklahoma. A statement of my biographical information and a statement about my experience and qualifications, which includes a listing of cases in which I have provided trial or deposition testimony, are attached to this report. I have published no articles in the past ten years. If I am later supplied with additional information, I reserve the right to modify or supplement my report. In addition, if the plaintiffs modify or supplement any of their reports, I reserve the right to modify or supplement my report. My standard hourly rate for litigation support services is approximately $265 per hour. I was assisted by other staff whose hourly billing rates are approximately $150 per hour. This compensation is unaffected by the outcome of this matter.

**Information Considered**

In connection with this engagement, I have studied a report from Mr. Marshall Hull, CPA, CMA, of Regier, Carr & Monroe, LLP, dated January 30, 2006. I have also read and studied the Asset Purchase Agreement (hereinafter "Agreement") which is central to the above-referenced matter. Other information and data I considered in forming the opinions set forth below are listed on **Attachment 1** hereto, or otherwise set forth within this report.

**Proper Determination of Lost Profits Damages**

Proper determination of lost profits claimed by a plaintiff for damages by a defendant's actions must be founded on facts, not conjecture or speculation. In some cases, estimates and assumptions may be necessary, but they are valid only if there are credible underlying facts that can support those estimates and assumptions. Furthermore, the methodologies used must be verifiable and able to be recomputed or checked both by the witness and someone reviewing the report. And, finally, the methodology should be executed in a professional manner, without significant mathematical errors.

Plaintiffs are not entitled to recover lost **gross** profits. The proper methodology to measure lost profits must include subtracting all costs and expenses that were saved because of the lost sales volume. These are referred to as variable expenses. See **Attachment 2** for a discussion of the differences between gross profit and net profit.

**AGH** An Independently Owned Member
of the RSM McGladrey Network

EXHIBIT
**C**


Dockets.Justia.com

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

Lost future net profits claimed by a plaintiff must be discounted to their present value, in order to take into account the economic fact that a dollar received in the future is not worth as much as a dollar received today.

My opinions, above, about proper determination of lost profits are based on my review of the treatises listed in **Attachment 3** hereto, my education, training and experience related to measuring economic losses and profits in accordance with the measurement principles articulated by generally accepted accounting principles.

### Plaintiff's Determination of Lost Profits Damages Is Improper

In my opinion, the report made by Mr. Hull, does not constitute a proper determination of lost profits. Mr. Hull, himself, does not make this claim in his report; his report should not be construed as such by anyone else.

Mr. Hull has based some of his opinions on the unsubstantiated representations and opinions of others – specifically the plaintiffs in this matter. He goes on to state that his "...opinions herein are to a reasonable degree of accounting certainty." I will discuss, later in this report, a number of factual circumstances which cast unreasonableness and uncertainty into Mr. Hull's calculations.

Mr. Hull's report contains considerable conjecture about events that never actually occurred. Therefore his conclusions are not useful for calculating damages.

The bases for my opinions, above, about this improper determination of purported damages, are as follows:

1. Any calculation of lost profits must be computed using net profits, not cash flows that are based on gross profits. Mr. Hull was engaged to perform an analysis and projection of cash flows. His methodology for arriving at an opinion was fundamentally unsound and not appropriate for expressing an opinion on lost profits, since his projected revenues are not properly reduced by variable expenses.

2. Any calculation of future lost profits must be discounted back to present dollars. Nowhere in Mr. Hull's report does he take this into account, even though the purported period of time in which the damages are alleged to occur includes several future years.

### Fundamental Flaws in Mr. Hull's Report

1. A cursory reading of the balance sheet Mr. Hull refers to reveals that Monsour's (at January 26, 2002) was insolvent. With negative Stockholders Equity ("Net Worth") of more than $1.3 million and creditors' claims totaling more than one and one half times the book value of all its assets, this company did not have the ability to meet its maturing obligations without a large injection of capital or additional borrowings. According to the sixth (current) edition of *Kohler's Dictionary for Accountants*, insolvency means:

   "Inability or failure to pay debts as they become due. This may occur because the firm is in an illiquid state. The term also is used to describe situations in which total liabilities exceed total assets with a negative net worth resulting."

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC

Menu Maker Foods, Inc.

Below is a schedule showing the history of the assets and liabilities of Monsour's, Inc.

### Monsour's Inc. -- Historical Balance Sheets

|  | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Cash | $ 81,142 | $ (81,349) | $ 37,172 | $ 7,733 | $ 0 |
| Trade Receivables | 457,138 | 519,094 | 646,222 | 921,791 | 765,071 |
| Inventory | 672,163 | 1,201,989 | 1,512,033 | 1,503,420 | 997,950 |
| Other Assets | 680,834 | 644,921 | 959,758 | 1,015,034 | 1,157,683 |
| Total Assets | $ 1,891,277 | $ 2,284,655 | $ 3,155,185 | $ 3,447,978 | $ 2,920,704 |
|  |  |  |  |  |  |
| Current Liabilities | $ 364,136 | $ 731,202 | $ 1,666,152 | $ 1,731,189 | $ 3,555,150 |
| Long-term Liabilities | 576,765 | 808,524 | 726,679 | 718,454 | 575,135 |
| Total Liabilities | 940,901 | 1,539,726 | 2,392,831 | 2,449,643 | 4,130,285 |
| Stock & Paid-in-capital | 68,630 | 68,630 | 68,630 | 543,253 | 400,750 |
| Treasury Stock | (1,709,080) | (1,934,080) | (1,934,080) | (1,934,080) | (1,934,080) |
| Retained Earnings | 2,590,826 | 2,610,379 | 2,627,804 | 2,389,162 | 323,749 |
| Total Net Worth | 950,376 | 744,929 | 762,354 | 998,335 | (1,209,581) |
| Total Liabilities & S/holders' Equity | $ 1,891,277 | $ 2,284,655 | $ 3,155,185 | $ 3,447,978 | $ 2,920,704 |

For years 1997 through 2000, amounts shown are from federal income tax returns. Year 2001 amounts are from Monsour's Inc. balance sheet, bates numbered 11688 - 9.

