IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MONSOUR'S, INC.                        )
                                       )
                    Plaintiff,         )        Case No. 05-1204-MLB
                                       )
v.                                     )
                                       )
MENU MAKER FOODS, INC.,                )
                                       )
                    Defendant.         )

## PLAINTIFF'S SUPPLEMENTAL RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Monsour's, Inc., (hereinafter "Monsour's"), by and through its counsel of record, provides the Court with a supplemental response brief.

## I.      PURPOSE OF SUPPLEMENTAL RESPONSE

During oral arguments on defendant's motion for summary judgment on November 20, 2006, the Court requested Monsour's to 1) authenticate the evidence and exhibits discussed during oral argument; 2) provide the Court with the legal authorities supporting plaintiff's position that the oral agreements made between the parties after execution of the written contract are admissible; and 3) provide the Court with proposed jury instructions. This supplemental response brief covers the first two requests.[1]

## II.     SU.C.C.INCT SUMMARY.

The proper measure of damages in this case for plaintiff's breach of contract claim concerning food service inventory is MO. ANN. STAT. 400.2-709.[2] The proper measure of

---

[1] Plaintiff's proposed jury instructions are being filed under a separate pleading.

[2] Both Kansas and Missouri have adopted the Uniform Commercial Code, however, since the Asset Purchase Agreement specifies that Missouri law applies, all cites will be to the Missouri Code. The corresponding provision in Kansas is found in Chapter 84, article 2 of the Kansas statutes.

damage for plaintiff's breach of contract claim concerning produce that was previously delivered by plaintiff and wrongfully rejected by defendant, or was ordered and not taken, is also MO. ANN. STAT. 400.2-709. The proper measure of damages for plaintiff's breach of contract claim concerning the future delivery of produce is MO. ANN. STAT. 400.2-708(2). Defendant's second motion for summary judgment [Doc. 86] argued that Monsour's had no evidence of "lost profit" and one of Monsour's expert's calculations were pure speculation. Plaintiff properly refuted that motion by establishing 1) that defendant was citing the improper measure of damages for this case; and 2) that expert testimony on damage issues is not required. Defendant still has not come forth with any case law requiring expert testimony for U.C.C. damages. Even if defendant did come forth with authority, Mark Monsour clearly qualifies to testify about the produce industry and plaintiff's damages as supported by the documents.

## III.    PLAINTIFF'S SUPPLEMENTAL ADDITIONAL STATEMENTS OF FACT.

The "additional Statements of Fact" contained within plaintiff's original response [Doc. 88] are incorporated herein by reference.

### A.    The Asset Purchase Agreement.

1.    Following the September 11, 2001 disaster, Monsour's food service business experienced a decline in revenue which created a cash flow problem. (Monsour Corporate Depo, p. 9, l. 9-p. 10, l. 2 and p. 10, ll. 19-23, attached as **Exhibit A**.)

2.    Menu Maker was interested in purchasing Monsour's because part of the contract was hiring Monsour's sales people and sales people have a relationship with customers and it was going to give Menu Maker a foothold in a new market area (southeastern Kansas and southwestern Missouri) with an existing customer base. (Graves Depo, p. 59, ll. 1-8; p. 60, ll. 7-13; and p. 61, ll. 13-19, attached as **Exhibit B**).

2

3.      Representatives of defendant Menu Maker reviewed the food service inventory at Monsour's prior to the execution of the Asset Purchase Agreement.  (Monsour Corporate Depo, p. 57, ll. 12-17, **Exhibit A**.)

4.      Monsour's also provided Menu Maker with a food service inventory report. (Monsour Corporate Depo, p. 44, ll. 3-19, **Exhibit A**.)

5.      The actual value of the food service inventory at Monsour's on or about January 14, 2002 (two weeks prior to the execution of the Asset Purchase Agreement) was between 1.1 and 1.2 million dollars.  (See the Inventory Valuation Totals, dated January 14, 2002, Bates Nos. 10083-10084, attached as **Exhibit C**; and Monsour Corporate Depo, p. 80, l. 6-20, **Exhibit A**.)

6.      The food service inventory valuation of $750,000 to $800,000 that the parties agreed Menu Maker was to purchase from Monsour's was negotiated between Dick Graves and Mark Monsour.  (Monsour Corporate Depo, p. 78, ll. 12-25, **Exhibit A**.)

7.      The Asset Purchase Agreement was drafted and prepared by Menu Maker's attorneys.  (Pretrial Order [Doc. 74] 4(a)(2).)

8.      The Asset Purchase Agreement with respect to food service inventory, in part, required:

a.      Menu Maker to purchase "All of the Seller's inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition) which items are presently being sold to current customers of Buyers or to selected customers of Seller. . . .  The parties estimate that the inventory to be purchased is estimated from $750,000 to $800,000 in value."

b.      Menu Maker "will make its best efforts to sell or assist in the sale of Monsour's remaining inventory."

c.      The inventory purchase price will be [Monsour's] cost which will be computed at [Monsour's] NDS computer system average cost of last 3 purchases, except that if such price exceeds the current market cost for any such inventory item then the price for such item will be negotiated by [Menu Maker] and [Monsour's].

3

     d.     [Menu Maker] shall be responsible for transportation of the inventory from [Monsour's] location at [Menu Maker's] cost.

     e.     Menu Maker "will purchase substantially all of its produce requirements through Monsour's . . .."

     f.     Mark Monsour and Monsour's would enter into a covenant not to compete.

(Asset Purchase Agreement, Bates Nos. 10146-10158, attached as **Exhibit D**).

9.     While the Asset Purchase Agreement is silent as to when the assets described within Section I of the Asset Purchase Agreement were sold and transferred from Monsour's to Menu Maker, the Non-Competition Agreement dated February 6, 2002 clarifies that those assets were "sold and transferred to Buyer (Menu Maker) on the date the Asset Purchase Agreement was executed." (See Non-Competition Agreement, dated February 6, 2002, Bates Nos. 10023-10030, attached as **Exhibit E**).

10.     The covenant not to compete prevented Mark Monsour and Monsour's from selling to any customers of Monsour's or Menu Maker any items being sold by either party for a period of six years and prevented them from engaging in the ownership or management of a food distribution business within any county that either party was doing business as of the date of the Asset Purchase Agreement. This prohibited Mark Monsour and Monsour's from selling food service items in practically the entire western half of Missouri, the eastern half of Kansas, the northeastern part of Oklahoma and the northwestern part of Arkansas. (See Non-Competition Agreement, ¶1, **Exhibit E** and the Map of Applicable Territories, Bates Nos. 10078-10082, attached as **Exhibit F**).

11.     After the Asset Purchase Agreement, many of Monsour's employees, including sales people and management personnel, became employees of Menu Maker. Additionally,

4

Menu Maker had its own employees in Monsour's building and had access to any records they wanted at any time.  (Monsour Corporate Depo, p. 89, l. 1-p. 90, l. 24, **Exhibit A** and Affidavit of Mark Monsour, attached as **Exhibit G**).

