Monsour et al v. Menu Maker Foods Inc
Case 6:05-cv-01204-JTM   Document 104-3   Filed 12/30/2006   Page 1 of 14
Doc. 104 Att. 2

# Exhibit A



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK MONSOUR, SHEILA MONSOUR AND
MONSOUR'S, INC.
vs.
MENU MAKER FOODS, INC.
Case No. 05-1204-MLB

DEPOSITION OF CORPORATE REPRESENTATIVE,
MARK MONSOUR
March 14, 2006

OFFICES   MISSOURI   ■   ILLINOIS   ■   KANSAS

HEADQUARTERS: 711 NORTH ELEVENTH STREET, ST. LOUIS, MISSOURI 63101
800.280.3376

Page 9

1  once?
2    A   Most likely.
3    Q   What were the nature of the cash flow
4  problems that Monsour's, Inc. was experiencing in,
5  oh, I don't know, how about November of 2001?
6    A   Let me tell you why I think the cash flow
7  problems arose. Does that work?
8    Q   Well, okay.
9    A   I think when September 11th happened we
10 lost, you know -- that hurt the industry. That hurt
11 America. We experienced 200,000 decline in sales --
12 decline weekly in sales. Now to give you a little
13 bit of background, I bought slightly under a $6
14 million company from Pete; okay? And we had almost
15 -- we had -- we had grown substantially. And the
16 good news about when you're growing your new revenue
17 is additional cash flow; right? And there is a
18 timing difference between when you buy something and
19 when you pay for it and when you collect for it. We
20 were pretty good at collecting. And pretty good
21 about taking the terms to pay, which is a good
22 business practice. Well, when you have a decline in
23 your revenue coming in, your sales, and on top of
24 that, I believe our buyers were slow to respond and
25 added increased inventory to our numbers, that just

Page 10

1  caused a cash flow problem. Does that answer your
2  question, sir?
3    Q   I think it does, but I'm going to ask the
4  Reporter to read back whatever the heck my question
5  was.
6        MR. DEVAUGHN: I can tell you. You
7  asked him what were the cash flow problems in
8  November of 2001.
9    Q   (By Mr. Wachtel) Okay. If I ask you
10 again what the cash flow problems were in November,
11 2001, would your answer be any different than that
12 which you have given me now?
13   A   It would be a summary, decreased sales.
14   Q   I'm sorry?
15   A   The summary would be decreased sales.
16   Q   Decreased sales in the amount of what per
17 month?
18   A   I'd say anywhere from 600 to 900,000.
19   Q   And those would be both produce and
20 inventory?
21   A   No, it was mostly food service, really.
22 People stayed home and ate. So the grocery stores
23 sales, retail actually was fine.
24   Q   Okay. During that same period of time,
25 were you adding to the company's -- during that same

Page 11

1  period of time, was the company purchasing or leasing
2  trucks and trailers?
3    A   That's correct.
4    Q   During that same period of time, was the
5  company incurring costs for freezer repair work?
6    A   I would probably have completed most of
7  the freezer work prior to, because I had -- I had --
8  when we talk freezer work, what you're talking about
9  is compressors to run the machinery, and I had redone
10 that. I had redone -- I had redone the machine room.
11   Q   Prior to September 11th?
12   A   Yeah.
13   Q   Was it --
14   A   It would have been maintenance, that would
15 have been it.
16   Q   During that period of time did Monsour's,
17 Inc. add any computers or new computer programs to
18 its inventory?
19   A   Nothing of significant dollars. The most
20 significant dollars there would have been the
21 leasing, the leases, because the leases came in
22 higher than we expected. The actual dollars off of
23 the leases came higher than we expected.
24   Q   Do you remember how much Monsour's would
25 have spent during the year 2001 to make repairs to

Page 12

1  its freezer?
2    A   I wouldn't even -- I wouldn't even guess.
3    Q   Would the records of that exist somewhere?
4    A   In the financial statements.
5    Q   No, would the actual invoices exist
6  somewhere?
7    A   I wouldn't know where, really.
8    Q   With regard to the amount of money that
9  might have been spent to upgrade computer systems
10 during that period of time, would that -- would the
11 invoices for that exist somewhere?
12   A   Probably. Yeah, they would have existed;
13 where they exist today --
14   Q   My questions is: Do they exist today?
15   A   Where? I don't know.
16   Q   Okay. I will come back to that. In
17 Monsour's, Inc.'s answers to interrogatories, in
18 particular interrogatory No. 1, Monsour's was asked
19 to give certain information about its indebtedness.
20 Now I only have my copy of those -- that
21 interrogatory answer.
22       MR. WACHTEL: I would Xerox it, Dustin,
23 if you want me to. Or I will just ask him about it.
24       MR. DEVAUGHN: Go ahead and ask him,
25 then let him refresh his recollection. I mean we can

CORPORATE REPRESENTATIVE, MARK MONSOUR 3/13/2006

Page 41

1 through his coffee, and different programs he has,
2 actually make him a very strong point in the food
3 service business. So I think the real point was we
4 thought of a merger or partnership or something like
5 that. Or -- and that was discussed in many different
6 ways. I wouldn't even begin to -- you know, brain
7 storm sessions or whatever. And I -- we would talk,
8 we would partner, and I would come up with ideas, he
9 would come up with ideas. And that's how it began.
10   Q  Uh-huh.
11   A  You know, and we talked about first the
12 purchase. I had a dollar figure that I threw out to
13 him and we -- and those figures were knocked around,
14 and it began -- you know, I think actually $2 million
15 was our asking price at the beginning.
16   Q  You believe what?
17   A  $2 million was my first sking price. And
18 over time that number went down to where it was maybe
19 -- you know, maybe something. And then it was buy
20 the inventory. Buy the produce. Get the customers
21 for free, in effect.
22   Q  Let me see if I understand you. The
23 negotiations took some period of time, commencing
24 either in November or earlier of 2001; fair
25 statement?

