# Exhibit B



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK MONSOUR, SHEILA MONSOUR AND
MONSOUR'S, INC.
vs.
MENU MAKER FOODS, INC.
Case No. 05-1204-MLB

ORIGINAL

DEPOSITION OF JON RICHARD GRAVES
March 13, 2006

OFFICES   MISSOURI ■ ILLINOIS ■ KANSAS

HEADQUARTERS: 711 NORTH ELEVENTH STREET, ST. LOUIS, MISSOURI 63101
800.280.3376
www.midwestlitigation.com

1    A    Uh-huh.

2    Q    -- is I need to not ask you another
3  question until you have completely given your answer.
4  And I need you to not start answering my question
5  until I have completed my question.  I know it's easy
6  for both of us to anticipate the ending of the other
7  person's sentences, so let's both worked hard on that.

8    A    I will if you will.

9    Q    That sounds good.

10   A    I think Monsour's reputation was that Pete
11 was a real free thinking type guy.  Didn't
12 necessarily do everything like everybody else.  And
13 most people would say that Mark Monsour at that time
14 had a good produce reputation, and wasn't really sure
15 about the rest of his business.

16   Q    And the time frame that you are talking
17 about is 17 years ago, or --

18   A    Up until when -- basically when Mark took
19 over.

20   Q    Okay.  What is your understanding as to
21 when Mark took over?

22   A    Understanding of what?

23   Q    Of when Mark took over Monsour's, Inc.

24   A    We are not on the same page.  What is my
25 understanding of what?

1  than we can in four or six. I don't think it will --
2  it won't take months and months, but we have to stay
3  organized." And that's essentially the process that
4  we used later to try to get it out, staying
5  organized.
6       Q    When you say he wanted out in four to six
7  weeks, what do you mean by that?
8       A    He wanted me to take possession here in
9  four to six weeks.
10      Q    And you're talking about the food service?
11      A    Yeah. Yes, sir.
12      Q    Okay.
13      A    I think there was some equipment that we
14 bought, I can't remember all what it was. Some
15 office equipment. There was listed things that we
16 bought that weren't on the asset purchase that were
17 -- maybe some -- maybe a van or truck or something,
18 and some cars. But that was basically it. I am not
19 the person who will commit to something when I am not
20 sure exactly what's going to happen, so do I do due
21 diligence? Yes, I do. The prudence depends upon the
22 situation.
23      Q    Okay.
24      A    That's it.
25      Q    You haven't talked at all about the

1   Q   So your thoughts about time being of the
2   essence was only because Mark had started wanting to
3   buy some of the goods from Menu Maker Foods; is that
4   accurate?
5   A   No, sir.
6   Q   So what were the other bases of your
7   knowledge?
8   A   As I stated, Fred Schaeffer talked with
9   Mark and said Mark wanted to talk to me. Because --
10  I forgot what the phraseology was, but basically
11  financial problems.
12  Q   So besides that, you have no other
13  knowledge?
14  A   No.
15  Q   Do you remember Mark telling you that with
16  respect to the food service inventory -- let me
17  rephrase the question. Do you remember Mark telling
18  you, with respect to Menu Maker Foods' purchase of
19  Monsour, Inc.'s food service inventory, that time was
20  of the essence?
21  A   Yes.
22  Q   And did you have any knowledge or
23  understanding as to why time was of the essence?
24  A   No. I'm sure what I assumed was financial
25  problems.

Page 59

1    Q    Now tell me, what -- this asset purchase
2  agreement, why did you perceive it to be beneficial
3  to Menu Maker Foods to go through this asset purchase
4  agreement?
5    A    Part of that contract was hiring Monsour's
6  sales people, and sales people have a relationship
7  with customers, and would be a chance for us to enter
8  that market.
9         MR. DEVAUGHN:  Okay.  I need to take a
10 very quick break and check the tape.
11         (WHEREIN, a discussion was held off the
12 record.)
13    Q    (By Mr. DeVaughn)  All right.  We are back
14 on the record.  Mr. Graves, we took about a one
15 minute break.  It's 10:35.  We'll keep going until
16 about 11:00 o'clock and I will give you a chance to
17 take another five minute break; is that fair?
18    A    Great.
19    Q    Are you doing okay?
20    A    I'm doing fine.
21    Q    All right.  Before we took that one minute
22 break, I had asked you why was it beneficial for Menu
23 Maker Foods to purchase the assets of Monsour's,
24 Inc., and I believe to paraphrase your response was
25 something to the effect of they had salesmen with an

Page 61

1  go either way.
2      Q    Well, my question was: there is the
3  potential of profit over long period of time, so the
4  answer to that question is "true"; correct?
5      A    There is potential, yes.
6      Q    Now the amount that Menu Maker Foods was
7  paying for the actual food service inventory, that
8  didn't have any type of premium value; what Menu
9  Maker Foods was paying to Monsour's, Inc. was
10 essentially the average cost of those items; true?
11     A    Yes, I think that's what the contract
12 says.
13     Q    Now by purchasing the assets of Monsour's,
14 Inc., and getting a foothold on this new market area,
15 what new market area were you going to be able to
16 take over?  In other words what was the market area
17 that you were going to be assuming with this asset
18 purchase agreement?
19     A    Southeastern Kansas.
20     Q    Now we are in March, 2006 now, so Menu
21 Maker Foods has been in that new market area for
22 approximately four years now?
23     A    Uh-huh.
24     Q    Has Menu Maker Foods positively profited
25 in that market area over the last four years?

