IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


MONSOUR'S, INC.,                          )
                                          )
                    Plaintiff,            )         **CIVIL ACTION**
                                          )
v.                                        )         No. 05-1204-MLB
                                          )
MENU MAKER FOODS, INC.,                   )
                                          )
                    Defendant.            )
_____   )


<u>**MEMORANDUM AND ORDER**</u>

Before the court is defendant's motion for summary judgment as to plaintiff's breach of contract claims.[1]  (Doc. 86.)  The court heard oral argument on the motion on November 20, 2006 and requested additional briefing from both parties.  The motions are now fully briefed and ripe for decision.  (Docs. 87, 88, 89, 104, 107.)  Defendant's motion for summary judgment on plaintiff's breach of contract claims is DENIED.

**I.  FACTS**

The following facts are uncontroverted.  On January 31, 2002, plaintiff Monsour's, Inc. ("Monsour's") and defendant Menu Maker Foods, Inc. ("Menu Maker") entered into an asset purchase agreement ("Agreement").  Pursuant to the Agreement, Menu Maker was to purchase food service inventory items and fresh produce items from Monsour's.  Monsour's was represented by counsel during negotiations for the Agreement but the Agreement was ultimately drafted and prepared by

_____

[1]  A previous motion for summary judgment by defendant seeking judgment on the claims of individual plaintiffs (Doc. 72) was granted by the court on November 29, 2006 (Doc. 97).  As a result of that motion, Monsour's, Inc. is the only remaining plaintiff.

Menu Maker's attorneys. The Agreement specified it would "be construed by and according to the laws of the State of Missouri." After the Agreement was executed, many of Monsour's employees, including sales and management personnel, became employees of Menu Maker and Menu Maker also had its own employees placed in Monsour's building.

Section I of the Agreement described the assets to be purchased, set an estimated value for those assets, and identified assets which were excluded from the Agreement. Section I defined the assets to be purchased, in part, as follows:

> All of the Seller's inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition) which items are presently being sold to current customers of Buyer or to selected customers of Seller. Buyers [sic] will make its best efforts to sell or assist in the sale of Monsour's remaining inventory. The parties estimate that the inventory to be purchased is estimated from $750,000 to $800,000 in value.

Regarding this inventory, section II of the Agreement set the purchase price and stated terms and conditions for purchase. No profit to Monsour's was contemplated or intended by Menu Maker's purchase of the inventory. Menu Maker was provided with an inventory report and reviewed the food service inventory at Monsour's prior to the execution of the Agreement. The predominant part of Monsour's inventory included perishable items.

Menu Maker told Monsour's that the majority of the inventory would be purchased within four to six weeks. Menu Maker was told by Monsour's that time was of the essence with respect to the purchase of the inventory and Menu Maker knew it was important to move fast on

the inventory because some of the inventory would probably expire. Monsour's counsel at the time of the negotiation of the Agreement testified that his contemporaneous notes are that Menu Maker would purchase fifty to sixty percent of the inventory between weeks three and five and Menu Maker would take delivery of the inventory no later than eight weeks after closing. Section V.5.1 of the Agreement states that "title to the inventory will not transfer until delivery to the Buyer."

Approximately four weeks after the Agreement was executed, Monsour's became concerned that Menu Maker was not purchasing the inventory but ultimately was assured by Menu Maker that the purchase of the inventory was going to happen. As time progressed, many of the inventory items began to expire and were thrown away. Monsour's stated through an affidavit of its owner, Mark Monsour, that Monsour's used reasonable efforts to resell the inventory but, because of the odd lots, the aging of the inventory, and a non-competition agreement, it could not sell the inventory at a reasonable price. Menu Maker purchased a total of $250,000 of inventory from Monsour's.

