# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MONSOUR'S INC.,

          Plaintiff,

          vs.

MENU MAKER FOODS, INC.,

          Defendant.

Case No. 05-1204-JTM

## MEMORANDUM AND ORDER

Presently before the court is defendant Menu Maker Foods Inc.'s (Menu Maker's) motion for summary judgment. (Dkt. No. 141). For the following reasons, the court denies the motion.

### I. Procedural History

This case has a lengthy procedural history, which is worth reviewing. Mark Monsour, Sheila Monsour and Monsour's, Inc. (Monsour's) initially filed a complaint against Menu Maker on June 30, 2005. In November 2006, summary judgment was granted by Judge Belot in favor of Menu Maker, and against the individual claims of Mark Monsour and Sheila Monsour, who were thus dismissed as plaintiffs. (Dkt. No. 97). Menu Maker's second motion for summary judgment was denied by the court in January 2007. (Dkt. No. 108). After Menu Maker's motion for reconsideration of the order denying summary judgment was also denied, it filed another motion for summary judgment (Dkt. No. 117), which was later terminated. The case was then reassigned to a different judge within the district of Kansas, where Menu Maker once again filed

a motion for summary judgment that is currently pending before the court, in which it sets forth essentially the same arguments that were previously denied by Judge Belot.  (Dkt. No. 141). Because MMF is raising issues that have already been determined by the court, its motion is denied.

## II.  Legal Standard

The standard for summary judgment is well-known.  Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(C).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2003).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  *Id.*  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the nonmoving party.  *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment.  *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate* Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party

must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1).

### III.  Facts

Because none of the facts have changed, the following facts are incorporated verbatim from the court's previous order denying summary judgment.

The following facts are uncontroverted. On January 31, 2002, plaintiff Monsour's and defendant Menu Maker entered into an asset purchase agreement ("Agreement"). Pursuant to the Agreement, Menu Maker was to purchase food service inventory items and fresh produce items from Monsour's. Monsour's was represented by counsel during negotiations for the Agreement, but the Agreement was ultimately drafted and prepared by Menu Maker's attorneys. The Agreement specified it would "be construed by and according to the laws of the State of Missouri." After the Agreement was executed, many of Monsour's employees, including sales and management personnel, became employees of Menu Maker, and Menu Maker also had its own employees placed in Monsour's building.

Section I of the Agreement described the assets to be purchased, set an estimated value for those assets, and identified assets which were excluded from the Agreement. Section I defined the assets to be purchased, in part, as follows:

> All of the Seller's inventory, except produce, (which is in a good and wholesome condition and 100% resellable condition) which items are presently being sold to current customers of Buyer or to selected customers of Seller. Buyers [sic] will make its best efforts to sell or assist in the sale of Monsour's remaining inventory. The parties estimate that the inventory to be purchased is estimated from $750,000 to $800,000 in value.

Regarding this inventory, section II of the Agreement set the purchase price and stated terms and conditions for purchase. No profit to Monsour's was contemplated or intended by Menu Maker's purchase of the inventory. Menu Maker was provided with an inventory report and reviewed the food service inventory at Monsour's prior to the execution of the Agreement. The predominant part of Monsour's inventory included perishable items.

Menu Maker told Monsour's that the majority of the inventory would be purchased within four to six weeks. Menu Maker was told by Monsour's that time was of the essence with respect to the purchase of the inventory and Menu Maker knew it was important to move fast on the inventory because some of the inventory would probably expire. Monsour's counsel at the time of the negotiation of the Agreement testified that his contemporaneous notes are that Menu Maker would purchase fifty to sixty percent of the inventory between weeks three and five and Menu Maker would take delivery of the inventory no later than eight weeks after closing. Section V.5.1 of the Agreement states that "title to the inventory will not transfer until delivery to the Buyer."

Approximately four weeks after the Agreement was executed, Monsour's became concerned that Menu Maker was not purchasing the inventory but ultimately was assured by Menu Maker that the purchase of the inventory was going to happen.  As time progressed, many of the inventory items began to expire and were thrown away.  Monsour's stated through an affidavit of its owner, Mark Monsour, that Monsour's used reasonable efforts to resell the inventory but, because of the odd lots, the aging of the inventory, and a non-competition agreement, it could not sell the inventory at a reasonable price.  Menu Maker purchased a total of $250,000 of inventory from Monsour's.

Section XI of the Agreement described the parties' obligations regarding fresh produce. Pursuant to section XI.F., Menu Maker agreed to purchase "substantially all" of its fresh produce requirements through Monsour's.  This obligation was subject to the following terms and conditions:

> (A) The quality of all products must meet or exceed current Menu Maker Foods, Inc., house acceptability standards.
>
> (B) The minimum fill rate of all orders received may not be less than 99.25% of acceptable quality produce under normal circumstances and conditions.  Acts of God, severe weather, trucking strikes, and otherwise similar situations and not in the control of Sellers and Buyer will not effect the validity of this Agreement.
>
> . . .
>
> (G) Product Specification - Below are a few item specific requirements, and unless otherwise stated, agreed quality will be USDA quality standards or better at time of receiving.
>
> . . .