The highlighted lines above demonstrate the increase in debt (especially those obligations that were due currently) and the decline in stockholders' equity (net worth). These changes in the financial condition of Monsour's, Inc. were not only rapid, but also dramatic. Mr. Hull's report contains a balance sheet for January 29, 2002 – just one month after the end of 2001 -- which depicts negative net worth over $1.32 million. The reduction of "Retained Earnings" from 2000 to 2001 represents a net loss for the period of over $2,065,000. In my opinion, these facts indicate that Monsour's ability to continue as a going concern was not an "accounting certainty."

2. The financial condition of Monsour's revealed by the aforementioned reading of the balance sheet for Monsour's raises serious questions about the operations of Monsour's -- specifically Monsour's management of inventory, accounts receivable from its customers, accounts payable to its vendors and its bank debt. In the exhibit above, "Current Liabilities" for 2001 includes a "negative cash balance" in the amount of over $452,000, which would indicate that Monsour's obligations were not being paid in a timely fashion.

3. Mr. Hull has projected a balance sheet subsequent to the Agreement in which the accounts receivable and inventory are completely liquidated. This would have left Monsour's in the position of still owing Bank of America over $500,000 on a line of credit that pledged accounts receivable and inventory as collateral. With all of the collateral gone, the remaining balance on the line of credit would be immediately due and payable. In that event, Monsour's would have been forced to liquidate all of its assets and would

*Allen, Gibbs & Houlik, L. C.*

*Page 3*

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

have been unable to continue in business and therefore Monsour's would have been unable to achieve any future profits to support a claim for lost profits.

4. Mr. Hull's proposed liquidation of the assets of Monsour's and the subsequent reduction of its debt unrealistically assumes that all of the assets of the company can be converted into cash immediately for their book values.

   a. According to Monsour's "Open Item Accounts Receivable Trial Balance" (bates stamp numbers 11283 through 11467), on January 18, 2002 (just eight days prior to January 26, 2002), total accounts receivable are shown as $739,011. Of that total, over $18,000 are shown as more than ninety days old. As an account receivable ages, the likelihood of its being fully collected diminishes. The likelihood of Monsour's being able to collect 100 percent of those old accounts cannot be determined with reasonable accounting certainty. It is also likely that, even among the current accounts, there are some that will never be collected – for various reasons. It is not within the realm of reasonable accounting certainty to believe:

      i. That Monsour's would collect every dollar of the balance of every account receivable.

      ii. That Monsour's would do so almost immediately.

   b. Mr. Hull assumes that the Note Receivable would also be collected immediately for full value. This, however, did not come about. According to Monsour's financial reports for March 30, 2002 (bates stamp numbers 11604 through 11609), almost $7,000 of this balance was written off as "bad debt."

   c. Prepaid expenses are seldom, if ever, recoverable as cash. It would not be reasonable to expect this amount on Monsour's balance sheet to be converted into cash. The "Other Assets" category includes $45,583 in deferred income taxes. This, too, is not something that can be converted into cash with any speed or certainty, if at all. So, to include the liquidation of these assets as sources of immediate cash is simply mistaken.

5. Related to the size of the debt on the company's books is the fact that the cash balance reported here is negative in the amount of over $452,000. This means that the company has, in essence, borrowed another $452,000 from its bank and should report this as debt, along with its Accounts Payable and other current liabilities.

   a. "Current" liabilities are those which must be paid within the current fiscal period or operating cycle. Mr. Hull's Exhibit 1.1 does not specifically identify "current liabilities" but they are assumed to be a total of $1,077,393. The subtotal of "notes payable" is not specifically labeled, but suggests that these balances are all long-term, or not due to be paid within the current fiscal period. Mr. Hull has accepted the company's contention that these notes would all be re-negotiated under terms that would not require substantial repayment within the current fiscal period. In my opinion, this is not a viable assumption and at least some portion, if not all, of these notes payable should have been reflected on this schedule as currently payable. **Attachment 4** is a letter from Bank of America to Mark Monsour, dated February 6, 2002, in which Bank of America states that there is a revolving credit line that "matures on April 2, 2002," and that this credit line

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

ceases as of February 6, 2002. This line of credit is shown on Mr. Hull's schedule as the first of two "Notes Payable – Bank of America," with a balance due of $975,000. In my opinion, current liabilities should include at least this $975,000, which was to come due just a little more than sixty days after the date of the Agreement.

    b.   The other note payable to Bank of America was a mortgage loan with monthly installments due of $11,457.47 each. Therefore, Monsour's should have included in its current liabilities the amount of principal due within the current fiscal period.

    c.   It is apparent that, in order to pay its current obligations, Monsour's would have required approximately $2,500,000 (listed current liabilities of $1,077,000 plus cash overdraft of $452,000, plus the balance on the line of credit of $975,000) -- much more immediate cash than was anticipated in the Agreement.

6.   Due to the aging and dollar volume of the accounts payable to vendors, it would appear that vendor relationships were strained. By April 11, 2002, Monsour's was indebted to its vendors by more than $1 million. According to an "Accounts Payable Aged Trial Balance" report (bates numbered 10281 – 10302) on that date, there were unpaid invoices dating as far back as July, 2001. More than $219,000 of the total due was more than 90 days past due. It would be unlikely that Monsour's would have been able to establish additional sources of credit with its vendors without the ability to draw on its line of credit at Bank of America. Mr. Hull has failed to demonstrate or explain how Monsour's, Inc., would be able to meet its maturing obligations without a line of credit or written agreements from new lenders to fund the company's cash flow needs, or the ability of any of the owners to fund working capital needs.

7.   If the company were able to liquidate all of its assets immediately and use the resultant cash to reduce its debt, it would not be able to continue operating due to the fact that it would have no cash and no inventory. In order to sell any product, the company must first buy that product. Mr. Hull has not determined with reasonable accounting certainty how the company would be able to purchase inventory without available credit.