**B.    Time was of the essence for Menu Maker to take delivery and pay for the food service inventory.**

12.    Dick Graves told Mark Monsour that the majority of the food service inventory would be purchased within four to six weeks.  (Mark Monsour Depo, p. 95, ll. 12-22, attached as **Exhibit H**).

13.    Even Dick Graves admits that he told Mark Monsour " . . . [the food service inventory purchase] won't take months and months."  (Graves Depo, p. 36, ll. 2-3, **Exhibit B**).

14.    Dick Graves specifically remembers Mark Monsour telling him that with respect to Menu Maker's purchase of Monsour's food service inventory, time was of the essence.  (Graves Depo, p. 53, ll. 15-21, **Exhibit B**).

15.    Additionally, Dick Graves knew that time was of the essence with respect to Menu Maker's purchase of Monsour's food service inventory because Monsour's was having financial problems.  (Graves Depo, p. 53, ll. 15-21, **Exhibit B**).

16.    Representatives of Menu Maker knew it was important to move fast on Monsour's food service inventory because some of it probably was going to expire.  (Goodwin Depo, p. 100, ll. 5-9, attached as **Exhibit I**.)

17.    Monsour's counsel, Kevin Mitchelson, testified that his contemporaneous notes of the declarations of Dick Graves were that "50% to 60% of the food service inventory would be purchased between weeks three to five" and that Dick Graves assured Mark Monsour "the buyers would take delivery no later than eight weeks after closing."  (Mitchelson Depo, p. 40,

5

l. 22-p. 41, l. 24, attached as **Exhibit J**).

C.    **Facts supporting Monsour's "food service" breach of contract claim.**

18.    Monsour's former employees Jim Senecaut and Matt Warford, who had become Menu Maker's employees, advised Mark Monsour that Menu Maker was not operating by the set procedure with respect to calculating the price of the inventory it was actually taking.  Instead, Menu Maker representatives would unilaterally set a price and say "Take it or leave it." Additionally, Menu Maker would take freight allowances and shipping allowances contrary to the terms of the contract.  (Monsour Corporate Depo, p. 96, l. 10-p. 97, l. 2, **Exhibit A**.)

19.    Menu Maker placed Ken Goodwin in charge of overseeing the food service acquisition from Monsour's after the Asset Purchase Agreement was executed.  (Graves Depo, p. 86, ll. 10-13, **Exhibit B**).

20.    While Dick Graves of Menu Maker testified that he told Ken Goodwin that time was of the essence with respect to the purchase of Monsour's food service inventory, Ken Goodwin testified he was never told that there was any time table.  (Graves Depo, p. 92, l. 24-p. 93, l. 23, **Exhibit B** and Goodwin Depo, p. 52, ll. 16-24, **Exhibit I**).

21.    Additionally, Ken Goodwin was never told that Menu Maker had agreed to purchase $750,000 to $800,000 worth of food service inventory from Monsour's until after the lawsuit was filed.  (Goodwin Depo, p. 115, ll. 4-10, **Exhibit I**).

22.    Ed Fairchild was Menu Maker's Director of Operations.   One of his responsibilities was merging or acquiring Monsour's food service inventory into Menu Maker's inventory.  Mr. Fairchild was not told of any timeframe and he testified that had he known there was a specific timeframe, as Director of Operations he could have acquired the inventory faster. (Fairchild Depo, p. 49, l. 25-p. 52, l. 24, attached as **Exhibit K**).

23.    While Menu Maker contracted to "make its best efforts to sell or assist in the sale of Monsour's remaining inventory," its only efforts consisted of contacting several vendors at Baron Spices, Degraffenreid Pickle, Rotella Bakery and Con Agri which resulted in the reimbursement of $2,000 and providing Monsour's with the names of some salvage folks. (Goodwin Depo, p. 87, ll. 5-16; p. 89, l. 22-p. 90, l. 18; and p. 97, ll. 2-16, **Exhibit I**).

**D.    The facts supporting plaintiff Monsour's "food service" damages.**

24.    Despite the fact Menu Maker contracted to purchase $750,000 to $800,000 worth of food service inventory from Monsour's, it only purchased $250,000.  (Graves Depo, p. 106, ll. 1-9, **Exhibit B**).

25.    Approximately four weeks after the Asset Purchase Agreement was executed, Mark Monsour became concerned that Menu Maker was not purchasing the food service inventory as promised.  When Mark Monsour brought this to Dick Graves' attention, he was assured it was going to happen.  (Affidavit of Mark Monsour, **Exhibit G**).

26.    The majority of Monsour's food service inventory included many perishable items and items with expiration dates including frozen goods, refrigerated items, bread products, spices and packaged goods.  (Affidavit of Mark Monsour, **Exhibit G**).

27.    As time progressed, many of the food service items began to expire and had to be thrown away.  (Affidavit of Mark Monsour, **Exhibit G**).

28.    Meanwhile, as Menu Maker continued to fail to purchase the food service inventory as promised, Mark Monsour used reasonable efforts in an attempt to resell the food service inventory.  However, because of the odd lots, the aging of the inventory and the Non-compete Agreement that he and Monsour's were required to execute, he could not sell the same at reasonable prices.  (Affidavit of Mark Monsour, **Exhibit G**).

29.    Monsour's was essentially forced out of business because 1) Monsour's was not receiving the much needed cash flow promised by Menu Maker from the sale of its food service inventory; 2) Menu Maker was not purchasing "substantially all" of its produce from Monsour's; and 3) Monsour's business activities were still limited because of the Non-compete Agreement. (Affidavit of Mark Monsour, **Exhibit G**).

30.    Monsour's sustained damages in the amount of $500,000 with respect to the food service inventory Menu Maker contracted to purchase and failed to do so and is claiming damages in the amount of $216,414.35 for the food service inventory that Menu Maker promised it would use its best efforts to sell, but failed to do so.  (Affidavit of Mark Monsour, **Exhibit G**).

**E.    Facts supporting Monsour's "produce" breach of contract claim.**

31.    With respect to produce, the Asset Purchase Agreement in relevant part provides, "Menu Maker, will purchase substantially all of its produce requirements through Monsour's . . ."The term "substantially all" was defined in the Asset Purchase Agreement to be 99.25 percent.  (Asset Purchase Agreement, **Exhibit D**.)

32.    Dick Graves testified that Mark Monsour and Monsour's had a "good produce reputation."  (Graves Depo, p. 23, ll. 2-15, **Exhibit B**.)

33.    The Asset Purchase Agreement also stated,

b.    Buyer will supply seller with approximate quantities and delivery dates for the following week by 2:00 p.m. on the preceding Monday for the following week. Specialty items will need to be exact or within the agreed fill rate requirements.