Page 42

1   A  Say it again.
2   Q  The negotiations with Mr. Graves took some
3 period of time; fair statement?
4   A  Right.
5   Q  They commenced either in November or
6 earlier in 2001; true?
7   A  Right.
8   Q  In the negotiations and the discussions,
9 various different methods were discussed?
10   A  Yes.
11   Q  A partnership?
12   A  (Witness nodded.)
13   Q  Right? A possible partnership?
14   A  Right.
15   Q  A possible acquisition of stock sale of
16 the company, where Mr. Graves would acquire the
17 company, its assets and its debt; right? We talked
18 about that.
19   A  Many things were discussed.
20   Q  Right. You talked about that, didn't you?
21   A  (Witness nodded.)
22   Q  You talked about an asset purchase; right?
23   A  (Witness nodded.)
24   Q  Right?
25   A  Correct.

Page 43

1   Q  If I understood your testimony correctly
2 -- well, I'm sorry. That's a bad question. When
3 there were discussions about Mr. Graves buying the
4 entire company as an entity, what value -- what was
5 the purchase price, if any, that you asked of Menu
6 Maker Foods for that kind of an acquisition?
7   A  I think that was $2 million.
8   Q  $2 million?
9   A  Yes.
10   Q  Eventually the discussions became
11 narrowed, at least in part, to an asset purchase?
12   A  Right.
13   Q  Right? What figure did you suggest in
14 your negotiations to Mr. Graves was the value of the
15 inventory?
16   A  At any one given time I wouldn't have
17 actually given him a value of the inventory. I would
18 have let the inventory value be what it was.
19   Q  Be what it was. It has been testified in
20 Mr. Graves' deposition that an inventory sale was
21 initially suggested by you at 1.1 to 1.2 million
22 dollars; is that true?
23   A  I would -- that would seem fairly accurate,
24 yes.
25   Q  However, you were willing to let the value

Page 44

1 of the inventory speak for itself; right?
2   A  At that time.
3   Q  And at that time, what information
4 regarding to inventory valuation did you give Mr.
5 Graves?
6   A  I think it would have been the 1.1 to 1.2
7 million dollars.
8   Q  Did you give it to him in writing?
9   A  I would have handed him an inventory
10 report that would have had numbers, value, cost.
11   Q  Was that a multiple page report?
12   A  Yes, it would have been.
13   Q  Would it have included -- would it have
14 included within it things other than just the
15 inventory?
16   A  The inventory report would have been the
17 inventory.
18   Q  We are talking about the food service.
19   A  Food service inventory.
20   Q  We are not talking about produce; right?
21   A  It would have been excluded, or should
22 have been.
23   Q  Should have been?
24   A  I believe it would. Would have been.
25   Q  And that document should have reflected an

11 (Pages 41 to 44)

Page 57

1   A   That's correct.
2   Q   All right. It has been alleged in this
3   case that prior to the execution of the asset
4   purchase agreement, that Menu Maker or its agents and
5   employees did a due diligence inspection of the
6   assets that they were purchasing; do you recall that
7   being alleged in this case?
8   A   I know they had employees there looking at
9   our inventory prior to the execution of this
10  agreement.
11  Q   All right.
12  A   That's what I know. They had people there
13  who looked at the inventory prior to. Whether you
14  want to call it due diligence or whether you want to
15  call it completed, they had people there who looked
16  at the inventory prior to the execution of this
17  agreement.
18  Q   Why don't we just not call it anything at
19  all, and talk about what happened. When was the
20  first time that you know about during the
21  negotiations for the asset purchase agreement that
22  any Menu Maker employee did any inspection of any
23  kind of Monsour's assets?
24  A   I don't recall the dates. I recall
25  general time frames.

Page 58

1   Q   Well, give me a general --
2   A   Let me give you this information. They
3   would have had access to any information, any
4   financial reports, anyplace in my premises at any
5   time. Period.
6   Q   All they had to do is ask you; right?
7   A   Right.
8   Q   Okay.
9   A   And as a buyer to seller, as one who was
10  buying me. If I was buying something, I would want
11  to look at it, touch it, feel it, smell it. They had
12  the opportunity to do that at any point, bar none.
13  Q   In the period commencing in November,
14  2001, through January 31st, 2002, what Menu Maker
15  employees came to Monsour's and physically inspected
16  the inventory that was being sold?
17  A   I don't recall. But I will tell you, they
18  had the opportunity to do that.
19  Q   I don't dispute that with you at all,
20  sir. All I need to know is whether or not you can
21  name -- whether or not Monsour's, Inc. can remember
22  the name of one person.
23  A   Dick Graves.
24  Q   All right. Were you present when Mr.
25  Graves inspected the inventory?

Page 59

1   A   Me and Dick -- or Dick and me would walk
2   through. We spent time walking through there talking
3   about things.
4   Q   And of that time that you spent -- how
5   much time did you spend walking through, talking
6   about things?
7   A   I don't remember.
8   Q   Of that amount of time, how much was
9   dedicated to an inspection of the condition of the
10  inventory?
11  A   I don't recall.
12  Q   Okay. We know from Mr. Graves testimony
13  that he asked Fred -- I'm sorry. He asked Mr.
14  Schaeffer to go into the Monsour's freezer and take a
15  look at the Jon Graves meat products; do you remember
16  Mr. Schaeffer doing that?
17  A   I remember him doing that; if I was there
18  or something, no, but I remember that happened.
19  Q   Other than your recollection of Mr.
20  Schaeffer looking at the Jon Graves meat inventory,
21  and other than what you have just described about Mr.
22  Graves looking through the -- walking around the
23  plant with you and discussing things and looking at
24  assets, what other inspection of the assets prior to
25  the execution of the asset purchase agreement did

Page 60

1   Menu Maker Foods agents make, to the best of your
2   knowledge and recollection?
3   A   From what I can recall, there what times
4   that they had other people down there.
5   Q   Do you recall --
6   A   Who those people -- no, I wouldn't care to
7   recall who they were. You know, anyone of those
8   people who came from Menu Maker, they would have had
9   access to my place.
10  Q   If a Menu Maker representative had come to
11  you and said, "Here, I'm here to do an inspection of
12  the inventory," you would have said, "Go ahead on"?
13  A   For whatever reason.
14  Q   And you would have said, "Go ahead on";
15  right?
16  A   Right.
17  Q   And?
18  A   What information can I help you with?
19  Q   And you believe that that occurred, but
20  you do not remember who the people were, other than
21  those two people we have identified so far today?
22  A   That's correct.
23  Q   And you do not remember when during this
24  November to January 31 process that any of that
25  occurred?