Page 62

1   A   When I went into this thing with Mark he
2   told me his volume was about 180, 190,000 a week,
3   food service. By the time that this -- that we
4   worked this out, I think our first week sales was
5   125. A lot of their freight hadn't been added in, so
6   whatever margin they were making was not as high. We
7   went out and priced it based on what they told us
8   what they were marketing it at. We gave a lot of
9   credits, which hurt our credibility. We went down to
10  about 85,000. Yes, we profited over the four years,
11  but we had to come back from 85. There is about
12  $100,000 difference between what I was told that
13  their sales were, and what ours got down to because
14  of basically pricing issues. And they had lost a lot
15  of their market before we took over. So yes, we had
16  profit, not to the extent that I had hoped we would.
17      Q   Has Menu Maker Foods broken down in any
18  type of analysis this specific market area? Do you
19  track specific market areas?
20      A   Yes.
21      Q   Has the Southeast Kansas market area been
22  profitable each year since the asset purchase
23  agreement?
24      A   Yes, it has.
25      Q   How much, to the best of your

```
 1        Q    And if he testified that he did not know
 2   the terms --
 3        A    Uh-huh.
 4        Q    -- he's either just forgot, or he is
 5   mistaken, or he is not testifying accurately, one of
 6   those three things?
 7        A    No, I can't say one of those three things.
 8   But if he said he didn't, then he may -- then he
 9   obviously believes he didn't.  Or he -- you know.
10        Q    Now who was in charge of overseeing the
11   food service acquisition from Monsour's, Inc. after
12   the asset purchase agreement was executed?
13        A    Ken Goodwin.
14        Q    Did you provide Ken Goodwin with a copy of
15   the executed asset purchase agreement?
16        A    I can't say that we read it together or
17   whether he had a copy of it, but I'm sure he is fully
18   cognizant of the terms.
19        Q    Did you make certain that he was fully
20   aware of the terms as of February 1st, 2002, which is
21   when this thing would have taken effect?
22        A    Yeah, I'd say right -- maybe right before
23   that, or -- within a day or two of it.
24        Q    If either Ron Orr or Ken Goodwin didn't
25   comply with the terms of the asset purchase agreement
```

1   A   No. We did have trouble with quantities
2   and those kind of things when they came up. We would
3   order 100, they would send us 50. And then maybe we
4   would order 30, we would get none. But that would be
5   quantity mistakes on their inventory, I'm sure.
6       Q   The asset purchase agreement provides that
7   the buyer will be entitled to have somebody there to
8   inspect the food service inventory before it's loaded
9   up on the buyer's trucks?
10      A   Is that what it says? Yeah, I don't -- I
11  can't remember that.
12      Q   I will represent to you that that is what
13  it says.
14      A   That's fine.
15      Q   Why didn't Menu Maker Foods have anybody
16  there inspecting it before it was loaded up?
17      A   I guess because we expected the Monsour
18  people to do what the contract says, put the goods on
19  the truck in good shape.
20      Q   Now tell me all of the problems, if any,
21  that Menu Maker Foods had with respect to the food
22  service items that were being delivered from
23  Monsour's, Inc. to Menu Maker Foods.
24      A   I wouldn't be real familiar with that. I
25  know we had some. Of course I read in some

```
 1     Q    Sheila Monsour?
 2     A    Yes.
 3     Q    Creighton Cox?
 4     A    Yes.
 5     Q    Ron Boss?
 6     A    Yes.
 7     Q    Melvin Childs?
 8     A    Yes.
 9     Q    Kevin Mitchelson?
10     A    Yes.
11     Q    John Trisler?
12     A    Yeah, I think that is the second time you
13 asked that.
14     Q    Say again?
15     A    I think you asked about him before.
16          MR. WACHTEL:  I think you covered it.
17     Q    (By Mr. DeVaughn)  Have you reviewed
18 anybody's testimony that you believed was simply not
19 true?
20     A    No.  I didn't spend a lot of time on
21 them.  I read them.  I believe they tried to answer
22 as truthfully as they could, considering the time
23 frame.  Four years is a long time.
24     Q    When you assigned Ken Goodwin to be in
25 charge of the food service inventory acquisition, did
```

1    Q    Do you have any idea how much food service
2    inventory Menu Maker Foods actually bought from
3    Monsour's, Inc.?
4    A    Not right -- 250,000, that would be the
5    range.  And I could be wrong.  I believe that's about
6    what it is.
7    Q    And obviously that is a far cry from 750
8    to 800,000; true?
9    A    Yes, sir.
10   Q    Now is one of the reasons that Monsour's,
11   Inc. essentially closed its doors, and Menu Maker
12   Foods simply didn't have an entity to actually buy it
13   from, at some -- let me rephrase this.
14   A    Yes.
15   Q    At some point in time Monsour's, Inc. was
16   essentially forced to close its doors because of its
17   financial condition; right?
18   A    I don't know that; they closed.
19   Q    Do you have -- I mean what is your belief
20   as to why Monsour's, Inc. closed?
21   A    Are you talking about the produce part of
22   it, or are you talking about the institutional part
23   of it.
24   Q    Let me put the ball back in your court; is
25   there a different reason for both?