Section XI of the Agreement described the parties' obligations regarding fresh produce. Pursuant to section XI.F., Menu Maker agreed to purchase "substantially all" of its fresh produce requirements through Monsour's. This obligation was subject to the following terms and conditions:

>  (A) The quality of all products must meet or exceed current Menu Maker Foods, Inc., house acceptability standards.
>
>  (B) The minimum fill rate of all orders received may not be less than 99.25% of acceptable quality produce under normal circumstances and

-3-

conditions.    Acts   of   God,   severe   weather,
trucking   strikes,   and   otherwise   similar
situations and not in the control of Sellers and
Buyer   will   not   effect   the   validity   of   this
Agreement.

. . .

(G) Product Specification - Below are a few item
specific   requirements,   and   unless   otherwise
stated,  agreed  quality  will  be  USDA  quality
standards or better at time of receiving.

. . .

(7) Buyer shall purchase no less than 99.25%
of approximate weekly quantities of the specialty
and limited life items as estimated by Buyer on
the preceding Monday.

Monsour's  intended  to  charge  Menu  Maker  for  the  produce  at  a  ten

percent gross margin (a ten percent mark up from Monsour's costs).

During the course of the Agreement's operation, all produce was to be

hauled from Monsour's in Pittsburg, Kansas, to Menu Maker in Jefferson

City, Missouri on trucks owned by Menu Maker.  The parties agreed that

at the time the produce was put on Menu Maker's trucks in Pittsburgh,

Kansas, the produce would become the property of Menu Maker.  Menu

Maker admits that if produce was damaged in transit, it was Menu

Maker's responsibility.

The Agreement provided that Menu Maker was entitled to have an

inspector present at the time the trucks were loaded at Monsour's and

if any produce was deemed objectionable, it would be set aside for

further  inspection.   Menu  Maker  did  not  provide  an  inspector  to

inspect the produce at the time the produce was loaded but at times

summarily rejected produce from Monsour's when it arrived at Menu

Maker claiming  it  did  not  meet  Menu  Maker's  quality  standards.

Monsour's believes the produce was of "marketable quality" when it was

placed on Menu Maker's trucks but that Menu Maker's trucks were of poor quality and did not maintain steady temperatures which damaged the produce.

Sections I and II of the Agreement also set out the terms for certain covenants not to compete executed between the parties. The covenants not to compete prevented both Monsour's and Monsour's owner, Mark Monsour, from selling to any customers of Monsour's or Menu Maker any items then being sold by either party for a period of six years. The covenants also prevented Monsour's and Mark Monsour from engaging in the ownership or management of a food distribution business within any county that either Monsour's or Menu Maker was doing business in as of the date of the Agreement.

The Agreement originally developed as a "win-win" opportunity for the parties. Monsour's was experiencing a cash flow problem as a result of a decline in the food service business following the September 11, 2001 disaster and Menu Maker was interested in expanding into a new market area (southeastern Kansas and southwestern Missouri) which was then occupied by Monsour's. Menu Maker was interested in Monsour's because part of the contract involved hiring Monsour's sales people who had established relationships with customers in those areas Menu Maker was hoping to expand into.

The Agreement, however, apparently did not end up benefitting the parties as they had hoped. The parties do not agree on the facts surrounding the alleged breach or breaches of the Agreement. Because, however, Menu Maker's motion rests on the legal issue of whether Monsour's can prove damages for the claims brought, no recitation of additional facts is necessary. In accordance with the summary

-5-

judgment standards set out below, any additional relevant facts discussed in the court's analysis, which have not been designated by the parties as uncontroverted, will be taken in the light most favorable to Monsour's, the nonmoving party.

## II. MOTION FOR SUMMARY JUDGMENT

The usual and primary purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted).

The moving party initially must show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law. See id. at 670. The nature of the showing depends upon whether the movant bears the burden of proof at trial with the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar materials negating the opponent's" claims or defenses. Celotex, 477 U.S. at 323. Rather, the movant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's claim.

-6-

Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at 325).  On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense. See, e.g., United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).