> (7) Buyer shall purchase no less than 99.25% of approximate weekly quantities of the specialty and limited life items as estimated by Buyer on the preceding Monday.

Monsour's intended to charge Menu Maker for the produce at a ten percent gross margin (a ten percent mark up from Monsour's costs). During the course of the Agreement's operation, all produce was to be hauled from Monsour's in Pittsburg, Kansas, to Menu Maker in Jefferson City, Missouri on trucks owned by Menu Maker. The parties agreed that at the time the produce was put on Menu Maker's trucks in Pittsburgh, Kansas, the produce would become the property of Menu Maker. Menu Maker admits that if produce was damaged in transit, it was Menu Maker's responsibility.

The Agreement provided that Menu Maker was entitled to have an inspector present at the time the trucks were loaded at Monsour's and if any produce was deemed objectionable, it would be set aside for further inspection. Menu Maker did not provide an inspector to inspect the produce at the time the produce was loaded but at times summarily rejected produce from Monsour's when it arrived at Menu Maker claiming it did not meet Menu Maker's quality standards. Monsour's believes the produce was of "marketable quality" when it was placed on Menu Maker's trucks but that Menu Maker's trucks were of poor quality and did not maintain steady temperatures which damaged the produce.

Sections I and II of the Agreement also set out the terms for certain covenants not to compete executed between the parties. The covenants not to compete prevented both Monsour's and Monsour's owner, Mark Monsour, from selling to any customers of Monsour's or Menu Maker any items then being sold by either party for a period of six years. The covenants also prevented Monsour's and Mark Monsour from engaging in the ownership or management of a

food distribution business within any county that either Monsour's or Menu Maker was doing business in as of the date of the Agreement.

The Agreement originally developed as a "win-win" opportunity for the parties. Monsour's was experiencing a cash flow problem as a result of a decline in the food service business following the September 11, 2001 disaster, and Menu Maker was interested in expanding into a new market area (southeastern Kansas and southwestern Missouri), which was then occupied by Monsour's. Menu Maker was interested in Monsour's because part of the contract involved hiring Monsour's sales people who had established relationships with customers in those areas Menu Maker was hoping to expand into.

The Agreement, however, apparently did not end up benefitting the parties as they had hoped. The parties do not agree on the facts surrounding the alleged breach or breaches of the Agreement. Because, however, Menu Maker's motion rests on the legal issue of whether Monsour's can prove damages for the claims brought, no recitation of additional facts is necessary. In accordance with the summary judgment standards set out above, any additional relevant facts discussed in the court's analysis, which have not been designated by the parties as uncontroverted, will be taken in the light most favorable to Monsour's, the nonmoving party.

## IV.  Analysis

Menu Maker argues that all of Monsour's claims must fail. Specifically, it argues that although it did not purchase the entire inventory, it may not have been required to, and if it was so required, then Monsour's alleged total price of $750,000 for the inventory is inaccurate. Further, Menu Maker claims that Monsour's other claims regarding the wrongful rejection of goods and lost profits must fail because they are based on speculation and lack evidence.

Monsour counters that Menu Maker's current motion for summary judgment represents the same arguments that were previously denied by Judge Belot in January 2007 (Dkt. No. 108), and thus the motion should be denied under the theories of collateral estoppel and res judicata.  In reply to that argument, Menu Maker argues that the court's earlier denial of its motion for summary judgment was not the end of the matter, and that the court's later order to re-submit a pretrial order is proof that the issues were not settled in the previous motions for summary judgment.

      This court agrees with Monsour's, in that Menu Maker is basically reiterating the same arguments that were previously raised and denied on summary judgment.  Courts in this district have noted that "once issues are decided by the court, those issues should not be relitigated or reconsidered unless they are clearly erroneous or unless some manifest injustice has been imposed." *Renfro v. City of Emporia*, 732 F. Supp. 1116, 1117 (D. Kan. 1990).  This court has reviewed the briefing and order involving the motion for summary judgment denied by Judge Belot, and has found nothing that is clearly erroneous nor anything signifying manifest injustice.  Further, any new issues raised in the current motion for summary judgment contain arguments that are fact specific, and are thus inappropriate for summary judgment.  Accordingly, the current motion for summary judgment must be denied.

      IT IS ACCORDINGLY ORDERED this 7th day of April, 2008, that defendant Menu Maker Foods Inc.'s motion for summary judgment (Dkt. No. 141) is hereby denied.

        s/ J. Thomas Marten
        J. THOMAS MARTEN, JUDGE