8.   Mr. Hull attempts to project "future operations" based upon conjectural information supplied to him by the plaintiff. I have read various financial reports and reports to lenders, some of which carry the same dates as one another, but which are contradictory to each other. I have since learned that Mark Monsour has admitted in his deposition testimony to falsifying the company's financial statements in order to deceive Monsour's creditors. Knowledge of these inconsistencies and falsifications raises serious doubts as to the credibility of the representations Mr. Hull has relied upon to arrive at an opinion of "reasonable accounting certainty."

9.   Mr. Hull's projections are an attempt to project "cash flow" and are based on gross profits, which (as stated before) is not an acceptable measurement of lost profits.

10.  Mr. Hull has tried to project overall operations, rather than to isolate the operations related to the defendant. This is unacceptable. Defendant is in no position to affect the purchases of other customers, nor is defendant in any position to affect the costs or expenses related to sales to other customers. Defendant cannot be held accountable for losses resulting from lost sales to other customers.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

11. Debt service, including both interest and principal payments, as used in Mr. Hull's report, is not part of the proper calculation of lost profits. Debt service is a factor in measuring cash flow, but principal payments are never considered in properly determining lost profits.

12. No attempt has been made to differentiate between variable expenses and fixed expenses. This distinction is a critical one. Fixed expenses are not used in the calculation of lost profits; only the amounts of variable expenses that were "saved" (in concert with the lost revenue) are used in a proper lost profits calculation.

13. Mr. Hull has used a term of six years from the date of the asset purchase (January 31, 2002) to project six years of lost cash flow. Using that time frame, the period would extend from February 1, 2002, (the date of the Agreement) to January 31, 2008. This means that any lost profits calculated for the years ending January 31, 2007, and 2008, should be discounted to their present value as of some current date. Mr. Hull has made no attempt to do so.

14. Mark Monsour's salary is shown separately, as a loss. It is unreasonable to calculate financial damage for services that Mr. Monsour did not render. Not only is Mr. Monsour's salary in the nature of a fixed expense, the fact that Mr. Monsour's employment was terminated at Monsour's, Inc., does not deprive him of the ability to earn compensation elsewhere that is commensurate with his business skills. Mr. Hull has failed to show any mitigation efforts by Mr. Monsour to earn fair compensation as an executive in a similar position elsewhere. Further, Mr. Monsour's claim for lost salary is outside of the company's claim for damages.

15. Mr. Hull has projected interest calculations remaining level for the entire six year period, when his own exhibit demonstrates otherwise. He has projected interest payments (at 5.5 percent) requiring $6,651 per month, or $79,812 per year. However, by the end of 2005, according to the table in his exhibit, the prime rate had risen from 4.75%, in 2002, to 7.0% at the end of 2005. This strongly suggests that Monsour's interest expenses would have been much higher in subsequent years.

16. Mr. Hull has calculated a "Cost of Sales Ratio" which he then uses to estimate the cost of sales to customers of Monsour's, Inc., other than Menu Maker Foods, Inc. He has stated that his ratio is more conservative than the pro forma estimates provided by Monsour's, Inc. However:

    a. Mr. Hull's methodology fails to take into account the fact that one of the tax returns he used (for the six-months from July 1, through December 31, 2000) to calculate his "average" was for a short time period. Thus, less weight should have been given to the gross profit margin percentage for that period than for the others. A simple weighted average calculation would have been appropriate.

    b. The financial statement Mr. Hull references as "FYE 12/31/2001" may or may not be accurate. I have read the statement Mr. Hull refers to, bates numbered 10004. Additionally, I have read Monsour's, Inc's. financial statement "For the Period (Ended) 12/29/01" (bates numbered 11687) which shows Gross Sales of $14,758,228 (as opposed to Mr. Hull's amount of $15,002,041) and Cost of Goods Sold of $12,413,217 (as opposed to Mr. Hull's amount of $11,012,739). This alternate financial statement displays Gross Profit of $2,345,011 (as opposed to Mr. Hull's amount of $3,989,302) and a Gross Profit Margin of 15.89

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

percent (as opposed to Mr. Hull's percentage of 26.59 percent). My reading of the balance sheets associated with these two versions of the income statement leads me to believe that Mr. Hull's version is not as reliable as the other version.

c.    I have modified Mr. Hull's calculation by weighting the periods appropriately (as discussed in a. above) and using the gross profit percentage calculated on the alternate statement (as discussed in b. above) for the year ended December 31, 2001. The results of my calculations are as follows:

| Period Ended | Gross Profit Percentage | Months | Weighted Percentage |
|---|---|---|---|
| 6/30/1999 | 23.24% | 12 | 278.88% |
| 6/30/2000 | 24.57% | 12 | 294.84% |
| 12/31/2000 | 23.48% | 6 | 140.88% |
| 12/31/2001 | 15.89% | 12 | 190.68% |
| | | 42 | 905.28% |
| Divided by | | | 42 |
| Weighted Average Percentage | | | 21.55% |

Mr. Hull projected an average gross profit margin of 24.47 percent. This difference of nearly 3 percent in gross profit margin would yield a significant difference in Mr. Hull's cash flow projections. The circumstance of multiple versions of financial statements purporting to be for the same time period calls into question the validity of the underlying data given to Mr. Hull.

## Overall Opinion Regarding Mr. Hull's Report

In my opinion, Mr. Hull's methodology has relied upon unsubstantiated speculation and conjecture. The premise of Mr. Hull's report (to estimate cash flows) is faulty, in that cash flows based on gross profits is not a proper measure of economic loss. Mr. Hull has not reasonably taken into account the financial condition of Monsour's at the date of the Agreement and he has not properly accounted for the present value of any profits or losses. Based upon the above discussion, I find no support for the plaintiff's claim for economic damages in Mr. Hull's report.

## Proper Estimation of Lost Profits

You have asked me to calculate the plaintiff's actual lost profit on the basis of the documents you have made available to me and using proper methodology to arrive at a conclusion. I have read and studied the Agreement and certain other documents (listed on Attachment 1 or otherwise identified herein).