(Asset Purchase Agreement, **Exhibit D**.)

34.    The parties agreed that the produce would be sold from Monsour's to Menu Maker for a ten percent mark-up on top of Monsour's costs.  Before entering into the Asset Purchase Agreement, Monsour's presented a proposed list of the cost of the produce to

8

Menu Maker which evidenced a 10 percent mark-up.  (Monsour Corporate Depo, p. 74, ll. 17-20, **Exhibit A**; Produce List, Bates Nos. 10005-10006, attached as **Exhibit L**; and Monsour Affidavit, ¶16, **Exhibit G**..)

35.    The parties agreed that the produce would be put on the Menu Maker trucks at Monsour's facility in Pittsburg, Kansas and it would become the property of Menu Maker at that time.  (Monsour Corporate Depo, p. 108, l. 21-p. 109, l. 2, **Exhibit A**; and Asset Purchase Agreement, **Exhibit D**.)

36.    The Asset Purchase Agreement also provides that the "buyer will be entitled to have inspector present at all loading and any items objected to by that inspector shall be set aside for further inspection," but Dick Graves admitted that no one from Menu Maker was present to inspect the produce.  (Asset Purchase Agreement, **Exhibit D**; and Graves Depo, p. 90, ll. 15-19, **Exhibit B**.)

37.    Dr. Jean-Pierre Emond, (hereinafter "Dr. Emond"), who has been designated by Monsour's as an expert in this case, has a Ph.D. in Agricultural Engineering/Food Engineering from the University of Florida and is the co-director for the Center for Food Distribution and Retailing at the University of Florida.  (C.V. of Dr. Emond, attached as **Exhibit M**; and Notice of Expert Disclosures, Doc. 52.)

38.    Dr. Emond's expert report provides:

> The buyer should have inspected the load prior to taking ownership and rejected it if the quality did not meet his standards.  Since the buyer was in charge of the transportation and equipment, the seller has no control of the conditions during transportation.  The seller cannot be blamed for mistreating the shipment unless a temperature recorder showed that the buyer maintained the appropriate conditions between Pittsburg, Kansas and Jefferson City, Missouri.

(Report of Dr. Emond, p. 1, attached as **Exhibit N**.)

39.     Dennis Lutz was employed by Menu Maker as a driver from February 2001 through August 2005 and he transported produce from Pittsburg, Kansas to Jefferson City, Missouri.  (Lutz Affidavit, attached as **Exhibit O**.)

40.     Menu Maker's driver Dennis Lutz testified:

> The refrigerated trailers used by Menu Maker, Foods, Inc. to transport produce between its Jefferson City, Missouri facility and Monsour's Pittsburg, Kansas facility were old, not well-insulated and the actual reefer units <u>would frequently quit working</u>.

(Lutz Affidavit, ¶3, [emphasis added], **Exhibit O**.)

41.     Mr. Lutz testified that the reefer units would have problems three times a week on a five day work week and these temperature and mechanical problems with the refrigerated trailers were communicated to Menu Maker management.  (Lutz Affidavit, ¶¶3&7, **Exhibit O**.)

42.     Lutz testified,

> I have personally observed the temperatures in the refrigerated trailers significantly lower and higher than the temperatures at which they were set.  Further, the refrigerated trailers utilized by Menu Maker were not equipped with temperature alarms and did not have temperature logs that recorded the temperature fluctuation.

(Lutz Affidavit, ¶¶6&8, **Exhibit O**.)

43.     Ron Orr is the produce buyer for Menu Maker and he knew Menu Maker was not checking the quality of the produce when loaded.  (Orr Depo, p. 4, ll. 9-11**;** and p. 97, ll. 23-25, attached as **Exhibit P**.).

44.     Before Ron Orr, Ed Fairchild held the position of Head Produce Buyer at Menu Maker for three years and then became Director of Operations.  (Fairchild Depo, p. 7, l. 16-22; and p.11, l. 22-p. 12, l.18, **Exhibit K**.)

45.     Mr. Fairchild testified that he knew the trailers that Menu Maker was utilizing to haul the produce from Monsour's had temperature fluctuations and that the purchased produce

was on the Menu Maker trailers anywhere from 15 to 19 hours.  (Fairchild Depo, p. 32, ll. 6-11; and p. 28, l. 23-p. 29, l. 5, **Exhibit K**.)

46.     Mr. Fairchild further testified he would not have chosen those types of trailers to haul produce and would not keep produce on a trailer for 15 to 19 hours.  (Fairchild Depo, p. 30, l. 25-p. 31, l. 5, **Exhibit K**.)

47.     Dennis Hughes was the produce buyer at Monsour's and had direct knowledge of the produce that was being purchased from Monsour's wholesalers and shipped to customers including Menu Maker and he testified that following the asset sale, he personally observed the produce that was being shipped by Monsour's to Menu Maker and that "This produce was marketable quality."  (Hughes Affidavit, ¶¶2&3, attached as **Exhibit Q**.)

48.     Despite the fact Monsour's produce was marketable quality, Menu Maker would summarily reject the produce claiming it did not meet its quality standards.  (Hughes Affidavit, ¶4, **Exhibit Q**.)

49.     Menu Maker's produce buyer would constantly change the amount, size and packaging required of the produce after it was ordered.  (Monsour Corporate Depo, p. 135, l. 19-p. 136, l. 15, **Exhibit A**.)

50.     Menu Maker would unilaterally take credits for the produce that was wrongly rejected.  Mr. Monsour testified:

Q:     . . . . Let me tell you where I get lost here, and maybe you can help me understand.   If Menu Maker was wrongfully rejecting Monsour's produce, as you contend, why did you give them credits for the wrongfully rejected produce?

A:     I never gave them credit.  They took it.

Q:     They took credit?

A:     In fact sometimes he took credits for more than he purchased, which was amazing.

Q:     Well, when Menu Maker Food was taking these credits, you of course picked up the phone, called Mr. Graves, and said words to the effect 'damnit, Mr. Graves, you are wrongfully taking credits from me,' right?

A:     When I addressed Dick Graves, I was telling Dick Graves what Ron Orr was doing.

(Monsour Corporate Depo, p. 149, l. 15-p. 150, l. 5, **Exhibit A**.)

51.     When asked why Mark Monsour acted in this manner, he testified,

See, I was bound by an Agreement, sir, to supply them produce and to sell them inventory.  And I intended to keep my end of the Agreement.  That's what I kept on doing, keeping my end of the Agreement.  That's what - - that's what my outlook was, keep my end of the Agreement.

(Monsour Corporate Depo, p. 151, ll. 2-12, **Exhibit A**.)

52.     After Menu Maker continued to wrongfully reject the produce, Mark Monsour

retained a retired USDA inspector to inspect the produce prior to delivery.  (Hughes Affidavit,

¶5, **Exhibit Q**; and Krueger Expert Report, attached as **Exhibit S**.)