Page 73

1 develop customers.
2  Q  For marketing purposes?
3  A  Marketing and development.
4  Q  Marking and development, and not as just
5 income to be spent on other costs necessarily?
6  A  Yeah. Exactly.
7  Q  "Allowance Income," we talked about that.
8 Then the next column is "Less: Costs of Goods Sold";
9 what does that mean?
10  A  I believe what you have there is simply --
11 you have total sales at the very top, and your Less:
12 Cost of Goods Sold is probably your total of the Cost
13 of Goods sold. Those are just summary numbers, total
14 figures.
15  Q  Then I see a column titled "Gross Profit"?
16  A  That's correct.
17  Q  And what is that column telling me?
18  A  Your income less your cost of goods sold.
19  Q  And that is my projected gross profit for
20 some period of time; right?
21  A  Right. Weekly, monthly, annualized.
22  Q  Okay.
23  A  That would probably be an average.
24  Q  Average. And was this done for the -- to
25 consider the year going forward after the asset

Page 74

1 purchase --
2  A  Yes.
3  Q  -- agreement?
4  A  Yes.
5  Q  Then "G.P. %"; what is that called?
6  A  Gross profit percentage.
7  Q  Tell me what it means.
8  A  Sales, less cost of goods sold.
9  Q  So what does the, under weekly, "19.1%"
10 mean?
11  A  Gross. That is your gross profit of your
12 total sales.
13  Q  All right. To the right of that column, I
14 see in handwriting, "10% margin lowers the total
15 gross margin"; do you see that?
16  A  Yes.
17  Q  What does that mean?
18  A  What that is referring to is with Menu
19 Maker, what was agreed on was that we would sell Menu
20 Maker cost plus 10%.
21  Q  Which would be what, lower than the 19.1%
22 otherwise --
23  A  Exactly. That's why we lowered the
24 margin.
25  Q  What was the -- what was the normal gross

Page 75

1 profit for retail sales?
2  A  Higher.
3  Q  Higher than 19.1?
4  A  Yeah, that's why it's lower, because the
5 10% is having a -- or in effect.
6  Q  To the best of your recollection, how much
7 higher was it? Excuse me. To the best of your
8 recollection, what was it?
9  A  I wouldn't -- I wouldn't want to recollect
10 on that. I just know that it probably would have
11 been higher. How much higher, that's a moving
12 target.
13      MR. WACHTEL: Okay. Everything is here.
14 We might as well just go off the record and dispense
15 with that, because I am going to stay on this
16 document.
17      (WHEREIN, a recess was taken.)
18  Q  (By Mr. Wachtel) Back on the record.
19 With regard to Graves Exhibit 2, which you have
20 before you, does the section of this document that
21 was already -- that we have already talked about take
22 into consideration rebates that Monsour's would have
23 had to have given to its customers?
24  A  The revenue wouldn't take into effect
25 that.

Page 76

1  Q  Does that show up someplace else in this
2 document?
3  A  I'm going to have to look at this thing to
4 answer that question. I don't know offhand.
5  Q  Take a look.
6  A  Offhand, I didn't see that.
7  Q  All right. Would that be an important
8 consideration in trying to figure out the
9 profitability over the --
10  A  It would have an effect, that's correct.
11  Q  What was the -- if you know, what was the
12 average rebate that your customers would receive, in
13 a percent number?
14  A  If we got a quarter you might give them a
15 nickel.
16  Q  So it's about what, 20?
17  A  20%.
18  Q  Do you know why that was not included in
19 this?
20  A  One, I'm not sure that it wasn't.
21  Q  All right.
22  A  But if it wasn't, no, I wouldn't.
23  Q  If you -- if Monsour's had not done the
24 asset agreement with Menu Maker, would Monsour's have
25 been as profitable in 2002 as it was in 2001?

Page 77

1  A  Would it have been as profitable what?
2  Q  In 2002 as it was in 2001?
3  A  That would be speculation, but I wouldn't
4  know. It would be speculative on my part.
5  Q  Okay. I know that you do not know the
6  answer, but the proforma, like Graves Exhibit 2, is
7  an estimation, right? Isn't it? A projection?
8  A  Yes, of simply the retail business.
9  Q  Well, project for me, if you will, whether
10  or not had you not done the deal, if you can, whether
11  or not, had you not done the deal with -- excuse me,
12  Menu Maker, that you would have been as profitable in
13  the retail side as you were the previous year?
14  A  As a whole, the company probably would
15  have been more profitable, because retail business
16  always supported food service.
17  Q  You think you would have been --
18  A  More profitable.
19  Q  -- more profitable. You may lay that
20  aside, because I'm not going to ask you any more
21  questions. I think if we give it to the Reporter.
22  And I'm going to ask you some questions about the --
23  about the asset agreement, and certain parts of it,
24  and you may want to look at Exhibit No. 1. Section 1
25  of the asset purchase agreement, which is Defendant's

Page 78

1  Exhibit 1, says at Section 1, Subsection 1.1, quote
2  -- well, let me rephrase that. Section 1.1 says
3  that "Subject to terms of this agreement, seller
4  agrees to sell, free and clear of all liens, and
5  buyer agrees to purchase the following assets: 1.
6  All of the seller's inventory, except produce, (which
7  is in good and wholesome condition and 100%
8  resellable condition), which items are presently
9  being sold to the current customer of buyer, or to
10  the selected customers of seller. Buyer will make
11  its best efforts to sell or assist in the sale of
12  Monsour's remaining inventory. The parties estimate
13  that the inventory to be purchased is estimated from
14  $750,000 to $800,000 in value." Now how was the
15  estimated value arrived at?
16  A  Negotiation between Dick and I.
17  Q  All right. Why was a hard number -- why
18  was an estimated -- why were estimated numbers placed
19  in this section of the agreement rather than a hard
20  number?
21  A  That was Dick's discretion, not mine.
22  Q  That was something that Dick negotiated --
23  Mr. Graves negotiated for, and you agreed to; right?
24  A  Those -- those -- that range in the value.
25  Q  All right.