1    A    I'm sorry, I can't tell you.  I really
2  can't remember.
3    Q    Do you recall whether Mr. Monsour
4  complained about Ron Orr first or whether Ron Orr
5  complained about Monsour's' produce first?
6    A    I can't -- I don't know.
7    Q    Are you familiar with the requirement that
8  Menu Maker Foods was to supply Monsour's, Inc. with
9  its approximate quantities and delivery dates with
10  respect to produce orders?
11    A    Quantities, I'm not sure; delivery dates
12  may or may not have been part of that same thing, I'm
13  not quite sure of -- about that, but quantities, yes.
14    Q    And you understand that from the seller's
15  standpoint, in this case, Monsour's, Inc., that's
16  extremely important, so that they know what its
17  buyer, in this case, Menu Maker Foods, would be
18  needing, that those quantity orders are very
19  important?
20    A    Yes, sir, I would agree with that.
21    Q    Did you have knowledge that Ron Orr was
22  not providing those for the majority of the month of
23  February, 2002, did you have that knowledge?
24    A    No, sir, I did not.  And I'm not sure that
25  he didn't.

1  Q    I will represent to you that Mr. Orr
2  testified in his deposition that he didn't provide
3  any quantity orders to -- any quantity orders or
4  estimated usages until February 20th, 2002; were you
5  aware of that?
6  A    No, sir.  From what I remember Ron's
7  deposition, he said that he had -- Mark called and
8  asked where it was, and -- or maybe he asked Ken, one
9  of the two, anyway somebody called up here and talked
10 with either Ken or Ron.  Ron said he had already
11 faxed it to them, but would refax it.
12 Q    Would you agree with me that it would
13 really hamstring, or impair a seller like Monsour's,
14 Inc. to be able to provide produce if they didn't get
15 the usage sheets from the buyer; true?
16 A    If there were not other communication, I
17 would.
18 Q    You have read the testimony of
19 Ed Fairchild --
20 A    Yes, sir.
21 Q    -- and Melvin Childs and the other Menu
22 Maker Foods employees that heard Ron's repeated
23 comments about his thoughts about Monsour's, Inc. and
24 this asset purchase agreement, you have read those?
25 A    I don't know that I remember anything that

1    A    Asked me one more time so I can be clear.

2    Q    (By Mr. DeVaughn)  Sure.  Once the produce
3  is loaded onto to Menu Maker Foods' trailers in
4  Pittsburg, if it -- if the quality of the produce
5  deteriorated in transit because of problems with the
6  reefer, whose responsibility would that be?  Would it
7  be Menu Maker Foods as the buyer, or would it be
8  Monsour's, Inc., as the seller?

9         MR. WACHTEL:  I will object to form.

10   A    If it were caused by temperature, and not
11 by other quality characteristics that were not
12 related to a short term temperature, it would be menu
13 makers.

14   Q    Do you have recollection of Mark Monsour
15 visiting Menu Maker Foods and reviewing the produce
16 coming off of a Menu Maker Foods' trailer with you,
17 and indicating to you that this produce did not look
18 like this when it was loaded?

19   A    No, sir.

20   Q    Based upon your observations and your
21 personal knowledge, do you believe there is any
22 possibility whatsoever that Ron Orr was trying to
23 sabotage this deal with Monsour's, Inc. with respect
24 to the produce?

25   A    I don't believe Ron was trying to sabotage

Page 154

1   Q    And the end result, no matter how you look
2   at it, is that Menu Maker Foods essentially had to
3   buy $250,000 worth of inventory at cost and produce
4   from Monsour's, Inc. for approximately four or five
5   months, and ended up with a whole new territory that
6   is generating significant business profits?
7        MR. WACHTEL:  Let me object to the form
8   of the question.
9   A    Too compound.  Could you ask them
10  individually?
11  Q    (By Mr. DeVaughn)  I want to -- the
12  question -- if you are saying that you cannot answer
13  that question --
14  A    I can't answer that question.
15  Q    You cannot?  I didn't hear what you said.
16  A    I can't answer that question.
17  Q    All right.  The end result, no matter how
18  we look at it, is Menu Maker Foods ended up only
19  buying about $250,000 worth of food service
20  inventory; true?
21  A    I believe that's accurate.
22  Q    The end result, no matter how we look at
23  it, is Menu Maker Foods only had to buy produce from
24  Monsour's for approximately five or six months; true?
25  A    Yes, I would agree to that.