Once the moving party properly supports its motion, the burden shifts to the nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Muck v. United States, 3 F.3d 1378, 1380 (10th Cir. 1993).  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Adler, 144 F.3d at 671.  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 533 (10th Cir. 1994). A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988).  Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual

-7-

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Accordingly, the court must review the "factual record and reasonable inferences therefrom in the light most favorable to the nonmoving/opposing party." Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 851 (10th Cir. 1996); Anderson, 477 U.S. at 255. If sufficient evidence exists on which a trier of fact could reasonably find for the non-moving party, summary judgment is inappropriate. Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

## III.  ANALYSIS

Monsour's alleges Menu Maker breached the Agreement's inventory and produce clauses. Menu Maker moves for summary judgment on Monsour's breach of contract claims by alleging that Monsour's has failed to produce any evidence of recoverable damages, a necessary element of Monsour's prima facie case for breach of contract. As an initial matter, the parties dispute the law governing the resolution of this case, a matter which is first taken up by the court. The court then discusses Menu Maker's summary judgment motion regarding each of Monsour's breach of contract claims.

A.  GOVERNING LAW

This is a diversity action brought pursuant to 28 U.S.C. § 1332. As such, the substantive law of the forum state, including that forum state's choice of law rules, applies. See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (holding that in a diversity action, the federal court must use the forum's conflict of laws rules to determine the law to be applied in a breach of contract

-8-

action); <u>Henderson v. Nat'l Fid. Life Ins. Co.</u>, 257 F.2d 917, 919 (10th Cir. 1958) ("The measure of damages for breach of contract is undoubtedly substantive law, as to which the state law is controlling.").

Kansas is the forum state and Kansas' choice of law rules in contract-based actions "permit parties to choose the law applicable to their agreement." <u>Brenner v. Oppenheimer</u>, 273 Kan. 525, 538, 44 P.3d 364, 374 (2002). Therefore, a contracted choice of law provision controls all questions of law flowing from the parties' contract and any breach thereof. <u>See Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.</u>, 431 F.3d 1241, 1255 (10th Cir. 2005) (stating that in a diversity case arising in a federal court in a Kansas forum, when faced with a contracted provision that an agreement and "all its terms and conditions shall be governed by and interpreted under the laws of the State of New York," the claims of the plaintiff premised on a breach of the underlying agreement would be governed and interpreted by New York law). Regarding the law to be applied to this dispute, the Agreement states in entirety: "This Agreement shall be construed by and according to the laws of the State of Missouri." The parties expressly chose Missouri law to govern any claims stemming from their Agreement. Therefore, the court will apply Missouri law to the issue of damages for the breach of contract claims.

B.  BREACH OF CONTRACT

Monsour's asserts two claims based on breach of contract; one based on Menu Maker's alleged breach of the Agreement to purchase inventory, and one based on Menu Maker's alleged breach of the Agreement to purchase produce. Menu Maker asserts that Monsour's has

not offered any evidence that could support a claim for damages for either claim. Because damages are an essential element of a breach of contract claim, Menu Maker argues it is entitled to summary judgment.

As stated above, Missouri law governs this dispute. Missouri has adopted the Uniform Commercial Code which governs transactions in goods. Mo. Rev. Stat. § 400.2-102. Goods are defined as "all things . . . which are moveable at the time of identification to the contract for sale." § 400.2-105(1). The inventory and produce at issue in the Agreement are "goods" and the parties do not dispute that the Uniform Commercial Code applies to their transaction.