Under the terms of the Agreement, there were to be two purchases made by Menu Maker Foods, Inc., from Monsour's, Inc., that are the subject of this action. Each of these purchases might ordinarily include some element of profit. They are as follows:

1.    Purchase of Monsour's grocery inventory on hand at the date of the Agreement.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

   2.  Future purchases of produce inventory from Monsour's, Inc.

Item 1, the purchase of Monsour's grocery inventory on hand at the date of the Agreement, is part of the plaintiff's claim for damages. In this aspect of the Agreement, the calculation of "lost profits" is fairly simple and clear. Monsour's agreed to sell its grocery inventory to Menu Maker Foods at its (Monsour's) cost. Ultimately, Menu Maker Foods did not purchase as much (in dollar amount) as Monsour's wished for them to buy. However, when anything is sold for the same price that was paid for it, there is no profit or loss. The purchase of one asset at fair market value with another asset of equal value does not result in financial damage. Simply put, a dollar given for a dollar in return does not result in any profit or loss and, therefore, results in no economic damage.

For the volume of purchases that was actually delivered, there is no profit. For the volume of purchases that might have been made, there would be no profit. Assuming the inventory on hand was in good, marketable condition, any that was in excess of what was delivered likely could have been returned to its source for credit, or otherwise disposed of. In any event, no profit was ever intended to be made on this part of the transaction, therefore none would be lost.

My conclusion is that, relative to the purchase of inventory on hand at the date of the Agreement, Monsour's lost profit amount was $0.00 because no profit was ever intended by the parties.

Item 2, the future purchases of produce inventory, is also part of the plaintiff's claim for damages. Calculation of lost profits on this aspect of the Agreement might be somewhat more complex. However, in this case, it is made simpler by the facts of the case.

As I have pointed out earlier in this report, Monsour's liabilities were one and one half times the book value of its assets, resulting in negative net worth. That negative net worth was about $1.3 million dollars according to Monsour's own financial reports. Monsour's had written checks on its cash accounts that overdrew that account by more than $452,000. Its inventory was encumbered by creditors' claims more than double the value of that inventory.

Despite any claims to the contrary, Monsour's was in such poor financial condition that it could not continue as a going concern. In fact, Monsour's did close its doors just a few months after the Agreement was signed. At the date of the Agreement, Monsour's was not in a position to procure acceptable produce inventory for Menu Maker Foods to buy. Therefore, Menu Maker Foods was left to acquire inventory from other sources.

According to Mr. Hull, Mark Monsour stated that produce sold to Menu Maker Foods would be sold to them at a markup (gross margin or gross profit margin) of 10% over Monsour's cost. Monsour's has represented (and Mr. Hull relied upon that representation) that it was accustomed to gross profit margins in the range of 23% to 27%; yet, even at that higher range of margins, Monsour's was losing money. It is unreasonable to assume that Monsour's could have stayed in business if its gross profit margin were to be reduced to 10% on the remaining segment of its business.

Taking these factors into consideration, it is my opinion that Monsour's was unable to remain in business, and to provide inventory to sell to Menu Maker Foods. Therefore, it was impossible for Menu Makers Foods to purchase any substantial amounts from Monsour's. If Monsour's could not obtain the inventory to sell to Menu Maker Foods – at any level of gross profit margin – then, the alleged lost profits become meaningless.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

In my opinion, the lost profits to Monsour's from Menu Maker Foods' failure to purchase produce inventory from Monsour's amounted to $0.00 because Monsour's did not have the financial ability to provide inventory to sell to Menu Maker Foods.

**Conclusion regarding Proper Calculation of Lost Profits**

**In my opinion, to a reasonable degree of accounting certainty, the amount of lost profits from both the sale of existing inventory on hand at the date of the Agreement and from future potential sales of produce inventory after the date of the Agreement amount to a total of $0.00.**

**A Hypothetical Lost Profits Calculation**

You have requested that I prepare an example of the proper methodology for calculating lost profits. For this purpose, I have modified (to some degree) Monsour's situation. However, this scenario is strictly hypothetical, and should in no way be construed as anything but hypothetical. It is for illustration purposes only.

I have used the following modifications to the case:

1. The Agreement between Menu Maker Foods and Monsour's, Inc., clearly stated the value (the cost) of Monsour's inventory on hand, *that it was physically counted and verified* and was agreed to be $750,000 (the Agreement does not actually contain this provision). Consequently, the selling price was to be $750,000, payable upon delivery.

2. That Monsour's current liabilities and debt obligations at the date of the Agreement were such that Monsour's could be reasonably expected to continue business and procure any amount of acceptable produce inventory it would need to fulfill the terms of the Agreement (as stated elsewhere in this report, this was not, in my opinion, reasonably certain).

As I have stated earlier, the cost of the inventory on hand was to be the selling price and the seller would receive no profit or loss from the sale of it. If the undelivered inventory were truly in "acceptable condition," the seller should have returned it to its original source for credit or could have sold it to other of its customers who were not covered under the terms of the Agreement. In fact, if the seller had sold the inventory, at a profit, to another customer, it might be argued that the seller (Monsour's) would have received profits on those sales that mitigated any other lost profits.

Thus, proper calculation of lost profit on this part of the sale results in no loss at all.

Mr. Hull has stated that Mark Monsour told him that the sales of produce inventory to Menu Maker Foods, Inc., subsequent to the date of the Agreement were to be conducted at a gross profit margin of 10 percent. I have not been able to find in the Agreement any provision for the guarantee of any gross margin percentage on any later sales. However, for purposes of this hypothetical illustration, I have assumed it to be the case.