53.     When these loads of produce were rejected by Menu Maker for alleged quality

problems, Mr. Krueger then re-inspected the same.  (Krueger Expert Report, p. 1, **Exhibit S**.)

54.     Mr. Krueger, has been identified by Monsour's as an expert.  Mr. Krueger's expert

report provides:

It is my opinion that the produce being shipped from Monsour's was of good quality and the quality described in my notes.  The produce should not have been rejected.  I also inspected a return shipment of produce from Menu Maker that I had previously evaluated before.  The produce did not appear to be the same produce as it was in significantly worse condition evidencing the produce had been subjected to improper temperatures and/or handling techniques.

(Krueger Expert Report, p. 1, **Exhibit S**; and Doc. 52.)

55.     In regard to rejected produce, Mark Monsour testified:

12

> Q:   . . . how much produce did you order for the defendant that was wrongfully rejected? A dollar amount, please.
>
> A:   What I can tell you here that comes to my mind is that I know I threw between $120,000 and $200,000 worth of produce away that we had ordered at the direction of Ron Orr.  It was either, one, never taken, and that would be the large part of that thrown away, or, two, rejected. . . .

(Monsour Corporate Depo, p. 16, ll. 10-21, **Exhibit A**.)

56.    This is supported by the credit invoices and order sheets that were produced in discovery and authenticated by Mark Monsour's affidavit.  (Credit Invoice, Bates No. 10480, attached as **Exhibit U**; Order Sheets, Bates Nos.10474-10479, attached as **Exhibit V**; and Monsour Affidavit, ¶15, **Exhibit G**.)[3]

57.    Dick Graves admits that if the produce was damaged in transit, then it was Menu Maker's responsibility.  (Graves Depo, p. 142, ll. 2-13, **Exhibit B**.)

58.    Mark Monsour also testified specifically about a load of potatoes that Menu Maker produce buyer Ron Orr requested, stating:

> A:    And there was the time when Ron Orr called and asked us to bring out a load of potatoes for him. . . . And he asked that to Dennis Hughes, or to me.  But whoever, I made – whoever it was, whether it was me calling back Ron to verify that, or Dennis, in other words, I made sure that I verified it from his mouth over for my ears at least twice. So we brought that load of potatoes in for Menu Maker.  In fact, we even buy good labels, because we wanted to make sure we made him happy, because that was our entire point.  We brought gold label centennial potatoes in, a straight load, at the direction of Ron Orr.  And once we got them in here, to our – into our – into our coolers, $17,000, that load of potatoes, because they were expensive time of the year.  That's when Ron Orr said, 'I don't buy potatoes from you.'  I said, Ron, I verified it from your mouth to my ear twice that you wanted me to bring these in.  'I don't buy my potatoes from you.'  I let Dick know about that.  And we had a load of potatoes in our cooler that cost us

---

[3]  The order sheets maintained by Monsour's for orders sent to Menu Maker are evidenced by **Exhibit V** which is an example of the order sheets.  The credits taken by Menu Maker for rejected or returned produce are evidenced by **Exhibit U** which is an example of the credit invoices.  All documents were produced and authenticated by Mark Monsour's affidavit.  These documents have been produced in discovery, Bates Nos. 10390-10625.  If the Court desires to review all 235 documents, they will be immediately delivered to the Court.

$17,000 that Ron Orr personally ordered from me, and verified by Dennis Hughes and verified by Peter Monsour, and didn't want them.  <u>And they never took a single box.  We threw them away.</u>

(Monsour Corporate Depo, p. 105, l. 15-p. 106, l. 16, **Exhibit A**.)

59.     The contract required that order sheets be completed for the approximation of the amount of Menu Maker's produce order from Monsour's and Dick Graves agreed that it would be "extremely important" for Monsour's to "know what its buyer, in this case, Menu Maker, would be needing."  (Graves Depo, p. 125, ll. 14-20, **Exhibit B**; and Asset Purchase Agreement, **Exhibit D**.)

60.     Dick Graves agreed that failure to provide the order usage sheets as outlined in the contract would "really hamstring" or "impair a seller like Monsour's to be able to provide produce."  (Graves Depo, p. 126, ll. 12-17, **Exhibit B**.)

61.     Ken Goodwin, Menu Maker's Director of Merchandising, admits that he was contacted by Mark Monsour regarding Menu Maker's failure to send the estimated usage report and he believed that Mark was communicating to him that Monsour's wanted to make the Agreement work.  (Goodwin Depo, p. 57, ll. 4-9, **Exhibit I**.)

62.     Ken Goodwin admitted that Mark Monsour "expressed his concern about the cooperation that he was receiving from Ron Orr in regards to the produce segment of the business."  (Goodwin Depo, p. 53, l. 22-p. 54, l. 1, **Exhibit I**.)

63.     Menu Maker did not provide any usage estimates prior to February 20, 2002. (Peter Monsour Notes produced in Initial Disclosure, Bates Nos. 10043-10050, attached as **Exhibit T**.; Monsour Affidavit, ¶18.)

64.     Ron Orr did not want the Agreement to work.  Ed Fairchild, Director of Operations, testified as follows:

Q:      I want to go back and - - and talk to you specifically about some of the comments that you personally overheard Ron Orr making concerning Monsour's.

Did you ever overhear Ron Orr saying orally that he did not want to buy produce from Monsour's?

A:      Yeah.  I heard him say – Ron said he didn't want to do it.

. . . .

Q:      When Monsour's and Menu Maker started doing business together, did you ever hear Ron Orr make comments about - - about his opinions as to whether he wanted to continue to do business with Monsour's?

A:      Oh, Ron didn't like, Ron didn't like the situation.

Q:      Did you overhear him make comments to that affect on more than one occasion?

A:      Oh, I think that - - yeah.  I mean, Ron made it clear that he didn't like the situation . . .

(Fairchild Depo, p. 41, l. 24-p. 42, l. 7**;** and p. 15, ll. 5-15, **Exhibit K**.)

65.      Ken Goodwin testified that Ron Orr did not want the Agreement to work.

Mr. Goodwin testified:

Q:      There's been some testimony early on in the case with Mr. Fairchild saying that he had heard Mr. Orr say he didn't approve of the Agreement and he didn't like the Agreement; had you heard Mr. Orr say things like that?

A:      Yes. . . .

Q:      Is it safe to say that Ron didn't like the Agreement?

A:      That's the impression I got.

Q:      Do you ever recall Mr. Orr saying, "this Agreement is just not going to work"?

A:      Yes.

(Goodwin Depo, p. 57, l. 20-p. 58, l. 2; and p. 58, ll. 7-9, and p. 58, ll. 15-17, **Exhibit I**.)

15

66.     Ed Fairchild admitted that he had heard that Ron Orr was "sabotaging the business relationship" between Menu Maker and Monsour's.  (Fairchild Depo, p. 93, ll. 17-25; and p. 94, ll. 6-8, **Exhibit K**.)