Page 79

1  A  Dick's attorney drew this up.
2  Q  Not withstanding who drew it up, this is
3  an estimated value that Mr. Graves was willing to
4  agree upon, and that you were -- that Monsour's was
5  willing to agree upon; isn't that correct?
6  A  Inventory to be purchased, value 750,
7  800,000.
8  Q  Estimated value; right?
9  A  Right.
10  Q  All right. And as a part of that
11  subsection, Menu Maker was to agree to use its best
12  efforts to sell or assist Monsour's in the sale of
13  whatever inventory remained; is that correct?
14  A  That was in there.
15  Q  Originally. I'm confused as to what that
16  meant. Let me go back.
17  A  It is in there.
18  Q  Yes, and that's something to which you
19  agreed to, that they -- that Menu Maker would either
20  sell or assist Monsour's in the sale of whatever
21  inventory remained?
22  A  Yes.
23  Q  And this was important to Monsour's, was
24  it not?
25  A  Absolutely.

Page 80

1  Q  And then section 2 of that same Section 1
2  talks about other intangible assets, which I won't
3  trouble you with here. And you have told me, have
4  you not, what you estimated -- I don't mean you, I
5  really mean Monsour's, estimated the value of its
6  inventory -- you told me what it estimated the value
7  of its inventory was, which was between 1.1 and 1.2
8  million dollars?
9  A  That wasn't an estimate; that was an
10  actual figure.
11  Q  That's an actual figure?
12  A  Supplied by the inventory valuation.
13  Q  And you are just as sure as you possibly
14  can be that that is an actual and correct figure?
15  A  There is no doubt -- yes, that report -- I
16  can tell you that for two reasons: One, we were
17  constantly -- Mike Trisler's job was verifying
18  inventory. That's what he did. He constantly
19  valuated inventory. Up one case, up or down,
20  whichever way, he corrected it.
21  Q  Okay. So --
22  A  So it was pretty darn close.
23  Q  Other than what has been produced in the
24  way of discovery, what other documents does Monsour's
25  have, if any, which could be relied upon to prove the

Page 89

1    A   They had access to any records they wanted
2  at any time.
3    Q   **They had the ability to input information**
4  **into your NDS system?**
5    A   They had employees in the building.
6    Q   **Prior --**
7    A   Yes, prior.
8    Q   **Who was --**
9    A   Matt Warford.
10   Q   **Prior?**
11   A   Matt Warford, an employee of Menu Maker.
12 Paid by Menu Maker, prior to.
13   Q   **Who else?**
14   A   Gene Fields, prior.
15   Q   **Who else?**
16   A   I will consider that one and let you know,
17 but those would be two key employees that would have
18 all that information available at their fingertips,
19 and that was one of their primary roles.
20   Q   **Did Matt Warford have access to Monsour's**
21 **computer system?**
22   A   Yes.
23   Q   **Was it not password protected?**
24   A   Matt Warford was a senior buyer of
25 Monsour's, Inc. who was paid my Menu Maker and was a

Page 90

1  liaison between us, and had access to all inventory
2  records, and was key in Monsour's, Inc. of
3  establishing that number.
4    Q   **Okay. Was the computerized system, the**
5  **NDS system, password protected?**
6    A   To a degree, yes. And Matt Warford's
7  password would have got him any information he would
8  have needed. And Gene Fields would have had probably
9  the utmost clearance and would have had access to
10 almost any records.
11   Q   **And after those people left the employ of**
12 **Monsour's, Inc., the passwords were not changed, and**
13 **they were not denied access; is that what you are**
14 **telling me?**
15   A   The information was valuable to those
16 people, because they were purchasing the food -- Menu
17 Maker was purchasing the food service part of the
18 business, which I was no longer necessary on, so they
19 would have had access to that, and they would not
20 have been changed. And they did have access to that
21 information on a daily basis, sir.
22   Q   **And with your permission.**
23   A   Yes, sir. And with my knowledge, and with
24 Menu Maker's knowledge, including Dick Graves.
25   Q   **Do you have any place in the documents**

Page 91

1  that you have given to your attorneys the last
2  inventory that was conducted prior to the execution
3  of the asset purchase agreement? If you know.
4        THE WITNESS:  January 29th, is that
5  right?
6        MR. DEVAUGHN:  Answer to the best of
7  your ability.
8    A   Best of my knowledge, I think it was --
9  what I seen in -- January 29th comes to mind. And I
10 believe that that would be in my lawyer's possession,
11 and hopefully in yours, too.
12   Q   **(By Mr. Wachtel) I'm sure that**
13 **Mr. DeVaughn --**
14   A   The number I seen there was like a million
15 one, something, generated from the computer system.
16   Q   **Of the assets that -- the food service**
17 **assets, nonproduce, and I'm going to restrict all**
18 **these questions to nonproduce for the time.**
19   A   I agree.
20   Q   **The assets that Monsour's had on hand at**
21 **the time of the execution of the agreement, what**
22 **percent of those assets do you think were in a**
23 **wholesome and 100% resellable condition?**
24   A   Majority. But I do admit, you know, what,
25 10, 20% maybe not.

Page 92

1    Q   **When was the last time prior to the asset**
2  **purchase agreement that you actually went through --**
3  **you actually went through and inventoried all those**
4  **assets?**
5    A   You see, I never did that. Because the
6  company was mine, and as I was constantly interacting
7  in that building, in my mind, I always knew what the
8  inventory was, and I knew what was not good and I was
9  constantly directing people as to dealing with things
10 that needed to be taken care of, adjusted, removed,
11 etc.
12   Q   **Okay.**
13   A   Because it's my money, or was my money at
14 that point, or the company's money.
15   Q   **Do you have an opinion, as of the**
16 **execution of the asset purchase agreement, how many**
17 **of your food service -- excuse me. Do you have, with**
18 **respect to the frozen goods, do you have an opinion**
19 **in your mind what percentage of those were not**
20 **wholesome and not 100% resellable?**
21   A   In the prior years leading up to it,
22 especially when I bought the business from Pete,
23 there was a lot of junk inventory there. One of the
24 first things I did in that first year was I -- we
25 brought in a big dumpster, and we filled that thing