1. Breach of Contract Based on Inventory

Menu Maker asserts in its motion for summary judgment that the appropriate measure of damages for the alleged breach of contract for failure to purchase Monsour's inventory is "the difference between the contract price and the market price." (Doc. 87 at 11.) Monsour's response counters that the correct measure of damages on this claim is an action for the contract price. (Doc. 88 at 14-15.) At oral argument on Menu Maker's motion and in supplemental briefing, both parties continued to argue these positions.[2]

---

[2]     Menu Maker's motion for summary judgment was apparently instigated by its receipt of Monsour's expert witness' opinion. Monsour's retained Marshal Hull to opine regarding its damages from the alleged breach of contract. Hull's report quantifies Monsour's damages only in terms of "lost cash flow." Because Menu Maker asserts the correct measure of damages is found in section 2-708 of the Uniform Commercial Code, Menu Maker argued Hull's opinion was irrelevant to the appropriate measure of damages for breach of contract. In its response, at oral argument, and in its supplemental briefing, Monsour's did not explain to the court the relevance of its expert's opinion on "lost cash flow" and focused only on the appropriate measure of damages under the Uniform Commercial Code. A

-10-

Section 1-106 of the Uniform Commercial Code requires that remedies "be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." Section 2-703 governs a seller's remedies for breach of contract. Section 2-703 states:

> Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 400.2-612), then also with respect to the whole undelivered balance, the aggrieved seller may
>
> (a) withhold delivery of such goods;
>
> (b) stop delivery by any bailee as hereafter provided (section 400.2-705);
>
> (C) proceed under section 400.2-704 respecting goods still unidentified to the contract;
>
> (d) resell and recover damages as hereafter provided (section 400.2-706);
>
> (e) recover damages for nonacceptance (section 400.2-708) or in a proper case the price (section 400.2-709);
>
> (f) cancel.

Menu Maker believes damages for a breach of the inventory agreement should be calculated under section 2-708(1); Monsour's believes damages should be calculated under sections 2-709(1)(a) and/or (1)(b).

Section 2-708 is titled "Seller's damages for nonacceptance or repudiation" and states:

> (1) Subject to subsection (2) and to the

---

ruling on the relevance or admissibility of Hull's proffered expert opinion is not requested by the parties and is not before the court at this time.

provisions of this article with respect to proof
of market price (section 400.2-723), the measure
of damages for nonacceptance or repudiation by
the buyer is the difference between the market
price at the time and place for tender and the
unpaid contract price together with any
incidental damages provided in this article
(section 400.2-710), but less expenses saved in
consequence of the buyer's breach.

(2) If the measure of damages provided in
subsection (1) is inadequate to put the seller in
as good a position as performance would have done
then the measure of damages is the profit
(including reasonable overhead) which the seller
would have made from full performance by the
buyer, together with any incidental damages
provided in this article (section 400.2-710), due
allowance for costs reasonably incurred and due
credit for payments or proceeds of resale.

Section 2-708(2) is sometimes referred to as the lost profit remedy.

Section 2-709 is titled "Action for the price" (sometimes
referred to as the seller's right to specific performance) and states:

(1) When the buyer fails to pay the price as it
becomes due the seller may recover, together with
any incidental damages under section 400.2-710,
the price

(a) of goods accepted or of conforming goods
lost or damaged within a commercially
reasonable time after risk of their loss has
passed to the buyer; and

(b) of goods identified to the contract if
the seller is unable after reasonable effort
to resell them at a reasonable price or the
circumstances reasonably indicate that such
effort will be unavailing.

In an action for the price, the seller has the burden of proving the
elements of the remedy. See Hymer v. Dude Hinton Pontiac, Inc., 332
S.W.2d 467, 469 (Mo. Ct. App. 1960) (stating the "general rule that
the burden always rests upon the plaintiff in any action to prove all
factual elements essential to his recovery").

-12-

In its supplemental brief, Monsour's argues that only an action for specific performance under section 2-709 will place Monsour's in as good a position as if Menu Maker had fully performed. Monsour's contends that both subsections (1)(a) and (1)(b) of section 2-709 are applicable. Monsour's argues subsection (1)(a) is applicable because the inventory qualifies as a "conforming good" that was damaged after risk of its loss had passed to Menu Maker. Monsour's argues subsection (1)(b) is applicable because the inventory was identified to the contract and Monsour's was unable to resell the inventory at a reasonable price. Monsour's then broadly argues that section 2-708 is not the correct measure of damages because it is not applicable when no profit to the seller is contemplated.