Mr. Hull has estimated that Menu Maker Foods would make purchases $1,350,000 each year from Monsour's for the next six years, resulting in annual gross profits of $122,727 each year. For purposes of this illustration, I have utilized this hypothetical estimate. I have also assumed that variable expenses would be saved in the same proportion to the pro forma total as Menu Maker's revenue bears to Monsour's pro forma total revenue.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                     Menu Maker Foods, Inc.

| | Monsur's Total Pro Forma | Transactions With Menu Maker Foods | Menu Maker Percentage |
|---|---|---|---|
| Revenue | $  6,210,000 | $  1,350,000 | 21.74% |
| Cost of Goods Sold | (4,898,031) | (1,227,273) | |
| Gross Profit | 1,311,969 | 122,727 | |
| Operating Expenses: | | | |
| Warehouse Labor | 129,360 | (28,122) * | |
| Drivers | 117,792 | (25,607) * | |
| Sales salaries | 208,800 | (45,391) * | |
| Office Payroll | 28,320 | | |
| Non-wage Personnel Costs | 48,000 | (10,435) * | |
| Forklifts | 82,944 | | |
| Pallet Jacks | 10,800 | | |
| Company Auto | 48,000 | | |
| Repairs and Maintenance | 60,000 | | |
| Bad Debts | 24,000 | | |
| Real Estate and Property Taxes | 12,000 | | |
| Advertising | 10,200 | | |
| Entertainment | 1,440 | | |
| Tractors | 100,800 | (21,913) * | |
| Trailers | 80,160 | (17,426) * | |
| Fuel | 28,800 | (6,261) * | |
| Utilities | 65,664 | | |
| Cell Phone | 2,880 | | |
| Telephone | 32,400 | | |
| Insurance | 48,000 | | |
| Workmens Comp Insurance | 14,400 | | |
| Auto Insurance | 4,800 | | |
| Auto Fuel & Service | 3,840 | | |
| Supplies | 12,000 | | |
| Computer & Software License Fees | 9,600 | | |
| Professional Fees | 6,000 | | |
| Other Expense | 6,000 | | |
| Total Expense | 1,197,000 | (155,155) | |
| Rebate Income | 156,000 | 33,913 * | |
| Net Profit From Transactions with Menu Maker Foods | | $  1,485  * * | |

    * - These are income and expense items that are likely to be variable in nature.  Whatever
       portion of these expenses (or income) items that can be saved (or lost) by NOT
       conducting business with Menu Maker Foods, Inc., should be subtracted from (or
       added to) Gross Profit from those transactions.
    * * - Because of the deduction of variable expenses and addition of Rebate Income, the result
       is a Net Profit From Transactions with Menu Maker Foods, Inc., that would be only
       about $1,485 per year.  This amount is illustrative only.

For purposes of this illustration, I have assumed that any profit would be constant over the
entire term of six years.  Typically, any reasonably predictable change should be taken into
account in the calculations.

Once the net profits for each year have been calculated, it is important to determine which of the
years in question are in the past and which, if any, are still in the future.  In this case, the
Agreement took effect on January 31, 2002.  We have assumed the term of the Agreement to
be six years; therefore, years 2006 and 2007 remain in the future (I have rounded to even
calendar years for this hypothetical scenario).

It is customary to calculate an interest component to past lost profits, so that the potential
earnings to be derived from them can be taken into account.  The general theory is to consider
the interest that could have been earned from those profits through some current date.  It also is
necessary for there to be a calculation to "discount" any future lost profits to their present value

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC    Menu Maker Foods, Inc.

in current dollars. The general theory is to provide a "fund" today, which will be able to earn enough money to replace those lost profits over the span of the period in question. The interest rate may vary, dependent upon a number of factors. I have used an interest rate of 4.5%, which is approximately the "riskless rate" earned by 20-year Treasury securities.

For purposes of this hypothetical example, I have calculated the "present value factors" using a "half-year convention." This yields a result as though the earnings were spread evenly throughout each year.

| Year | Net Lost Profit | Present Value Factor | Discounted Lost Profit |
|------|----------------|---------------------|------------------------|
| 1 | $    1,485 | 1.166560 | $    1,732 |
| 2 | 1,485 | 1.116325 | 1,658 |
| 3 | 1,485 | 1.068254 | 1,586 |
| 4 | 1,485 | 1.022252 | 1,518 |
| 5 | 1,485 | 0.978232 | 1,453 |
| 6 | 1,485 | 0.936107 | 1,390 |
|   |   |   | $    9,337 |

The final step in the calculation of total lost profits would be to add all of the various amounts together. In this scenario, the result would be as follows:

| | | |
|---|---|---|
| Net Lost Profit on the Initial Sale of Inventory On Hand | $ | 0 |

Net Lost Profits on Each Year of the Agreement:

| | |
|---|---|
| Year 1 | 1,732 |
| Year 2 | 1,658 |
| Year 3 | 1,586 |
| Year 4 | 1,518 |
| Year 5 | 1,453 |
| Year 6 | 1,390 |
| Total Lost Profits | $    9,337 |

I emphasize that this calculation is based upon the circumstances of the case, with some extra assumptions added. It should not be construed as a calculation of actual damages, but simply as a demonstration of the proper techniques and procedures to be used.

I have appreciated this opportunity to be of service. If you have any questions regarding this report, please contact me.

Respectfully,

ALLEN, GIBBS & HOULIK, L.C.

By: Kurt G. Breitenbach
   Executive Vice President
   For the Firm

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

**Attachment 1 – Data or other information considered in forming the opinions**

1.  Menu Maker Foods, Inc., Asset Purchase, Monsour's, Inc., February 6, 2002.

2.  Report prepared by Marshall Hull, CPA, CMA, January 30, 2006.

3.  Complaint, In the United States District Court, For the District of Kansas, filed June 30, 2005.

4.  Monsour's, Inc., internally prepared balance sheets and income statements as of and for the periods ending:

    a.  December 31,2000
    b.  December 29, 2001 (two versions)
    c.  January 26, 2002
    d.  February 23, 2002
    e.  March 31, 2002 ( three versions)
    f.  April 27, 2002 (three versions)
    g.  May 25, 2002

5.  Monsour's, Inc., Salesman Open Item Accounts Receivable Trial Balance, January 18, 2002.

6.  Plaintiff Monsour's, Inc.'s Responses to Defendant's First Set of Interrogatories, signed December 6, 2005.

7.  Letter from Bank of America to Mark Monsour, Terms for Monsour's-Graves Menu Maker Closing, February 6, 2002.

8.  Monsour's "ProForma," March 27, 2002

9.  U. S. Corporation Income Tax Return, Form 1120, for Monsour's, Inc., for the years 1996, 1997, 1998 and 1999; the short period from July 1, 2000 through December 31, 2000.