67.     Ron Orr testified that he had concerns about the Agreement before any produce had ever been delivered and he even voiced his opposition to Dick Graves when he was informed that the Agreement had been reached.  (Orr Depo, p. 24, l.8-p. 25, l. 9, **Exhibit P**.)

68.     Ron Orr admitted that even while the Agreement was going on, he was purchasing produce from other sources and Ron Orr understood that his instruction to purchase "substantially all" of the produce meant that he was to purchase "as much as we could" and he estimated that to be "75 percent."  (Orr Depo, p. 27, ll. 15-21, **Exhibit P**.)

69.     Dick Graves never even had a conversation with Ron Orr as to what "substantially all" meant.  (Orr Depo, p. 27, ll. 22-25, **Exhibit P**.)

70.     Dick Graves never informed Ron Orr of the Asset Purchase Agreement until after it happened and said Menu Maker was "going to expand into Kansas and that he was doing so by partnering with Mark Monsour."  (Orr Depo, p. 19, ll. 19-23; and p. 19, ll. 13-18, **Exhibit P**.)

71.     Ron Orr later claimed that he voiced his opposition to the Agreement to Dick Graves, but later in the deposition, changed from "opposition" to the Agreement to "concern."  (Orr Depo, p. 26, ll. 6-16, **Exhibit P**.)

72.     When Ed Fairchild voiced his opposition to the Agreement, Ed Fairchild testified in regard to the Asset Purchase Agreement, "this was a horrible business decision for Dick.  And I felt that way and I actually verbalized that [to Dick] more than one time, yeah," and Mr. Graves responded to Mr. Fairchild that he viewed the Agreement with Monsour's as "looking at the long term, not the short term."  (Fairchild Depo, p. 90, l. 20-p. 91, l. 15, **Exhibit K**.)

16

**F.    The facts supporting plaintiff Monsour's "produce" damages.**

73.    Menu Maker ended up having a new territory with an existing customer base which it has reaped profits from each year.  To obtain this, it only had to buy $250,000 worth of food service inventory at cost and buy produce from Monsour's for five to six months.  (Graves Depo, p. 154, l. 17-p. 155, l. 16; and p. 61, l. 6-p. 62, l. 16, **Exhibit B.**)

74.    Monsour's sustained damages because of defendant's breach of contract pertaining to produce in the amount of $1,204,350, and this is evidenced by Mark Monsour's testimony and the invoices and credits produced in discovery.  (Monsour Affidavit, ¶¶14&15, **Exhibit G**.)

**IV.    ARGUMENTS & AUTHORITIES**

**A.    Damages for food service inventory.**

**1.    The measure of damages for the breach of contract for food service inventory is an action for price pursuant to MO. ANN. STAT. 400.2-709(1)(a) and (b).**

As outlined in *Sharp Elec. Corp. v. Lodgistix*, 802 F. Supp. 370 (D. Kan. 1992, there are three basic situations in which MO. ANN. STAT. 400.2-709(1) will allow the seller to maintain a price action: (i) when the buyer has accepted the goods; (ii) when the goods have been lost or damaged after risk of loss has passed to the buyer; and (iii) when goods identified to the contract can not be resold.

MO. ANN. STAT. 400.1-106 states, "The Code requires that the remedies be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."  *Id.*  In this case, only an action for specific performance (an action for price) will place Monsour's in as good a position as if Menu Maker fully performed.

Mo. Ann. Stat.400.2-709(1) provides that a seller may recover the price of goods when the buyer fails to pay the price as it become due. In the immediate case, Menu Maker failed to pay the price of the food service inventory as it became due. Menu Maker contractually agreed to purchase $750,000 to $800,000 of Monsour's food service inventory. (SOF 6&8.) The parties intended that time was of the essence as Menu Maker made repeated representations and assurances that the food service inventory would be purchased in a timely manner and that Menu Maker "would take delivery no later than eight weeks after closing". (SOF 12-17.) Monsour's relied upon these assurances to its detriment. (SOF 25-27.) Contrary to the Asset Purchase Agreement and Menu Maker's repeated assurances, it only purchased $250,000 worth of inventory and failed to pay for the additional items. (SOF 24.)

   a.    **Monsour's is entitled to recover the price of the goods identified to the contract pursuant Mo. Ann. Stat. 400.2-709(1)(b) as it was unable after reasonable efforts to resell the foods service inventory.**

Mo. Ann. Stat. 400.2-709(1)(b) provides that when the buyer fails to pay the price as it becomes due, the seller may recover the price "of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." In the immediate case, the goods were identified to the contract and Monsour's was unable to resell the same at a reasonable price.

The "goods identified to the contract" were described by the parties as "All of Seller's inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition) which items are presently being sold to current customers of Buyer or to selected customers of Seller." After Menu Maker inspected the food service inventory at Monsour's and studied Monsour's food service inventory report, Menu Maker assigned a value and contractually agreed that the inventory to be purchased is estimated to be from $750,000 to

18

$800,000. (SOF 3-6.) While not identified by specific serial number, the goods were identified by both condition and value after a reasonable inspection.

Because of Menu Maker's repeated assurances that the food service inventory would be purchased (SOF 25), time continued to progress and as time progressed, many of the food service items began to expire and had to be thrown away (SOF 27.) As Menu Maker continued to fail to purchase the food service inventory as promised, Monsour's used reasonable efforts in an attempt to resell the food service inventory. (SOF 28.) However, because of the odd lots; the aging of the inventory; and the non-compete agreement that Mark Monsour and Monsour's were required to execute, Monsour's was not able to sell the remaining food service inventory at reasonable prices. (SOF 28.) Monsour's is entitled to maintain an action for the price of those goods as it is the sole remedy that will put Monsour's in as good a position as if Menu Maker had fully performed.

   **b.    MO. ANN. STAT. 400.2-709(1)(a) is applicable because under the totality of the circumstances, Menu Maker accepted the food service inventory.**

The immediate case is unlike most U.C.C. situations due to the fact this case involves a complete asset purchase and not simply a sale of goods. After the Asset Purchase Agreement, defendant Menu Maker's employees were on site at Monsour's facility and many of Monsour's employees, including food service sales personnel and upper management, had become employees of Menu Maker. (SOF 11). The effective result was that Menu Maker had significant control of the food service inventory.

Part I, Section 1.1 of the Asset Purchase Agreement requires Monsour's to sell and Menu Maker to purchase $750,000 to $800,000 of food service inventory. While Part II, Section 2.1 of the Asset Purchase Agreement requires payment to be made on an "as received" basis, there is no

provision within the Asset Purchase Agreement which indicates when these assets are "accepted", "sold" or effectively "transferred to the buyer." There is, however, a provision in the Non-Competition Agreement which is part of the Asset Purchase Agreement, which clarifies the assets are "sold and transferred to the Buyer at closing [on the date of the Asset Purchase Agreement]". (SOF 8-9).