Page 93

1  like two or three times, or we filled a truck up and
2  took it out to the dump. In other words I took all
3  of the old unsellable or dated merchandise and I got
4  rid of it, because it served me no purpose to fill up
5  space. Sometimes you buy right, sometimes you don't
6  buy right. Sometimes a good deal, you get some
7  inventory that, you know, you buy long on, it just
8  doesn't sell the way you are expecting it to.
9  Hopefully you give that back to the person you bought
10 it from, and they take it back. Eliminate the
11 problem. We were turning our inventory significantly
12 much more in the years leading up to the asset
13 purchase agreement. I would say the majority of the
14 inventory was in good -- was in good shape.
15    Q  And that would be true -- that would be
16 true with regard to that which was in the freezer?
17    A  True.
18    Q  And do you have a percentage of your -- in
19 your mind of what items in that -- in the freezer
20 might not have been wholesome and 100% resellable at
21 the time of the asset purchase agreement?
22    A  I'm going to go out on a limb and say that
23 at any time, that your average company would have 10%
24 of inventory that is probably slow moving, dated, not
25 as fresh as you want it to be. I think I have said

Page 94

1  that, 10, 20% would be maximum.
2     Q  With respect to the agreement, did Menu
3  Maker breach the agreement with regard to your
4  inventory other than produce?
5     A  There is prongs to the agreement. The
6  first part of the agreement is inventory. They were
7  to purchase a million one inventory at value of 750
8  to $800,000.
9        MR. DEVAUGHN: Speak up, Mark.
10    A  They were to purchase inventory at a value
11 of 750 to $800,000.
12    Q  (By Mr. Wachtel) Are you telling me they
13 breached that agreement, that part of the agreement?
14    A  Yes.
15    Q  When did they breach that part of the
16 agreement?
17    A  When they did not purchase (inaudible).
18       MR. DEVAUGHN: Speak clearly.
19    A  When they informed me they were no longer
20 going to purchase additional inventory, at that point
21 it was a breach.
22    Q  (By Mr. Wachtel) When did that happen?
23    A  I do not recall, but I know it happened.
24 After the asset purchase agreement.
25    Q  Certainly. In April?

Page 95

1     A  Perhaps. I'm not going to say. I don't
2  recall. I just know it happened.
3     Q  And they breached it with regard to items
4  other than produce when they didn't buy what,
5  $700,000 worth of -- $800,000 worth of inventory
6  items other than produce, is that it?
7     A  Right. The agreement was they were to
8  purchase the inventory, food service inventory.
9     Q  Uh-huh.
10    A  At a value between 750, $800,000. That
11 never occurred.
12    Q  All right. When did you first complain to
13 anyone at Menu Maker Foods that Menu Maker had --
14 that Menu Maker was not performing under Section 1 of
15 the asset purchase agreement?
16    A  Between the four to six weeks, which was
17 the time frame that Dick Graves told me the majority
18 of the inventory would be gone from my building, the
19 majority being almost it. That wasn't my number.
20 That was his number. Two weeks on the floor, two
21 weeks in order, then four to six weeks, that's when
22 they would take the majority of my inventory.
23    Q  If I understand that correctly then, your
24 first complaint to --
25    A  Dick Graves, in the fourth week.

Page 96

1     Q  You complained to Mr. Graves in the fourth
2  week following the execution of the asset purchase
3  agreement that Menu Maker Foods was not -- had not
4  taken your inventory as it had promised to do?
5     A  It wasn't a complaint. At that time I was
6  saying, "Okay, it's been four weeks now. Now it's
7  going to happen; right?"
8     Q  All right. And then?
9     A  Majority should be gone by eight weeks.
10    Q  And when next after that did you discuss
11 with anybody at Menu Maker Foods that the inventory
12 items had not been taken?
13    A  Actually, at that point, Jim Senecaut, and
14 maybe before that point, Matt Warford brought to me
15 the fact that Menu Maker wasn't operating by the set
16 procedure, and how we were to calculate the price.
17 And I actually talked to some buyer, I don't remember
18 who, over a 20 pound piece, when he was telling us
19 what he was going to pay, and it was not anywhere
20 near any type of cost I had ever seen, or our buyers
21 had seen, but he said, "Take it or leave it."
22    Q  I see.
23    A  Twenty pound piece. Whoever that buyer
24 would be here at Menu Maker, that would be the man.
25 Then when they start taking freight allowances,

CORPORATE REPRESENTATIVE, MARK MONSOUR 3/13/2006

Page 105

1 are up on it. Good. Yeah. It is -- I apologize.
2 My mistake.
3  Q  It's not necessary to apologize. So if I
4 understand you correctly, that Monsour's was unable,
5 for whatever reasons, to supply Menu Maker with
6 Colorado potatoes US No. 1 Centennial?
7  A  Twelve months out of the year. Couldn't
8 do it.
9  Q  So it was agreed among the parties that it
10 would not be necessary for my client to buy potatoes
11 from Monsour's?
12  A  Right. I need to add something to that,
13 Val.
14  Q  Sure.
15  A  And then there was a time when Ron Orr
16 called and asked us to bring in a load of potatoes
17 for him.
18  Q  Uh-huh.
19  A  And he asked that to Dennis Hughes, or to
20 me. But whoever, I made -- whoever it was, whether
21 it was me calling back Ron to verify that, or Dennis,
22 in other words I made sure that I verified it from
23 his mouth over for my ears at least twice. So we
24 brought that load of potatoes in for Menu Maker. In
25 fact we even buy good labels, because we wanted to

Page 106

1 make sure we made him happy, because that was our
2 entire point. We brought Gold Label Centennial
3 potatoes in, a straight load, at the direction of Ron
4 Orr. And once we got them in here, to our -- into
5 our -- into our coolers, $17,000, that load of
6 potatoes, because they were expensive time of the
7 year. That's when Ron Orr said, "I don't buy
8 potatoes from you." I said, "Ron, I verified it from
9 your mouth to my ear twice that you wanted me to
10 bring these in." "I don't buy my potatoes from
11 you." I let Dick know about it. And we had a load
12 of potatoes in our cooler that cost us $17,000 that
13 Ron Orr personally ordered from me, and verified by
14 Dennis Hughes and verified by Peter Monsour, and
15 didn't want them. And they never took a single box.
16 We threw them away.
17  Q  When did you tell Mr. Graves about that?
18 With regard to the potatoes that Mr. Orr ordered,
19 when did you tell Mr. Graves about that?
20  A  I told him about it right after that
21 happened.
22  Q  Uh-huh.
23  A  I kept reminding him about it, too.
24  Q  I'm sure you did. When did you tell him?
25  A  After they were in our dock. After they