Menu Maker responds in its supplemental brief that because Monsour's admits it cannot establish damages under section 2-708(2) because there was no profit contemplated on the sale of the inventory, the appropriate measure of damages should be the difference between the market price and plaintiff's costs, less expenses saved, under section 2-708(1). Menu Maker argues Monsour's has offered no evidence of either the market price or its costs, and therefore Monsour's cannot make a prima facie case of breach of contract of inventory.

After consideration of the parties' voluminous briefing on this topic, it is clear to the court that summary judgment is not appropriate. There are genuine issues of material fact precluding judgment as a matter of law for Menu Maker on the issue of Monsour's entitlement to damages on its breach of contract claim based on inventory under section 2-709. First, Monsour's has created a genuine issue over whether Menu Maker failed to "pay the price as it becomes

-13-

due." The Agreement specified that Menu Maker was to purchase inventory valued between $750,000 and $800,000. Monsour's owner testified that Menu Maker only purchased $250,000 worth of inventory. Menu Maker, however, knew that time was of the essence in the Agreement and that much of the inventory it had contracted to purchase was perishable.

Also, there is a factual dispute over the application of subsection (1)(b), and especially whether the inventory was resellable. The inventory was identified to the contract--Menu Maker was provided an inventory report and completed a visual inspection prior to completing the Agreement. Both parties to the Agreement are in the grocery supply industry and there is no dispute that the inventory at issue was perishable. Part of the parties' Agreement included a non-competition agreement executed by Monsour's and Mark Monsour. The non-competition agreement stated:

> For a period of 6 years . . . Sellers shall not, individually or through others, directly or through any entity, operate or otherwise be engaged in the ownership or management of a food distribution business (except permitted sales of produce to grocery stores and the right to continue produce sales to its current jobbers) within any county that Sellers or the Buyer are doing business as of this date.

Under this agreement, Monsour's asserts it was prohibited from engaging in the sale of its inventory, other than to Menu Maker. Thus, there is a factual dispute over whether the inventory could be re-sold once an alleged breach by Menu Maker occurred.[3]

---

[3] The court questions the applicability of section 2-709(1)(a) to Monsour's claim for damages with respect for inventory on the facts currently before it. Section 2-709(1)(a) allows a seller to recover the "price of goods accepted or of conforming goods lost or damaged

-14-

The facts, taken in a light most favorable to Monsour's, show a breach of the Agreement by Menu Maker and that Monsour's was unable to react to Menu Maker's breach because of the interaction between the perishable nature of the inventory and the non-competition agreement. Whether the breach occurred and whether Monsour's was prohibited from selling the inventory to others because of its perishable condition and the non-competition agreement are issues of fact for the trier of fact. Damages are an element of Monsour's claim and will need to be proven to the trier of fact to succeed. Monsour's at this point, however, has pointed to evidence that the inventory was perishable and not resellable, which is all its burden under the summary judgment standards requires it to do. For this reason, Menu Maker's motion for summary judgment on the claim of breach of contract based on inventory is DENIED.

2. Breach of Contract Based on Produce

Menu Maker asserted in its motion for summary judgment that the agreement to purchase substantially all of its produce requirements from Monsour's was a requirements contract under Uniform Commercial Code section 2-306. As such, Menu Maker asserted the correct measure of any alleged damages was lost profits under section 2-708(2). Menu Maker argued that because the produce to be purchased was not yet identified under the Agreement, the only appropriate measure of

------

within a commercially reasonable time after risk of their loss has passed to the buyer." The Agreement is clear that title to the inventory would not pass until the inventory was delivered to Menu Maker. The question before the court, however, is only whether Monsour's has created a genuine issue of material fact to avoid Menu Maker's motion for summary judgment. Finding that it has, the court need not resolve the issue at this juncture.

damages was lost profits, plus incidental damages, less expenses saved.