10. Dunn, Robert L., *Recovery of Damages for Lost Profits, Volume 1*, 5th Edition, Westport, CT, Lawpress Corporation, 1998.

11. Dunn, Robert L., *Recovery of Damages for Lost Profits, Volume 2*, 5th Edition, Westport, CT, Lawpress Corporation, 1998.

12. Brinig, Brian P., et al, *Guide to Litigation Support Services, Volume 1*, 10th Edition, Fort Worth, TX, Practitioners Publishing Company, 2005.

13. Cerillo, William A., Proving Business Damages, New York, NY, Wiley Law Publications, John Wiley & Sons, Inc., 1991.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

## Attachment 2 – Gross profits vs. net profits

The difference between gross profits and net profits is generally substantial, as indicated below.

*Formula for determining gross profits:*

> Sales, less Cost of goods sold = Gross profits

*Formula for determining net profits:*

> Gross profits, less operating expenses = Net operating profit

> Net operating profit, less other, non-operating expenses = Net profits (before taxes)

RMA Annual Statement Studies, provides financial ratio benchmarks for SIC Code 5141, "General Line Grocery Merchant Wholesalers", based on financial statements of approximately 388 such companies' financial statements submitted for year ends around December 31, 2003, illustrating the materiality of the difference between gross profits and net profits:

| | |
|---|---|
| Sales | 100.0% |
| Cost of Goods Sold | 81.0 |
| Gross Profit | 19.0 |
| Operating Expenses | 17.1 |
| Operating Profit | 1.9 |
| Other Expenses (net) | 0.2 |
| [Net] Profit before taxes | 1.7% (as reported) |

As can be seen from the above, for the period indicated, the average Gross Profit was 19.0%, but the average net profit, before taxes, was 1.7%. During the five-year period from 1999 to 2004, inclusive, net profits ranged from 1.5% to 2.0% for these Grocery Wholesalers.

Operating expenses normally include matters such as the following:

> Warehouse Labor
> Drivers
> Sales salaries
> Office Payroll
> Non-wage Personnel Costs
> Forklifts
> Pallet Jacks
> Company Auto
> Repairs and Maintenance
> Bad Debts
> Real Estate and Property Taxes
> Advertising
> Entertainment
> Tractors
> Trailers
> Fuel
> Utilities
> Cell Phone

*Allen, Gibbs & Houlik, L. C.*                                                                 *Page 13*

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC

Menu Maker Foods, Inc.

- Telephone
- Insurance
- Workmen's Comp Insurance
- Auto Insurance
- Auto Fuel & Service
- Supplies
- Computer & Software License Fees
- Professional Fees
- Other Expense

In addition to the above operating expenses, in order to arrive at net profits, gross profits must be furthered reduced by "other" expenses. The most common "other" expenses include interest expense and losses on dispositions of business assets, such as equipment.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

**Attachment 3 – Quotes from lost profits damages treatises**

### Proving Business Damages
Second Edition
Author:  William A. Cerillo

Wiley Law Publications
John Wiley & Sons, Inc., New York
Copyright 1991

Para. #130, Page 25
The general rule that damages may not be awarded for remote and speculative injury is stretched to its outer limit regarding proof of lost expected profits.  Establishing profits that were lost in the future because of defendant's activity strains the requirement that damages be shown with a reasonable certainty.  As a general principle, therefore, lost future profits are deemed too speculative to allow a recovery for their loss unless plaintiff presents "proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts."  Cargill, Inc. v. Taylor Towing Services, Inc. 642 F.2d 239, 241 (8th Cir. 1981).

Para. #160, Page 44
Where lost profits are sought, it is important to remember that only *net profits* may be obtained.  See Physicians Reference Laboratory, Inc. v. Daniel Seckinger, M.D. & Associates, P.A., 501 So. 2d 107 (Fla. Dist. Ct. App. 1987); All Star Amusement, Inc. v. Jones, 727 S.W. 2d 930, 932 (Mo. Ct. App. 1987); Petty v. Weyerhaeuser Co., 288 S.C. 349, 342 S.E. 2d 611, 616 (Ct. App. 1986) ("Ordinarily, in computing the amount of lost profits whether in a tort or contract action, the *expenses saved must be subtracted from any recovery*; that is, the plaintiff is entitled to net profits rather than expected gross profits").  Gross profits are not obtainable because, until all costs and expenses have been deducted from gross sales, it is impossible to determine whether there has been an actual profit.  In addition to proof of gross sales, there must be supporting evidence of overhead expenses and other costs of producing income from which a net profit figure may be derived.

### Litigation Services Handbook - The Role of the Financial Expert
Third Edition
Authors:  Roman L. Weil; Michael J. Wagner; Peter B. Frank
Published by John Wiley & Sons, Inc.
New York
Copyright 2001

Chapter 5, page 5.1
"Estimating Lost Profits and Economic Losses" by Victoria A. Lazear, MS

Page 5.2, third paragraph.  The essential features of a study of these losses are the quantification of the reduction in earnings, the calculation of interest on past losses, and the application of *financial discounting* to future losses.  The losses are measured as the difference between the earnings the plaintiff would have received if the harmful event had not occurred, and the earnings the plaintiff has received or will receive, given the harmful event.  The plaintiff may be entitled to interest for losses occurring before the trial.  Losses occurring after trial will normally be discounted.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

Formulas: page 5.2

Earnings before trial, had the harmful event not occurred *minus* actual earnings before trial *plus* prejudgment interest *equals* damages before trial.

Projected earnings after trial, had the harmful event not occurred *minus* projected earnings after trial *minus* discounting *equal* damages after trial.

Chapter 11, written by: Keith R. Ugone, PhD, Carly R. Taylor, MA, CPA, Randi L. Firus, MA; Section 11.2 pages 11.2 and 11.3.

Sec. 11.2, Page 11.3.  The lost earnings damages calculation includes both the projected lost past earnings (i.e., past damages) and the projected *present value of lost future earnings* (i.e., future damages).

The usual approach projects the plaintiff's undamaged earnings and the plaintiff's damaged earnings for the length of the damage period, which the expert must also estimate.  The *present value* of the difference in these two earnings streams becomes the damages amount.