In this case, Monsour's fully performed all of its obligations under the contract and is permitted to demand reciprocal performance from Menu Maker. Under the totality of the circumstances, Menu Maker, should be deemed to have "accepted" the food service inventory described in the Asset Purchase Agreement. Monsour's is entitled to maintain an action for the price.

### c. MO. ANN. STAT. 400.2-709(1)(a) is applicable because the "conforming goods" were damaged within a commercially reasonable time after risk of their loss passed to Menu Maker.

In this case, representatives of defendant Menu Maker reviewed the food service inventory at Monsour's prior to the execution of the Asset Purchase Agreement and were provided with a food service inventory report. Thereafter, Menu Maker assigned a value and contractually agreed to purchase $750,000 to $800,000 of food service inventory. (SOF 3-6.)

Based upon these facts, at least $750,000 of Monsour's food service inventory should be considered "conforming goods" as they were inspected and approved by defendant. Thereafter, Menu Maker failed to live up to the terms of the written contract and did not take possession and pay for the food service inventory in an expeditious manner as agreed. (SOF 12-30.) As a result, many of the food service items had to be thrown away by Monsour's as they had expired. (SOF 27.) Under the facts of this case, it is a question of fact for the jury to determine whether

the goods were "conforming goods" and whether they were damaged within a commercially reasonable time after risk of loss passed to the buyer.

2.    **MO. ANN. STAT. 400.2-708 is not applicable with respect to Monsour's breach of contract claim for food service inventory as Monsour was getting reimbursed the costs of these goods and a "profit" was not contemplated.**

MO. ANN. STAT. 400.2-708 applies in instances when the seller can mitigate its damages by resell or where a "profit" was contemplated.  In the immediate situation, Monsour's was to sell its food service inventory to Menu Maker at cost.  (SOF 8(c).)  Because of Menu Maker's assurances it would purchase the inventory and because of Menu Maker's failure to do so, many of the perishable goods expired.  (SOF 25-27).  While Monsour's attempted to resell the remaining food service inventory after it was blatantly obvious Menu Maker was not going to adhere to its contractual obligations or its verbal assurances, it was unable to do so at a reasonable price.  (SOF 28).

U.C.C. Section 2-708 provides no remedy to Monsour's because under the facts of this case, Monsour's was not going to be receiving a "profit" from Menu Maker's purchase of the food service inventory, but instead was simply getting reimbursed the funds it previously paid for the inventory it purchased.

B.    **Damages for produce.**

Monsour's has a valid action against defendant for its breach of the Asset Purchase Agreement related to produce.  The produce claim can be divided into two separate areas:  1) produce ordered by defendant and wrongfully rejected or not accepted, (this includes specialty produce Menu Maker ordered but did not accept after Monsour's obtained the produce), and 2) produce ordered from other suppliers, in violation of the Agreement, depriving Monsour's of profit from the sales.  Monsour's seeks to be placed in the same position as if Menu Maker had

21

fully performed under the Asset Purchase Agreement pursuant to MO. ANN. STAT. 400.1-106.

Menu Maker breached the contract pertaining to the purchase of produce as set forth within

paragraphs 31-74.

> **1.    The measure of damages for the breach of contract for produce that was wrongfully rejected or not accepted after it was ordered is an action for price pursuant to MO. ANN. STAT. 400.2-709.**

The actions of defendant violate the U.C.C. and entitle plaintiff to damages.  MO. ANN.

STAT. 400.2-703 outlines the seller's remedy upon breach.  The statute states:

> Where the buyer <u>wrongfully rejects or revokes acceptance of good</u> or fails to make payment due on or before delivery or repudiates with respect to any part or the whole, then with respect to any goods directly affected, and, if the breach is of the whole contract (2-612), then also with respect to any undelivered balance, the aggrieved seller may
>
> a)  withhold delivery of such goods (2-705);
> b)  stop delivery by any bailee as hereafter provided;
> c)  proceed under the next section respecting goods still unidentified to the contract;
> d)  resale or recover damages as hereinafter provided (2-706);
> e)  recover damages for non-acceptance (2-708) <u>or in a proper case</u>, <u>the price</u> (2-709); and
> f)  cancel.

*Id.*  (Emphasis added.)

Monsour's was prevented from performing under subsection (d) as it could not resell the

rejected produce damaged in transit.  (SOF 55&57.)  The U.C.C. comment provides guidance as

to the manner in which Monsour's can proceed against Menu Maker.  Since Monsour's is

asserting and has presented evidence that Menu Maker was in breach, a determination must be

made as to the appropriate measure of damage.  (2-708 for non-acceptance or 2-709 for price.)

MO. ANN. STAT. 400.2-708 provides the seller damages for non-acceptance or

repudiation. This section of the U.C.C. contemplates goods that are resellable to another buyer.

This section does not apply to these facts. This section is inadequate to put the seller "in as good a position as performance." Therefore, MO. ANN. STAT. 400.2-709 for price is applicable.

As outlined above, 400.2-709 is the seller's remedy for specific performance. *See Sharp Electronics Corp. v. Logistix*, 802 F. Supp. 370, 377 (D. Kan. 1992). Official U.C.C. comment, No. 2, states that an action for price is appropriate in cases "where resale of the goods is impracticable" where the goods "have been destroyed after risk of loss has passed to the buyer." *Id.*

In its motion for summary judgment, defendant argued that plaintiff needed expert testimony with respect to damages, but defendant has not presented any authority for this position. The evidence necessary to support a claim under this section for price is established by deposition testimony and the documents in this case. Even *arguendo*, if specialized or expert testimony was necessary, plaintiff has presented the testimony of Mark Monsour who has specialized knowledge from his lengthy history in the produce industry. (See plaintiff's initial response brief SOF 1-6 and Monsour Affidavit, ¶¶1-4, **Exhibit G**.)

**2.    The measure of damages for the breach of contract for plaintiff's produce that defendant ordered from other suppliers is MO. ANN. STAT. 400.2-708.**

Plaintiff Monsour's is also asserting a claim for the produce sales that never occurred because of defendant's breach of contract. Pursuant to the Asset Purchase Agreement, Menu Maker was required to purchase "substantially all" of its produce and that amount was contemplated at "99.25 percent." (SOF 31.) Monsour's has a claim for all produce defendant purchased from others during the time Monsour's was operational and also during the non-compete agreement. Damages for sales that did not occur are appropriately determined under MO. ANN. STAT. 400.2-708. Monsour's is only entitled to its profit as it did not incur the

overhead expense of purchasing the produce as outlined above.  There is uncontroverted evidence

that Monsour's is entitled to a 10 percent profit for sales that did not occur.  (SOF 34.)  However,

there is still no requirement for expert testimony.  These damages are determined by the

documents defendant produced in discovery showing purchases from other suppliers.[4]

### C.    Parole evidence concerning time being of the essence is admissible.

The Court requested legal authority that plaintiff would be able to submit evidence of

discussions or agreements by the parties not included in the Asset Purchase Agreement.