Page 107

1 were in our coolers, then Ron Orr told me he didn't
2 want them.
3  Q  Would that have been February, March or
4 April.
5  A  Would have been February, March or April.
6  Q  One of those three?
7  A  One of those three months.
8  Q  Were there any oral agreements with regard
9 to the purchase of cabbage?
10  A  Yeah.
11  Q  And?
12  A  Here, let me describe that agreement.
13  Q  Okay.
14  A  We would bring boxed medium cabbage in,
15 and then be told by Ron Orr, we don't want boxed
16 medium cabbage, we want sack, which is jumbo. Okay.
17 Then we ordered sack jumbo in, only to be told by Ron
18 Orr, we only use boxed, medium. Didn't matter.
19 Didn't matter. Bring boxed medium in, that's not
20 what he wanted. Bring sack jumbo in, that's not what
21 he wanted. We played that game three times. I don't
22 know if that's an agreement.
23  Q  I don't know whether it is either. Let's
24 explore it a little bit. I have been told that Menu
25 Maker, for its cabbage for its customers needed large

Page 108

1 cabbage heads?
2  A  That's jumbo.
3  Q  Jumbo.
4  A  Yeah.
5  Q  Thank you. I have been educated.
6  A  Okay.
7  Q  I have been told that Monsour's was only
8 able to supply a smaller head; is that true? Were
9 they only --
10  A  Completely inaccurate, Val.
11  Q  I also have been told that there was the
12 oral agreement reached with Monsour's that Menu Maker
13 was at liberty to buy cabbage from some other source;
14 is that also inaccurate?
15  A  That agreement was reached after it became
16 apparent that no matter what type of cabbage, as many
17 other items, Val, that I would bring in, wasn't going
18 to say the grade, because the man was going to change
19 his mind and his -- and his -- and his specs, let's
20 use specs, at any point that it suited him.
21  Q  Was there another agreement reach that is
22 not -- oral agreement reached with regard to
23 mushrooms?
24  A  Talking about oral agreements, it was
25 always orally agreed that when we put the produce on

27 (Pages 105 to 108)

CORPORATE REPRESENTATIVE, MARK MONSOUR 3/13/2006

Page 133

1  identify that -- I'm sorry -- to your lawyers that
2  would identify that?
3      A    No, and it wouldn't be a significant
4  number, to tell you the truth. Okay? One way or the
5  other.
6      Q    Well, that's all we are looking for
7  anyway. All right. Before moving on, what judgment
8  liens, if any, are there, as we sit here today,
9  against Monsour's, Inc.?
10     A    Outside of PACA, I'm going to say my
11 memory draws a blank, but that doesn't mean there
12 isn't.
13     Q    And we sort of discussed those kind of
14 things in your deposition, didn't we?
15     A    Right.
16     Q    Then I won't go back and rehash that with
17 you.
18     A    I guess Pitt Plastics would be a name I
19 should mention.
20     Q    And the law on Pitt Plastics is whatever
21 the law is to Pitt Plastics. Let me hand you yet
22 another document. This is identified as Defendant's
23 Exhibit 6. This document is multipages, and is Bates
24 stamped 10051 through 53. I will tell you that it
25 was provided to us by your counsel in discovery. It

Page 134

1  is the most legible copy that I have. But tell me
2  what Exhibit 6 is.
3      A    This is, I believe, Mike Trisler's
4  handwriting, after I had -- or -- yeah, I believe --
5  I believe it's Mike Trisler's handwriting. It's an
6  employee -- it's a Monsour's employee handwriting.
7  It's me trying to figure out what the actual problems
8  are and solve them. Its one of the things -- one of
9  the many things I did to try and satisfy Menu Maker.
10     Q    So were you asking John Trisler to provide
11 you with information?
12     A    Not John.
13     Q    Not John; Mike?
14     A    Mike.
15     Q    Sorry. And these are, you think, his
16 notes responding to information you may have asked
17 for?
18     A    This was me sending a person up there
19 trying to ascertain what is going on, I can figure
20 out.
21     Q    Up to Menu Maker Foods?
22     A    Right.
23     Q    All right. Now I can't read the first
24 line of the first entry; do you know what it says?
25     A    "Pictures developed --" and what was --

Page 135

1      Q    Do you know?
2      A    I shows -- the thing he is talking about
3  they are buying from C & C, and what's in their
4  coolers. Show what products they carry, what
5  products Menu Maker carries. Concerning produce.
6      Q    The next -- there is a line beneath the
7  first entry, and it says, the first two words, "Ed
8  said," and then it says, Tomatoes vine ripe." Ed
9  would be whom?
10     A    Ed --
11     Q    Fairchild?
12     A    -- Fairchild. Here, their tomatoes they
13 carry are vine ripe 6 x 6/5 x 6. Now that's --
14 that's different sizes. 6 x 6 would be called large;
15 5 x 6 would be extra large. "Their customers won't
16 take. They want a gas green product." It's
17 technical. I would like to make a comment here.
18     Q    Go ahead.
19     A    Okay. When it came to Ron Orr, I would
20 send Ron Orr gas greens, and they would say, "They
21 are not the right color. I want salmon." So then I
22 would send him gas green salmons. "They are not the
23 right size." So then would I get the sizing right,
24 and then he would say, "I want vine ripe." So then I
25 would send him vine ripe, and then he would say,

Page 136

1  "They are not red enough." Then I would send him
2  redder tomatoes, and he'd say, "They are not the
3  right size." And it got to the point that he would
4  say every one of his tomatoes were exactly uniform
5  and completely in size. And it didn't matter if I
6  send him gas green, he wanted vine ripes. If I got
7  it correctly, in the vine ripe, right size, right
8  color, he would revert back to gas greens. Played
9  the game three or four times. In fact on sometimes
10 when I would send him tomatoes, he wanted credit. I
11 would send him maybe 50 cases of tomatoes.
12 Miraculously, he would need 70 cases of credit, when
13 I only send him 50. That's an example. May not be
14 true example, this was the mind set of Ron Orr, the
15 buyer here, that I was running into.
16     Q    Let us go back to this document, which is
17 Exhibit 6. The third entry on page 10051 appears to
18 be dated March 11th, 2002; do you have any reason to
19 believe that the entry that follows that was not an
20 entry made either on March 11th, 2002, or about
21 information discovered on March 11th, 2002?
22     A    They are talking about Menu Maker trailers
23 here.
24     Q    Absolutely, which is not what we asked
25 you.