Monsour's did not address the alleged breach of the produce agreement separately in its response to Menu Maker's motion.  In total, regarding the appropriate measure of damages for the breach of the produce agreement, Monsour's response to Menu Maker's motion for summary judgement stated:

> Plaintiff seeks . . . the damages caused by defendant's failure to purchase substantially all of its produce from Monsour.
> . . .
> In addition, defendant suggests that plaintiff has failed to offer proof of the value of goods that were sold to other parties.  This argument lacks merit because Mark Monsour was under a non-compete agreement and thus could not sell the produce to others without violating the agreement.  Defendants want this Court to ignore this provision and to find that plaintiff failed to offer evidence of the possible sale of produce to other entities when the contract specifically prohibits this.

At oral argument, Monsour's clarified that it was seeking two separate measures of damages for produce: 1) damages under section 2-709 for the produce it alleges was delivered to Menu Maker but wrongfully rejected by Menu Maker and 2) damages under section 2-708(2) for the produce that was to be sold under the Agreement for the forthcoming six years.

In its supplemental brief, Monsour's again argues that the produce claim should be divided into two categories: 1) damages under 2-709 for the produce ordered by Menu Maker but allegedly wrongfully rejected or not accepted, and 2) damages under 2-708 for "produce ordered from other suppliers, in violation of the Agreement, depriving Monsour's of profit from the sales."  At oral argument and in its

-16-

supplemental brief, Menu Maker has continued to argue that section 2-708(2) (lost profits) is the correct measure of damages for produce and that Monsour's has failed to show any evidence allowing damages under that section.

Requirements contracts are recognized and enforced by Missouri courts. See e.g., Kirkwood-Easton Tire Co. v. St. Louis County, 568 S.W.2d 267, 268 (Mo. 1978) (collecting cases). Section 2-306 of Missouri's Uniform Commercial Code defines requirements contracts. Section 2-306 states:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

The measure of damages for a requirements contract governed by the Uniform Commercial Code is determined by the same statutory sections as above.

Monsour's has created a genuine issue of material fact precluding judgment as a matter of law on the issue of proof of damages for the produce allegedly wrongfully rejected or not accepted by Menu Maker. As stated above, section 2-703 permits recovery of the price of goods under application of section 2-709(1)(b) when its prerequisites of identified, resellable goods have been met. Like with inventory, the

-17-

produce in the Agreement has been identified to the contract. Menu Maker was to purchase "no less than 99.25% of approximate weekly quantities" from Monsour's. Monsour's also again points to the non-competition agreements as evidence that the produce was not resellable and to Menu Maker's alleged damage to the quality of the produce. Monsour's has proffered Mark Monsour, the owner of Monsour's to testify regarding the price of the produce rejected and/or not accepted by Menu Maker.

Monsour's has also created a genuine issue of material fact precluding judgment as a matter of law on the issue of proof of damages for the produce allegedly to be purchased by Menu Maker for the six-year duration of the Agreement. Section 2-708(2) requires only that Monsour's prove the profit which the seller would have made from full performance by the buyer. Monsour's was to receive a ten percent profit for sales of produce to Menu Maker under the Agreement. Menu Maker was to purchase 99.25 percent of its produce requirements from Monsour's.

Because sufficient evidence exists from which a trier of fact could reasonably find for the non-moving party, summary judgment is inappropriate. Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991). Menu Maker's motion for summary judgment on Monsour's breach of contract claims based on produce is DENIED.

## IV. CONCLUSION

Defendant's motion for summary judgment is DENIED. The clerk is directed to set this case for trial.

A motion for reconsideration of this order under Local Rule 7.3 is not encouraged. The standards governing motions to reconsider are

-18-

well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>.  The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.

   IT IS SO ORDERED.

   Dated this   <u>22nd</u>   day of January 2007, at Wichita, Kansas.


                          S/Monti Belot
                          Monti L. Belot
                          UNITED STATES DISTRICT JUDGE