In most cases, the plaintiff's earnings history prior to the incident offers a good source for understanding the base-year earnings and predicting the future earnings.

Sec. 11.2 (d) "Discounting Lost Earnings to Present Value"  Pages 11.6 -11.7.

In selecting a discount rate in loss of earnings cases, the expert should not treat the plaintiff's future uncertain income stream as a certain one.

.......  In either case, the maturity of the financial instrument used to discount the plaintiff's lost earnings should match the damage period, to best approximate the interest the plaintiff will earn on the lump-sum award.  For example, in a case with a loss period of 20 years, one can expect the plaintiff to withdraw the award steadily over the damage period.  In computing the discount rate, the expert should consider securities with maturities up to 20 years.  The expert may incorporate more than one discount rate.

**Recovery of Damages for Lost Profits - Volume 1**
Author:  Robert L. Dunn
5th Edition
Copyright 1978, 1981, 1987, 1992, 1998 by Lawpress Corporation
Published by:  Lawpress Corporation, Westport, CT

Chapter 6 "Calculation of Lost Profits Damages"  Section 6.1  A. Net Profits.  Page 430.

Lost profits damages are usually defined as lost net profits; all costs must be deducted.  For breach of contract, this means the contract price less cost of performance, or cost of completion, or, as it is sometimes put, *"expenses saved"* as a result of plaintiff's being excused from performance by the other party's breach.

Section 6.25 A, "Discounting Future Damages, pages 501-502.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

Future profits should be discounted at an appropriate rate because the purpose of the award of damages is to provide a fund that, with principal and interest, will yield plaintiff an amount equivalent to its loss. Thus, if the award is to compensate for a loss of profits projected over 10 years, the amount should be that which, if invested for 10 years at appropriate (probably conservative) rates of return, would produce the amount of the loss. An award today of the amount that would be earned 10 years hence will give plaintiff more than is necessary to make plaintiff whole. Relatively few cases specifically consider whether future profits must be discounted. The principle has often been approved.

In Eden United, Inc. v. Short, supra, the plaintiff claimed lost profits damages arising from defendant's interference with a contract to purchase real property to be sold by the owner to plaintiff. ..... Plaintiff's damages evidence projected lost profits 10 years into the future. Citing and quoting the text, the court held that it was error not to discount the award of future lost profits to present value.

Numerous cases are cited.

**Recovery of Damages for Lost Profits - Volume 2**
5th Edition
Robert L. Dunn

Sec. 7.27 C. "Evidence Too Speculative" page 603 – 605

....... The court reversed an award of lost profits for the future containerized cargo business as speculative, holding:

> Buyer's own evidence shows that the connection between the one system and the future business is, as a matter of law, *too remote, too speculative and too theoretical.*

> The suggested scheme was not evidenced by formal plans, by proposed budgets by specific site plans, by the formation of a new legal entity, or by anything that would have moved from an aspiration to a concrete plan.

> All that was offered was a hope of commercial fortune hanging from a thin thread of "what-ifs" –buoyed by the buyer's after-the-fact testimonial conviction that success and profits would surely have been there for the taking. The evidence forming the necessary chain of causation ... comes down to little more than pure speculation. Buyer's evidences as to causation are as reliable as the "investment" at the $2 window.

**Guide to Litigation Support services – Volume 1**
Tenth Edition
Authors: Brian P. Brinig, *et al*
Copyright 2005 by Practitioners Publishing Company
Published by: Practitioners Publishing Company, Fort Worth, Texas

Section 303.36 "Mitigation of Damages" page 3-16

The plaintiff has a duty to mitigate its damages. This means that the plaintiff has a responsibility to take whatever actions are appropriate to overcome the damage caused by the defendant's

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

breach or tort [*Culligan Rick River Water Cond. Co. v. Gearhart*, 443 N.E. 2nd 1065 (2nd Dist. 1982)].  Generally, if a plaintiff loses an income-producing asset, for example, it cannot recover lost profits the asset would have produced beyond the reasonable period of time it would have taken the plaintiff to replace the asset.  *Lack of adequate resources to replace the asset would generally not be a sufficient legal excuse to justify the failure to mitigate one's damages.*  In determining the plaintiff's lost earnings, *the amount of earnings lost as a result of the plaintiff's failure to mitigate its own damages are not recoverable.*

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC

Menu Maker Foods, Inc.

## Attachment 4 – Letter From Bank of America, Dated February 6, 2002

**Bank of America**

Bank of America
Commercial Banking
KS8-376-01-01
216 North Broadway
Pittsburg, KS 66762

Tel 316.231.0600
Fax 316.231.0696

February 6, 2002

HAND DELIVERED

Mr. Mark D. Monsour, President
Monsour's, Inc.
112 North Elm Street
Pittsburg, Kansas 66762

Re:  Terms for Monsour's-Graves Menu Maker closing

Dear Mark:

The following are the terms upon which Bank of America, N.A. will proceed with the closing of the proposed sale of your institutional grocery business to Menu Maker, Inc. and ultimately the release of our security interest in your assets proposed to be sold:

1.  Monsour's, Inc. shall pay to Bank of America, N.A. the $60,000 of the $100,000 to be received at the closing today pursuant to § 2.5(i) of the Asset Purchase Agreement;

2.  Monsour's, Inc. shall assign to and shall pay to Bank of America, N.A., as and when received, the 2% and 1% additional compensation to be received for the Covenant Not To Compete pursuant to § 2.5(ii) of the Asset Purchase Agreement;

3.  The Inter-Creditor Agreement with Central Bank of Jefferson City, the buyer's bank, shall require that the inventory shipped from Friday to Thursday of each week shall be paid for by wire transfer to our Bank weekly on Friday;

4.  Monsour's, Inc. understands and agrees that execution of Inter-Creditor Agreement by Bank of America is not an implication that Bank of America will and does not commit Bank of America to continue to loan money to Monsour's, Inc.;

5.  Monsour's, Inc. shall provide to Bank of America, N.A. each Friday a detailed invoice and itemized receipt detailing the items of inventory purchased by buyer from the preceding Friday through Thursday;

6.  Monsour's, Inc. promptly shall provide to Bank of America, N.A., and shall authorize Menu Maker, Inc. to disclose to Bank of America, N.A., such information about Monsour's inventory and accounts receivable as Bank of America, N.A. shall request from time to time;

7.  Monsour's, Inc. promptly shall provide to Bank of America, N.A. such financial statements and other financial information as Bank of America, N.A. reasonably may request from time to time;

1

10270

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                     Menu Maker Foods, Inc.