Missouri case law allows such evidence.  Most importantly, case law discusses "time is of the

essence provisions" and deems such testimony admissible.  The parole evidence rule under

Missouri law only excludes evidence of prior and contemporaneous oral agreements that vary or

contradict the terms of an unambiguous, final and complete writing.  *Sherman v. Diehl*, 193

S.W.3d 863, 866 (Mo. App. S.D. 2006)(citing *Building Erection Servs. Co. v. Plastic Sale Mfg.

Co.*, 163 S.W.3d 472, 479 (Mo. App. W.D. 2005)).  In order to determine if a contract is final

and unambiguous the entire contract is examined to determine if parole evidence is necessary to

determine the intent of the parties.  *Id.*  If reasonable people can differ as to the meaning and

---

[4]  MO. ANN. STAT. 400.2-723 outlines the manner in which a proof of the market price should
occur.  This section is attempted to "eliminate the obvious difficulties arising in connection
with the determination of market price."  84-2-723, official U.C.C. comment.  This section also
notes that the "Court is granted reasonable leeway in receiving evidence of prices."  *Id.*
However, it is noted that K.S.A. 84-2-723 "is not intended to exclude the use of any other
reasonable method of determining market price or of measuring damages if the circumstances
of the case make this section necessary."  In the *Sharp* case, this Court determined that the
testimony of the sales director was admissible in establishing market price based upon his
knowledge of commercial judgment.  *Sharp* at 381.  It is plaintiff's contention that testimony
of profit is not necessary as the parties agreed to 10 percent mark-up.  However, if necessary,
the testimony of Mark Monsour and the testimony of Denis Hughes, his head produce buyer,
are admissible in establishing market price based upon our commercial judgment and
experience in the produce industry.

interpretation of the contract, then it is ambiguous such that parole evidence is admissible to interpret the contract. *Id.*

Under Missouri law, the parole evidence rule is substantive and not just a rule of evidence. *Don King Equip. Co. v. Double D Tractor Parts, Inc.*, 115 S.W.3d 3636, 372 (Mo. App. S.D. 2003). However, Missouri courts still apply the rule in terms of whether evidence is admissible. Parole evidence is admissible in interpreting an ambiguous contract when it does not contradict, alter, or vary the contractual terms. *Cameron v. Morrison*, 901 S.W.2d 171, 177 (Mo. App. W.D. 1995).

**1.    The parole evidence rule does not exclude proof that an alleged contract omits a fundamental assumption upon which the agreement is made.**

Missouri case law established that the parole evidence rule does not exclude proof that an alleged contract omits a fundamental assumption upon which the agreement is made. *Don King*, 115 S.W.3d at 373. The contract must be examined in its totality to determine the meaning of any potentially ambiguous phrases. In *Sherman*, 193 S.W.3d at 866-67, the Court noted that it was appropriate to introduce extrinsic evidence in that case because it did not contradict the contract; it simply attempted to "give meaning to [a disputed term]." It was a "fundamental assumption" of the parties that the contract would be performed promptly because the parties had not only agreed to this, but given the nature of the perishable goods, the circumstances dictate that time was of the essence. The contract considered frozen foods which have a limited shelf life.

**2.    The parole evidence rule does not prohibit the presentation of evidence to determine if a contract is fully integrated.**

Plaintiff is permitted to offer extrinsic evidence to show that the Asset Purchase Agreement is ambiguous because it fails to unambiguously and completely spell out the

agreement of the parties.  "All authorities agree that the Court must determine if the contract is integrated before it applies the parole evidence rule."  *Missouri Highway & Transp. Comm'n. v. Maryville Land Partnership*, 62 S.W.3d 485, 489 (Mo. App. E.D. 2001).  If the writing omits a consistent additional term that is either agreed to for separate consideration or might naturally have been omitted in the circumstances, that agreement is considered only partially integrated and collateral facts and circumstances may be introduced to prove consistent additional terms. *Craig v. Jo. B. Gardner, Inc.*, 586 S.W.2d 316, 324 (Mo. en banc 1979)(citing Restatement (Second) Contracts § 216(2)).

In other words, because the contract is ambiguous as to the time for performance or time is of the essence, the contract is not fully integrated and plaintiff is able to present evidence of collateral facts – such as the testimony of Dick Graves that he knew the contract had to be performed promptly and was representing this to Mark Monsour.  (SOF 12-17.)  This testimony is even more compelling considering the admission by defendant's employees that Dick Graves did not give them a timeframe to complete the purchase, and if he would have, it could have been accomplished sooner.  (SOF 19-23.)

### 3.    The U.C.C. allows extrinsic evidence of trade usage.

Mo. Ann. Stat. 400.2-202 permits evidence of "trade usage" or "course of dealing" to explain contract terms under the Code's parole evidence rule.   The code's parole evidence rule permits evidence of trade usage or course of dealing if it does not contradict the agreement.  The ambiguous or omitted terms may be supplemented or explained by extrinsic evidence of the course of dealing.  Mo. Ann. Stat. 400.2-202. The code defines "usage of trade" in § 1-205(2) as

> "a usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade in as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope such a usage are to be proved as facts. "

MO. ANN. STAT. 400.1-205(2).

Contracts for the sale of perishable goods always intend that performance be completed in time to transfer the goods while the goods are still in sellable condition. To permit a party to delay the delivery of the goods so long that the goods are ruined would negate the intent of the parties. Contracts for perishable goods are by their very nature meant to be performed within a short period of time; otherwise, the goods are useless to the buyer and the seller. Because of this, when the Court looks at the totality of the surrounding circumstances, the parole evidence can come in to prove usage of trade.

**4.    Courts can provide missing terms to a contract to fulfill the parties' intent.**

Contracts may have missing or omitted terms and the Court is to supply the missing term. A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties that recognizes the existence of such a contract. MO. ANN. STAT. 400.2-204(1). The code also defines a contract as the "total legal obligation which results from the parties' agreement as affected by the code and any other applicable rules of law. MO. ANN. STAT. 400.1-201(11). If the expressions in the agreement are clear, the Court determines the intent of the contracting parties from a reading of the writing. *Computer Network, Ltd. v. Purcell Tire & Rubber*, 747 S.W.2d 669, 674 (Mo. App. E.D. 1988) . If the intent of the parties "is not clearly expressed, <u>then the surrounding circumstances may be considered – the subsequent actions of the parties and the practical construction of the contract</u>. " *Id*. at 675. (Emphasis added.)  Under the modern objective test, the Court looks at the intent of the parties

and the fact that a term is missing is not dispositive. *Id.* Under the U.C.C., even though there are missing terms, a contract still exists, provided there exists a reasonably certain basis for giving an appropriate remedy. MO. ANN. STAT. 400.2-204(3). The fact that terms (such as the time for performance) are not spelled out does not indicate that the parties did not agree to these terms. In fact, the Court can supply a term based on a reasonable interpretation of the parties' intent. *Sedmak v. Charlie's Chevrolet, Inc.,* 622 S.W.2d 694, 697 (Mo. App. E.D. 1981).