34 (Pages 133 to 136)

Page 138

1  A  In hindsight, my answer is yes.
2  Q  What was your opinion --
3  A  On 3-11. All I was trying to get done is
4  get whatever problems were solved on my end that I
5  could control. Not deal with the ever changing
6  specifications, desires, thoughts, bullshit of a
7  buyer here.
8  Q  Well, then let's lay that document aside
9  for a moment and look at a document that is marked
10 Defendant's Exhibit 7. I'm sorry. Defendant's
11 Exhibit 7. That was produced by your counsel in
12 discovery. I believe at the top of the document it
13 says, "Dennis Hughes." Do you think I have read that
14 correctly?
15 A  Yeah. That's my writing.
16 Q  That's your writing?
17 A  That's my writing.
18 Q  And that document --
19 A  Me and Dennis came to a meeting --
20 Q  Excuse me. Excuse me. I'm really trying
21 to make it easy for the Court Reporter. And that
22 document is dated in your handwriting 3-26-2002;
23 right?
24 A  3-26-02.
25 Q  Right. Look at the parenthetical note

Page 139

1  No. 3. It says, "The conversation I had with Ron Orr
2  was not what you would say a positive one. In my
3  opinion, we were set up to fail before we ever got
4  started." Now that was a note that you wrote?
5  A  That's not my writing.
6  Q  It is not?
7  A  No.
8  Q  Do you recognize the handwriting --
9  A  This is Dennis Hughes' writing. That is
10 my writing that says "Dennis Hughes" at the top.
11 Q  And so that date then, 3-26-02 would have
12 been what, the date you received this document from
13 Mr. Hughes?
14 A  Most likely.
15 Q  All right.
16 A  This was probably in reference to us
17 either first meeting up here in this room with Dennis
18 -- with Dick Graves, Ron Orr, Creighton Cox, Melvin,
19 and a couple other people, either in preparation for
20 coming up here, or after we got back from that
21 meeting.
22 Q  All right.
23 A  When we were still trying to, in good
24 faith, work out the problems.
25 Q  It was -- excuse me. Evidently, and from

Page 140

1  these notes, it was Mr. Hughes' opinion that
2  Monsour's was being set up to fail before it ever got
3  started, evidently under the agreement; did you
4  discuss this opinion with Mr. Hughes?
5  A  Yes.
6  Q  When did you discuss it with him?
7  A  Probably close to this date, and I would
8  have hold told him, "I don't care about Ron Orr; I
9  believe Dick Graves will do what he says he's
10 supposed to do, what the agreement calls for."
11 That's where I had my complete faith. I had no faith
12 in Ron Orr, as a person, or as a buyer. I do -- I
13 did have complete faith in Dick Graves to do the
14 right thing.
15 Q  Well, then who, if not Menu Maker Foods,
16 was setting Monsour's up to fail before it ever got
17 started?
18 A  Dennis Hughes is referring to Ron Orr.
19 Q  Okay.
20 A  And what I can say about that is the day
21 after we signed this agreement, or shortly
22 thereafter, the week after, when I was standing in my
23 location with Ron Orr there, and I looked at Ron Orr,
24 and I say to Ron Orr, "I guess you'll be buying your
25 produce from me now, and we'll take good care of

Page 141

1  you." And that's when Ron Orr said, "Oh, really? I
2  didn't know that." Which is in complete contrast to
3  all the stuff we talked about here. And I said, "You
4  act like I was telling something for the first
5  time." And that's when he said to me the very first
6  time, "I'm not going to do it." He said that about
7  10 times, but that would be over time, Val.
8  Q  What was Mr. Hughes' title with Monsour's
9  on --
10 A  Buyer. Pardon me.
11 Q  Let me see if I can finish that. On 3-26,
12 2002, Dennis Hughes' title with Monsour's, Inc. was
13 produce buyer; right?
14 A  Yes, sir.
15 Q  What did his job responsibilities entail?
16 A  Buying produce.
17 Q  I don't know what a produce buyer is, Mr.
18 Monsour; can you enlighten me?
19 A  He would buy -- he would acquire produce
20 from all sources, be it the West Coast, Texas,
21 Mexico, Florida, etc. And get them -- acquire
22 shipping and get them into our location in a timely
23 manner.
24 Q  And as part of that job he would have been
25 buying produce that was to be sold to Menu Maker

CORPORATE REPRESENTATIVE, MARK MONSOUR 3/13/2006

Page 142

1  Foods; am I right.
2     A   Yes.
3     Q   Was he a trusted employee?
4     A   Yes.
5     Q   Did you trust his judgment?
6     A   Yes, sir.
7     Q   Did you rely on him for advice?
8     A   No.
9     Q   Okay. In any event, by not later than
10 March 26th, 2002, Mr. Hughes believed that Menu Maker
11 Foods had set your company up to fail, and he had
12 communicated that decision, that opinion to you;
13 isn't that true?
14    A   That's his opinion.
15    Q   That's his opinion?
16    A   That's what is says right here.
17    Q   And you were aware -- was he your chief
18 produce buyer?
19    A   He was the only produce buyer.
20    Q   Okay. Is it true that by April of 2002,
21 you had discussed with Mr. Mitchelson, at least, the
22 fact that Monsour's believed that Menu Maker was in
23 violation of both the asset -- excuse me. The
24 inventory portion of the asset purchase agreement,
25 and the produce portion?