8. Monsour's, Inc. acknowledges that the revolving credit ceases as of this date, that the
revolving credit loan matures on April 2, 2002, that it shall be paid in full at that time,
and that there will be no further draws or advances on that revolving credit from and
after February 5, 2002;

Mr. Mark D. Monsour, President
February 6, 2002
Page 2

9. Monsour's, Inc. shall be solely responsible for and promptly pay all legal fees and
related expenses incurred by or on behalf of Bank of America, N.A. with respect to
transaction, and you acknowledge that Wheeler & Mitchelson, Chartered represents
both your Company and our Bank from time to time and waive any conflict of
interest with respect to such representation; and

10. All of Bank of America, N.A.'s rights under any agreement previously executed by
Monsour's, Inc. and its stockholders continue in full force and effect.

We are pleased to cooperate with you in this transaction and appreciate your efforts.
Please indicate your agreement to these terms by signing the enclosed copy of this letter
and returning it to me at the Closing.

Sincerely,
Bank of America, N.A.

By: Michael W. Slack
      Senior Vice President

Accepted and agreed to
this 6th day of February 6, 2002

Monsour's, Inc.

By: _____   PRESIDENT
      Mark D. Monsour, President

_____
Mark D. Monsour, individually

_____
Sheila D. Monsour, individually

2

10271

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

**Attachment 5 – Statement of Experience and Qualifications**

**KURT G. BREITENBACH**
*Assurance Department – Executive Vice President*
**ALLEN, GIBBS & HOULIK, L.C.**
**301 North Main, Suite 1700**
**Wichita, Kansas 67202**

A native Kansan, Mr. Breitenbach graduated in 1979 from Emporia State University with a Bachelor of Science in Business degree.  Mr. Breitenbach is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants, Kansas Society of Certified Public Accountants, and the Institute of Management Accountants.  He is a licensed Certified Public Accountant in Kansas and Oklahoma.  He has served in key roles on numerous community boards.  He has served as past President of the Wichita Chapter of C.P.A.s, President of the Wichita Children's Home, Chairman of the Board of Junior Achievement and is past Chairman of the Board of the Mental Health Association of South Central Kansas.

Mr. Breitenbach joined Allen, Gibbs & Houlik in 1980. He was promoted to Manager in 1984 and was named an Officer in 1990.

<u>Service to the Firm</u>

Mr. Breitenbach serves primarily as an Assurance Officer.  He specializes in serving middle-market, closely held businesses.

Mr. Breitenbach has more than 25 years of experience serving clients in the following industries: retail, wholesale distribution, manufacturing, auto dealerships, franchisors with multi-state franchising, mutual funds, investment banking, various publicly held entities, construction contractors, hotel and restaurant industry, and is responsible for all of the Firm's ERISA auditing.

<u>Litigation Support</u>

Mr. Breitenbach has directed litigation support projects related to lost profits/business interruption, damage calculation, insurance settlements, insolvency dispute, forensic accounting on contract disputes and cost accounting issues for an aerospace company, billing disputes and shareholder disputes, divorces and a criminal fraud case with the Kansas Bureau of Investigation.

<u>Present and Past Service to the Business Industry</u>

| <u>Wholesale/Retail Trade/Service</u> | <u>Construction/Manufacturing</u> |
|---|---|
| Auto dealers | Aircraft wiring manufacturer |
| Detroit Diesel distributors | Construction company |
| Fire and safety wholesale | Custom furniture manufacturer |
| Health clubs | Ethanol manufacturer |
| Home security provider | Fiberglass tank manufacturing |
| Hotel management | General contractor |
| Oil and gas drilling | Insulation, foam manufacturer |
| Real estate companies | Pressure sensitive striping |
| Retail lumber company | Printing industry |
| Wholesale paper company | Steel contractor and fabrication |

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                    Menu Maker Foods, Inc.

<u>Investment Banking</u>                    <u>Food Service</u>
Broker Dealers                    Multi-unit restaurant franchisor
                                  Pizza restaurant franchises
                                  (Public) multi-unit restaurant

<u>Other</u>
More than 60 Department of Labor pension audits
Medical treatment centers
Three large multi-employer union pension audits

<u>Trial and Deposition Expert Testimony</u>

- Clark Applicators, Inc. v.
  Rodger E. Grizzell and Kirk Grizzel d/b/a/ Grizzell and Sons, Inc.
  Case No. 0034 – Stafford County
  Billing Disputes
  Trial and Deposition Testimony

- Theodore Grant Davis, III vs. G. Dawson Grimsley, et al,
  Case No. 03 CV1010
  Damage calculation, lost profits
  Deposition Testimony

- State of Kansas vs. Thomas V. Black
  Pratt County, Case No. 03 CR259
  Criminal Trial Testimony

<u>Service to Community</u>

Mr. Breitenbach has been active at the Board and office level of numerous civic and
professional organizations. A selected profile of activity is:

- Currently serving on the Executive Committee as Past President of the Wichita Children's
  Home.

- Served on the Executive Committee as past Chairman of the Board of the Mental Health
  Association of South Central Kansas.

- Named as a participant in the 1994 class of Leadership Wichita.

- Served as "Professional Sector Chairman" of the 2000 and 1994 United Way Campaign.

- Previously served on the Junior Achievement Board of Directors and was the Chairman of
  the Board for the 1992-1993 year.

- Served for five years as a member of the board of Wichita Chapter of the Kansas Society of
  Certified Public Accountants and was the President of that organization for 1991-1992
  years.

Mr. John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher, LLC                Menu Maker Foods, Inc.

- Previously served a four-year term on the Board of Directors of the Emporia State University Alumni Association.