This means that if the Court considers the statements of the parties, then it can determine the parties objectively manifested intent to make time of the essence.

**5.    "Time is of the essence" may be an omitted term.**

If the Court finds that the parties intended that time is of the essence, it is not necessary that the contract expressly state that "time is of the essence." *Sabin Robbins Paper Co. v. Cal Hirsch and Sons Mercantile Co.*, 263 S.W. 479 (Mo. Ct. App. S.L. 1924) (unpublished opinion). In that case, the parties disagreed whether time was of the essence. The Court looked at the totality of circumstances and concluded that the intent of the parties was that time was of the essence. The Court stated

> While it is doubtless true that time is not generally considered as of the essence of a contract unless by the terms thereof it expressly so provided, yet to render time of the essence of the contract it is not necessary that the contract expressly so declare. <u>It is sufficient if it appears that it was the intention of the parties that time should be of the essence of the contract.</u>

*Id*. at 481-482. (Emphasis added.) In *Sabin-Robbins*, the plaintiff sought to purchase cardboard backing boards. The plaintiff presented evidence that he told the defendant that he needed the cardboards to fill a contract with the U.S. Navy and that there was great need for immediate delivery. He also stated that an agent of defendant had told him that delivery could be made by a certain date. Because of the evidence that the seller knew the buyer needed these goods quickly,

the Court held that "it further appears that plaintiff knew of the necessity of prompt action on its part. It cannot be doubted, we think, that under the circumstances time was of the essence of the contract." *Id*. at 482.[5]

### 6.      Whether time is of the essence is a question of fact.

The Missouri courts have held that whether time truly was of the essence is a determination that must be made by the jury. In *Cochran v. Grebe*, 578 S.W.2d at 353-54, the Court stated that "parties may stipulate by their contract that time is of the essence." But, even in cases where the parties do not expressly state that time is of the essence "such a condition nevertheless may be implied depending upon the language of the contract, the purpose which it was intended to serve and all of the surrounding circumstances." *Id*. at 354. Furthermore, even if the parties at the outset had not intended time to be of the essence, the *Cochran* Court held that time can be made of the essence by one party informing the other that prompt action is required.

In *Cochran*, the plaintiff asserted in their affidavit, "(t)hat on several occasions we told, asked, and otherwise directed defendants to make payments as provided for in said Contract" and "(t)hat on several occasions we told defendants that prompt payment was required and continued failure to do such would result in declaration of forfeiture rights." The Court held that

---

[5]  Missouri law has a long history of implying the term to the effect that time is of the essence. See e.g. *Cochran v. Grebe*, 578 S.W.2d 351 (Mo. App. W.D. 1979)("where parties have not expressly stipulated that time is of the essence, such condition nevertheless may be implied depending upon the language of the contract, purpose for which it was intended to serve and all the surrounding circumstances") ; *Walker v. American Auto Ins. Co.*, 70 S.W.2d 82 (Mo. App. 1934)(the subject matter of the contract or the nature of the goods thereof or the surrounding circumstances may indicate that the parties intended that time is of the essence); *Harris v. Capps*, 9 S.W.2d 87 (Mo. App. 1928)(the circumstances surrounding the contract may demonstrate that that the parties intended that time is of the essence); *Howe Scale Co. v. Geller, Ward, & Hasner Hardware Co.*, 285 S.W. 141 (Mo. App. 1926)(time may be of the essence of contract, not expressly so declaring, if such intent appears from the circumstances).

because the defendants were told of the urgency of performance, those demands "might have the effect of making time of the essence." *Id.  See Wimer v. Wagner*, 20 S.W.2d 650 (Mo. 1929).

In the *Cochran* case, the defendants denied the allegations that they were told that time was of the essence, and thus, the Court held that "the matter of whether plaintiffs made demand upon defendants for prompt performance presents a genuine issue of fact which must be resolved on live evidence rather than upon summary judgment based on mere affidavits." *Cochran*, 578 S.W.2d at 354.  In concluding its decision, the *Cochran* Court concluded:

> In view of these diametrically opposing affidavits, the conflict must be resolved by trial with a regular presentation of evidence by means of which the fact finder may see and evaluate the testimony of the witnesses in person and subject to cross-examination. This constitutes a genuine issue of fact, not appropriate for disposition on summary judgment.

*Id.*  Similarly, the jury should rule the determination above the agreement between the parties. Plaintiff has come forth with evidence that defendant knew time was of the essence in defendant performing under the contract and such evidence is admissible for the jury to make a credibility determination.

## CONCLUSION

WHEREFORE for the above and foregoing reasons, plaintiff requests that this court deny defendant's motion for summary judgment.

Respectfully Submitted,


s/ Dustin L. DeVaughn_____
Dustin L. DeVaughn, #16559
Richard W. James, #19822
Donald H. Snook, #21775
*Attorneys for Plaintiff*
McDONALD, TINKER,
SKAER, QUINN & HERRINGTON, P.A.
R.H. Garvey Building
300 West Douglas Avenue, Suite 500
P.O. Box 207
Wichita, KS 67202-2909
Telephone: (316) 263-5851
Fax: (316) 263-4677
Email: ddevaughn@mtsqh.com
        rjames@mtsqh.com
        dsnook@mtsqh.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of December, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

John Val Wachtel
Alex Mitchell
Klenda, Mitchell, Austerman & Zuercher,
201 North Main, Suite 1600,
Wichita, KS 67202
Tele: 316.267.0221
Fax: 316.267.0333
jvwachtes@kmazlaw.com
Attorneys for Defendant

Jeffrey Eastman
Keleher & Eastman Law Firm
403 N.W. Englewood Rd.
Gladstone MO 64118
Business Tele: 816.452.6030
Fax: 816.455.0969
jse@keleher-eastman.com
Attorney for Defendant

And a courtesy copy will be hand delivered to:

Honorable Monti L. Belot

                              s/ Dustin L. DeVaughn
                              Dustin L. DeVaughn, #16559
                              Richard W. James, #19822
                              Donald H. Snook,#21775
                              *Attorneys for Plaintiff*
                              McDONALD, TINKER,
                              SKAER, QUINN & HERRINGTON, P.A.
                              R.H. Garvey Building
                              300 West Douglas Avenue, Suite 500
                              P.O. Box 207
                              Wichita, KS 67202-2909
                              Telephone: (316) 263-5851
                              Fax: (316) 263-4677
                              Email: ddevaughn@mtsqh.com
                                      rjames@mtsqh.com
                                      dsnook@mtsqh.com