Page 143

1     A   That is exactly right.
2     Q   And did you --
3     A   By this time I had thrown over $100,000
4  worth of produce away that Ron or ordered and never
5  taken, ever, and I had thrown it away.
6     Q   And that occurred when?
7     A   February, until April.
8     Q   And so by --
9     A   At a time when I didn't need to be
10 throwing money away.
11    Q   And so by sometime between February and
12 April of 2002, Monsour's, Inc. was aware, one, that
13 the contract had been breached; correct?
14    A   Aware, one, that the person in charge of
15 buying the produce never intended to actually do his
16 end.
17    Q   Well, let me go back --
18    A   Menu Maker never substantially purchased
19 all its produce from me.
20    Q   Let me go back --
21    A   Menu Maker never purchased more than 15%
22 of its produce from me, ever, in any given week.
23    Q   Let me go back and reask my question. It
24 is true that by your meeting with -- no. Excuse me.
25 It is true that somewhere between February and April

Page 144

1  of 2002, Monsour's, Inc. knew that Menu Maker Foods
2  was in violation of this agreement, didn't it?
3     A   Yes.
4     Q   And it is also true that somewhere between
5  February and April of 2002, Monsour's, Inc. knew that
6  it had been damaged by the breach of the agreement?
7     A   Yes, sir.
8     Q   And it communicated that to its lawyers;
9  right?
10    A   And I communicated that to Dick Graves,
11 too. You are correct. Correct.
12    Q   And it asked its lawyers for advice, not
13 its current lawyers, but Mr. Mitchelson?
14    A   Yes.
15    Q   And Mr. Mitchelson advised what?
16    A   I was simply letting Mitchelson know what
17 the inevitable was, due to the fact that non --
18 breach of the contract, noncompliance, there was no
19 way that I was going to stay in business.
20    Q   Did Mr. Mitchelson offer any advice at
21 all?
22    A   Not to my recollection.
23    Q   Was there any --
24    A   I'm sure he did, but I haven't read his
25 deposition.

Page 145

1     Q   In any event, if he says he did, or if he
2  said he didn't, do you dispute what he said?
3     A   I do not dispute what he would say.
4     Q   All right. Let's look at what has been
5  marked as Deposition Exhibit No. 8.
6     A   I find No. 5, Dennis Hughes' notes to be
7  accurate, too.
8         MR. DEVAUGHN: Just answer his question.
9         MR. WACHTEL: Excuse me. Off the
10 record.
11        (WHEREIN, a discussion was held off the
12 record.)
13    Q   (By Mr. Wachtel) Let's talk briefly about
14 Deposition Exhibit 8. I notice that on the upper
15 left-hand corner of that one page exhibit is -- there
16 are handwritten words, "Matt Warford"?
17    A   That is my writing.
18    Q   Is that what it says?
19    A   Yes, "Matt Warford." That is my writing.
20    Q   It is also dated 3-26-02?
21    A   Yes, sir.
22    Q   What is this document?
23    A   This is Matt Warford's -- Matt Warford had
24 been telling me some things about the ongoing
25 inventory purchase that Menu Maker -- or the items

37 (Pages 142 to 145)

Page 149

1  Q  Were you present when Mr. Krueger gave his
2  deposition --
3  A  No.
4  Q  -- in this case. Have you read it?
5  A  I don't think I actually have, no.
6  Q  In any event, you would not dispute with
7  Mr. Krueger's opinion of what day it is he came to
8  Monsour's and did his inspection?
9  A  No.
10 Q  And since there is -- you have not read
11 his deposition, there is nothing that you would care
12 to add to what he said about his inspection?
13 A  I have not read it, so you are right.
14 Q  For once today. That's good. Excuse me.
15 Let me tell you where I get lost here, and maybe you
16 can help me understand. If Menu Maker was wrongfully
17 rejecting Monsour's produce, as you contend, why did
18 you give them credits for the wrongfully rejected
19 produce?
20 A  I never gave them credit. They took it.
21 Q  They took credits?
22 A  In fact sometimes he took credits for more
23 than he purchased, which was amazing.
24 Q  Well, when Menu Maker food was taking
25 these credits, you of course picked up the phone,

Page 150

1  called Mr. Graves and said words to the effect of
2  "Dammit, Mr. Graves, you are wrongfully taking
3  credits from me"; right?
4  A  When I addressed Dick Graves I was telling
5  Dick Graves what Ron Orr was doing.
6  Q  Well, Ron Orr --
7  A  And I expected Dick Graves to correct that
8  problem.
9  Q  Ron Orr was an employee of Menu Maker
10 Foods; right? So you called Mr. Graves the first
11 time somebody wrongfully took credits from you and
12 complained; right?
13 A  After a while it became so old I didn't
14 keep calling.
15 Q  Is the answer to my question yes or --
16 A  First time --
17 Q  -- no?
18 A  Correct.
19 Q  And the second time it happened you
20 called?
21 A  That's correct.
22 Q  And what were you told?
23 A  He would take care of it.
24 Q  And the third time it happened, you
25 called; right?

Page 151

1  A  Perhaps.
2  Q  Okay. Did you have, other than to just
3  call and -- and like a voice crying in the wilderness,
4  did you have something else that you could do to
5  complain?
6  A  See, I was bound by an agreement, sir, to
7  supply them produce and to sell them inventory.
8  Q  Right.
9  A  And I intended to keep my end of the
10 agreement. That's what I kept on doing, keeping my
11 end of the agreement. That's what -- that's what my
12 outlook was, keep my end of agreement.
13 Q  According to Mr. Krueger, who is offered
14 to us as an expert in produce, and I think he was
15 also once upon a time in his life a Federal
16 Government produce inspector, Mr. Krueger tells us
17 that if your produce was being wrongfully rejected,
18 you could have called for an inspection of that
19 produce; is that not true?
20 A  That would be news to me. Because the way
21 that you could call inspection on the produce, when I
22 received it from my supplier, I had two days to call
23 for me to get my produce inspected.
24 Q  Right.
25 A  Now I didn't know that once I had taken

Page 152

1  possession of that produce, and you know what, he
2  makes a great point. I wish I would have done that,
3  that had been the case, but I had the next best
4  thing, I had the guy who would have done that. I had
5  a retired guy that would have done it, doing my
6  reports to me. And since -- money -- money was
7  something I wasn't long on. I was doing everything I
8  could to keep my expenses down.
9  Q  Let me ask you this: if Mr. Krueger
10 acknowledged that -- your expert, not mine, indicates
11 that if the produce that you sold to Menu Maker, that
12 was wrongfully rejected, if his opinion is that you
13 could have called for an inspection on that, are you
14 telling me he is wrong?
15 A  No, I'm telling you, one, he never told me
16 that. Two, the requirements -- the produce
17 requirements set forth in the agreement, my stuff met
18 every one of them.
19 Q  Well, that may very well be, but I didn't
20 ask you that.
21 A  No, not by my standards, but by Federal
22 standards, anyone's standards. I'd be glad to go
23 over them with you.
24 Q  If Mr. Krueger wrongly believed that you
25 could have complained to the government -- excuse